J. Robert Forshey
State Bar No. 07264200
Laurie Dahl Rea
State Bar No. 00796150
Dylan T.F. Ross
State Bar No. 24104435
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Fort Worth, TX 76102
Telephone: 817-877-8855
Facsimile: 817-877-4151
bforshey@forsheyprostok.com
lrea@forsheyprostok.com
dross@forsheyprostok.com

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| AMERICAN WORKERS INSURANCE | ) | Case No. 19-44208-mxm-11 |
| SERVICES, INC., | ) | |
| | ) | |
| ASSOCIATION HEALTH CARE | ) | Case No. 19-44209-elm-11 |
| MANAGEMENT, INC. | ) | |
| | ) | (Motion for Joint Administration Pending) |
| Debtors. | ) | **Emergency Hearing Requested** |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (A) AUTHORIZING USE OF CASH COLLATERAL, (B)
APPROVING ADEQUATE PROTECTION, (C) GRANTING REPLACEMENT
LIENS, (D) RECHARACTERIZING ALLEGED ASSIGNMENTS AS SECURED
TRANSACTIONS, AND (E) GRANTING RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

American Workers Insurance Services, Inc. ("AWIS") and Association Health Case

Management, Inc. ("AHCM," and together with AWIS, the "Debtors") file this motion for interim

and final orders (i) authorizing the use of cash collateral; (ii) approving adequate protection; (iii)

granting replacement liens; (iv) seeking recharacterization of alleged assignments as secured

transactions;[1] and (v) granting related relief (the "Motion"). In support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (D), (K), (M), and (O). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL BACKGROUND

2.      On October 14, 2019 (the "Petition Date"), the Debtors, both Texas corporations, filed their voluntary cases under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their business and manage their property as debtors-in-possession. No creditors' committee has been appointed in this case by the United States Trustee. Further, no trustee or examiner has been requested or appointed in this chapter 11 case.

3.      The Debtors are affiliates as that term is defined in section 101(2) of the Bankruptcy Code and have requested that their chapter 11 cases be jointly administered.

## FACTUAL BACKGROUND

### A.      The Debtors' Business

4.      AWIS and AHCM work in tandem to provide essential services in the insurance industries. The Debtors are not insurance companies and do not issue insurance policies; rather, they manage insurance-related services for insurance companies, insurance agents, and insureds. The Debtors derive their income from their management services to those constituents.

5.      In recent years, insurance carriers have moved away from having captive agents and from providing the structure to train and support insurance agents for the purposes of marketing insurance products and providing customer service. Without training, support,

---

[1] The Debtors do not seek recharacterization relief as part of the interim relief requested in this Motion but will seek that relief as part of the Court's final order or in an adversary proceeding as appropriate.

customer service, and marketing, it is more difficult for insurance companies to get insurance products to consumers who need the policies.

6.      The Debtors, and companies like them, fill that need by facilitating the distribution of insurance products and other health-related benefits (the "Products") issued by insurance carriers (the "Vendors").  The Products include prescription coverage, accidental death and dismemberment insurance, accidental medical insurance, critical illness insurance, and limited medical procedures insurance, but also include some travel-related insurance.  AWIS and AHCM are affiliated entities that together market and sell Products for the Vendors and collect premiums from customers and pass those premiums along to the Vendors.

7.      The Debtors also provide various services, including training and support services, to state licensed insurance carriers, insurance agents, agencies, groups of agencies, field marketing organizations, and others who actually market and sell the Products to customers (the "Producers").  Producers earn commissions when they sell the Products.  As part of their management services, the Debtors collect payments from the Producer's customers and, in addition to paying premiums to the Vendors, they also pay Producers the commissions earned by them from the Producers' sales of the Products.  In addition, the Debtors provide services to the customers who buy the Products, including customer service support and premium collection and disbursement.

### (i)      An Overview of the Debtors' Business

8.      AWIS has an Association Membership Agreement[2] with the National Association of Preferred Providers ("NAPP") to market Products to NAPP's members.  AWIS's customers are all members of NAPP (the "Members").  NAPP is a Texas non-profit association that provides its members with access to health and wellness programs, like insurance policies and discount programs.  NAPP has approximately 34,000 Members who are served by the Debtors.

---

[2]AHCM has a similar agreement with NAPP.

9.     NAPP contracts with Vendors (*i.e.* insurance companies) to provide Products to the Members.  The Members are able to buy the Products because of their membership in NAPP. AWIS contracts with NAPP to market the Products to the Members, and NAPP pays AWIS for its marketing services.   AWIS also contracts with Producers who actually market and sell the Products to the Members.

10.     AHCM acts as the third-party administrator ("TPA") for AWIS and NAPP.  AHCM is a licensed TPA in Texas and thirty-two (32) other states.[3]  As such, it is subject to, among other things, the requirements of the Texas Insurance Code and Texas Administrative Code as they apply to TPAs.  AHCM collects premiums and other amounts due for the Products from the Members and remits them to the parties to whom they are owed—including the Vendors with respect to premiums and the Producers with respect to commissions earned.

### (ii)     The Ownership Structure of the Debtors

11.     These Debtors have a long history in the insurance industry.  AHCM has been in business since 1983.  AWIS has been in business since 2002.  The current owner acquired the Debtors on June 28, 2018.

12.     AHCM and AWIS originally offered a smaller portfolio of insurance and healthcare products.  Since buying the companies in 2018, the current ownership and management have expanded the Debtors' businesses. Both Debtors are 100% owned by AHCM Holdings, LLC. AHCM Holdings, LLC is 100% owned by Rendon Management Group, LLC.   Rendon Management Group, LLC is 100% owned by Landon Jordan.

### (iii)     AWIS's Role, Employees and Assets

13.     As mentioned above, the Debtors serve different roles in the overall business. AWIS is an insurance agent and an insurance marketing organization or IMO.[4]  Its role in the

---

[3] Florida, Arkansas, Rhode Island, Arizona, Louisiana, South Carolina, Missouri, Wyoming, Nebraska, New Mexico, Maine, North Carolina, Ohio, Maryland, Georgia, Delaware, Idaho, Wisconsin, Illinois, Indiana, Mississippi, Oklahoma, California, Kansas, Tennessee, West Virginia, Pennsylvania, Utah, Oregon, Iowa, Nevada, and Kentucky.
[4] IMOs are sometimes referred to as "independent marketing organizations" or "field marketing organizations."

Debtors' business is to package the Products and to market them to NAPP's Members through the Producers.

14.     AWIS has 700 to 800 total Producers, and those relationships are governed by 127 producer agreements (the "Producer Agreements"). Generally, the Producers are independent insurance agents, or they are lead agents in a group who have other agents working for or with them. In other words, the Producers are usually individuals rather than business entities. The Producer Agreements outline services the Producers will receive from AWIS (or, as explained in more detail below, from AHCM as AWIS's third party administrator) and the Producers' obligations as they sell Products to Members.

15.     Producers earn commissions (the "Commissions") for selling the insurance Products. Under the Producer Agreements, Producers earn the Commissions when premiums are actually received and recorded by the Debtors. Because the Commissions are payable only after a Member pays sufficient premiums, Producers often want advances on their Commissions. The Producer Agreements permit AWIS (at its sole discretion) to make advances to Producers for future Commissions (the "Future Commissions"). The advances are not loans; rather, if a Producer wants an advance on a Future Commission, the Producer agrees to assign that Future Commission to AWIS, giving AWIS all right and title to it. AWIS obtained funds to make the advances from Insurety Capital LLC ("Insurety") through assignment or pledge of the Producer's Future Commission to Insurety. The Debtors' relationship with Insurety is discussed in more detail below.

16.     The Producers are not employees of AWIS. AWIS has one employee, Randee Mascorro. She serves as Senior Director of Business Operations for AWIS, and her duties include maintaining business operations, providing service to Producers, and maintaining records of Commissions. Ms. Mascorro is a salaried employee of AWIS. She has a support staff that assist her with her duties, but they are employees of AHCM. Ms. Mascorro is paid by AHCM through ADP along with the employees of AHCM.

17.     Any tangible assets AWIS uses to perform its part of the Debtors' business are owned by AHCM Holdings, LLC (the owner of AHCM). AWIS's assets consist of the Producer Agreements, its agreement with NAPP, and various other agreements.

### (iv)     AHCM's Role, Employees and Assets

18.     AHCM acts as AWIS's TPA. In that capacity, AHCM handles the general operations of both Debtors, many of the obligations under the Producer Agreements, service to the Members, and all collections and payments.

19.     As a TPA, AHCM provides back-office services for insurance agencies (AWIS and others), including product development, legal issues, information technology support, website maintenance, human resources, employee payments and benefits, accounting, billing and payment of expenses. With respect to the Producers, AHCM provides training and support, marketing materials (*e.g.* brochures and websites), and payment of Commissions. AHCM also provides services to the Members, including customer service, claims processing, premium payment collection, premium refunds, forwarding premiums to the insurance carriers, and providing fulfillment packages (*i.e.* insurance cards, policies, explanatory materials).

20.     AHCM collects all Member payments and makes all payments for the Debtors. Because of the number of Products sold, many dollars flow through the Debtors. Much of the cash flow belongs to the Vendors as premiums and another large piece is for Producer Commissions. The Debtors' income is what remains and is for the Debtors' many management services to the Vendors, Producers, and Members.

21.     Most of the Debtors' pre-petition collections were deposited into its main account at Comerica Bank. All premium payments go into a general account at Comerica Bank (the "Comerica Account") by ACH or check, with the exception of premiums from the "face-to-face" sales and other sales (described more below), which go into a Bank of America account (the "Bank of America Account"). From each paid premium, AHCM calculates the amount owed to the Vendors for the Product sold, the amount due to the Producers for Commissions, and any

amount due to Insurety. The remainder of the cash flow is used to fund the Debtors' operations and pay their expenses.

22. AHCM has ninety (90) employees. They handle member services, claims, billing, information technology, and management. About eighty-four percent (84%) of AHCM's employees are paid on an hourly basis—generally those who handle member services, claims, and billing. The other sixteen percent (16%) of AHCM's employees are paid a salary—generally those in management and information technology. All employees are paid on a bi-weekly basis through ADP, one week in arrears.

23. In addition to being a TPA for AWIS, AHCM provides similar services for about fourteen (14) other entities. They are third party groups (the "Third-Party Groups") to which AHCM sells benefits and provides services. Some Third-Party Groups bill and collect premiums themselves. Others have AHCM bill and collect for them, in which case the funds go through the Bank of America Account.

24. The Debtors also have another line of business, which they call the "face to face" business (the "Face to Face Business"). In this part of the business, Products are marketed to NAPP members on an in-person basis to immigrant communities, but the accounting is completely separate. Funds attributable to the Face to Face Business go into the Bank of America Account. Insurety has no involvement in, and no claim to any interest in, the revenues and proceeds generated by either the Third Party Group business or the Face to Face Business.

### *(v)* *The Debtors' Bank Accounts*

25. As mentioned above, the Debtors have two main bank accounts—one at Bank of America and one at Comerica Bank. There are several subaccounts at Comerica Bank for special purposes.

26. The Comerica Account is a general operating account that is used to collect all premiums from Members and to disburse all funds related to its business, except for funds related to the Face to Face Business and the Third-Party Group business. The Comerica Account

contains commingled funds, therefore, at any given moment it contains cash in which multiple parties have an interest. Those parties may be the Vendors, the Producers, Insurety, and the Debtors.

27. The Comerica Account receives Member payments on a daily basis. AHCM makes payments out of that account to the Vendors, transferring to them the amount of the Member payment attributable to premiums. AHCM also transfers Commissions from that account to the appropriate party. AHCM also transfers payroll expenses from the Comerica Account into another account (also at Comerica) for payroll. That payroll account is swept by ADP, and ADP actually issues payroll from its accounts. AHCM also transfers money to an operating account (also at Comerica) as necessary to pay rent and similar operating expenses for the Debtors.

**B.      Commission Advances and the Debtors' Pre-Petition Agreements with Insurety**

28. Because the Commissions are payable only after Members have made a number of premium payments, it often takes up to six (6) months from the sale of a Product for the Commissions to be paid to Producers. Many Producers cannot wait six (6) months for the income. Accordingly, the Producers often desire to receive advances on the Commissions. AWIS arranged to provide advances on Commissions through Insurety. As described below, Insurety stopped making advances on or about July 5, 2019. Since then, AWIS has been making advances to Producers as necessary.

29. Producers are crucial to the Debtors' business. Most of the Producers are not beholden to the sell Products for the Debtors and the NAPP Vendors—they can choose to sell other Products. So, making the Producers feel secure by, among other things, providing for advances on Commissions is an important part of maintaining the Debtors' business.

30. Insurety is in the business of making insurance commission advances. On July 16, 2018, AWIS, AHCM, and Insurety entered into three (3) agreements—a TPA Servicing Agreement, a Commission Assignment Agreement, and an Exclusive Management Services

Agreement[5] (collectively, the "<u>Agreements</u>").  The Agreements created something similar to a factoring agreement in that Insurety advanced money on the premise that it would be assigned and repaid from future receivables—in this case the Future Commissions.[6]  However, the Agreements do not clearly provide for a series of sale transactions.  Rather, they look more like a series of secured loans, since all of the risk of non-payment or default rests with the Debtors.

31.    The Debtors entered into the Agreements so they could pay the Producers their Commissions more quickly.  In exchange for the advances, each Producer assigns to AWIS the right and title to the Future Commission for which the advance is made.  AWIS, in turn, assigns to Insurety that Future Commission and the right to receive payment in an amount equal to the advanced amount, plus fees and other charges, including interest. Each of the Agreements are briefly described below.

32.    The TPA Servicing Agreement (the "<u>Servicing Agreement</u>") was executed on July 16, 2018 by both Debtors and Insurety, and it established the terms upon which Insurety made advances to AWIS for the purpose of AWIS making advances on Future Commissions to the Producers.  In general, the parties agreed that Insurety would advance funds by purchasing the Future Commissions of the Producers.  The Debtors agreed to provide certain services to Insurety with respect to Future Commissions that Insurety purchased (the "<u>Purchased Commissions</u>"), including collecting payments and premiums and making disbursements to Insurety on account of its Purchased Commissions.  The parties also agreed to a waterfall structure for AHCM to make payments from its collection of money from the Members.  Those payments are to be made in the following order: (a) first, to the Vendors on account of the Products purchased by the Members and on account of which the Producer is due the Purchased Commission (*i.e.* the premiums); (b) second, to Insurety on account of Purchased Commissions

---

[5] AWIS sent a notice of termination of the Exclusive Management Services Agreement to Insurety on September 5, 2019.

[6] The Debtors contend that Insurety has not purchased Future Commissions, but that they entered into a lending arrangement with Insurety and the Future Commissions serve as Insurety's collateral.

if a Producer who received an advance has an outstanding advance balance; (c) third, to the Producers for Commissions not purchased by Insurety; and (d) fourth to AWIS. *See* Servicing Agreement, §1.02(2).

33. The Commission Assignment Agreement (the "Assignment Agreement") was executed by AWIS and Insurety on July 16, 2018. AWIS agreed to sell and Insurety agreed to purchase *certain* Commissions—those being the Future Commissions for which the advances were being made. The Commissions purportedly purchased under the Assignment Agreement— described as *certain* Commissions—are called the "Purchased Assets." The Debtors expect Insurety to contend that the Assignment Agreement is a sale of *all* Future Commissions or a security interest on *all* Commissions. But the Debtors believe that the plain language of the Assignment Agreement makes it, at most, an assignment of only *certain* Future Commissions; that is, only Future Commissions for which advances were made, but not all Commissions. On other words, the term "Purchased Assets" in the Assignment Agreement refers only to the Future Commissions for which Insurety actually made advances. The Debtors also believe the Assignment Agreement is more accurately characterized as a security agreement to secure an extension of credit by Insurety. The Assignment Agreement contains many hallmarks of a loan, including the grant of a security interest in the "Purchased Assets and all collections and proceeds thereof." So, under the Assignment Agreement, Insurety has only purchased the Purchased Assets or has a lien on only the Purchased Assets. Moreover, in the instance of a true assignment, the risk of default through non-payment rests with the assignee (*i.e.* Insurety). However, the Assignment Agreement places all of the risk of default on the Debtors, as assignor, through a guarantee that Insurety will be repaid all of the money paid by Insurety to acquire the Purchased Assets. *See* Assignment Agreement, §1.01(j).

34. The Exclusive Management Services Agreement ("Management Agreement") is an agreement that governs the terms under which the Debtors will service the Products that generate the Future Commissions for the benefit of Insurety and its Purchased

Commissions/Purchased Assets. It, too, contains a grant of a security interest in accounts, general intangibles, collections, and their proceeds, *"but only to the extent these arise from the or result from the Purchased Assets."* This provision of the Management Agreement shows that Insurety only has an interest in the Purchased Assets or Purchased Commissions—whether it be an ownership interest or a security interest.

35.     As explained more fully below, the Debtor has many sources of income that are not derived from Purchased Assets or Purchased Commissions (*i.e.* the Future Commissions for which Insurety made advances).

**C.     Factors Leading to the Bankruptcy**

36.     These bankruptcy cases were filed, in short, because of a cash flow crisis created by Insurety and resulting litigation. Insurety wanted to acquire a majority ownership position in the Debtors.[7] Insurety arbitrarily stopped purchasing Future Commissions under the Agreements (even though the Debtors were not in default under the Agreements) for the purpose of pressuring the Debtors' owner to transfer equity interests in the Debtors to Insurety or its principals. When the Debtors refused, Insurety simply stopped making advances (*i.e.* buying Future Commissions), leaving the Debtors in a cash flow crisis in which they were forced to spend some of the Commissions purchased by Insurety (or some of Insurety's collateral) in order for the business to survive and to continue operating to fulfill the Debtors' obligations to the Members, the Producers, and the Vendors. In addition to attempting to obtain ownership of the Debtor and stopping Commission advances, Insurety also sought to enforce the exclusivity provision in the Management Agreement and took the position that the Debtors could not obtain Commission advances for their Producers from any other source. Ownership or control is not a condition of the Agreements, but Insurety made it a condition to additional advances for Producers. In other

---

[7] Insurety's last written term sheet provided for a transfer of 34% of AHCM to Insurety. But Insurety recently expressed that its interest is in taking over the whole company.

words, Insurety demanded something it wasn't entitled to and, when rebuffed, attempted to destroy the Debtors' businesses or hold the Debtors hostage.[8]

37.     This crisis led to litigation in the 215th District Court of Harris County (the "State Court") pending as Cause No. 201953545 and styled *Insurety Capital LLC v. American Workers Insurance Services, Inc., Association Health Care Management, Inc. and Landon Jordan* (the "State Court Action").

38.     In the State Court Action, Insurety sought an injunction and sued the Debtors for breach of contract, specific performance, conversion, and fraudulent transfer.  Insurety sued AWIS additionally for breach of fiduciary duty.  Insurety also sued Landon Jordan for conversion and breach of fiduciary duty.

39.     AWIS has made a counterclaim against Insurety in the State Court seeking an injunction and seeking damages for breach of contract, usury, fraudulent inducement and declaratory judgment.

40.     The State Court entered a temporary restraining order on August 7, 2019 and a temporary injunction on September 10, 2019, enjoining the Debtors from taking certain actions and directing them to turn over in excess of $6 million.  The State Court's decisions are the subject of pending appeals—in an accelerated appeal as to the temporary injunction and a petition for writ of mandamus as to the contempt order. As a result of Insurety's arbitrary and bad faith actions, the Debtors' business and finances have been harmed.  That harm has been exacerbated by the State Court's decisions. The Debtors have been forced to file these chapter 11 cases to protect their business and the Producers and Members who depend on their continued operation.

## **RELIEF REQUESTED**

41.     By this Motion, the Debtors request entry of interim and final orders pursuant to sections 105(a), 361, and 363 of the Bankruptcy Code and Bankruptcy Rules 4001 and 6003(b)

---

[8] Robert Gray of Insurety has expressed, in effect, that Insurety would make an advance only if the Debtors would agree to a proposal giving Insurety complete control of the Debtors.

(i) authorizing use of cash collateral; (ii) approving adequate protection; (iii) granting replacement liens; (iv) recharacterizing Insurety's alleged purchases to secured transactions; and (v) granting related relief.

42.     As interim relief, the Debtors seek permission to use cash collateral in accordance with the Budget attached hereto as **Exhibit A**. The Debtors also seek a finding that Insurety is adequately protected by the anticipated payment of the Future Commissions it has either purchased or in which it has a security interest.  The total amount loaned by Insurety is about $22 million.  The value of the income stream attributable to its Purchased Assets is believed to be about $75 million. In the alternative, the Debtor offers replacement liens on its other assets to the extent of any diminution in value of Insurety's collateral.

43.     As part of their final relief, the Debtors may also seek to recharacterize Insurety's purchases as a secured loan.

## BASIS FOR RELIEF REQUESTED

### A.    Cash Collateral

44.      Section 363(a) of the Bankruptcy Code defines "cash collateral" as "cash…or other cash equivalents…in which the estate and an entity other than the estate have an interest…" For cash or its equivalent to be considered cash collateral, a debtor need only show what Section 363(a) requires—that both the debtor and another entity have an interest in the cash or cash equivalent.  If the dual interest exists in the cash, then the cash is cash collateral, and a court can permit its use provided the other entities claiming an interest are adequately protected.

45.     All of the Debtors' cash flow goes through accounts that contained a commingling of funds that are payable to or owned by different parties, including the Vendors, the Producers, Insurety, in some cases the Members, and the Debtors.  This is because one of the Debtors' duties as a manager is to collect all of the payments from Members and disburse them as required by law or contract. Therefore, many parties, including the Debtors, have an interest in all of the Debtors' cash in its accounts and all of the anticipated payments that will go into those accounts.

Accordingly, the Debtors contend that all cash or cash equivalents in this case are "cash collateral" under the definition used in Section 363(a).

46.     The Debtors have the following four (4) distinct sources of cash flowing through their bank accounts:

      a.   Cash attributable to the Third-Party Group business;

      b.   Cash attributable to the Face to Face Business;

      c.   Cash from Commissions not sold to Insurety; and

      d.   Cash from Commissions sold to Insurety, which include a residual interest for the Debtors.

47.     The first two (2) categories—Commissions related to the Third-Party Group business and the Face to Face Business —have never been sold or pledged to Insurety and are owned free and clear of any right of Insurety.   Accordingly, the income from those sources is completely unencumbered and is not cash collateral.   They are not Insurety's property and are not its collateral.   The Debtors have accurate records of the income from these categories of cash flow, which, for the most part, pass through the Bank of America account and are accounted for on a different platform. The Debtors intend to use income from these sources as they wish to operate their business in the ordinary course post-petition.

48.     The third category—cash from Commissions not sold to Insurety (because Insurety quit making advances) cannot be Insurety's property.   This cash flow source will be referred to herein as the "Potential Cash Collateral."   The Potential Cash Collateral may or may not be cash collateral, but Insurety has no basis to claim ownership of cash attributable to Commissions it refused to buy. The Debtors do not concede that Insurety has a security interest in the Potential Cash Collateral, but it is arguable that it does.   On an interim basis, the Debtors do not expect the Court to determine the Potential Cash Collateral is not cash collateral. The Debtors do, however seek to use the Potential Cash Collateral on an interim basis and in accordance with the Budget

with appropriate adequate protection or replacement liens to Insurety. The Debtors can accurately account for and identify all Potential Cash Collateral.

49.     The fourth category—cash from Commissions sold to Insurety (although the Debtor contests that characterization) are cash collateral, because both Insurety and the Debtors have an interest in them. This cash flow source will be referred to herein as the "Cash Collateral." As demonstrated in the waterfall in the Servicing Agreement, every payment and every dollar that comes into the AHCM system has four components—what the Vendors are owed for premiums, what Insurety is owed on Purchased Commissions/Purchased Assets, what Producers are owed for unsold Commissions, and a residual interest owed to the Debtors for their extensive management services. Accordingly, both the bankruptcy estates and another entity have an interest in every dollar that comes into the estate even from sold Commissions. That makes them cash collateral under Section 363(a). The Debtors seek to use the Cash Collateral in accordance with the Budget and with appropriate protections to Insurety. The Debtors can accurately account for and identify all Cash Collateral, including cash from any Purchased Assets/Purchased Commissions, and can segregate those amounts for the protection of Insurety's interest in them— be it an ownership interest or its collateral.

**B.     The Debtors' Request to Use Cash Collateral**

50.     The Debtors seek entry of interim and final orders pursuant to sections 105(a) and 363 of the Bankruptcy Code and Rules 4001 and 9014 of the Bankruptcy Rules authorizing the Debtors to use their cash income, including the Potential Cash Collateral and the Cash Collateral to pay operating expenses and other costs associated with this Chapter 11 case.

51.     The Debtors' four (4) week operating budget (the "Budget") is attached as **Exhibit A**. The Debtor seeks permission to use the Potential Cash Collateral and the Cash Collateral in accordance with the Budget.

**C.     Proposed Adequate Protection and Replacement Liens**

52.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use cash

collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Additionally, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee [or debtor-in-possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

53.     Insurety is adequately protected by virtue of the total Future Commissions stream that will be paid into the Debtors on account of Purchased Commissions, which the Debtors believe will be $75 million.  Insurety is owed approximately $22 million. Accordingly, the assets available for payment of Insurety's claim far exceed the money it has loaned.

54.     Moreover, if the Debtors are not permitted to use Potential Cash Collateral and Cash Collateral, the business will soon grind to a halt.  If the Debtors cannot use cash, the Debtors cannot provide services to Members, Providers, and Vendors.  Without Commission payments and advancements,  Producers would soon begin selling other insurance products until no one is left to sell the Products serviced by the Debtors.  Likewise, Members who don't get the services they expect will cancel their policies and go elsewhere.  As Members quit paying, the cash flow will decrease and eventually stop, and the business—along with Insurety's chances of being repaid—will be gone.

55.     The Debtors believe they can account for and set aside incoming payments attributable to Insurety's Purchased Commissions.  That will also serve as adequate protection of Insurety's interests.

56.     To the extent that the proposed adequate protection is insufficient, the Debtors request that the Court, pursuant to sections 361 and 363(e) of the Bankruptcy Code, grant Insurety valid, perfected, and enforceable new liens and security interests (collectively, the "Replacement Liens") on its other assets to the extent of any diminution in value of the Potential

Cash Collateral and the Cash Collateral caused by the Debtors' use of it.

57.    The use of the Potential Cash Collateral and the Cash Collateral is necessary to prevent immediate and irreparable harm to the Debtors' estates, including for the preservation and maintenance of the going concern value of the Debtors' estates.  The Debtors are working on obtaining debtor in possession financing, but currently must rely on their ability to use existing the Potential Cash Collateral and the Cash Collateral to fund the operation of their business.  The Debtors believe that payment of such operating expenses is reasonable and necessary to continue the Debtors' business operations and that, without the use of the Potential Cash Collateral and the Cash Collateral, the Debtors will be seriously and irreparably harmed and may be unable to preserve their going concern value.

58.    In addition to damaging the Debtors' business, lack of access to cash will have a negative impact on Members and Producers who rely on the Debtors.

**D.    The State Court Injunctions Do Not Apply**

59.    Pursuant to 11 U.S.C. § 362, the automatic stay stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(c). Insurety obtained a temporary restraining order (the "TRO") and temporary injunction (the "TI" and collectively with the TRO, the "Injunctions") in the State Court Action. The Injunctions attempt to obtain possession of property of the estate and/or exercise control over property of the estate. The Injunctions cannot apply to Debtors' Face to Face Business or the Third-Party Group business in which Insurety has no interest, or to the Commissions Insurety did not purchase, which includes, the Potential Cash Collateral. Furthermore, as discussed below, the Injunctions similarly cannot apply to the assets Insurety alleges to have purchased, because the Debtors contend the Agreements were a secured transaction, not a true sale. Therefore, the Injunctions are stayed under section 362 in their entirety.

60.     The automatic stay has great reach, especially in the Fifth Circuit. Even if it is unclear whether property is property of the estate, the automatic stay applies. *Brown v. Chestnut (In re Chestnut)*, 422 F.3d 298, 301 (5th Cir. 2005). In *Chesnut*, the issue was whether a mortgagee violated the automatic stay by foreclosing on property titled in the name of the non-debtor spouse without first obtaining relief from the automatic stay. The Fifth Circuit addressed the question whether a creditor violates the stay if it forecloses on an asset to which the debtor has "only an arguable claim of right" without the bankruptcy court's permission. In other words, does the stay apply to property that is only arguably property of the estate? *Id.* at 300. The Court held that the stay applies in the face of uncertainty. *Id.* Even though the property was *later* determined not to be property of the estate, the Court held that because at the time of the foreclosure its status as estate property was unclear, all parties should presume it was protected by the automatic stay. *Id.* at 303. First, the Court reasoned that the automatic stay has broad application, and that "in the face of uncertainty or ambiguity" its protection should be presumed. *Id.* Second, the Court said that the broad discretion given by Congress to bankruptcy courts to lift the stay is evidence that the bankruptcy court is the proper forum for determining stay issues. *Id.* Third, the Court discussed how simple it is to obtain relief from the stay. *Id.* And finally, the Court noted that even if the stay is later determined not to apply—because in that case the property presumed to be protected by the stay turned out not to be property of the estate—to encourage creditors or other parties to make that determination on their own would encourage abuse. *Id.* at 304.

61.     If a pre-petition injunction concerns the assets of a debtor's estate (or those that are arguably assets of the estate), then it is unenforceable.

> The purpose of the automatic stay is to protect creditors in a manner consistent with the bankruptcy goal of equal treatment. The stay of pre-petition proceedings enables the bankruptcy court to decide whether it will exercise its power under section 502(b) of the Bankruptcy Code to establish the validity and amount of claims against the debtor or allow another court to do so, thereby preventing a "chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts."

*Hunt v. Bankers Trust Co.*, 799 F.2d 1060, 1069 (5th Cir. 1986) (quoting *In re Holtkamp*, 669 F.2d 505 (7th Cir. 1982). In *Hunt*, the Fifth Circuit held that a pre-petition injunction did apply to the debtor because it solely related to venue (regarding where the debtor could file for bankruptcy). Because of this, the injunction was outside the scope of the automatic stay and the court permitted its enforcement.

62.     "[A] state court prepetition order which does not relate to the collection of prepetition claims or property of the estate may be enforced by contempt proceedings against the debtor and its officers in order to vindicate the dignity of the state court without violating the automatic stay." *In re Cohoes Industrial Terminal, Inc.*, 62 B.R. 369, 378 (Bankr. S.D.N.Y. 1986) (citing *Dumas v. Atwood (In re Dumas)*, 19 B.R. 676 (Bankr. 9th Cir. 1982); *David v. Hooker, Ltd.*, 560 F.2d 412 (9th Cir. 1977)).

63.     In *Action Redi-Mix Corp. v. N.Y. State Dep't of Taxation and Fin. (In re Action Redi-Mix Corp.)*, the District Court affirmed the bankruptcy court's determination that the pre-petition temporary restraining order did not prohibit debtor from continuing to use the collateral post-petition on the basis that the collateral was part of the debtor's estate. *Action Redi-Mix Corp. v. N.Y. State Dep't of Taxation and Fin. (In re Action Redi-Mix Corp.)*, 2005 U.S. Dist. LEXIS 10996 (S.D.N.Y. June 7, 2005), *aff'd*, 175 Fed. Appx. 484 (2nd Cir. 2006). A creditor in *Redi-Mix* obtained a pre-petition temporary restraining order enjoining the debtor from using its purported collateral. *Id.* at *2-3. After the Debtor filed for relief, the creditor moved to lift the automatic stay to permit the creditor to take possession of its collateral and hold the debtor and its principals in contempt for violation of the temporary restraining order. *Id.* The bankruptcy court denied the creditor's motion on the basis that it determined the collateral to be property of the estate. *Id.* at *8.

64.     Using the same analysis, the United States Bankruptcy Court for the Western District of Texas in *In re Stone Creek Vill. Prop. Owners Ass'n* enforced a state court injunction,

because the property *was not* part of the debtor's estate: "Because the [collateral] *does not* constitute property of the debtor's estate, the automatic stay *will not* prevent the state court plaintiffs from seeking to enforce their state court injunction with respect to the [collateral] against the non-debtor defendants." *In re Stone Creek Vill. Prop. Owners Ass'n*, 2011 Bankr. LEXIS 2944 at *11 (Bankr. W.D. Tex. 2011) (emphasis added).

65.     As explained in more detail above, the Debtors' cash flow can be separated into four (4) distinct sources: (1) Insurety's purported assets or collateral; (2) the Face to Face Business; (3) this Third-Party Group business; and (4) Commissions Insurety did not and does not allege to have purchased. The TRO enjoins AWIS from (1) "using Insurety's property,"[9] (2) "executing agreements for the advancement of insurance commissions,"[10] and (3) "twisting policyholders." *Temporary Restraining Order*, Harris County 215th Judicial District, Cause No. 2019-53545 (Aug. 7, 2019. The TI further attempts to obtain possession of property of the estate and exercise control over property of the estate by: (1) ordering Debtors to "immediately place … $1,796,864.88 and … $2,070,167.14 into the registry of the Court;" (2) ordering Debtors to "place the Outstanding Renewal Collection to Date in the registry of the Court;" (3) ordering Debtors to "transfer custody of the Future Collections" to Insurety on a weekly basis; (4) enjoining Debtors from "violating their contracts with Insurety;" and (5) ordering the increase of the Debtors' bond for the TRO to $100,000.00. *Order Granting Temporary Injunction and Directing Deposit into the Court's Registry of Property Held in Trust by Defendants*, Harris County 215th Judicial District, Cause No. 2019-53545 (Sept. 9, 2019).

66.     As a result of the automatic stay, the Injunctions cannot apply to the Debtors' income from its Face to Face Business, its Third-Party Group business, or from the Commissions Insurety did not and does not allege to have purchased. Additionally, the Injunctions are also

---

[9] The Debtors contest that Insurety **owns** anything, and the State Court has **not** determined that issue. The Debtors are asking this Court to characterize the transactions as either sales or secured loans.

[10] The Debtors have not assumed the Agreements yet, thus the exclusivity provision that Insurety is attempting to enforce and that the State Court refers to here, does not bind the Debtors and is not in the best interest of the estates or their creditors.

barred by the automatic stay regarding Insurety's allegedly purchased assets because Debtors'

contend that Insurety, *at most*, has a secured claim to the collateral because the Agreements

constituted a loan, not a sale. That issue has not yet been decided by any court, and the Debtors

have asked this Court to address the issue at the appropriate time.

67.    The Debtors contend that all of the restrictions in the Injunctions are "act[s] to

obtain possession of property of the estate … or to exercise control over property of the estate"

pursuant to section 362(a)(3). Therefore, any attempt to enforce these restrictions would be a

violation of the automatic stay.

68.    Furthermore, the Injunctions seek to enforce provisions of executory contracts

between Debtors and Insurety that have not yet been assumed or rejected under section 365.

"The purpose for allowing the trustee or debtor-in-possession to assume or reject an executory

contract is to enable a trustee or troubled debtor to take advantage of a contract that will benefit

the estate by assuming it or alternatively, to relieve the estate of a burdensome contract by

rejecting it." *In re Norquist*, 43 B.R. 224, 225 (Bankr. E.D. Wash. 1984). "[Debtor-in-possession]

need not satisfy pre-petition obligations until it makes determination to assume [executory

contracts] in accordance with Section 365(a) of the Code." *In re Lionel Corp.*, 23 B.R. 224, 225

(Bankr. S.D.N.Y. 1982).

69.    Here, Debtors have not yet accepted or rejected the Agreements with Insurety, nor

do they have any obligation to do so at this time. 11 U.S.C. § 365. The Debtors cannot yet be

bound by contracts that they have not yet assumed. Therefore, any attempt to enforce provisions

of the Agreements, particularly in this case the exclusivity clause, is unenforceable. *See*

Management Agreement § 1.02(a).

70.    Based on the above, the enforcement of the Injunctions as to Debtors' Face to

Face business, the Third-Party Group business, and the assets Insurety did not and does not

allege to have purchased would be a violation of the automatic stay pursuant to section 362, and

requiring the Debtors to abide by the restrictions in the not yet assumed contracts would be in conflict with section 365.

**E.**      **Request for Recharacterization of Assignments and Secured Transactions**

71.     The Debtors are not seeking recharacterization of Insurety's interest on an interim basis, but it will do so at the final hearing on this Motion. The transactions between Insurety and Debtors are not true sales but instead are disguised secured loans. Therefore, Insurety has, at most, a secured lien against Purchased Assets/Purchased Commissions; it does not have any ownership interest.

72.     If an alleged buyer retains a security interest in future receivables it does not unambiguously create an ownership interest. *Kerr v. Commer. Credit Group, Inc. (In re Siskey Hauling Co.)*, 456 B.R. 597, 607 (Bankr. N.D. Ga. 2011). Courts must also look at whether the "language in the Purchase Agreement provides [Buyer] with recourse against Debtor." *Id.* Because, "[w]hen a buyer of accounts receivable holds substantial recourse against the seller, thereby shifting all risk of non-collection on the seller, courts have routinely held the transaction to be a financing arrangement and not a sale." *Id.* (citing *Major's Furniture Mart, Inc.*, 602 F.2d 538, 544-45 (3rd Cir. 1979); *Lange v. Inova Capital Funding, LLC (In re Qualia Clinical Serv., Inc.*), 441 B.R. 325, 329-31 (B.A.P. 8th Cir. 2011) (finding an invoice purchase agreement that shifted all risk of non-collection to the seller to be a "disguised loan rather than a true sale.")).

73.     In determining if a transaction is a true sale, courts throughout the country analyze several factors:

> [T]he right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and whether the assignment itself reduces the debt.

*Endico Potatoes v. CIT Group/Factoring*, 67 F.3d 1063, 1068 (2d Cir. 1995) (citing *Major's*, 602 F.2d at 543-46; *Levin v. City Trust Co.*, 482 F.2d 937, 940 (2d Cir. 1973); H*assett v. Sprague*

*Electric Co.*, 30 Bankr. 642, 647-48 (Bankr. S.D.N.Y. 1983); *In re Evergreen Valley Resort, Inc.*, 23 B.R. 659, 660-61 (Bankr. D. Me. 1982)). In sum, "[t]he root of all of these factors is the *transfer of risk.*" *Id.* at 1069 (emphasis added). The important distinction comes "[w]here the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." *Id.* However, "[i]f the lender holds only a security interest … the lender's risk is derivative or secondary." *Id.* And it is a not a true sale if "the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan." *Id.* (emphasis original). In *Kerr*, the court held that the agreement was a loan because the recourse of the buyer against the seller transfers the risk of non-collection to the seller. *Kerr,* 456 B.R. at 329-31.

74.     Here, Debtors maintained *all of* the risks of non-collection. If the Members do not pay premiums (which include the Commission component), the Debtors are still liable to Insurety in full, plus costs and fees. For example, the TPA Servicing Agreement provides that: (1) "[Insurety] shall have the right to set off refunds, no-takes, attrition and chargebacks allocated to any Producer against any future Purchase Asset purchases;" and (2) [Debtors] will take any and all steps to maintain and protect [Insurety's] rights and not allow any party to take steps to interfere with [Insurety's] rights." *See* Servicing Agreement. The Assignment Agreement provides that: (1) "To the extent that the amount of any Purchased Assets purchased by [Insurety] hereunder is not collected due solely to the operation of any Attrition Rate or No Take Amount [sic] then [Insurety] may off-set such amounts not collected against any amount due to the [Debtors] under this Agreement;" (2) Debtors "irrevocably and unconditionally [guarantee] to [Insurety] the collection in full of the value of the Purchased Assets purchased by [Insurety];" (3) "[Debtors agree] that if there is any failure to provide [Insurety] with full value of the Purchased Assets, [Debtors] will, as an independent and primary obligation, indemnify [Insurety] immediate on demand against any

cost, loss or liability it incurs as a result of the applicable non-receipt;" and (4) "Neither … any delay in taking, pursuing or exercising any of the foregoing actions, rights, powers or remedies … by [Insurety] or anyone acting for [Insurety], shall extinguish or affect the obligations of the [Debtors] hereunder, but the [Debtors] shall be and remaining liable for all the guaranteed obligations until fully paid and performed …" *See* Assignment Agreement. Lastly, the Management Agreement provides that: (1) "[t]he IMO hereby agrees to guarantee any payments due from the Producers to [Insurety]. Such guarantee is a guarantee of *payment*, and *not of collection.*" *See* Management Agreement (emphasis added). It is clear from the excerpted provisions of the Agreements that Debtors maintained all of the risk in the transaction and remained liable to Insurety.

75.      Accordingly, because Debtors maintained the entirety of risk of non-payment and were still liable to Insurety, the transaction between Insurety and Debtors was not a true sale. The Agreements between Insurety and Debtors should be recharacterized for what they truly are, a loan for the advancement of Commissions.

## REQUEST FOR INTERIM RELIEF

76.      An immediate need exists for the Debtors to use the Potential Cash Collateral and the Cash Collateral or the ability of the Debtors to remain in business will be severely impaired. Accordingly, the Debtors request that the Court set a preliminary hearing on this Motion on an emergency basis, and at such hearing, enter an interim order granting the relief requested herein to avoid immediate and irreparable harm to this bankruptcy estate.  The Debtors additionally request that the Court set a final hearing on this Motion when the Court's calendar will allow, consistent with Bankruptcy Rule 4001.

## LIMITED NOTICE

77.      Notice of this Motion has been provided to (i) the office of the United States Trustee for the Northern District of Texas, (ii) Insurety, (iii) Insurety's counsel; (iv) the holders of the twenty

(20) largest unsecured claims against the Debtors, and (v) other parties-in-interest as set forth in the Certificate of Service below. The Debtors submit that no other further notice need be provided.

## CONCLUSION

WHEREFORE, the Debtors respectfully requests entry of an order (i) authorizing use of cash collateral; (ii) approving adequate protection; (iii) granting replacement liens; (iv) recharacterizing sale transactions as secured loans; and (iv) granting related relief.

Dated: October 14, 2019.                          Respectfully submitted,

/s/ J. Robert Forshey
J. Robert Forshey
State Bar No. 07264200
Laurie Dahl Rea
State Bar No. 00796150
Dylan T.F. Ross
State Bar No. 24104435
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
bforshey@forsheyprostok.com
lrea@forsheyprostok.com
dross@forsheyprostok.com

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon the parties listed below via email, and on the attached service list via United States Mail, first class postage prepaid, or via ECF electronic Notice, if available, on October 14, 2019.

United States Trustee
Attn: Erin Schmidt, Trial Attorney
1100 Commerce Street, Room 976
Dallas, TX 75242
*Email: Erin.Schmidt2@usdoj.gov*

United States Trustee
Attn: Elizabeth Young, Trial Attorney
1100 Commerce Street, Room 976
Dallas, TX 75242
*Email: Elizabeth.A.Young@usdoj.gov*

/s/ J. Robert Forshey
J. Robert Forshey

L:\BFORSHEY\American Workers Insurance (Assc Health Care) #6050\Pleadings\Motion to Permit Use of Cash Collateral.docx

# Exhibit A
# Budget

## BUDGET (WITH ADVANCE PARTNER)

| | Week 1<br>10/14 - 10/20 | Week 2<br>10/21 - 10/27 | Week 3<br>10/28 - 11/03 | Week 4<br>11/04 - 11/10 |
|---|---|---|---|---|
| **Cost of Goods Sold** | | | | |
| Advance Commissions CyberX | 250,000 | 250,000 | 250,000 | 250,000 |
| Commissions Care "Face to Face" | - | 120,000 | - | - |
| Carrier Payments | 315,010 | 275,791 | 582,411 | 323,476 |
| Merchant Services Fees | 94,503 | 82,737 | 174,723 | 97,043 |
| Legal Fees | - | 50,000 | - | 50,000 |
| **Total COGS** | 659,513 | 778,528 | 1,007,134 | 720,519 |
| **Expense** | | | | |
| Accounting and Auditing | 500 | 500 | 500 | 500 |
| Advertising | 1,000 | 1,000 | 1,000 | 2,000 |
| State Registeration Fees | 1,000 | 1,000 | 1,000 | 2,000 |
| Bank Service Charges | 3,000 | 3,000 | 6,000 | 3,000 |
| Contract Labor | 1,000 | 1,000 | 47,000 | 1,000 |
| Computer Supplies | 2,500 | 2,500 | 2,500 | 2,500 |
| Dues and Subscriptions | 500 | 500 | 500 | 500 |
| FICA Taxes | - | 15,000 | - | 15,000 |
| 401K Funding / Employer | - | 2,500 | - | 2,500 |
| Health Insurance | - | - | 20,000 | - |
| Insurance | 500 | 500 | 3,500 | 500 |
| Office Expense | 2,500 | 2,500 | 2,500 | 2,500 |
| Office Supplies | 2,500 | 2,500 | 2,500 | 2,500 |
| Automobile Expense | 750 | 750 | 750 | 750 |
| Other Taxes | - | - | 1,500 | - |
| Permits and Licenses | 125 | 125 | 125 | 125 |
| Postage | 2,500 | 2,500 | 2,500 | 2,500 |
| Printing | 1,500 | 1,500 | 1,500 | 500 |
| Computer and Internet Expenses | 1,500 | 1,500 | 1,500 | 500 |
| Rent | - | - | 30,000 | - |
| Bonus | 1,500 | 1,500 | 1,500 | 1,500 |
| Shipping | 3,500 | 3,500 | 3,500 | 4,500 |
| Telephone and Long Distance | 17,177 | 1,000 | 27,000 | 1,000 |
| Meals and Entertainment | 2,500 | 2,500 | 2,500 | 2,500 |
| Travel Expense | 3,500 | 3,500 | 4,500 | 3,500 |
| Workers Comp Insurance | - | - | 2,000 | - |
| Payroll Expenses | - | 150,000 | - | 150,000 |
| Professional Fees | - | 10,000 | - | 10,000 |
| **Total Expense** | 49,552 | 210,875 | 165,875 | 211,875 |
| **Total All Expenses:** | 709,065 | 989,403 | 1,173,009 | 932,394 |

# Service List

**Service List**
**AWIS/AHCM**
**#6050**

American Workers Insurance Services, Inc.
2305 Ridge Road #205
Rockwall, TX 75087

Association Health Care Management, Inc.
11111 Richmond Ave., Suite 200
Houston, TX 77082

Internal Revenue Service
Centralized Insolvency Operations
PO Box 7346
Philadelphia, PA 19101-7346

Comptroller of Public Accounts
111 E. 17th St.
Austin, TX 78774-0100

United States Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242

Texas Workforce Commission
Labor Law Section
101 East 15th St.
Austin, TX 78778-0001

Co-Nexus Communication Systems
PO Box 609
Cedar Rapids, IA 52406

Insurety Capital, LLC
c/o Robert S. Harrell / Andrew Elkhoury
Mayer Brown LLP
700 Louisiana Street, Suite 3400
Houston, TX 77002

Insurety Capital, LLC
c/o Charles E. Harris II
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606

Joanna Cheng and Putative Class
c/o Mark L. Javitch
Javitch Law Office
480 S. Ellsworth Ave.
San Mateo, CA 94401

Spectrum Internet/Telephone Service
4145 S. Falkenburg Rd.
Riverview, FL 33578-8652

# TWENTY LARGEST UNSECURED CREDITORS

Agentra Healthcare Solutions
4201 Spring Valley Rd., Suite 1500
Dallas, TX 75244

American Express
PO Box 650448
Houston, TX 75265

Assured Benefits Administration
PO Box 679145
Dallas, TX 75267-9145

BlueCross BlueShield of Texas
PO Box 731428
Dallas, TX 75373-1428

Capital One, N.A.
PO Box 60024
New Orleans, LA 70160

Comcast
PO Box 660618
Dallas, TX 75266-0618

CyberX Group LLC - 212 Connect
1677 E Miles Ave., Bldg. 2
Hayden, ID 83835

Dell
PO Box 731381
Dallas, TX 75373-1381

FCAWMA
10878 Westheimer Rd.
Houston, TX 77042

Insurety Capital, LLC
600 Brickell Ave., Suite 1900
Miami, FL 33131

Iron Mountain
PO Box 915004
Dallas, TX 75391-5004

James Wise CPA
12345 Jones Rd., Suite 185
Houston, TX 77070

Level 3 Communications LLC
PO Box 910182
Denver, CO 80291-0182

Lone Star Coffee
PO Box 691634
Houston, TX 77269-1634

Mike Rabie
1723 Parklake Village Dr.
Katy, TX 77450

Neopost USA, Inc.
Dept. 3689
PO Box 123689
Dallas, TX 75312-3689

NxSource
3654 Dumbarton St.
Houston, TX 77025

VeriTrust Corporation
7804 Fairview Rd., Suite 153
Charolotte, NC 28226

Voicetext.com
3706 Speedway
Austin, TX 78705

Zenith Real Estate
PO Box 42146
Houston, TX 77242-2146