J. Robert Forshey
State Bar No. 07264200
Laurie Dahl Rea
State Bar No. 00796150
Dylan T.F. Ross
State Bar No. 24104435
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Fort Worth, TX 76102
Telephone: 817-877-8855
Facsimile: 817-877-4151
bforshey@forsheyprostok.com
lrea@forsheyprostok.com
dross@forsheyprostok.com

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| AMERICAN WORKERS INSURANCE SERVICES, INC., | ) ) ) | Case No. 19-44208-mxm11 |
| | ) | |
| ASSOCIATION HEALTH CARE MANAGEMENT, INC. | ) ) | Case No. 19-44209-elm11 |
| | ) | |
| | ) | (motion for joint administration pending) |
| Debtors. | ) | **Emergency Hearing Requested** |

### DEBTORS' MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTORS TO PAY PREPETITION COMMISSION OBLIGATIONS TO PRODUCERS AS CRITICAL VENDORS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COME NOW American Workers Insurance Services, Inc. ("AWIS") and Association Health Care Management, Inc. ("AHCM," and together with AWIS, the "Debtors"), both Texas corporations, as debtors in possession, and file this Motion for Entry of Order Authorizing Debtors to Pay Prepetition Commission Obligations to Producers as Critical Vendors (the "Motion"). In support of this Motion, the Debtors respectfully state as follows:

### I. JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. Sections 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. Section 157(b). Venue is proper before this Court pursuant to 28 U.S.C. Sections 1408 and 1409.

## II. PROCEDURAL BACKGROUND

2. On October 14, 2019 (the "Petition Date"), the Debtors, both Texas corporations, filed their voluntary cases under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their business and manage their property as debtors-in-possession. No creditors' committee has been appointed in this case by the United States Trustee. Further, no trustee or examiner has been requested or appointed in this chapter 11 case.

3. The Debtors are affiliates as that term is defined in section 101(2) of the Bankruptcy Code and have requested that their chapter 11 cases be jointly administered.

## III. FACTUAL BACKGROUND

**A. The Debtors' Business**

4. AWIS and AHCM work in tandem to provide essential services in the insurance industries. The Debtors are not insurance companies and do not issue insurance policies; rather, they manage insurance-related services for insurance companies, insurance agents, and insureds. The Debtors derive their income from their management services to those constituents.

5. In recent years, insurance carriers have moved away from having captive agents and from providing the structure to train and support insurance agents for the purposes of marketing insurance products and providing customer service. Without training, support, customer service, and marketing, it is more difficult for insurance companies to get insurance products to consumers who need the policies.

6. The Debtors, and companies like them, fill that need by facilitating the distribution of insurance products and other health-related benefits (the "Products") issued by insurance carriers (the "Vendors"). The Products include prescription coverage, accidental death and dismemberment insurance, accidental medical insurance, critical illness insurance, and limited medical procedures insurance, but also include some travel-related insurance. AWIS and

AHCM are affiliated entities that together market and sell Products for the Vendors and collect premiums from customers and pass those premiums along to the Vendors.

7. The Debtors also provide various services, including training and support services, to state licensed insurance carriers, insurance agents, agencies, groups of agencies, field marketing organizations, and others who actually market and sell the Products to customers (the "Producers"). Producers earn commissions when they sell the Products. As part of their management services, the Debtors collect payments from the Producer's customers and, in addition to paying premiums to the Vendors, they also pay Producers the commissions earned by them from the Producers' sales of the Products. In addition, the Debtors provide services to the customers who buy the Products, including customer service support and premium collection and disbursement.

### *(i)* *An Overview of the Debtors' Business*

8. AWIS has an Association Membership Agreement[1] with the National Association of Preferred Providers ("NAPP") to market Products to NAPP's members. AWIS's customers are all members of NAPP (the "Members"). NAPP is a Texas non-profit association that provides its members with access to health and wellness programs, like insurance policies and discount programs. NAPP has approximately 34,000 Members who are served by the Debtors.

9. NAPP contracts with Vendors (*i.e.* insurance companies) to provide Products to the Members. The Members are able to buy the Products because of their membership in NAPP. AWIS contracts with NAPP to market the Products to the Members, and NAPP pays AWIS for its marketing services. AWIS also contracts with Producers who actually market and sell the Products to the Members.

10. AHCM acts as the third-party administrator ("TPA") for AWIS and NAPP. AHCM

---

[1] AHCM has a similar agreement with NAPP.

is a licensed TPA in Texas and thirty-two (32) other states.[2] As such, it is subject to, among other things, the requirements of the Texas Insurance Code and Texas Administrative Code as they apply to TPAs. AHCM collects premiums and other amounts due for the Products from the Members and remits them to the parties to whom they are owed—including the Vendors with respect to premiums and the Producers with respect to commissions earned.

### *(ii)* *The Ownership Structure of the Debtors*

11. These Debtors have a long history in the insurance industry. AHCM has been in business since 1983. AWIS has been in business since 2002. The current owner acquired the Debtors on June 28, 2018.

12. AHCM and AWIS originally offered a smaller portfolio of insurance and healthcare products. Since buying the companies in 2018, the current ownership and management have expanded the Debtors' businesses. Both Debtors are 100% owned by AHCM Holdings, LLC. AHCM Holdings, LLC is 100% owned by Rendon Management Group, LLC. Rendon Management Group, LLC is 100% owned by Landon Jordan.

### *(iii)* *AWIS's Role, Employees and Assets*

13. As mentioned above, the Debtors serve different roles in the overall business. AWIS is an insurance agent and an insurance marketing organization or IMO.[3] Its role in the Debtors' business is to package the Products and to market them to NAPP's Members through the Producers.

14. AWIS has 700 to 800 total Producers, and those relationships are governed by 127 producer agreements (the "Producer Agreements"). Generally, the Producers are independent insurance agents, or they are lead agents in a group who have other agents working for or with them. In other words, the Producers are usually individuals rather than

---

[2] Florida, Arkansas, Rhode Island, Arizona, Louisiana, South Carolina, Missouri, Wyoming, Nebraska, New Mexico, Maine, North Carolina, Ohio, Maryland, Georgia, Delaware, Idaho, Wisconsin, Illinois, Indiana, Mississippi, Oklahoma, California, Kansas, Tennessee, West Virginia, Pennsylvania, Utah, Oregon, Iowa, Nevada, and Kentucky.

[3] IMOs are sometimes referred to as "independent marketing organizations" or "field marketing organizations."

business entities. The Producer Agreements outline services the Producers will receive from AWIS (or, as explained in more detail below, from AHCM as AWIS's third party administrator) and the Producers' obligations as they sell Products to Members.

15. Producers earn commissions (the "Commissions") for selling the insurance Products. Under the Producer Agreements, Producers earn the Commissions when premiums are actually received and recorded by the Debtors. Because the Commissions are payable only after a Member pays sufficient premiums, Producers often want advances on their Commissions. The Producer Agreements permit AWIS (at its sole discretion) to make advances to Producers for future Commissions (the "Future Commissions"). The advances are not loans; rather, if a Producer wants an advance on a Future Commission, the Producer agrees to assign that Future Commission to AWIS, giving AWIS all right and title to it. AWIS obtained funds to make the advances from Insurety Capital LLC ("Insurety") through assignment or pledge of the Producer's Future Commission to Insurety. The Debtors' relationship with Insurety is discussed in more detail below.

16. The Producers are not employees of AWIS. AWIS has one employee, Randee Mascorro. She serves as Senior Director of Business Operations for AWIS, and her duties include maintaining business operations, providing service to Producers, and maintaining records of Commissions. Ms. Mascorro is a salaried employee of AWIS. She has a support staff that assist her with her duties, but they are employees of AHCM. Ms. Mascorro is paid by AHCM through ADP along with the employees of AHCM.

17. Any tangible assets AWIS uses to perform its part of the Debtors' business are owned by AHCM Holdings, LLC (the owner of AHCM). AWIS's assets consist of the Producer Agreements, its agreement with NAPP, and various other agreements.

### (iv) AHCM's Role, Employees and Assets

18. AHCM acts as AWIS's TPA. In that capacity, AHCM handles the general operations of both Debtors, many of the obligations under the Producer Agreements, service to

the Members, and all collections and payments.

19. As a TPA, AHCM provides back-office services for insurance agencies (AWIS and others), including product development, legal issues, information technology support, website maintenance, human resources, employee payments and benefits, accounting, billing and payment of expenses. With respect to the Producers, AHCM provides training and support, marketing materials (*e.g.* brochures and websites), and payment of Commissions. AHCM also provides services to the Members, including customer service, claims processing, premium payment collection, premium refunds, forwarding premiums to the insurance carriers, and providing fulfillment packages (*i.e.* insurance cards, policies, explanatory materials).

20. AHCM collects all Member payments and makes all payments for the Debtors. Because of the number of Products sold, many dollars flow through the Debtors. Much of the cash flow belongs to the Vendors as premiums and another large piece is for Producer Commissions. The Debtors' income is what remains and is for the Debtors' many management services to the Vendors, Producers, and Members.

21. Most of the Debtors' pre-petition collections were deposited into its main account at Comerica Bank. All premium payments go into a general account at Comerica Bank (the "Comerica Account") by ACH or check, with the exception of premiums from the "face-to-face" sales and other sales (described more below), which go into a Bank of America account (the "Bank of America Account"). From each paid premium, AHCM calculates the amount owed to the Vendors for the Product sold, the amount due to the Producers for Commissions, and any amount due to Insurety. The remainder of the cash flow is used to fund the Debtors' operations and pay their expenses.

22. AHCM has ninety (90) employees. They handle member services, claims, billing, information technology, and management. About eighty-four percent (84%) of AHCM's employees are paid on an hourly basis—generally those who handle member services, claims, and billing. The other sixteen percent (16%) of AHCM's employees are paid a salary—generally

those in management and information technology. All employees are paid on a bi-weekly basis through ADP, one week in arrears.

23. In addition to being a TPA for AWIS, AHCM provides similar services for about fourteen (14) other entities. They are third party groups (the "Third-Party Groups") to which AHCM sells benefits and provides services. Some Third-Party Groups bill and collect premiums themselves. Others have AHCM bill and collect for them, in which case the funds go through the Bank of America Account.

24. The Debtors also have another line of business, which they call the "face to face" business (the "Face to Face Business"). In this part of the business, Products are marketed to NAPP members on an in-person basis to immigrant communities, but the accounting is completely separate. Funds attributable to the Face to Face Business go into the Bank of America Account. Insurety has no involvement in, and no claim to any interest in, the revenues and proceeds generated by either the Third Party Group business or the Face to Face Business.

### (v) The Debtors' Bank Accounts

25. As mentioned above, the Debtors have two main bank accounts—one at Bank of America and one at Comerica Bank. There are several subaccounts at Comerica Bank for special purposes.

26. The Comerica Account is a general operating account that is used to collect all premiums from Members and to disburse all funds related to its business, except for funds related to the Face to Face Business and the Third-Party Group business. The Comerica Account contains commingled funds, therefore, at any given moment it contains cash in which multiple parties have an interest. Those parties may be the Vendors, the Producers, Insurety, and the Debtors.

27. The Comerica Account receives Member payments on a daily basis. AHCM makes payments out of that account to the Vendors, transferring to them the amount of the

Member payment attributable to premiums. AHCM also transfers Commissions from that account to the appropriate party. AHCM also transfers payroll expenses from the Comerica Account into another account (also at Comerica) for payroll. That payroll account is swept by ADP, and ADP actually issues payroll from its accounts. AHCM also transfers money to an operating account (also at Comerica) as necessary to pay rent and similar operating expenses for the Debtors.

**B.    Commission Advances and the Debtors' Pre-Petition Agreements with Insurety**

28.    Because the Commissions are payable only after Members have made a number of premium payments, it often takes up to six (6) months from the sale of a Product for the Commissions to be paid to Producers. Many Producers cannot wait six (6) months for the income. Accordingly, the Producers often desire to receive advances on the Commissions. AWIS arranged to provide advances on Commissions through Insurety. As described below, Insurety stopped making advances on or about July 5, 2019. Since then, AWIS has been making advances to Producers as necessary.

29.    Producers are crucial to the Debtors' business. Most of the Producers are not beholden to the sell Products for the Debtors and the NAPP Vendors—they can choose to sell other Products. So, making the Producers feel secure by, among other things, providing for advances on Commissions is an important part of maintaining the Debtors' business.

30.    Insurety is in the business of making insurance commission advances. On July 16, 2018, AWIS, AHCM, and Insurety entered into three (3) agreements—a TPA Servicing Agreement, a Commission Assignment Agreement, and an Exclusive Management Services Agreement[4] (collectively, the "Agreements"). The Agreements created something similar to a factoring agreement in that Insurety advanced money on the premise that it would be assigned

---

[4] AWIS sent a notice of termination of the Exclusive Management Services Agreement to Insurety on September 5, 2019.

and repaid from future receivables—in this case the Future Commissions.[5] However, the Agreements do not clearly provide for a series of sale transactions. Rather, they look more like a series of secured loans, since all of the risk of non-payment or default rests with the Debtors.

31. The Debtors entered into the Agreements so they could pay the Producers their Commissions more quickly. In exchange for the advances, each Producer assigns to AWIS the right and title to the Future Commission for which the advance is made. AWIS, in turn, assigns to Insurety that Future Commission and the right to receive payment in an amount equal to the advanced amount, plus fees and other charges, including interest. Each of the Agreements are briefly described below.

32. The TPA Servicing Agreement (the "Servicing Agreement") was executed on July 16, 2018 by both Debtors and Insurety, and it established the terms upon which Insurety made advances to AWIS for the purpose of AWIS making advances on Future Commissions to the Producers. In general, the parties agreed that Insurety would advance funds by purchasing the Future Commissions of the Producers. The Debtors agreed to provide certain services to Insurety with respect to Future Commissions that Insurety purchased (the "Purchased Commissions"), including collecting payments and premiums and making disbursements to Insurety on account of its Purchased Commissions. The parties also agreed to a waterfall structure for AHCM to make payments from its collection of money from the Members. Those payments are to be made in the following order: (a) first, to the Vendors on account of the Products purchased by the Members and on account of which the Producer is due the Purchased Commission (*i.e.* the premiums); (b) second, to Insurety on account of Purchased Commissions if a Producer who received an advance has an outstanding advance balance; (c) third, to the Producers for Commissions not purchased by Insurety; and (d) fourth to AWIS. *See* Servicing Agreement, §1.02(2).

---

[5] The Debtors contend that Insurety has not purchased Future Commissions, but that they entered into a lending arrangement with Insurety and the Future Commissions serve as Insurety's collateral.

33. The Commission Assignment Agreement (the "Assignment Agreement") was executed by AWIS and Insurety on July 16, 2018. AWIS agreed to sell and Insurety agreed to purchase *certain* Commissions—those being the Future Commissions for which the advances were being made. The Commissions purportedly purchased under the Assignment Agreement—described as *certain* Commissions—are called the "Purchased Assets." The Debtors expect Insurety to contend that the Assignment Agreement is a sale of *all* Future Commissions or a security interest on *all* Commissions. But the Debtors believe that the plain language of the Assignment Agreement makes it, at most, an assignment of only *certain* Future Commissions; that is, only Future Commissions for which advances were made, but not all Commissions. On other words, the term "Purchased Assets" in the Assignment Agreement refers only to the Future Commissions for which Insurety actually made advances. The Debtors also believe the Assignment Agreement is more accurately characterized as a security agreement to secure an extension of credit by Insurety. The Assignment Agreement contains many hallmarks of a loan, including the grant of a security interest in the "Purchased Assets and all collections and proceeds thereof." So, under the Assignment Agreement, Insurety has only purchased the Purchased Assets or has a lien on only the Purchased Assets. Moreover, in the instance of a true assignment, the risk of default through non-payment rests with the assignee (*i.e.* Insurety). However, the Assignment Agreement places all of the risk of default on the Debtors, as assignor, through a guarantee that Insurety will be repaid all of the money paid by Insurety to acquire the Purchased Assets. *See* Assignment Agreement, §1.01(j).

34. The Exclusive Management Services Agreement ("Management Agreement") is an agreement that governs the terms under which the Debtors will service the Products that generate the Future Commissions for the benefit of Insurety and its Purchased Commissions/Purchased Assets. It, too, contains a grant of a security interest in accounts, general intangibles, collections, and their proceeds, **"but only to the extent these arise from the or result from the Purchased Assets."** This provision of the Management Agreement

shows that Insurety only has an interest in the Purchased Assets or Purchased Commissions—whether it be an ownership interest or a security interest.

35. As explained more fully below, the Debtor has many sources of income that are not derived from Purchased Assets or Purchased Commissions (*i.e.* the Future Commissions for which Insurety made advances).

## C. Factors Leading to the Bankruptcy

36. These bankruptcy cases were filed, in short, because of a cash flow crisis created by Insurety and resulting litigation. Insurety wanted to acquire a majority ownership position in the Debtors.[6] Insurety arbitrarily stopped purchasing Future Commissions under the Agreements (even though the Debtors were not in default under the Agreements) for the purpose of pressuring the Debtors' owner to transfer equity interests in the Debtors to Insurety or its principals. When the Debtors refused, Insurety simply stopped making advances (*i.e.* buying Future Commissions), leaving the Debtors in a cash flow crisis in which they were forced to spend some of the Commissions purchased by Insurety (or some of Insurety's collateral) in order for the business to survive and to continue operating to fulfill the Debtors' obligations to the Members, the Producers, and the Vendors. In addition to attempting to obtain ownership of the Debtor and stopping Commission advances, Insurety also sought to enforce the exclusivity provision in the Management Agreement and took the position that the Debtors could not obtain Commission advances for their Producers from any other source. Ownership or control is not a condition of the Agreements, but Insurety made it a condition to additional advances for Producers. In other words, Insurety demanded something it wasn't entitled to and, when rebuffed, attempted to destroy the Debtors' businesses or hold the Debtors hostage.[7]

37. This crisis led to litigation in the 215th District Court of Harris County (the "State

---

[6] Insurety's last written term sheet provided for a transfer of 34% of AHCM to Insurety. But Insurety recently expressed that its interest is in taking over the whole company.

[7] Robert Gray of Insurety has expressed, in effect, that Insurety would make an advance only if the Debtors would agree to a proposal giving Insurety complete control of the Debtors.

Court") pending as Cause No. 201953545 and styled *Insurety Capital LLC v. American Workers Insurance Services, Inc., Association Health Care Management, Inc. and Landon Jordan* (the "State Court Action").

38. In the State Court Action, Insurety sought an injunction and sued the Debtors for breach of contract, specific performance, conversion, and fraudulent transfer. Insurety sued AWIS additionally for breach of fiduciary duty. Insurety also sued Landon Jordan for conversion and breach of fiduciary duty.

39. AWIS has made a counterclaim against Insurety in the State Court seeking an injunction and seeking damages for breach of contract, usury, fraudulent inducement and declaratory judgment.

40. The State Court entered a temporary restraining order on August 7, 2019 and a temporary injunction on September 10, 2019, enjoining the Debtors from taking certain actions and directing them to turn over in excess of $6 million. The State Court's decisions are the subject of pending appeals—in an accelerated appeal as to the temporary injunction and a petition for writ of mandamus as to the contempt order. As a result of Insurety's arbitrary and bad faith actions, the Debtors' business and finances have been harmed. That harm has been exacerbated by the State Court's decisions. The Debtors have been forced to file these chapter 11 cases to protect their business and the Producers and Members who depend on their continued operation.

## IV. RELIEF REQUESTED

41. By this Motion, the Debtors respectfully request the entry of an order authorizing the Debtors to disburse to the Producers all amounts collected by the Debtors from Members prior to the Petition Date which constitute Commissions owed to the Producers. The Debtors further request that the Court waive the fourteen (14) day stay period set forth in Federal Rule of Bankruptcy Procedure 6004(h) and direct that any order granting this Motion shall be immediately enforceable upon entry.

## V. BASIS FOR RELIEF

42. As set forth above, AHCM collects payments from the Members on account of the Products purchased by the Members. Some of the payments received by AHCM include Commissions that are owed to the Producers pursuant to the Producer Agreements. Certain payments from Members received by AHCM prepetition include Commissions owed to the Producers which were not paid to the Producers before the Petition Date. The Debtors estimate that approximately 35 of the Producers are owed Commissions collected prepetition. These 35 Producers are not simply 35 individuals but include groups with multiple agents. The Debtors estimate that the total amount of Commissions collected prepetition which have not been paid to the Producers is approximately $787,000.00.

### A. Postpetition Payment of Prepetition Debts Owed to Critical Vendors is Permissible Under Certain Circumstances

43. Pursuant to section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). When invoking the equitable powers of section 105(a), the Court must rely upon a specific provision of the Bankruptcy Code. *In re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1334 (5th Cir. 1993); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). As set forth in *CoServ*, sections 1107(a) and 1106 of the Bankruptcy Code provide the basis on which the Court may exercise the equitable powers of section 105(a) to grant the relief requested herein.

44. Section 1107(a) of the Bankruptcy Code requires the Debtors, as debtors in possession, to perform all the functions and duties of a trustee under the Bankruptcy Code. "Implicit in the duties of a Chapter 11 trustee or debtor in possession as set out in Sections 1106 and 704 of the Bankruptcy Code is the duty of such a fiduciary to protect and preserve the estate, including an operating business's going-concern value." *In re CoServ*, 273 B.R. at 497. Thus, "it is only logical that the bankruptcy court be able to use Section 105(a) of the Code to

authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate." *Id.*

45. Courts have developed the "Doctrine of Necessity" for use in determining whether payment of prepetition obligations is permissible. *See In re Just for Feet, Inc.*, 242 B.R. 821, 825-26 (D. Del. 1999); *In re CoServ*, 273 B.R. at 491-93. The doctrine generally provides that a debtor may pay prepetition obligations if payment of such obligations is critical to the debtor's reorganization. In *CoServ*, the Court analyzed the Doctrine of Necessity and adopted a three-element test the debtor must meet to satisfy the "necessity" requirement:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*In re CoServ*, 273 B.R. at 498. The payment of the Commissions collected prepetition and owed to the Producers pursuant to this Motion satisfies each of the elements set forth the above.

**B.  Application of the *CoServ* Test to the Case at Bar**

46. First, it is indeed critical that the Debtors continue to deal with the Producers owed Commissions collected prepetition. The Producers are not merely providers of goods or services without which the Debtors' business can continue to function. Rather, the Producers are responsible for selling the Products to Members. The Debtors' ability to continue operating successfully and generating revenue is entirely dependent on the Producers continuing their efforts to sell Products to the Members. If Products to be administered by AHCM stop being sold by the Producers, the Debtors' revenue stream will dry up. Without the Producers, the Debtors' business will collapse and their going concern value will be seriously diminished, if not altogether destroyed.

47. Second, the Debtors will suffer harm and the loss of economic advantages if the

Producers do not continue their efforts to sell the Products marketed by AWIS and administered by AHCM. However, the potential harm in these cases is not limited to the loss of economic benefits that will diminish the value of the estates and the Debtors' going concern values. Rather, loss of the relationships with the Producers could very well destroy the Debtors' prospects for reorganization. The efforts of the Producers in selling Products to the Members is an integral component of the Debtors' business model. Again, without the Producers, the Debtors' business would collapse as there would be no one selling the Products AHCM administers.

48. Third, payment of the Commissions collected prepetition to the Producers entitled to such Commissions is the only practical way to maintain the relationships with those Producers. If Producers are not timely paid the Commissions they have earned, they will stop selling Products marketed by AWIS. Such Producers that are currently exclusively selling Products marketed by AWIS will simply quit. With respect to Producers that are not exclusively selling Products marketed by AWIS, they will stop selling AWIS marketed Products and focus on selling other products. In any event, the Debtors will lose valuable Producers and the future revenue generated by the Products those Producers would otherwise sell.

49. The loss of any meaningful number of Producers would be devastating to the Debtors' business and prospects for reorganization. And, the lost Producers could not be easily or quickly replaced. The process of securing a new Producer involves both recruitment and negotiation of the terms of the Producer Agreement that will govern the parties' relationship. This recruiting and negotiation process typically takes sixty (60) days or more for any given Producer. Consequently, replacement of multiple lost Producers could not happen overnight.

50. If the Debtors are required to replace Producers lost on account of unpaid prepetition Commissions, the process to accomplish this – assuming it could be accomplished at all – would stretch out over the course of months. In the meantime, the Debtors' operations will be impaired due to the inevitable and material reduction in volume of Products being sold to

Members for AHCM to administer. The Debtors can ill afford to lose Producers and revenue at this juncture, as they transition into operating as debtors in possession. Furthermore, the process of recruiting and negotiating agreements with new Producers would consume a substantial amount of time on the part of the Debtors' management and personnel during the early stages of these cases. This would be highly detrimental to the Debtors and their prospects for reorganization because the Debtors' management and personnel will already be stretched thin working to maintain normal operations while meeting all of the additional requirements that accompany operating a business in chapter 11.

51. For the foregoing reasons, there is ample justification to allow the Commissions collected prepetition to be paid to the Producers now, rather than under a plan of reorganization. Payment of the Commissions now will ensure that the relationships with the relevant Producers are maintained and that such Producers continue selling Products that will support the Debtors' business going forward. The potential consequences of Producers ceasing to sell Products marketed by AWIS and administered by AHCM because of non-payment of their earned Commissions are simply too severe to delay payment. Payment of the Commissions collected prepetition and owing to the Producers in these cases unquestionably satisfies the requirements of the Doctrine of Necessity as interpreted and applied in the *CoServ* case.

## VI. THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

52. Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") prohibits the Court from authorizing the use of property of the estates within twenty-one (21) days of the Petition Date unless such relief "is necessary to avoid immediate and irreparable harm." Fed. R. Bank. P. 6003. Granting the relief requested herein is integral to the Debtors' ability to transition into operating as debtors-in-possession in chapter 11. If this Motion is denied, the Debtors face the prospect of immediate and irreparable harm. As set forth above, failure to timely pay Producers their earned Commissions that were collected prepetition places the Debtors at serious risk of losing many of its Producers. If Producers stop selling the

Products marketed by AWIS and administered by AHCM, the Debtors' business will immediately suffer and the Debtors' prospects for reorganization will be greatly diminished. Therefore, the Debtors assert that the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 is satisfied in this instance.

## VII. NOTICE

49. Notice of this Application has been provided to (a) the Office of the United States Trustee for the Northern District of Texas; (b) all known creditors of the Debtors; and (c) certain governmental entities, counsel and parties-in-interest; all as set forth in the below Certificate of Service.

## PRAYER

WHEREFORE, the Debtors respectfully request entry of an order granting (a) the relief requested herein and (b) such other and further relief as is just and proper.

Dated: October 14, 2019.

Respectfully submitted,

/s/ *J. Robert Forshey*
J. Robert Forshey
State Bar No. 07264200
Laurie Dahl Rea
State Bar No. 00796150
Dylan T.F. Ross
State Bar No. 24104435
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Fort Worth, TX 76102
Telephone: 817-877-8855
Facsimile: 817-877-4151
bforshey@forsheyprostok.com
lrea@forsheyprostok.com
dross@forsheyprostok.com

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing document was served upon the parties listed below via email, and on the attached service list via United States Mail, first class postage prepaid, or via ECF electronic Notice, if available, on October 14, 2019.

United States Trustee
Attn: Erin Schmidt, Trial Attorney
Attn: Elizabeth Young, Trial Attorney
1100 Commerce Street, Room 976
Dallas, TX 75242
Email: erin.schmidt2@usdoj.gov
Email: elizabeth.a.young@usdoj.gov

                                                                  /s/ J. Robert Forshey
                                                                  J. Robert Forshey

L:\BFORSHEY\American Workers Insurance  (Assc Health Care) #6050\Pleadings\Motion to Pay Prepetition Commissions to Critical Vendors 10.11.19.doc

**Service List**
**AWIS/AHCM**
**#6050**

American Workers Insurance Services, Inc.
2305 Ridge Road #205
Rockwall, TX 75087

Association Health Care Management, Inc.
11111 Richmond Ave., Suite 200
Houston, TX 77082

Internal Revenue Service
Centralized Insolvency Operations
PO Box 7346
Philadelphia, PA 19101-7346

Comptroller of Public Accounts
111 E. 17th St.
Austin, TX 78774-0100

United States Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242

Texas Workforce Commission
Labor Law Section
101 East 15th St.
Austin, TX 78778-0001

Co-Nexus Communication Systems
PO Box 609
Cedar Rapids, IA 52406

Insurety Capital, LLC
c/o Robert S. Harrell / Andrew Elkhoury
Mayer Brown LLP
700 Louisiana Street, Suite 3400
Houston, TX 77002

Insurety Capital, LLC
c/o Charles E. Harris II
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606

Joanna Cheng and Putative Class
c/o Mark L. Javitch
Javitch Law Office
480 S. Ellsworth Ave.
San Mateo, CA 94401

Spectrum Internet/Telephone Service
4145 S. Falkenburg Rd.
Riverview, FL 33578-8652

## TWENTY LARGEST UNSECURED CREDITORS

Agentra Healthcare Solutions
4201 Spring Valley Rd., Suite 1500
Dallas, TX 75244

American Express
PO Box 650448
Houston, TX 75265

Assured Benefits Administration
PO Box 679145
Dallas, TX 75267-9145

BlueCross BlueShield of Texas
PO Box 731428
Dallas, TX 75373-1428

Capital One, N.A.
PO Box 60024
New Orleans, LA 70160

Comcast
PO Box 660618
Dallas, TX 75266-0618

CyberX Group LLC - 212 Connect
1677 E Miles Ave., Bldg. 2
Hayden, ID 83835

Dell
PO Box 731381
Dallas, TX 75373-1381

FCAWMA
10878 Westheimer Rd.
Houston, TX 77042

Insurety Capital, LLC
600 Brickell Ave., Suite 1900
Miami, FL 33131

Iron Mountain
PO Box 915004
Dallas, TX 75391-5004

James Wise CPA
12345 Jones Rd., Suite 185
Houston, TX 77070

Level 3 Communications LLC
PO Box 910182
Denver, CO 80291-0182

Lone Star Coffee
PO Box 691634
Houston, TX 77269-1634

Mike Rabie
1723 Parklake Village Dr.
Katy, TX 77450

Neopost USA, Inc.
Dept. 3689
PO Box 123689
Dallas, TX 75312-3689

NxSource
3654 Dumbarton St.
Houston, TX 77025

VeriTrust Corporation
7804 Fairview Rd., Suite 153
Charolotte, NC 28226

Voicetext.com
3706 Speedway
Austin, TX 78705

Zenith Real Estate
PO Box 42146
Houston, TX 77242-2146