```
                    IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                          FORT WORTH DIVISION
```

In Re:                          )   **Case No. 19-44208-mxm-11**
                                )
AMERICAN WORKERS INSURANCE      )   Fort Worth, Texas
SERVICES, INC.,                 )   October 17, 2019
                                )   3:00 p.m.
        Debtor.                 )
                                )   FIRST DAY MOTIONS
_____)
                                )
In Re:                          )   **Case No. 19-44209-mxm-11**
                                )
ASSOCIATION HEALTH CARE         )
MANAGEMENT, INC.,               )
                                )   FIRST DAY MOTIONS
        Debtor.                 )
_____)

```
                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE MARK X. MULLIN,
                  UNITED STATES BANKRUPTCY JUDGE.
```

APPEARANCES:

For the Debtors:            J. Robert Forshey
                            Laurie Rea
                            Dylan Ross
                            FORSHEY & PROSTOK, LLP
                            777 Main Street, Suite 1290
                            Fort Worth, TX  76102
                            (817) 877-8855

For Insurety Capital, LLC:  Ian T. Peck
                            HAYNES AND BOONE, LLP
                            201 Main Street, Suite 2200
                            Fort Worth, TX  76102
                            (817) 347-6613

For Insurety Capital, LLC:  Robert S. Harrell
                            MAYER BROWN, LLP
                            700 Louisiana Drive, Suite 3400
                            Houston, TX  77002
                            (713) 238-2700

```
 1   APPEARANCES, cont'd.:

 2   For Agentra, LLC and          William S. Richmond
     CyberX Group, LLC:            PLATT CHEEMA RICHMOND, PLLC
 3                                 1201 N. Riverfront Blvd.,
                                     Suite 150
 4                                 Dallas, TX  75207
                                   (214) 559-2700
 5
     For State of Texas Office     J. Casey Roy
 6   Of Attorney General,          OFFICE OF THE TEXAS ATTORNEY
     Bankruptcy and Collections      GENERAL
 7   Division:                     P.O. Box 12548 MC-008
     (Telephonic)                  Austin, TX  78711-2548
 8                                 (512) 475-4861

 9   For the U.S. Trustee:         Elizabeth Ziegler Young
                                   OFFICE OF THE UNITED STATES
10                                   TRUSTEE
                                   1100 Commerce Street, Room 976
11                                 Dallas, TX  75242
                                   (214) 767-8967
12
     For Landon Jordan:            Eric M. Van Horn
13                                 SPENCER FANE, LLP
                                   2200 Ross Avenue, Suite 4800 West
14                                 Dallas, TX  75201
                                   (214) 750-3610
15
     Recorded by:                  Karyn Rueter
16                                 UNITED STATES BANKRUPTCY COURT
                                   501 W. 10th Street
17                                 Fort Worth, TX  76102
                                   (817) 333-6038
18
     Transcribed by:               Kathy Rehling
19                                 311 Paradise Cove
                                   Shady Shores, TX  76208
20                                 (972) 786-3063

21

22

23

24          Proceedings recorded by digital sound recording;
              transcript produced by transcription service.
25
```

1            FORT WORTH, TEXAS - OCTOBER 17, 2019 - 3:51 P.M.

2            THE CLERK:  All rise.

3            THE COURT:  Good afternoon.  Please be seated.

4    Ready?

5            THE CLERK:  Yes.

6            THE COURT:  All right.  We're on the 3:00 o'clock

7    docket, American Workers Insurance Services and Association

8    Health Care Management.  Why don't we take appearances in the

9    courtroom and then on the telephone?

10           MR. FORSHEY:  Good afternoon, Your Honor.  Laurie

11   Rea, Dylan Ross, and Bobby Forshey for the Debtors, Your

12   Honor.

13           THE COURT:  Good afternoon.

14           MR. PECK:  Good afternoon, Your Honor.  Ian Peck and

15   Jarom Yates with Haynes and Boone for Insurety Capital, and

16   we're here today with our co-counsel, Robert Harrell from

17   Mayer Brown.

18           THE COURT:  Good afternoon.

19           MR. PECK:  Thank you, Your Honor.

20           MS. YOUNG:  Good afternoon, Your Honor.  Liz Ziegler

21   Young for the U.S. Trustee.

22           THE COURT:  Good afternoon.

23           MR. VAN HORN:  Good afternoon, Your Honor.  Eric Van

24   Horn with Spencer Fane.  We represent Mr. Jordan individually

25   in the state court action.

1          THE COURT:  Good afternoon.

2          MR. RICHMOND:  Your Honor, Bill Richmond, counsel for

3   creditors Agentra, LLC and CyberX Group, LLC.

4          THE COURT:  All right.  Good afternoon.  And then on

5   the telephone do we have Mr. Roy?

6          MR. ROY:  Yes.  Good afternoon, Your Honor.  Casey

7   Roy with the Texas Attorney General's Office on behalf of the

8   Texas Department of Insurance.

9          THE COURT:  Good afternoon, sir.  Is there anyone

10  else on the telephone that would like to make an appearance?

11     All right.  Mr. Forshey, it's to you.

12         MR. FORSHEY:  We would like, if we could, to

13  bifurcate the presentation this way, as a number of -- I

14  guess these are unopposed motions.  There may need to be some

15  evidence to back them up, particularly one that is, in

16  effect, a required to enter type of motion.  But other than

17  that, the most contentious thing, I think, will be the cash

18  collateral, which I'll handle.

19         THE COURT:  All right.  Thank you.  Ms. Rea?

20         MS. REA:  Thank you, Your Honor.  Laurie Rea for the

21  Debtors.

22     We have six first day motions to present today.  And just

23  from easiest to hardest, they are a joint administration

24  motion.  I don't think anyone has any objection to that.  We

25  have a motion to provide adequate assurance to our three

1   utility companies.  We have a motion to pay pre-petition

2   wages and benefits to employees, which is I don't think

3   controverted right -- or, I don't think anybody opposes that.

4   We've also asked that the Debtor can go ahead and pass

5   through payment it receives from the insureds or members or

6   customers and pass those through to the insurance carriers.

7   And then we have a payment that's a critical vendor motion to

8   pay producers.  They are the people that sell policies and

9   other products.  And they're supposed to be paid tomorrow,

10  and they need to be paid tomorrow, and if they're not, bad

11  things might happen.  So we'd like to get permission to pay

12  them.  And then, lastly, the cash collateral.

13      And I think that I'm safe to say that the U.S. Trustee is

14  okay with all of the relief that we seek, with two caveats.

15  One, that we need to make a record on the critical vendor

16  issue with the producers.  And she'd like to see a final

17  version of the cash collateral order.  And then we made some

18  changes to the budget so that it's clear we're not paying

19  professionals, people who aren't employed, without a court

20  order.  And I think those were her only issues.  So we have

21  addressed or we will address those.

22      I think it's safe to say that Insurety doesn't oppose

23  joint administration, payment -- or, you know, deposits to

24  utilities, payment of employees, pass-through of premiums, or

25  payment of producers.  I think their issue is just with what

1   money can be used to make those payments.  So, and since we

2   don't have an agreement on that, I have three witnesses to go

3   through all of these issues, and Mr. Forshey has the fourth.

4            THE COURT:  All right.

5            MS. REA:  Okay.  So I'd like to call -- well, let me

6   just preview for the Court.  Mr. Jordan, I'll call first.

7   He's the ultimate owner of the Debtors, and he'll kind of

8   give an overview of the business and how we got here.  Ms.

9   Mascorro is the director of business operations for AWIS, and

10  she and her team keep track of commissions and the producers,

11  which is a big driver here, as you might have gleaned from

12  the pleadings.  And then Mr. Lee is the COO, and he -- of

13  AHCM.  He processes all receipts and disbursements, so he can

14  address the utilities and the employees and those kinds of

15  issues.

16      So, with that, I'll call -- oh.

17            THE COURT:  Yes.  Mr. Peck?

18            MR. PECK:  Your Honor, one just quick comment.  I

19  suppose it goes more to procedure than substance.  But as Ms.

20  Rea noted, our objection is to the cash collateral usage.

21  That obviously has overlap with any other motion where usage

22  of cash is required.  I'm happy to save that for the end, but

23  I want to make clear that -- I suppose, with everyone's

24  agreement, we won't cross these witnesses in connection with

25  these other first days.  We'll save all testimony in

1  connection with cash collateral until the end.  Does that

2  make sense to everyone?

3           THE COURT:  Sure.

4           MS. REA:  Well, it's kind of mixed up.  So, Mr. -- I

5  think that --

6           THE COURT:  Why don't we just take the -- wouldn't it

7  be easier, then, just to take the witnesses, and then, once

8  we're all done, then the Court can enter the rulings in each

9  of the matters?

10          MS. REA:  Yes.

11          THE COURT:  And to the extent, Mr. Peck, you have any

12  issue with respect to any of the matters, that we can take it

13  up at the end in closing argument?

14          MR. PECK:  That's fine, Your Honor.  I guess the

15  purpose -- so, do you want us to cross the witnesses on cash

16  collateral now, as we go?  Is that -- I guess that's the

17  clarification I'm looking for.  Do we cross their witnesses

18  now, or are they going to be putting on these witnesses a

19  second time in connection with the cash collateral motion?

20          THE COURT:  Well, it's your case, not mine.  It

21  doesn't matter to me, honestly.  But it sounds like it may be

22  easier just to take one witness at a time --

23          MS. REA:  Uh-huh.

24          THE COURT:  -- for all matters, unless -- it's up to

25  you.  I don't know how easy or how much easier it's going to

1    be for your case.

2              MS. REA:  That's the way that we'd planned it,

3    because --

4              THE COURT:  How many of your witnesses are going to

5    be dealing with cash collateral?

6              MS. REA:  It's mostly going to be the last witness,

7    to tell you the truth.  As if I would tell you anything else

8    but the truth.  But the last --

9              THE COURT:  That's sort of what I was assuming, that

10   some of these witnesses --

11             MS. REA:  Right.

12             THE COURT:  -- are going to be --

13             MS. REA:  They'll --

14             THE COURT:  -- more towards the other forms of relief

15   that are being sought.

16             MS. REA:  Uh-huh.  They'll say things that pertain to

17   the cash collateral relief we seek, but most of that will

18   come from the last witness.

19             THE COURT:  Okay.

20             MS. REA:  There is some overlap.

21             MR. PECK:  I guess my only concern, Your Honor, is

22   that I guess it's a little odd to not have opening remarks on

23   the cash collateral before we get right into the testimony.

24             THE COURT:  We can have opening statements, if you'd

25   like.  It doesn't matter to me.

1             MR. PECK:  That would be appreciated.

2             MR. FORSHEY:  I would welcome that opportunity, Your

3   Honor.

4             MR. PECK:  I think we should do it.

5             THE COURT:  All right.  That's fine.  Yes.  Again,

6   it's -- I can adapt to however you all want to run your case.

7   So, --

8             MR. PECK:  Thank you, Your Honor.

9             THE COURT:  Thank you.

10            MR. FORSHEY:  May I approach, Your Honor?

11            THE COURT:  Yes, of course.  Thank you.

12            MR. FORSHEY:  Yes, sir.

13              OPENING STATEMENT ON BEHALF OF THE DEBTORS

14            MR. FORSHEY:  What I've given you is a proposed term

15   sheet that I've shared with Mr. Peck and his co-counsel prior

16   to the hearing.  And we worked diligently on trying to reach

17   a deal, but we were just not quite able to get there.

18       What you've got -- and a lot of what I'm going to tell

19   you I think moots a lot of what their objections are.  The

20   first one is that they object that commissions streams that

21   they've already bought we can't use as cash collateral.  And

22   would the Court mind looking at Exhibit #9 in the notebook up

23   there?

24            THE COURT:  I am there.

25            MR. FORSHEY:  What the Debtor does is it processes

1   payments on insurance policies.  And so what the Debtor does

2   is it gets a payment.  And like assume hypothetically the

3   payment is a hundred bucks.  Twenty-five cents of that dollar

4   may go to the credit card servicer, you know, whoever was the

5   facilitator that advanced the money, and then to the insurer

6   to cover premiums and their costs.  Then, from what's left

7   over of that 75 percent, maybe 40 percent of that is the

8   commission that Insurety would buy.  And then the other 35

9   percent would be money that the Debtor got to keep.

10      What we've modeled here in Exhibit #9 is an attempt to

11  show the collection of the commissions that has been

12  purchased by Insurety.  Our Proposed Term #1 there is that

13  we'll give them -- we do not propose to use those.  Those

14  would be collected.  We have a separate account at BBVA

15  Compass Bank, and those would be put in there, and then they

16  would be disbursed, along with the advance fees that they are

17  entitled to receive.

18      The advance fees, as I understand it, are in essence what

19  Insurety is given in return for making these -- buying these

20  things.  It's where they get their profit.  They would deny

21  it's interest, but there is going to probably be an issue at

22  some point whether this is actually a true purchase or

23  whether it is a loan and should be recharacterized as such.

24  In any event, we are not proposing to use the commissions

25  that Insurety purchased.

1      Then there is a second group -- over the summer, Insurety

2   discontinued advances to the Debtor to buy new stuff.  The

3   Debtor was put in a very tough position at that point because

4   it needed to buy the commissions from its producers or it's

5   going to lose these people.  These are people that are

6   selling it, and unless they can get their commissions paid,

7   they're not going to do business with us and they're not

8   going to sell to us.

9      So when we were cut off, we took some of Insurety's money

10   and we used it to buy other commissions.  Some of that money

11   that was used to do that, probably most of it, was

12   Insurety's.  Some of that money was ours.  We used that money

13   and we bought these.  And so you have a group of commission

14   streams that were not purchased by Insurety but they were

15   purchased in part with money that came from Insurety, if the

16   Court understands what I'm saying.

17            THE COURT:  Of course.  I do.

18            MR. FORSHEY:  Okay.  What we've proposed here to them

19   is that we would split that 70/30 between Insurety and the

20   Debtors.

21      It was also suggested by Insurety that we agree that our

22   30 percent, that any commissions that we bought with that

23   would belong to Insurety, because a lot of that money is

24   going to be used to buy new commissions.  We're agreeable to

25   that.

1    We'll send Insurety each day a copy of the page

2    reflecting all activity through that Comerica account for the

3    previous days.  We get to use the cash collateral and our

4    other -- other -- our other cash.  There are two other lines

5    of businesses.  One is it's a face-to-face business where you

6    sell premiums.  These go through call centers, what Insurety

7    does; the others are face-to-face.  Insurety has no ownership

8    or role in those.

9    In addition, we're going to start servicing some business

10   for affiliated companies where they are going to be buying

11   commissions and we'll be collecting for them on a fee basis.

12   Again, Insurety has no interest in those.

13   So those would not be things that they would have, and we

14   would be entitled to use those.

15   Insurety had also asked us to agree -- in here, we had

16   proposed in the sheet a monthly payment.  Insurety had asked

17   us to agree that we would pay them weekly, and we indicated

18   we would be willing to do so.  Assuming that a week runs

19   Monday through Sunday, we would pay them, then, by the next

20   Friday.

21   We also -- they requested that we would give them a

22   weekly report reflecting collections, productions, and

23   cancellations.  We're willing to do that at the same time as

24   the payments are made.

25   They have also asked -- in the document, in addition to

1  selling to them the commissions, there's a provision wherein

2  the company agrees that they will guarantee that Insurety

3  will collect and get paid what it paid out for these

4  commissions.  So, hypothetically, if they paid $100,000 for a

5  bunch of commissions, the company is guaranteeing, then, that

6  they'll get that $100,000.  We'll agree to reaffirm that

7  guaranty as a part of this.

8      Lastly, they've asked that a CFA -- a CF -- a certified

9  or financial examiner of some sort, financial professional

10  that is mutually acceptable to the two of us be appointed.

11  And part of that person's job would be for he or she, in

12  effect, to look over our shoulder and make sure that we're

13  doing what we're supposed to do.

14      Insurety has somewhat of heartburn with the Debtor,

15  because as you read in there, the Debtor was enjoined from

16  using this stuff.  There were some injunctions.  And I'll

17  tell you upfront, they violated it.  They did not honor those

18  injunctive provisions, because they couldn't.  And they want

19  somebody to look over our shoulders and make sure we do it.

20  That's fine.

21      I would assert today that that's really not what we're

22  here for.  We're here today to try to keep this thing open so

23  we can continue to collect these assets and try to get them

24  paid.  If they want to file a motion for a trustee, then so

25  be it.  But I have no objection to having a financial

1   professional, an FA of some sort acceptable to both of us

2   that looks over our shoulder.  And then if they want them to

3   file like a weekly report with the Court or Insurety or

4   whoever else, I'm fine with that, too.

5       Finally, I think Mr. Peck had requested the usual request

6   for replacement liens in the event that their collateral was

7   diminished.  And, of course, we would agree to that.  I think

8   that's pretty much a matter of course.

9       So, you can see I've pretty much rolled over like a

10  turtle and agreed to everything.

11      So, based on that, we would ask the Court to approve the

12  use of cash collateral as per our budget.  We're prepared to

13  put on evidence on that.

14          THE COURT:  All right.  Thank you.  Before I go to

15  you, Mr. Peck, is there anyone else in support of any of

16  these motions that wishes to be heard now?

17      All right.  Mr. Peck?

18       OPENING STATEMENT ON BEHALF OF INSURETY CAPITAL, LLC

19          MR. PECK:  Thank you, Your Honor.  I think I'm going

20  to approach this a little differently than Mr. Forshey.  I'm

21  going to tell you a little bit about our position, and then

22  I'll get into our views on the proposed resolution.

23      We filed our objection to cash collateral earlier today.

24  And for the record, this is Ian Peck on behalf of Insurety

25  Capital.  And we didn't give you much time to read it.

1   Hopefully, you had a chance to at least skim through it.

2        And because, as I noted, because cash is required for

3   several of the other first day motions, I guess, by

4   extension, we're sort of objecting to some of those as well.

5        Regarding the cash collateral motion, there is a

6   threshold problem with the relief sought by the Debtor, which

7   I think you've figured out by now, and that is the funds in

8   question are neither property of the estate nor cash

9   collateral.  So I want to take a minute just to make sure

10  we're all on the same page and talk about the assets at

11  issue.  That requires a little bit of a walk down the path of

12  explaining how insurance policies work, something I hadn't

13  thought about much before yesterday.

14       Your Honor may be well aware of this, but it was news to

15  me that the way these policies are purchased is through

16  agents, and those agents are referred to in these documents

17  as producers.  In this case, these producers are independent,

18  but they have a relationship with the Debtors.

19       So, how do producers get paid?  Consumers pay insurance

20  premiums, as you know.  A portion of that premium, as Mr.

21  Forshey noted, goes to the insurance carrier -- United

22  Healthcare, whoever it may be -- and a portion of the premium

23  goes to pay commissions to that producer that sold the

24  policy.  The exact percentage varies greatly by the type and

25  quality of the insurance product.  For the type of policies

1  here, we're talking somewhere in the realm of 40 to 50

2  percent commission to the producers.

3      The problem for the producers is that the commission is

4  paid over time as the consumer makes their monthly premium

5  payments.  This delay in compensation structure doesn't work

6  for these producers.  That's a problem.  So my client,

7  Insurety, offers a solution.  We buy the rights to future

8  commissions with cash up front.

9      Now, typically, Insurety buys these from insurance

10  marketing organizations like the Debtor, AWIS.  So the

11  insurance marketing organization is able to provide its

12  producers with cash now, and Insurety gets the commissions as

13  they come in the future.

14      Now, does Insurety have a risk?  Yes.  Policies can be

15  canceled.  And when a policy is canceled, the commission

16  obviously stops.  In the industry, this is called attrition.

17  Attrition is due to various causes.  Consumers may just fail

18  to pay their premiums.  Consumers may not like the insurance

19  product, don't like the coverage, decide to do something

20  else.  A consumer may be lured away by a competitor's

21  product.  Or the agent that sold them the policy in the first

22  place may have moved on to another organization and say, hey,

23  I know I sold you a policy over here, but I've got this Newco

24  and I want to sell you a new policy over here; why don't you

25  cancel your old one?  That's not supposed to happen, but I

1    understand that in the industry sometimes it does.  And

2    that's called twisting, is the industry term for that, Your

3    Honor.

4        Obviously, when a consumer cancels his policy, there's no

5    more cash flow.  And unfortunately, as you'll hear today in

6    the evidence, the attrition rate can be very high.  In other

7    words, the rate at which customers cancel their policies.

8        So, I want to talk for just a minute about the documents

9    that put this in place in this particular instance.  There

10   are three agreements that are relevant.  They're all cited in

11   our pleading.  You've got a commission assignment agreement,

12   a TPA servicing agreement, and an exclusive management

13   services agreement.  And I won't go through each one of

14   those, Your Honor.  I know we're late in the day and --

15           THE COURT:  Take your time.

16           MR. PECK:  -- you delayed to allow us time to talk,

17   and I appreciate it.  So I will return the favor and speed

18   ahead.

19       But I think the most relevant one for our purposes today

20   is the commission assignment agreement.  This is the

21   agreement that governs the sale of the commissions from the

22   Debtor, AWIS, to Insurety.  Section 1.01 of that agreement

23   says the Seller -- and this is quoted in Paragraph 22, I

24   believe, of our objection.  The Seller agreed -- the Seller,

25   AWIS -- agreed to sell, pledge, transfer, assign, and

1   otherwise convey to Buyer the purchased assets.

2       The other agreements have similar references to the

3   absolute transfer of these assets from the Debtors to

4   Insurety.  And that's all described in detail in Paragraphs

5   22 through 24 of our objection.

6       So, as Mr. Forshey noted, there are various sort of

7   buckets of assets here that we're talking about that are

8   covered by the Debtors' cash collateral motion.  But I'm just

9   going to talk about two of them, because they're the two that

10  we care about.

11      The first bucket is commissions that we purchased,

12  Insurety purchased, in connection with that commission

13  agreement I just mentioned.  As Mr. Forshey, I think, just

14  acknowledged, those commissions are our property.  As they

15  come in, those are our funds, and the Debtors are essentially

16  caretakers of those funds.  They're fiduciaries that are

17  holding those funds in trust for us and are supposed to turn

18  them over to us.  They are not the Debtors' property.

19  There's no loan.  There's no cash collateral.

20      We have a unique circumstance here where there's a second

21  bucket of property.

22          THE COURT:  Let me just stop you, because I want to

23  make sure since I'm learning this, can I ask Mr. Forshey a

24  question:  Is that what you said?  That's not what I heard,

25  but I don't want --

1          MR. FORSHEY:  I'm not saying -- the properties --

2    we're agreeing to pay it to them.  But there's going to be an

3    issue here about recharacterization.

4          THE COURT:  Okay.  That's -- and I just wanted to

5    make sure of that.

6          MR. FORSHEY:  And if the recharacterization --

7          THE COURT:  I thought that there was a dispute as to

8    -- I get Mr. Peck's client is saying we own them, and I

9    assume the Debtors' position is, no, it's a financing

10   transaction.  You don't own them.  I just wanted to make sure

11   that I was on the right page, that there is a dispute on that

12   issue.

13         MR. FORSHEY:  That is correct, Your Honor.

14         THE COURT:  All right.

15         MR. PECK:  Fair point, Your Honor.

16      All right.  The second bucket of property is a little bit

17   of a unique circumstance here, and that is caused by the fact

18   that, as Mr. Forshey noted, prior to the bankruptcy case, as

19   funds came in in that first bucket that we say belonged to

20   Insurety, the Debtor refused to turn those over to Insurety

21   and instead used them to buy other assets.  In this case,

22   those assets happened to be additional future commissions.

23   So you've got sort of commissions on top of commissions.  But

24   those are Insurety's funds used to buy new assets.  And we

25   haven't received any payment from those, either.

1      So our point there, and I think we tried to make this

2   clear in the pleading, is that those commissions, those

3   assets, were acquired using our property that the Debtors

4   converted, and we don't think the Debtors' use of those funds

5   is appropriate in any way.

6      All right.  So, as Mr. Forshey noted, there is a history

7   here, and we describe that in our pleadings and I won't

8   belabor it.  But I do want to point out that this started

9   when we had some concerns, Insurety had some concerns about

10   some of the Debtors' business practices and the ability of

11   Insurety to collect its property.  It did try to buy an

12   equity stake in the Debtors to have more visibility, but

13   ultimately it did not work out.  So in -- I believe it was in

14   July, Insurety began to decline to purchase certain

15   commissions.  They had the right, they had complete

16   discretion whether to buy or not buy under the contracts.

17   And the Debtors took an aggressive response in -- took an

18   aggressive response.  Specifically, they exercised self-help

19   by withholding money that came in that was Insurety's funds.

20   And, again, they used that to buy that second bucket of

21   property I mentioned.

22      In addition to contract violations, this was also a

23   violation of the Texas Insurance Code, which required Debtor

24   AHCM to act as a fiduciary and hold our funds in trust.

25      So, Insurety obviously had a major problem with this.

1    They filed a complaint in the state court in Houston.  The

2    judge issued a TRO enjoining the Debtors from breaching their

3    obligations.  The Debtors promptly violated that TRO.  The

4    judge found them in contempt.

5        The judge then issued a lengthy and detailed temporary

6    injunction, finding that Insurety would likely prevail on the

7    question of ownership of the commissions, and required the

8    deposit of $3.7 million into the registry of the Court and

9    required the Debtors to turn over other funds to Insurety.

10   The Debtors promptly violated that injunction as well and

11   filed this bankruptcy on the eve of the second contempt

12   hearing.

13       So, for those reasons, Judge, we don't think this is an

14   adequate protection issue.  We don't think you ever get to

15   that argument because we don't think there's any property of

16   the estate here at issue or any cash collateral at issue.  If

17   the Court disagrees and ultimately takes a look at adequate

18   protection, we don't think there is any kind of adequate

19   protection.  Obviously, the burden is on the Debtor to prove

20   it.  There are some income streams, but as I mentioned,

21   income streams are subject to the risk of attrition, and the

22   evidence you will hear is that that's a very high risk here.

23       I think, finally, I'll just wrap up by responding to a

24   few things that Mr. Forshey noted regarding our discussions.

25   We did make some headway, but we just couldn't get over the

1   goal line with our discussions.  And the reason -- I'll point

2   to a few things, Your Honor.  First, as you would expect,

3   Insurety has serious concerns about the Debtors' management

4   controlling the administration of future collections of our

5   client's money.  They have violated their contract with us.

6   They have violated two court orders that required them to

7   turn those funds over to us or to the Court.

8        So while we have great respect for this Court and other

9   courts, I'm not sure that we have confidence that the Debtors

10  have that same respect.  So any solution that involves the

11  Debtors continuing to administer our funds is problematic for

12  us.  And that's why -- that's really the main reason we

13  couldn't get over the goal line on an agreed solution here.

14       There is an easy solution to that problem, and it could

15  be appointing a trustee.  There's no motion in front of Your

16  Honor, but it could be something short of that.  It could be

17  a CRO.  It could be a financial advisor with some unique

18  expanded powers.  There are things that would work there.

19  But we think just someone with oversight is not good enough,

20  because this Debtor -- these Debtors have shown that

21  oversight doesn't work.  Court orders don't really work, Your

22  Honor, either.  But we need somebody else in there that's

23  independent that owes a fiduciary duty consistent with the

24  Insurance Code and the Bankruptcy Code.

25       The other thing, and you'll hear more about this later,

Jordan - Direct                        23

1   another concern of ours is that we understand the Debtors'

2   principals have formed another insurance service company, and

3   we are very concerned that customers of this -- of these

4   Debtors that have policies that will result in payment of

5   commissions to us will be moved over to this other entity.

6   And I don't know how to get around that, Your Honor, on an

7   agreed order basis.

8        The Debtors aren't willing to agree to some sort of

9   noncompete or to cessation of those activities, and that's

10  very problematic and really prevents us from some sort of

11  agreed resolution, because every customer that departs our

12  relationship and moves to another company is a commission

13  that we'd lose and never get back.

14       So, for those reasons, Your Honor, we would ask that the

15  cash collateral motion be denied.

16           THE COURT:  All right.  Thank you, Mr. Peck.

17       How would you like to proceed with evidence?

18           MS. REA:  Your Honor, I would like to call Landon

19  Jordan.

20           THE COURT:  All right.  Please come forward, sir.

21             LANDON JORDAN, DEBTORS' WITNESS, SWORN

22                     DIRECT EXAMINATION

23  BY MS. REA:

24  Q    Would you please state your name for the record?

25  A    Yes.  Landon Jordan.

1    Q    And what's your relationship to the Debtors?

2    A    I'm CEO and owner.

3    Q    Okay.  And if you'll just flip real quick to Exhibit 3.

4    A    Yes, ma'am.

5    Q    Is this an organizational chart that shows that?

6    A    Yes, ma'am.

7    Q    Okay.  And you're the ultimate direct -- you're the

8    ultimate indirect owner of both Debtors?

9    A    Yes, ma'am.

10   Q    How long have you owned them?

11   A    So, I was a partial owner of 40 percent for about six

12   months, and then I bought out my previous partner and took

13   over the other 60 percent I would say in January.

14   Q    Okay.  So, the 40 percent, you got in June of 2018; is

15   that right?

16   A    Yes, ma'am.

17   Q    And then you acquired the rest in January of 2019?

18   A    Yes, ma'am.

19   Q    So you haven't had them too long?

20   A    Yes.

21   Q    Okay.

22   A    Yes.  That's correct.

23   Q    Could you briefly tell your background in the insurance

24   industry?

25   A    Yes, ma'am.  I'm a second-generation insurance

1    salesperson from right here in the Dallas-Fort Worth area.

2    Basically, over the first seven to ten years of my career, I

3    was an individual insurance agent, and then for the next five

4    or six I owned some call centers that I sold to a publicly-

5    held company.  And then just a few years back we started

6    looking for a TPA to purchase, and I ran across the one in

7    Houston.

8    Q    Okay.  And are you involved in the operation of both of

9    these Debtors?

10   A    Yes, ma'am.

11   Q    At what level?

12   A    Um, --

13   Q    So what do you do?

14   A    -- as far as the day-to-day, or --

15   Q    Yeah.  What do you do on a daily basis?

16   A    So, day-to-day, basically, I work with different

17   carriers.  Work with customer services, agent services.

18   Certainly help in making the decisions when it comes to more

19   the day-to-day operations as well.

20   Q    Okay.  Can you briefly describe what AWIS is and what it

21   does?

22   A    Yeah.  So, AWIS is an insurance agency that basically

23   sells product in about 42 to 45 states, approximately.

24   Q    Okay.  Do you also call them an IMO?

25   A    Yes.  So, IMO would be like the level of an agency that

1    it is.  Yes, ma'am.

2    Q    Okay.  And then can you explain briefly what AHCM does

3    and what it is?

4    A    Yeah.  So, AHCM is a third-party administrator, and

5    basically what it does, its function is basically it helps

6    put programs together, kind of like a program manager, and

7    then it also bills and collects, and certainly helps with the

8    function of the everyday customer service and things of that

9    nature.

10   Q    Okay.  And why are these roles necessary in this

11   industry?  Why don't insurance companies just do this

12   themselves?

13   A    Well, sometimes they do.  Sometimes they elect to, I

14   guess, you know, basically like sub it out, where basically,

15   you know, they just don't take on the expense to do it.

16   Q    And so they've outsourced all those things to --

17   A    Yes.

18   Q    -- IMOs and TPAs?

19   A    Yes.

20   Q    Okay.  And who are the Debtors' customers?  We sometimes

21   call them members, insurance customers.

22   A    Right.  So, --

23   Q    Who are they?

24   A    So, we have, obviously, members and insureds.  And then

25   we have agents as well.

1   Q    Are your customers members of a group?

2   A    Yes.  So, they are.  They're -- they're -- most of them

3   join an association, and so for being a member of the

4   association they can get certain type of benefits and things

5   of that nature.

6   Q    Okay.  And is that group NAPP?

7   A    Yes, it is.

8   Q    What does that stand for?

9   A    National Association of Preferred Providers.

10  Q    Okay.  And so what is NAPP and what does it do?

11  A    So, NAPP is an independent company that's owned by its

12  members that basically goes out and gets contracts to get

13  some insurance, some non-insurance, just different type of

14  benefits for its consumers.

15  Q    Okay.  Is it kind of like a Sam's or Costco for

16  insurance?

17  A    It --

18  Q    If you join, you get good deals?

19  A    It -- very similar, yes.

20  Q    And you get good deals on insurance instead of good deals

21  on paper towels?

22  A    And other type of products as well.

23  Q    Okay.

24  A    Yes.

25  Q    Okay.  How -- do you know how many members NAPP has?

1    A    We -- approximately between 34,000 and 40,000.

2    Q    And how do they join?

3    A    Most of them go online and basically fill out information

4    asking for a request, different type of products, different

5    variations of things.  And then basically at that time then

6    it's driven to one of the agencies that provides some

7    different product lines.

8    Q    Okay.  And do the members have to pay a fee to NAPP, a

9    membership fee?

10   A    They do.

11   Q    Okay.  Do you know what that is?  Is it pretty small?

12   A    It's pretty small.  I don't know the exact amount.

13   Q    Okay.  And so do the Debtors market and service insurance

14   policies to NAPP's customers?

15   A    They do.

16   Q    Okay.  Or NAPP's members, I'm sorry.

17   A    NAPP's members, yes.

18   Q    And do the Debtors have contracts with insurance carriers

19   or is it NAPP that has the contracts with the insurance

20   carriers?

21   A    So, the Debtors do have some contracts as well.  But the

22   association does from what I understand as well, too.

23   Q    So it's mostly NAPP holding them?

24   A    Yes.  Correct.

25   Q    And we call those vendors in our pleadings because

1   they're not all insurance carriers?  They might be something

2   like that, so we call them --

3   A    Yeah.  There's different PPO networks.  There's discount.

4   There's a lot of different variations.

5   Q    So sometimes we'll call them vendors and sometimes

6   insurance carriers?  Okay.  What kinds of insurance policies

7   are we talking about that the Debtor handles?

8   A    Basically, there's several different layers of it.

9   There's accident plans.  There's critical illness type plans.

10  There's a lot of ancillary benefit product line.  There's

11  some limited medical and things of that nature.  But we sell

12  a lot of ancillary product lines.

13  Q    Okay.  Like accidental death and dismemberment?

14  A    Like accidental dea... absolutely.

15  Q    Okay.  And critical illness insurance?

16  A    Yes.

17  Q    Okay.  On a day-to-day basis, who actually sells these

18  products to the customers?

19  A    So, there's agents all across the United States that sell

20  these products.  We call them producers, but they're licensed

21  agents.

22  Q    Okay.  And does AWIS contract with the producers to do

23  that?

24  A    Yes, they do.

25  Q    Okay.  And how are producers -- how do producers make

1   money?  How do they earn income?

2   A   That's kind of like what you guys were talking about

3   earlier, is, you know, there's a commission residual stream

4   which -- in which they get paid.

5   Q   Okay.  There's a lot more to say about commissions, but

6   we're going to go easy and then get harder.  Okay.  So, do --

7   who do the members pay their monthly payments to?

8   A   They're collected by AHCM.

9   Q   Okay.  And do those payments include several components?

10  A   Yes, they do.

11  Q   What are they?

12  A   You have, obviously, the commissions to the agents.  You

13  obviously have premiums that'll be due to the carriers or

14  whoever provides the benefits.  And then there are certainly

15  other portions that are like service fees and things of that

16  nature.

17  Q   Okay.  And that extra part after you pay the commission

18  and the premium to the carrier, that's -- the rest of that is

19  the Debtors' money for --

20  A   Right.

21  Q   -- providing these services?

22  A   That's correct.

23  Q   Okay.  And so from each member payment, does AHCM pay the

24  insurance carrier as a pass-through?

25  A   Yes, ma'am.

1   Q    Okay.  So you don't leave extra money?  You just pass it

2   straight through from the consumer to the carrier?

3   A    That's correct.

4   Q    Okay.  And what would happen if you don't do that?

5   A    Well, obviously, the insureds would lose their coverage.

6   Q    Okay.  And then also from the member payments, does AHCM

7   also pay the commissions to the producers?

8   A    That is correct.

9   Q    Okay.  And we've already talked about the remainder is

10   the Debtors'.  Okay.  So, how many customers do the Debtors

11   have?  And basically how many payments do you get on a

12   monthly basis?

13   A    Yeah.  So the Debtors would have, you know, quite a few

14   clients.  I don't know basically right off the top of my

15   head, but obviously, you know, the carriers and then

16   obviously the agents and things of that nature, and then all

17   of the other services that we provide to people, we have to

18   pay.

19   Q    I probably --

20   A    And the consumer, you know, obviously ultimately is who

21   we're looking after here.

22   Q    Do you have -- from the members or the customers or

23   insureds, you have payments coming in constantly?

24   A    Yes, ma'am.  That's correct.

25   Q    Like about 40,000 a month?

1   A    Roughly, yes.  Yes, ma'am.

2   Q    And what's the -- are the average about $300-ish?

3   A    Yeah.  Well, it would range anywhere from, you know, some

4   people just buy some smaller ancillary plans.  Some people,

5   you know, buy two or three, four ancillary plans.  And then

6   some other people buy some other type of benefit.  So I'd say

7   there's a range anywhere from $150 to possibly $300 a month.

8   Q    So you're dealing with a whole bunch of small payments

9   all the time?

10   A    Yes, ma'am.

11   Q    And does someone with the Debtors track each of these

12   payments and how it's supposed to get divided up and

13   disbursed in the three components?

14   A    Yes, ma'am.

15   Q    And who does that?

16   A    We have a team that actually does it.  I would say that

17   probably Randee does it, and then we have another team that

18   deals with the carrier side of it.  So we have two different

19   -- probably Delbert would be the best person to ask about

20   that.

21   Q    Okay.

22   A    But, yeah, we have two different teams that take care of

23   that.

24   Q    And do you also lease a system or a platform that helps

25   with that?

1    A    We do.

2    Q    And what's that called?

3    A    That's called CyberX.

4    Q    Does that help you keep pretty good tabs on things?

5    A    Yeah.  So, basically, that's a third-party vendor and

6    they provide the service to us, and that's basically where

7    they go onto the engine and they're able to basically put in

8    the clients' information.  It also does the billing and

9    collecting.  It also has the information in there about the

10   plans.  They're able to look and see what they bought pretty

11   well immediately.

12        So it's a platform for the consumer, but also for the

13   agent as well.

14   Q    Okay.  To help you keep track of all those details you

15   have to know?

16   A    Yes, ma'am.

17   Q    And are you confident that your employees -- the Debtors'

18   employees and the CyberX platform can accurately keep track

19   of all those details?

20   A    Yes.

21   Q    Okay.  Now let's come back to commissions some more.  You

22   already testified that producers who sell policies earn

23   commissions.  How important are the producers to the

24   business?

25   A    Well, they're obviously the driving piece.  They're

Jordan - Direct                                34

1   obviously the one that's going out and seeing the consumer,

2   talking to the consumer.  And so basically they're the people

3   that drive the sales and the revenue of the company.

4   Q   Okay.  And does it take a while -- well, as Mr. Peck

5   said, does it take a while for the commission to build up

6   sufficiently so a producer can actually get paid?

7   A   Yes.  There's certainly an acquisition cost, obviously,

8   to that salesperson to generate a sale.  So basically they, a

9   lot of times, need help getting possibly paid on three, four,

10  five months' worth of commission at one time to help them,

11  you know, justify the expense.

12  Q   Okay.  So they work with you and they want and need

13  sometimes these advances?

14  A   Yes, ma'am, that is correct.

15  Q   Okay.  What -- how do advances work, in general terms?

16  A   So, --

17  Q   Commission advances?

18  A   -- you know, basically, what generally happens is we

19  collect the first months of commission, and we would send it,

20  say, to the advance company.  The advance company then, once

21  they receive that first month, would then advance out on

22  further months to that producer.

23  Q   Okay.  And since you've been involved with these Debtors,

24  have you arranged to obtain those advances for your

25  producers?

Jordan - Direct                         35

1    A    Yes, ma'am.

2    Q    And why do you do that?

3    A    We basically want to secure that, you know, that the

4    agents -- and as they brought up in their argument, what you

5    try to do is you keep your agents and producers at one place,

6    you try to keep them there with you.  We offer, obviously,

7    all kinds of different product lines.  So if your agents stay

8    with the organization, you don't have some of the issues of

9    the twisting and the type of things that they were talking

10   about.

11   Q    So you keep them happy and things go well?

12   A    That's correct.

13   Q    Okay.  Before the bankruptcy, did you use Insurety to

14   obtain advances for the producers?

15   A    Yes.

16   Q    Okay.  And if you'll just look at Exhibits 13, 14, and

17   15.

18   A    Yes, ma'am.

19   Q    What are these?  Not in great detail, just --

20   A    Yeah.  Just, so it's a servicing agreement, the

21   commission assignment agreement, and the exclusive management

22   services agreement.

23   Q    Okay.  And are these the only three agreements between

24   the Debtors and Insurety?

25   A    That I'm aware of, yes.

Jordan - Direct                         36

1   Q    Okay.  Now, Insurety provided commission advances until

2   July?

3   A    That's correct.

4   Q    You just explained how that happened.  And you

5   understand, just as the Court picked up on, you understand

6   that Insurety contends that it owns the stream of income from

7   the commissions it advanced on?

8   A    Yes.

9   Q    And the Debtors contend that that may just really be a

10  loan with a security interest?

11  A    That's correct.

12  Q    Okay.  But we're not asking the Court to decide that

13  today?  And Insurety stopped funding advances in July.  Do

14  you know -- do you know why they did that?

15  A    We had been in negotiations for a purchase of some sort

16  where they wanted to be obviously the majority holder in our

17  company.  And we just never could make the agreement work.

18  Q    Uh-huh.  But when they stopped advancing, were you in

19  default under any of your agreements, --

20  A    No.

21  Q    -- to your knowledge?  So the negotiations you talk about

22  happened after they stopped funding?

23  A    That is correct.

24  Q    Okay.  So you must have asked them to restart the

25  advances.

1  A    Yeah.  Well, I mean, we were moving along.  We were

2  receiving advances.  And, you know, there was some hiccups

3  here and there as far as, you know, they said they were

4  having -- I believe there are some emails saying that there

5  was some funding issue or some type of issue.  And then, you

6  know, we assumed that we would receive the advance, and we

7  didn't.  And then there was some back and forth of, you know,

8  if we can get this agreement done, then they would start

9  advancing us again, and it just never happened.

10 Q    Okay.  So let's try to break down.  When you asked them

11 to make -- to restart the advances, can you describe what

12 they said and did?

13 A    Well, basically, at that time, is it was pretty simple.

14 They wanted to have majority control of the company.  And we

15 had talks, and we even wrote -- negotiated different things,

16 and then we were under the impression that we would start

17 receiving advancing, and we just did not.

18 Q    Did you get -- how did they communicate this --

19 A    So, we --

20 Q    -- to you?

21 A    I think we have text messages and obviously phone

22 conversations.

23 Q    And emails and --

24 A    And emails.  Yes.

25 Q    -- in person?

Jordan - Direct                         38

1   A    Yes, ma'am.

2   Q    Okay.  So who -- so, did they convey to you that they

3   wanted some complete ownership or complete control over the

4   Debtors?

5   A    Yes.

6   Q    And who was it specifically that conveyed that to you?

7   A    Well, I think it was their team as a whole.  I certainly

8   met with Robert Gray.  I met with Jorge on their team.  And I

9   met with Josh Wonder (phonetic) as well.

10  Q    Okay.  And so they're all the people that conveyed that

11  to you?

12  A    Yes.

13  Q    Okay.  What was your response to their demand for

14  complete control or ownership?

15  A    We obviously were against complete control, and we did

16  negotiate a different type of agreement.  But although we

17  signed the end of it, it never happened and they never

18  started advancing again.

19  Q    So what you're talking about, did you agree to give them

20  34 percent ownership?

21  A    So we -- yes.  So there was a term sheet that was drafted

22  that we did agree to.  And we were told that if we did agree

23  to the term sheet, that we would receive the advancing, and

24  we did not.

25  Q    Okay.  Because they ultimately wanted a hundred percent?

Jordan - Direct                              39

1   A    (No audible response.)

2   Q    And so you refused to give them a hundred percent

3   control.  And what did the Debtors do after Insurety stopped

4   funding advances?

5   A    Basically, you know, like I said, at that point, the way

6   advancing works is agents write for a certain period of time

7   and then they get paid like a week later.  So by the time we

8   had been negotiating and things had started, we had already

9   advanced two or three times ourselves even at that particular

10  point.  And so that put us in a position of obviously

11  advancing these guys -- what people have to understand is

12  we're very close to open enrollment.  And when you're this

13  close to open enrollment and there's a significant change,

14  you could lose all your agents.  They could move to our

15  competitors which we do not have any control over, and they

16  could move this whole block of business overnight, especially

17  November 1st is right here around the corner.

18  Q    Okay.  So AWIS started funding advances itself?

19  A    Yes.

20  Q    And you believed you had to do that?

21  A    I absolutely believed we had to.

22  Q    Okay.  So what do you think -- you probably just said

23  this, but let me ask it again.  What would have happened if

24  you had not advanced?  Who would have been hurt?

25  A    Yes.  So, well, I mean, significantly, everybody

Jordan - Direct                    40

1  involved.  Insurety would have been hurt.  We would -- AWIS

2  or AHCM would be hurt.  And then obviously the consumer could

3  be hurt if the agents felt like they didn't get paid and felt

4  like they needed to move these members someplace else.

5  Q   Okay.  Did Insurety also take the position at that same

6  time period that the Debtors can't obtain commission advances

7  from anyone else?

8  A   That's correct.  We reached out to two or three different

9  groups, trying to get advancing, and basically, you know, I

10  believe Insurety would at least contact the people and just

11  explain the situation and certainly kept us from getting any

12  type of advancing.

13  Q   Okay.  So, Insurety both refused to advance and then

14  tried to stop you from getting advances from anyone else?

15          MR. HARRELL:  Your Honor?

16          THE WITNESS:  That is correct.

17          THE COURT:  Hold on.  Go ahead.  I'm sorry.  Go

18  ahead.

19          MR. HARRELL:  I've been letting her lead just to get

20  through this, but now I think she's arguing her case from the

21  podium, and so I object to leading the witness.

22          THE COURT:  Sustained.

23          MS. REA:  Okay.

24  BY MS. REA:

25  Q   What would be the consequence of not making advances?

Jordan - Direct                          41

1  A    Yeah.  So it would be the agents would leave.  And like I

2  say, we're right here at open enrollment.  That's kind of the

3  most important time of the year for this business.  So

4  there's certainly the exposure of losing the members.

5  Q    If you didn't make advances, would the business

6  effectively be destroyed?

7  A    I would say so, yes.

8  Q    Okay.  Are you trying to arrange for another entity to

9  make premium advances?

10  A    I am.

11  Q    Has that happened yet?

12  A    It has not.  It's in final stages.

13  Q    Okay.  So, Insurety filed the lawsuit in the state court.

14  Would you look at Exhibits 21 and 22?

15  A    Yes.

16        MS. LEA:  Your Honor, can I offer Exhibits 13, 14,

17  and 15 into evidence?

18        THE COURT:  Any objection?

19        MR. HARRELL:  No objection, Your Honor.

20        THE COURT:  All right.  Debtors' Exhibits 13, 14, and

21  15?  Is that correct?  13 --

22        MS. REA:  Yes.

23        THE COURT:  Yes.

24        MS. REA:  Yes.

25        THE COURT:  13, 14, and 15 are each admitted.

1          MS. REA:  Okay.

2          (Debtors' Exhibits 13, 14, and 15 are received into

3    evidence.)

4    BY MS. REA:

5    Q    Let me see.  Okay.  Exhibits 21 and 22, can you tell the

6    Court what these are?  I'm sorry.  20 and 20 -- what?

7    A    Is it 20 and 21?

8    Q    It's 20 and 21.

9    A    Yes.  One second.  So, this is -- this is the case in the

10   Harris County District Court.

11   Q    And were these orders entered by the judge there?  Or the

12   judges there?

13   A    Yes.

14   Q    And did you understand these orders?

15   A    Certainly, I understood -- obviously, I'm not an

16   attorney, but to the best level that my attorneys could

17   explain to me, yes.

18   Q    And did you take them seriously?

19   A    Absolutely.

20   Q    Okay.  In Exhibit 20, at Page 2, does the Court enjoin

21   you from using Insurety's property or from executing other

22   advancement commission agreements?

23   A    Yes.

24   Q    It's kind of at the bottom.  Okay.  And then also Exhibit

25   21 at Page 3, the state court ordered you to turn over quite

Jordan - Direct                           43

1   a bit of money?

2   A    Yes.  That is correct.

3   Q    So, between the stated amounts in the last paragraph of

4   Page 2, --

5   A    Yes, ma'am.

6   Q    -- the Court ordered you to turn over about $1.8 million

7   and then about $2 million?

8   A    Yes, ma'am.

9   Q    Plus some outstanding renewals?

10  A    That is correct.

11  Q    What would you say the total of all that is?

12  A    I think it was a little -- at that time, a little over $3

13  million.

14  Q    Well, with the outstanding -- with the outstanding

15  renewals, would it have been more like five or six?

16  A    Yeah.  Well, now, yes.

17  Q    Okay.

18  A    But --

19  Q    Okay.

20         MS. REA:  Your Honor, could I move to admit Exhibits

21  20 and 21?

22         THE COURT:  Any objection?

23         MR. HARRELL:  No objection.

24         THE COURT:  All right.  Debtors' Exhibits 20 and 21

25  are admitted.

1        (Debtors' Exhibits 20 and 21 are received into evidence.)

2    BY MS. REA:

3    Q    Do you respect courts and their orders?

4    A    Yes, ma'am.

5    Q    Okay.  But were you able to do what these orders said?

6    A    I was not.  It would have caused -- unfortunately, it

7    would have caused, you know, such a harm to the overall

8    business if we would have turned that money over at that

9    particular time, we would not have been able to meet our

10   fiduciary responsibilities to the carriers which would then

11   take care of the members, which is obviously the most

12   important thing.

13   Q    Okay.  And has this dispute with Insurety made it hard

14   for AWIS to obtain advances from other companies?

15   A    Darn near impossible.

16   Q    Okay.  Because people don't want to advance to AWIS?

17   A    Right.  I mean, obviously, you have ongoing litigation

18   and the problems that are out there, and obviously, until

19   this gets resolved one way or the other, there's probably not

20   a lot of people that would like to do that.

21   Q    Okay.  So have you made some changes in the business to

22   overcome that?

23   A    Yes.  We've entered into an agreement with an agency that

24   we're very familiar with.  And basically we would still do

25   some of the, you know, basically, customer service and agent

1   services and providing some of the programs.  So AHCM would

2   still get a fee and make money, but it'd also allow the

3   agents to go out and be with another firm that can give them

4   advances and do the things that need to be done.  So we would

5   be more just using more of a program manager type system.

6   Q    Okay.  And can you explain why that does not hurt these

7   Debtors or their bankruptcy estates?

8   A    It helps everybody involved.  Hopefully, it keeps all our

9   consumers in one place.  Certainly, it brings in income for

10  AHCM, which is obviously important for it to stay in

11  business, and then obviously repay the Debtors.

12  Q    What's your -- what's the income that it gets from this

13  new --

14  A    Obviously, it's not started yet, but once it starts, I

15  think, you know, it would range anywhere from, you know, $14

16  to $20 per member per month for all the different type of

17  services that it would provide.

18  Q    Okay.  And AHCM would be doing what it does best -- that

19  is, to manage?

20  A    That's correct.  So, AHCM would be doing like the

21  customer service, the fulfillment, dealing with the agents,

22  still helping in all the ways with them, and certainly

23  helping the consumers understand their plans, helping their

24  plans work better, all the different things that we do.

25  Q    And you think that will bring in a lot of income?

1  A    I certainly -- certainly do.

2  Q    Let me have you look at Exhibit 11B.  Mr. Brock is going

3  to testify more about this, but is Exhibit 11B the income

4  stream you foresee from that new way of doing things or that

5  new component of your business?

6  A    Yes, ma'am, I do.

7  Q    Okay.  And you heard Mr. Peck mention that Insurety is

8  afraid this is going to harm them, take away their customers.

9  Why does this not hurt Insurety?

10 A    Anytime we can keep the agents with a friendly agency or

11 agencies that we work together, then if there is any issues

12 with agents trying to move business or something that's

13 supposed to happen, then obviously we would work together to

14 make sure those things don't happen.

15 Q    So you don't think it will hurt Insurety?

16 A    I do not.

17 Q    Okay.

18 A    I think it will help them.

19 Q    Okay.  And I'm going to ask Mr. Lee and Ms. Mascorro more

20 details about the following matters, but I want to ask you:

21 Do you believe the Debtors will suffer immediate and

22 irreparable harm if they cannot pass the premiums along to

23 the carriers?

24 A    Absolutely.

25 Q    Do you think they'll suffer immediate and irreparable

1    harm if they can't pay the employees their full expected

2    wages next Friday?

3    A    Absolutely.  Yes, ma'am.

4    Q    Do you think the Debtors will suffer immediate and

5    irreparable harm if they can't pay the producers what the

6    producers are expecting tomorrow?

7    A    Yes, ma'am.  That's correct.

8    Q    Okay.  And if the Debtors are not allowed to use cash to

9    do these things or to otherwise operate, will that cause

10   immediate and irreparable harm?

11   A    It would.

12             MS. REA:  I'll pass the witness.

13             THE COURT:  Thank you.  Mr. Harrell?

14             MR. HARRELL:  May I have just one minute to set up?

15             THE COURT:  Of course.  Yes.  Take your time.

16        (Pause.)

17             MR. HARRELL:  Judge, I've got a notebook for the

18   Court.

19             THE COURT:  Of course.  Thank you.

20             MR. HARRELL:  May I approach the bench?

21             THE COURT:  Yes, please.  Yes.  Thank you.

22             MR. HARRELL:  And we've got extras.

23             THE COURT:  That'll be terrific.

24        (Pause.)

25             MR. HARRELL:  May I proceed, Your Honor?

Jordan - Cross                              48

1           THE COURT:  Of course.  Thank you.

2                       CROSS-EXAMINATION

3    BY MR. HARRELL:

4    Q    Good afternoon, Mr. Jordan.

5    A    Yes, sir.

6    Q    Your company and the company I represent have been in a

7    pretty extended fight for the last three months, haven't we?

8    A    Yes.

9    Q    I don't want to rehash everything you said, but there's a

10   couple of points I'd like to make just for clarification.

11   A    Sure.

12   Q    Number one is when you were having those discussions with

13   Insurety, with Mr. Gray, who actually is in this courtroom --

14   that's Robert Gray --

15   A    Yeah.

16   Q    -- of Insurety, right?

17   A    Yes.

18   Q    And Insurety made the decision to quit advancing

19   commissions, right?

20   A    I was not notified of the decision that they were going

21   to stop.

22   Q    Did they make the decision to stop and at some point you

23   found out, didn't you?

24   A    Because they didn't pay us.

25   Q    Okay.  And so my -- my question is not about the timing

Jordan - Cross                                    49

1  as about their right to fund or not fund.  Under the

2  agreements, Insurety had the right to make the decision and

3  the option to either fund or not fund, didn't they?

4  A    Yes.

5  Q    And so when Insurety made the decision to quit funding,

6  they weren't breaching any of the agreements that they had

7  with your company, were they?  To your knowledge?

8  A    I'm not an attorney.  I don't know how to answer that.

9  Q    Pardon me?

10 A    I said, I'm not an attorney.  I don't know how to answer

11 that.

12 Q    I'm just asking for your understanding.  You've been

13 through this fight now for three months with us.  You know

14 full well that this contract gives Insurety the right to make

15 that call, don't you?

16 A    Yes.

17 Q    Now, at the beginning of this dispute, Insurety wanted

18 documents and records of things like the money coming in, the

19 amount of policies and the number of policies that were being

20 sold, and a lot of financial information, so that Insurety

21 could get some comfort that it was protected.  And we had

22 three hearings or four hearings about getting those

23 documents.  Along the way, your company fought us on getting

24 that financial information, didn't it?

25 A    I wouldn't say they fought it.  I believe that obviously

1  in the courts they were battling back and forth.

2  Q   It was your position that you weren't going to give it to

3  us, wasn't it?

4  A   I wouldn't say that was my position, no.

5  Q   Pardon me?

6  A   I wouldn't say that was my position, no.

7  Q   Well, do you recall that we had to have a contempt

8  hearing --

9  A   Yes.

10  Q   -- because -- and the reason we had to have that hearing

11  is you had not handed over information that you had been

12  ordered to give us.  Do you recall that?  We were together in

13  the courtroom that day, right?

14  A   Yeah.  That's correct.

15  Q   And our argument was, Judge, we are entitled to a

16  contempt order because they have not complied with the

17  Court's orders about giving us information.  And you opposed

18  that, didn't you?

19  A   I did not oppose it, no.

20  Q   Well, your company opposed it, right?

21  A   I believe legal counsel opposed it.

22  Q   Well, you're the CEO, right?

23  A   That's correct.

24  Q   You're the guy who makes the decisions for your company,

25  aren't you?

1   A    That's correct.

2   Q    And your lawyer is just the lawyer who represents the

3   client, right?

4   A    Yes.

5   Q    Your lawyer stood in front of the judge and opposed

6   giving us those documents, didn't he?

7   A    Yes, he did.

8   Q    And as a result, you had another contempt order entered

9   against your company, didn't you?

10  A    Yes.

11         MR. HARRELL:  Judge, I would refer you, please, to

12  Tab 1 of our notebook, which is our Exhibit 1.  And I

13  apologize.  We did not have time to put stickers on them.

14         THE COURT:  Not a problem.

15         MR. HARRELL:  We'll fix that so --

16         THE COURT:  No need to.  We've got it.  It's in your

17  notebook, --

18         MR. HARRELL:  Okay.

19         THE COURT:  -- properly designated.

20         MR. HARRELL:  Thank you.  And I guess we need a

21  notebook for the witness.  Excuse me.

22         THE COURT:  I would ask, to the extent you remember,

23  if you're referring to an Insurety exhibit number, say

24  Insurety Exhibit Number, and if it's a Debtors' exhibit

25  number, say Debtors' Exhibit Number, since they're both

Jordan - Cross                          52

1  numerical.  But other than that, that's fine.

2          MR. HARRELL:  Thank you, Judge.

3          THE COURT:  Just to keep the record as clear as

4  possible.

5          MR. HARRELL:  That's a good reminder.

6  BY MR. HARRELL:

7  Q   So, for the record, we're referring to Insurety's Exhibit

8  #1 behind Tab 1, Mr. Jordan.

9  A   Okay.

10 Q   That's the amended order holding Defendants in contempt

11 and granting Rule 11 sanctions, right?

12 A   Yes.

13 Q   And you'll see it was signed by the judge on September

14 18, 2019, right?

15 A   Yes.

16 Q   And you actually were in the courtroom for that hearing,

17 weren't you?

18 A   I was certainly in for one of them.  I don't remember if

19 it was that one or not.

20 Q   I'm sorry?  I --

21 A   I said, I was certainly there for one of them.  I don't

22 remember if it was this specific one or not.

23 Q   You were there that day at the courthouse.  You were in

24 the Judge's office --

25 A   Yeah.

Jordan - Cross                          53

1   Q    -- where we actually had this hearing, right?

2   A    Yes.

3   Q    And at the end of the hearing, if you'll look at the

4   bottom of Page 1, it says you were restrained and enjoined

5   from, and then on Page 2, using Insurety's property in any

6   manner that violates their agreements with Insurety or

7   violates their obligations under Texas law and otherwise

8   violating existing obligations under the agreements.

9        And then it goes on to say, The Court finds that while

10  the temporary restraining order was in full force and effect,

11  AWIS and AHCM knowingly and intentionally violated the terms

12  of the temporary restraining order by failing to comply with

13  their inspection obligations under the agreements.  Right?

14  A    That's what it says, yes.

15  Q    And those inspection obligations under the agreements

16  were provisions of the agreements that gave us the right to

17  look at records of the Debtors to make sure that our

18  advancements, our property, was secure, right?

19  A    Yes.

20  Q    And because you wouldn't give us those documents still as

21  of early September, the judge found you in contempt, right?

22  A    Well, there was documents given.  Prior to.

23  Q    But --

24  A    At inspection.  There -- there was documents given.

25  Q    Can you answer my question?  Because you didn't give us

Jordan - Cross                              54

1  the documents that the judge had ordered, she found you in

2  contempt in this order, right?

3  A    Yes.

4  Q    And then she ordered you then to produce records, and

5  that's the bottom of Page 2, and those are records that after

6  this hearing you produced, correct?

7  A    Yes.

8  Q    Since that time, your company has not given us any other

9  records, has it?

10  A    I assume not, no.

11  Q    Even though we have continued to ask for more records,

12  right?

13  A    Yes.

14  Q    So we have no records from August.  Excuse me.  We have

15  no records from September, right?

16  A    It's just October, right?  So, --

17  Q    Correct.

18  A    So, those documents take time to produce.

19  Q    We have no records from September, do we?

20  A    No.

21  Q    And it's real easy to generate a bank statement, isn't

22  it?  You can do that right off the computer.  That's what Mr.

23  Lee told us in his deposition.

24  A    Okay.

25  Q    Right?

Jordan - Cross                              55

1  A    Yeah.  I'm assuming.  That's what he said.

2  Q    Right.  You just push a button and generate a bank

3  statement.  But we still haven't seen recent bank statements,

4  have we?

5  A    No.

6  Q    And we're here in front of this judge today in this Court

7  where you're asking for relief, yet you have not been

8  transparent on the transactions that have occurred at least

9  over the last six weeks, have you?

10 A    No.

11 Q    And, indeed, the judge entered a temporary injunction on

12 that same day that she entered this contempt order, didn't

13 she?

14 A    Yes.

15 Q    And that was Exhibit 21 that your counsel asked you

16 about?

17 A    Yes.

18 Q    And that temporary injunction required you to pay money

19 into the Court, right?

20 A    Yes.

21 Q    And it required you, after the day of the hearing, as new

22 money came in that was ours, to pay it over weekly.  Right?

23 A    Yes.

24 Q    And did you do that?

25 A    No.

Jordan - Cross                          56

1    Q   Did you, through your lawyers, come back to us and say,

2    look, we're not doing this, we can't, let's -- you know,

3    there's a reason we can't do it?  Was there some sort of at

4    least overture to us of why you couldn't do that?

5    A   I'm not aware of that.

6    Q   And I'm not as well.  And, indeed, following your

7    violation of that temporary injunction, we filed a motion and

8    an application for a receivership, didn't we?

9    A   Yes.

10   Q   And we filed a motion for a further contempt order,

11   didn't we?

12   A   Yes.

13   Q   And that hearing was set on a Wednesday, and you filed

14   this bankruptcy proceeding on the Monday before that

15   proceeding, right?

16   A   Yes.

17   Q   And you filed it only after you'd gone to the Court of

18   Appeals in an attempt to get relief from the outstanding

19   orders, and that had been turned down by the Texas Court of

20   Appeals, right?

21   A   No.  We were already working on this prior to that.

22   Q   Right.  But you got an order on the Monday before our

23   receivership hearing denying your relief to stay those state

24   court rulings, and it was after that that you filed this

25   proceeding, right?

1    A    Well, we were working with our attorneys on it, but yes.

2    Prior to.

3    Q    Just a couple other questions for you, sir.  You said

4    that you have another group of agents or an affiliated group

5    that you want to be working with going forward.

6    A    Yes.

7    Q    And is Mr. Brock here?

8    A    Yes.

9         MR. HARRELL:  And who is Mr. Brock?

10        MR. BROCK:  I am.

11        MR. HARRELL:  Are you -- hi, Mr. Brock.  Nice to meet

12   you, sir.

13   BY MR. HARRELL:

14   Q    Does Mr. Brock or has Mr. Brock set up a company that can

15   do what AWIS can do?

16   A    The agency?  Yes.

17   Q    And so if you wind down your business, you can direct

18   your agents over to Mr. Brock's agency, can't you?

19   A    Yes.  For AHCM.

20   Q    And, indeed, what we've learned today is you have filed

21   this proceeding but it's your intention in a couple of weeks

22   or very shortly to actually wind down this company?

23   A    No.  AHCM will still be -- the agency would be the only

24   one.  The AHCM is still going to be making money off this

25   opportunity, which is who ultimately owes the money.

1   Q    Okay.  And that's a good point.  We've got two Debtors

2   here.  We've got the TPA, which is AHCM, --

3   A    Yes.

4   Q    -- which has the money?

5   A    That's correct.

6   Q    And then we've got AWIS, which is the agency that

7   controls the producers?

8   A    That's correct.

9   Q    And what you're saying is you're ready to shut down one

10  of the Debtors, AWIS, that has those producers?

11  A    Well, only because I can't get advancing, and we won't

12  have any agents left if we don't.

13  Q    And I'll let you explain all this, but I'm just trying to

14  figure out what your intention here is today before this

15  Court.

16  A    To --

17  Q    And that is, one of the Debtors, at least, AWIS, it's

18  your intention to shut that down?

19  A    No, it's not.

20  Q    It's your intention to wind it down, then?

21  A    No.  It's our intention that we have different -- we have

22  face-to-face producers at AWIS that will continue to produce

23  business.  There are still going to be some call centers that

24  stay with AWIS.  But if we're going to pay you guys, we

25  cannot advance out the kind of money we've been advancing

Jordan - Cross                                   59

1    out, so obviously we have to put a plan in place so that

2    everybody gets paid, the consumers are getting taken care of,

3    the agents get taken care of.  That's -- that's all it's

4    about.

5    Q    So, Mr. Jordan, simply stated, if you start winding down

6    AWIS, your producers are going, at least in part, to Mr.

7    Brock's agency, aren't they?

8    A    Yes.

9    Q    And if they go to Mr. Brock's agency, they're taking

10   their customers with them, aren't they?

11   A    No, they're not.

12   Q    They have relationships with customers that they have

13   sold policies to, right?

14   A    They do.

15   Q    And so you heard Mr. Peck's opening that there can be

16   attrition, and indeed there is attrition --

17   A    Yes.

18   Q    -- on these policies when you sell them?

19   A    That's right.

20   Q    Meaning that you sell these policies and, over time,

21   those policies end up getting terminated, and I think Mr.

22   Peck said for one of four reasons, and he gave four reasons.

23   But, regardless, we know there is an attrition rate --

24   A    Yes, sir.

25   Q    -- there?  And one of the things that can happen is, when

Jordan - Cross                              60

1  agents leave a company and they go to another company and

2  just, you know, all of a sudden then there's an incentive for

3  that agent to sell a new policy or switch out a policy with a

4  customer, right?

5  A    Yes.

6  Q    And so if agents go from your company to Mr. Brock's

7  company, --

8  A    Yes.

9  Q    -- then there is a danger of those agents and their

10  customers switching out policies, isn't there?

11  A    There's certainly a chance.

12  Q    The attrition rates in the first few years of a policy

13  are higher than in the later years, right?

14  A    I'd say the first few months.

15  Q    I'm sorry.  I misstated.  I -- excuse me.  And I'm sorry

16  to interrupt you.

17  A    No, no, no.  No, I'm good.

18  Q    But I just realized I misstated it.

19  A    Okay.

20  Q    So let me ask it again.  You look at premiums being paid

21  on a month-by-month basis, right?

22  A    Yes, sir.

23  Q    And we know from experience that the attrition rate is

24  higher in those first months of a policy?

25  A    That's correct.  Yes, sir.

Jordan - Cross                        61

1    Q    And, in fact, in the first month, the attrition rate

2    could be up to 25 or 30 percent, can't it?

3    A    It can be as much as 40.  Yes, sir.

4    Q    As much as 40 percent?

5    A    Yes, sir.

6    Q    And it's high in the second month, isn't it?

7    A    It's certainly not near as high as first, but yes, sir,

8    I'd probably say about half, but still high.  Yes, sir.

9    Q    But it could still go up to 25 percent in the second

10   month, right?

11   A    That's correct.

12   Q    And in the third month, it's still high, but it's a

13   little bit less, so maybe 15 percent or 20 percent?

14   A    Each month there's more stability, for sure.

15   Q    But those first let's say four months, there is a lot of

16   turnover in those policies, isn't there?

17   A    That's where the majority fall, yes.

18   Q    Yeah.

19        MR. HARRELL:  Just one moment, Your Honor.  I might

20   be finished.

21        THE COURT:  All right.  Take your time.

22      (Pause.)

23        MR. HARRELL:  Okay.

24   BY MR. HARRELL:

25   Q    Just one other question, just to clarify something for

Jordan - Cross                    62

1    the record that I might have misspoken on, is when we're

2    talking about advances to producers in this business, --

3    A    Yes.

4    Q    -- like the advances that Insurety was making, we're

5    talking about an advance of several months, aren't we?

6    A    Yes, we are.

7    Q    So it could be six months or nine months or some period

8    of time like that?

9    A    That is correct.  Yes, sir.

10   Q    And so for each of the policies that Insurety advances

11   on, if that policy terminates or goes away, then Insurety

12   doesn't get paid back, right?

13   A    That's correct.

14   Q    And so Insurety has taken on the risk of those policies

15   terminating?  That's part of the deal, and that's the risk

16   that Insurety takes on, right?

17   A    Yes.

18   Q    But we know that that's a real risk, especially in the

19   first months?

20   A    Yes, sir, we do.

21   Q    And we also know that if agents leave, that's not good

22   for your business, but it's also not good for the business of

23   getting paid on those policies, because those policies might

24   have been terminated?  Fair?

25   A    Unless they're in a controlled environment.  I would

Jordan - Redirect                          63

1    agree.

2    Q    All right.

3              MR. HARRELL:  Pass the witness.

4              THE COURT:  Thank you.  Ms. Rea?

5                        REDIRECT EXAMINATION

6    BY MS. REA:

7    Q    Mr. Jordan, Insurety is worried about twisting, losing

8    policies, losing members.  But can AWIS make advances to

9    producers now?

10   A    Certainly and not meet all its obligations that it

11   should, no.

12   Q    Okay.  And Insurety won't make advances?

13   A    No.

14   Q    AWIS can't make advances?

15   A    No.

16   Q    You haven't found a new advance partner?

17   A    No.

18   Q    Okay.  So what's the eventual result of that?

19   A    Well, the agents would go, they would scatter.

20   Basically, right now, in our space, there's a few major --

21   obviously, everybody is making a push because open enrollment

22   is right here.  So they would go to one of five different

23   people who we obviously have no control over, and nor does

24   Insurety.  So most likely the members would be gone.

25   Q    Okay.  And that will eventually happen if things take

1  their course?

2  A    Yes.

3  Q    Okay.  So what was -- your setting up the new agency, --

4  A    Yeah, so it's a controlled environment.  Obviously, Mr.

5  Brock and I go back since I was, I think, seven or eight

6  years old.  I think he used to pick me up by my ears when I

7  was a kid.  But a lot of years.  He had a relationship with

8  my father for thirty years or so.  And certainly he's a

9  trusted source, somebody that I rely on heavily.

10      And I can tell you that the whole setting up of the -- a

11 new agency to keep AHCM in business so that everybody gets

12 paid and the members are taken care of, it's just the intent

13 of controlling the agents, making sure that they don't move

14 business, and things like that happen.

15      Like I can give an example of one group that left us and

16 went to work for a company called AOBG, which Insurety

17 advances, and we do have proof, not only in recordings but in

18 phone calls and texts, that they were moving our business

19 with their advances.  So they're actually the ones who did

20 the twisting.  And we have proof.

21 Q    Okay.  So you're setting up the -- you're providing the

22 new agency for the producers to work with, not to shut AWIS

23 down and not to hurt Insurety, right, --

24 A    No.

25 Q    -- but to make sure that your -- the environment is

Jordan - Redirect                           65

1   controlled, that producers don't twist the policies?

2   A    Still the same products that they're used to selling.

3   Still the same -- we're going to actually use AHCM in that

4   role, just to provide product.  Just to -- also, in addition

5   to providing product, obviously, do the agent services and

6   different services of that nature, yes.

7   Q    Okay.  And you think AHCM will make a lot of money doing

8   that?

9   A    I do.

10  Q    Okay.  Going back earlier in Mr. Harrell's questioning,

11  he said in the beginning of this dispute they made requests

12  -- Insurety made requests for documents that they didn't get.

13  Did they request documents -- did your -- let me just think

14  how to say this.  Is that the reason they stopped funding,

15  because you didn't give them documents, or did you not give

16  them documents later?

17  A    Later.

18  Q    Okay.  So you didn't refuse to give them documents;

19  therefore, they stopped advancing?

20  A    No.

21  Q    Okay.  And are you offering to give that information now?

22  A    Yes.

23  Q    Okay.  And back to maybe beat the same drum, you

24  understood those injunctions?

25  A    Yes.

Jordan - Recross                              66

1  Q    And you admit that you didn't -- you did not obey them

2  because you could not?

3  A    I would say there was two things.  I was advised by

4  counsel, and then the second thing I would say is that it

5  would have shut the business down and we would not have been

6  able to meet obligations to our consumers.

7  Q    Okay.

8          MS. REA:  Pass the witness.

9          MR. HARRELL:  I promise --

10          THE COURT:  Sure.

11          MR. HARRELL:  -- I'll make it short.

12                          RECROSS-EXAMINATION

13  BY MR. HARRELL:

14  Q    With respect to documents, I heard now for the first time

15  you're willing to give us financial information now.  Are you

16  aware that two days ago we asked your lawyers if they could

17  give us the more recent bank statement, which, as I said and

18  as you know, requires just pushing a button and it will

19  generate and it could have easily been sent to us, and we

20  never got anything?

21  A    I was not aware of that.

22  Q    And one other thing.  Once you wind down this part of

23  your business that has these agents in it that receive these

24  advances and you move those agents over to Mr. Brock's

25  agency, those agents have an incentive to change policy with

Mascorro - Direct                         67

1   one of their customers because then they can get a commission

2   again, correct?

3   A    If they were allowed to, yes.

4           MR. HARRELL:  Pass the witness.

5           THE COURT:  Ms. Rea?

6           MS. REA:  No further questions.

7           THE COURT:  All right.  Thank you, sir.  You may step

8   down.

9           THE WITNESS:  Thank you.

10       (The witness steps down.)

11          MS. REA:  Your Honor, now I'd like to call Ms. Randee

12   Mascorro.

13          THE CLERK:  Will you raise your right hand?

14            RANDEE MASCORRO, DEBTORS' WITNESS, SWORN

15                     DIRECT EXAMINATION

16   BY MS. REA:

17   Q    Would you please state your name for the record, and

18   maybe spell it for the court reporter?

19   A    Randee Mascorro.  R-A-N-D-E-E, M-A-S-C-O-R-R-O.

20   Q    And what's your position with the Debtors?

21   A    I am the director of business operations for AWIS.

22   Q    Okay.  Where is your office?

23   A    In Rockwall, Texas.

24   Q    And what are your responsibilities?

25   A    I handle the agent services team.  Also, the commissions

1  and calculations, and appointments and licensing for AWIS.

2  Q    Okay.  Do you have people that assist you?

3  A    Yes.

4  Q    How many?

5  A    Four.

6  Q    And do those people work in the Rockwall office?

7  A    They do.

8  Q    But are they employees of AHCM?

9  A    Yes, ma'am.

10 Q    Okay.  And as Mr. Jordan testified, AHCM collects all the

11 payments from the members.  Do you and your staff keep track

12 of the commission components of those payments?

13 A    Yes, we do.

14 Q    And I asked him, but I'll ask you again.  How many

15 payments do you estimate you receive and deal with each

16 month?

17 A    So, in regards to AWIS, I would say 20,000, 25,000.

18 Q    Okay.  And how do you keep track of those?

19 A    So, we have -- or, we.  We use a platform called CyberX.

20 And when an agent is onboarded, we enter in their -- the

21 contract for commissions.  And once a payment is run through

22 that system, it automatically calculates the commissions that

23 are due.

24 Q    Okay.  So CyberX, does CyberX help you keep track of what

25 the policy is?

Mascorro - Direct                        69

1    A    Yes.

2    Q    And does it help you keep track of how much the

3    commission is?

4    A    Yes.

5    Q    Okay.  But there's a lot of information in there, right?

6    A    Correct.

7    Q    It's huge?

8    A    Correct.

9    Q    Okay.  So we couldn't bring that here as an exhibit?

10   A    No.

11   Q    Okay.  Would you look at Debtors' Exhibit 4?  And would

12   you tell the Court what this is?

13   A    So, this is an example of a report that's generated out

14   of the CyberX system.  And it just shows examples of how the

15   numbers are broken down.  You can see the transaction date,

16   the member ID, the policy number that is in reference to the

17   product that has been purchased by the member, the amount of

18   payment that the member has paid, the commissionable amount

19   that the agent can earn commission on, the commission

20   percentage that the agent is contracted for, the earned --

21   earned amount, which would be the commissionable premium

22   multiplied by the percentage.  And in this first example, it

23   would be $234 times 37 percent, which comes out to $86.58 in

24   earned commissions.  And then it also shows $114.75 is the

25   net rate that would go -- be passed through to the carrier.

Mascorro - Direct                              70

1   And then what's left over would be for AHCM's fees, services,

2   and like employee payments, et cetera.

3   Q   So, for each -- this is just a sample of three payments

4   that have come into the system, right?

5   A   Correct.

6   Q   So, for each payment that comes in, you can identify the

7   three components of it?

8   A   Yes.

9   Q   Okay.  Who do you pay the commission to?  Let me break it

10  down.  If an advance hasn't been made on a commission, who do

11  you pay it to?

12  A   The producer.

13  Q   Okay.  If there has been an advance on it and it's not

14  yet repaid, who do you make the payment to?

15  A   It would go to the advance partner.

16  Q   Okay.  And do you -- can you tell from the CyberX system

17  and your file who the -- who made the advance?

18  A   Yes.

19  Q   So you can tell whether Insurety did, whether AWIS did,

20  or someone else perhaps?

21  A   Yes.

22  Q   Okay.

23          MS. REA:  Your Honor, I'd like to admit Exhibit 4.

24          THE COURT:  Any objection?

25          MR. HARRELL:  No objection.

1          THE COURT:  Debtors' Exhibit 4 is admitted.

2          (Debtors' Exhibit 4 is received into evidence.)

3   BY MS. REA:

4   Q    Okay.  One of our motions today asks that the Debtors be

5   allowed to pay commission to producers.  Do you know roughly

6   how many producers there are?

7   A    That are owed for this week?

8   Q    The total number of people that are actually out there

9   doing this.

10  A    Between 700 and 800.

11  Q    Okay.  And how many do the Debtors actually have

12  contracts with?

13  A    About 127.

14  Q    Okay.  And do you just pay those 127?

15  A    Yes.

16  Q    How do the others get paid?

17  A    They would get paid based on contracts they have with

18  their upline or their agency that they're contracted with.

19  Q    Okay.  So you pay the 127, and the 127 pay the rest of

20  the people?

21  A    Correct.

22  Q    Because they are the ones that owe them?

23  A    Yes.

24  Q    Okay.  What's the normal schedule for paying commissions?

25  A    We pay, for business written Monday through Sunday, the

1    next Friday.

2    Q    Okay.  So, tomorrow, --

3    A    Uh-huh.

4    Q    -- what are the producers -- the producers are expecting

5    to get paid for last week?

6    A    Correct.  Last Monday through Sunday.

7    Q    Okay.  How much do -- how much do the Debtors owe the

8    producers for last week?

9    A    It's around $787,000.

10   Q    Okay.  If you'll look at Exhibit 7.

11   A    Yeah.  Oh.  $729,416.67.

12   Q    Okay.  And what is this list?

13   A    This is going to be a list of all the producers that have

14   written business during that pay period and the total amount

15   due to them.

16   Q    Okay.  And just for everybody's sake, we've redacted much

17   of their names.  We have given the U.S. Trustee a copy with

18   their full names.  But these are real people who are

19   expecting real dollars tomorrow?

20   A    Correct.

21   Q    Okay.  Speaking of which, do you have some understanding

22   of what the producers expect as far as payments every Friday?

23   A    Yes.  They expect them in their bank accounts Friday

24   morning.

25   Q    Do you work with them, get a lot of calls from them?

Mascorro - Direct                          73

1    A    I sure do.

2    Q    Okay.  And so you're aware that they -- or, it's your

3    impression from those calls that they need the money every

4    Friday?

5    A    Yes, they do.

6    Q    Okay.  And what do you think happens if they don't get

7    paid tomorrow?

8    A    If they don't get paid tomorrow, then they'll stop

9    writing business.  And then especially with it being right

10   before open enrollment and if we don't pay them, they're

11   going to go somewhere else.

12   Q    Okay.  And if a producer quit selling the products for

13   the Debtors, is it easy to get another one to replace them?

14   A    No, it's not.

15   Q    And do you think it hurts the Debtors' reputations with

16   other producers in the industry if you don't make a payment?

17   A    Yes.

18   Q    Okay.  And like I asked Mr. Jordan, do you think not

19   paying the producers tomorrow will cause immediate and

20   irreparable harm to the Debtors?

21   A    Yes.  Of course.

22   Q    Okay.  And you testified before, based on your master

23   funding file, or your file and CyberX, you can tell who's

24   made an advance on a commission?

25   A    Yes.

Mascorro - Direct                          74

1    Q    And do you believe those systems, the CyberX and your

2    files, allow you to accurately account for all of that?

3    A    Yes.

4    Q    Okay.  Going forward -- and another witness, or, Mr.

5    Brock will testify more about this -- but going forward, will

6    the Debtors be able to set those aside, the premium -- the

7    commissions that Insurety advanced on, will the Debtors be

8    willing to set those aside in a separate account?

9    A    Yes.

10   Q    Okay.  And as you do that, will you provide a collection

11   report for them?

12   A    Yes.

13   Q    Okay.  And what would that collection report show?

14   A    Similar to what I just explained, --

15   Q    Okay.

16   A    -- it would be a line-by-line, every single policy that

17   they purchased and how much was collected during that

18   specific month that is owed to them.

19   Q    Okay.  So it would be kind of like Exhibit 4?

20   A    Yes.

21   Q    So it'll show the details of the money that comes in and

22   where it goes?

23   A    Correct.

24   Q    Okay.

25             MS. REA:  I'll pass the witness.

Mascorro - Cross                          75

1          THE COURT:  Yes.  Ms. Young?

2          MS. YOUNG:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4   BY MS. YOUNG:

5   Q    I just have two questions for you, just so I can fully

6   understand the relationship between the producers and the

7   Debtor.  And that's by terms of the agreement that's behind

8   Tab #8; is that correct?

9   A    Yes, ma'am.

10  Q    And so each of the producers enters into this contract

11  with AWIS?

12  A    Yes.

13  Q    And do you at AWIS then provide any kind of 1099s or any

14  kind of other tax forms to these producers, or is there any

15  other kind of tax forms that you provide to them?

16  A    Yes.  They would get a 1099 at the end of the year.

17  Q    Okay.  And that would be -- so, let's say, for example,

18  the first one on this list under Tab #7, which is ADB, for

19  $34,806.11, over the course of the year you will get -- that

20  would get sent to them as a 1099?

21  A    Yes.

22  Q    Okay.  And that may then be shared with -- it's either a

23  corporation or it's an individual?

24  A    Correct.

25  Q    Okay.

1           MS. YOUNG:  I'll pass the witness.

2           THE COURT:  Thank you.

3                     CROSS-EXAMINATION

4   BY MR. HARRELL:

5   Q   Would you spell your name for me again, please?

6   A   Sure.  It's R-A-N-D --

7   Q   Okay.  I have that part.

8   A   Okay.  Last name, M as in Mary, A-S-C-O-R-R-O.

9   Q   Thank you.  I just didn't want to misstate it.  Ms.

10  Mascorro?

11  A   Uh-huh.  Yes.

12  Q   Ms. Mascorro, I have just a couple of follow-up questions

13  for you.

14  A   Uh-huh.

15  Q   Number one is, looking at Exhibit 7, which are the

16  amounts that you say are owed to and need to be paid to

17  agents tomorrow; is that correct?

18  A   Correct.

19  Q   Are all of these for money that is due right this minute,

20  or is some of it actually for advances to these agents?

21  A   Some of it is advances, yes.

22  Q   So, give me an example of a couple of the payments here

23  that are advances.  I assume those would be the bigger ones?

24  A   Yes.

25  Q   So, I see, for example, DIR, $105,000.  Would that be an

1    advance?

2    A    Part of that would be an advance, yes.

3    Q    And then right -- oh, I'm sorry.

4    A    Part of that would be an advance, yes.

5    Q    Part of that would be an advance?  Okay.  Actually, the

6    biggest part would be an advance, right?

7    A    Yes.

8    Q    And then GO, $77,000.  The biggest part of that would be

9    in advance, right?

10   A    Correct.

11   Q    And so would it be fair -- we could pick the bigger

12   numbers, and most of the big numbers would be advances,

13   right?

14   A    Correct.

15   Q    In the agreements that AWIS has with these producers, is

16   there an obligation by AWIS to actually make advance payments

17   of commissions, as opposed to just paying the commissions

18   that are due?

19   A    So, when the agent is onboarded, they -- they select to

20   either be advanced or earned, and we intend to honor their

21   request.

22   Q    So, are you saying, then, that for each of these that you

23   advance, you have a contractual obligation to advance to

24   them?

25   A    I'm not a hundred percent sure.  I'd have to go through

1   the agreement --

2   Q   Okay.  So, --

3   A   -- to give you a yes or no answer.

4   Q   Okay.  Well, and I don't want you to guess.  So, what

5   you're saying is today, under oath, before this Court, you

6   can't tell us whether AWIS has a contractual obligation to

7   pay these large amounts?  Fair?

8   A   Fair.

9   Q   One other -- a couple of questions.  You said that you

10  would be able to set up a separate account for Insurety's

11  commissions.  Did I get that right?

12  A   Correct.

13  Q   What that triggered in my mind is that, up until now,

14  when payments have come in from customers --

15  A   Uh-huh.

16  Q   -- who are making payments on health policies, all that

17  goes into one account, doesn't it?

18  A   Yes.

19  Q   And so AWIS and the TPA never set up a segregated trust

20  account for Insurety's money, did they?

21  A   I'm not a hundred percent sure.  I'm not in the

22  accounting department and they would be the ones to handle

23  all the bank accounts.

24  Q   So you're not aware of what kind of setup there is today

25  --

Mascorro - Cross                              79

1    A    Correct.

2    Q    -- regarding the money that comes in, whether that's

3    going into a segregated account or into one big account for

4    everybody?

5    A    Correct.  I don't have any views to the banking.

6            MR. HARRELL:  Pass the witness.

7            THE COURT:  Thank you.  Ms. Rea, any redirect?

8            MS. REA:  First I want to make sure I offered

9    Exhibits 7 and 8 and ask that they be admitted.

10           THE COURT:  Any objection to Debtors' Exhibits 7 and

11   8?

12           MR. HARRELL:  No objection, Judge.  And I failed to

13   offer Insurety Exhibit #1, which we talked about.  And so

14   could I offer that at the present time, please?

15           MS. REA:  Sure.

16           THE COURT:  Any objection?

17           MS. REA:  No.

18           THE COURT:  All right.  So, Debtors' Exhibits 7 and 8

19   are each admitted, and -- oh, what do I call it?  Ah,

20   Insurety.  Insurety's Exhibit 1.  I just want to make sure

21   I'm consistent on what I call it.  Insurety's Exhibit 1 is

22   admitted.

23       (Debtors' Exhibits 7 and 8 are received into evidence.

24   Insurety Capital's Exhibit 1 is received into evidence.)

25           MS. REA:  Okay.  And I just, I just have one

1   question.

2                        REDIRECT EXAMINATION

3   BY MS. REA:

4   Q    You said you didn't know if there was a contractual

5   obligation to make these advances tomorrow.  But what happens

6   if you don't make these advances tomorrow?

7   A    Then, again, the agents will stop selling for us and they

8   will go sign up somewhere else to produce their business.

9   Q    Okay.

10            MS. REA:  Pass the witness.

11            THE COURT:  All right, ma'am.  You may step down.

12   Thank you.

13       (The witness steps down.)

14            THE COURT:  Did you have any redirect?  I'm sorry.

15            MR. HARRELL:  No.

16            THE COURT:  Yeah.  That's fine.

17            MR. HARRELL:  No, Your Honor.

18            THE COURT:  All right.  Thank you.  Ms. Rea?

19            MR. FORSHEY:  Your Honor?

20            THE COURT:  Yes.

21            MR. FORSHEY:  Could I petition the Court for a brief

22   -- just a brief break?

23            THE COURT:  Absolutely.  It's -- how much are you

24   talking about?  Ten minutes or so?  Is that what you want?

25            MR. FORSHEY:  No.  I just -- somebody's outside with

Lee - Direct                          81

1   my car, and I need to go get my fob and park it.  That's --

2   that's why I'm asking.

3            THE COURT:  That's fine.  We can -- why don't we take

4   a break.  When you come back in, Karyn will come get us.

5   How's that?

6            MR. FORSHEY:  Thank you, Your Honor.

7            THE COURT:  All right.  Thank you.

8         (A recess ensued from 5:28 p.m. until 5:40 p.m.)

9            THE CLERK:  All rise.

10           THE COURT:  Please be seated.  Thank you.  All right.

11   We're back on the record.  Ms. Rea?

12           MS. REA:  Your Honor, I'd like to call Delbert Lee.

13           THE COURT:  Please come forward, sir.

14           THE CLERK:  If you'd raise your right hand.

15              DELBERT LEE, DEBTORS' WITNESS, SWORN

16                      DIRECT EXAMINATION

17   BY MS. REA:

18   Q    Would you please state your name for the record?

19   A    Delbert Lee.

20   Q    And what's your position with the Debtors?

21   A    COO.  Chief operating officer for Association Health Care

22   Management.

23   Q    Okay.  And what are your responsibilities?

24   A    To oversee the day-to-day operations in the company and

25   its various departments and employees.

1  Q   Okay.  Let's talk about utilities for a minute.  How many

2  utility providers do the Debtors have?

3  A   Two.  Three, with AWIS.

4  Q   Okay.  Would you look at Exhibit 5 for me, please?  And

5  why don't you have a whole lot more utilities, like water,

6  gas, electricity?

7  A   Those things are paid through the lease payments that we

8  pay on a monthly basis.

9  Q   Okay.  So these are your only three utility providers?

10  A   That is correct.

11  Q   And does AHCM pay utility expenses for both Debtors?

12  A   That is correct.

13  Q   Okay.  Do you know if you are current with all three of

14  them?

15  A   We are.

16  Q   Okay.  Did you or someone at your direction calculate the

17  average monthly bill for each one?

18  A   That is correct.

19  Q   Okay.  And is that how you determined the amount of the

20  deposit you propose to make?

21  A   Yes.

22  Q   Okay.  And you propose to make the deposits listed on

23  Exhibit 5?

24  A   That is correct.

25  Q   Do you think that provides adequate security for them?

1    A    I do.  Yes, I do.

2            MS. REA:  Your Honor, could I offer Exhibit 5,

3    please?

4            THE COURT:  Any objections?

5            MR. HARRELL:  No objection.

6            THE COURT:  All right.  Debtors' Exhibit 5 is

7    admitted.

8            MS. REA:  Okay.

9        (Debtors' Exhibit 5 is received into evidence.)

10   BY MS. REA:

11   Q    Let's talk about employees for a few minutes.  How many

12   employees does AWIS have?

13   A    One.

14   Q    And about how many does AHCM have?

15   A    Approximately 90.

16   Q    Okay.  When is the next payday for employees?

17   A    October 25th.

18   Q    October 25th?  Next Friday?

19   A    That is correct.

20   Q    And does that include a pre-petition component?

21   A    It would, yes.

22   Q    About one week?

23   A    One week's.

24   Q    So about October 7th through --

25   A    The 11th.

Lee - Direct                                    84

1   Q    -- October 11th?  Okay.  Okay.  Did you -- would you look

2   at Exhibit 6, please?

3   A    Yes.

4   Q    And tell the Court what this is.

5   A    This is a listing of all of the employees that are due to

6   be paid in the various departments.

7   Q    And is the last column, which says One Week, is that the

8   pre-petition amount you're seeking to pay them next Friday?

9   A    That is correct.

10  Q    Okay.  And did you provide the numbers that are provided

11  in our motion for all the pre-petition wages and benefits

12  that are owed?

13  A    I did, or someone from the various departments

14  responsible.

15  Q    Okay.  And just focusing on the pre-petition amounts due,

16  will any one person receive more than $12,850 in wages or

17  benefits?

18  A    No, they will not.

19  Q    Okay.

20       MS. REA:  Your Honor, I'd move to admit Exhibit 6.

21       THE COURT:  Any objections?

22       MR. HARRELL:  No objection.

23       MS. REA:  Okay.

24       THE COURT:  All right.  Debtors' Exhibit 6 is

25  admitted.

1        (Debtors' Exhibit 6 is received into evidence.)

2    BY MS. REA:

3    Q    What will happen if AHCM doesn't pay these pre-petition

4    wages?

5    A    I'm pretty sure these employees will probably seek

6    employment someplace else.

7    Q    Okay.  Do you think that would cause immediate and

8    irreparable harm to the Debtors?

9    A    It will.  Obviously, to the employees and their families,

10   supporting them.  And then also, since many of these

11   employees are essential to running the business every day, we

12   would not be able to service the members that call in on a

13   daily basis.  Obviously, would not be able to process any

14   payments to any carriers or any vendors.

15   Q    Okay.  Let's talk about the Debtors' bank accounts.  How

16   many bank accounts do the Debtors have?

17   A    There are currently three main bank accounts, one which

18   is a -- and, again, two of these accounts were in existence

19   when we bought the company back in June of last year.  There

20   is a Bank of America account which the face-to-face business

21   and wholesale business is processed through, through that

22   merchant.  And then there's a Comerica account, which is the

23   main account, which processes all of the other payments.  And

24   then recently we opened a Compass Bank account with the

25   intention of putting aside monies to be paid to Insurety.

Lee - Direct                                    86

1   Q    Okay.  Do you know -- do you remember how much was in

2   each of these bank accounts when we filed the bankruptcy

3   cases?

4   A    I'm trying to think back.

5   Q    That's okay.  It'll be in the schedules.  We'll have the

6   answer --

7   A    Yeah.

8   Q    -- and it'll be public.  Yeah.  We don't have to worry

9   about that right now.

10  A    Right now.

11  Q    Okay.  And that third account, you've offered to put

12  Insurety's commissions, the commissions Insurety claims in

13  those -- in that account?

14  A    That is correct.

15  Q    Okay.  And can you provide regular information to

16  Insurety about the account?

17  A    Yes.

18  Q    And actually about the Comerica account and the Compass

19  Bank account?

20  A    Well, yes.  Well, the company -- the Compass Bank

21  account, for sure, yes, and the Comerica account, yes.

22  Q    Okay.  Okay.  Let's flip to Debtors' Exhibit 12.  What is

23  this?

24  A    This is a budget that we were asked to prepare for the

25  next four weeks with regard to the bankruptcy hearing.

Lee - Direct                          87

1   Q    Okay.  Are these your cash needs for the next four weeks?

2   A    That is correct.

3   Q    Okay.  Can we -- let's go real quick so everybody

4   understands what each line item is.  The first one, Debtors'

5   Request to Advance Commissions.  What is that?

6   A    Well, the first one is the advances that would be due to

7   those producers that have sold this past week that are --

8   that's going to be due tomorrow.

9   Q    And that's what Ms. Mascorro just talked about?

10  A    That's correct.

11  Q    So it's a combination of straight commissions and also

12  advances of commissions?

13  A    To those, yes, those producers, yes.

14  Q    Okay.  And then the next line, Commissions on -- F-to-F

15  is Face-to-Face?

16  A    The Face-to-Face.  Yes, that's the agents that were in

17  place when we took over the business.  Some 300 of those.

18  They're really small independent agents and operators, and

19  they are due commissions also this week.

20  Q    Okay.  The next is Cost of Benefits-Carrier Payments.

21  Are those the premium payments to those --

22  A    Those would be premium payments to those carriers for the

23  benefits that have been provided to the members.

24  Q    And what are Merchant Services?

25  A    In order to process those payments, we have to pay a

1  merchant fee to process each and every transaction.

2  Q    Is a credit card fee -- a processing --

3  A    Yes.

4  Q    -- credit card fee?  Okay.

5  A    Correct.

6  Q    Okay.  And then what is involved in the Accounting &

7  Auditing expense?

8  A    We sometime have to have an independent accounting.  We

9  also pay software, so we have an accounting software piece --

10  I don't know if it's QuickBooks or something like that --

11  that we pay expenses through that to process our internal

12  accounting.

13  Q    Okay.  And what's your Advertising expense?

14  A    Advertising consists of fliers that we provide to some of

15  the independent agents, and then other expenses may be, you

16  know, for our Internet marketing departments, that type of

17  thing.

18  Q    Okay.  And what kind of state registration fees do you

19  pay?

20  A    There are always registration fees.  We have licenses in

21  50 -- 48 states, so there's always some sort of fee that

22  we're paying on a regular basis for those.

23  Q    Okay.  And the line item for Bank Service Charges?

24  A    Those are traditional -- regular bank service charges.

25  Again, we process twenty-some-odd thousand payments, you

1    know, in a month.  Sometimes the face-to-face, we process and

2    bill those on a regular basis every day.  So those are

3    thousands of payments that run through there, and there are

4    bank charges that are attributed to that.

5    Q    What is the Contract Labor line item?

6    A    Contract Labor, we do have an employee or employees that

7    are considered contract labor.  We don't hire them on a, you

8    know, a regular basis.  They come and perform certain duties

9    for them, and we have to pay those as well.

10   Q    Okay.  What's the line item for Computer Supplies?

11   A    Obviously, with 90 employees and tons of equipment, we

12   have to replace and repair on a regular basis, and it's the

13   cost of doing that.

14   Q    Okay.  How about Dues & Subscriptions?

15   A    Again, a lot of it has to do with some of the dues that

16   we have to pay to keep our DMPO licenses and some of the

17   other licenses.  And some things require you to subscribe to

18   some things.  So those are just periodicals or, again, dues.

19   Q    Okay.  And then the FICA Tax line, that's what we -- as

20   part of the relief we ask for in our motion, those are

21   withholding taxes, right?

22   A    Attributable to the payroll, correct.

23   Q    Okay.  And the 401(k) Funding, what is that?

24   A    That is the portion that we would pay to the --

25   contribute to the employees' payroll.  To the 401(k).

Lee - Direct                                90

1   Q   Okay.  And the Health Insurance?

2   A   That's our portion, again, that we pay for on behalf of

3   the employees that we have there.

4   Q   Okay.  What's the just plain Insurance?  What does that

5   encompass?

6   A   So, that's for general liability insurance, for E&O

7   insurance, and various business insurances that we require to

8   stay in business.

9   Q   Okay.  What is the Office Expense line item?

10  A   Office Expense may be attributable to what we provide to

11  employees.  It may be, you know, it could be coffee or water

12  or something of that nature.

13  Q   Okay.  And Office Supplies?

14  A   Office Supplies:  again, paper, pens, equipment, that

15  type of thing.

16  Q   Okay.  What's the -- there's an Automobile Expense.

17  A   Yes.  So there are -- Automobiles Expense goes to two

18  automobiles that are leased for management.

19  Q   Actually, I made a mistake.  When I changed this budget,

20  I accidentally pulled out a line item.  Okay.  So, this

21  automobile expense is for gas.  The one that I accidentally

22  pulled out is for the two car payments.  So, I'm sorry.  As I

23  recall, they were -- one was about $2,000 and the other was

24  about $585.

25  A   That is correct.

Lee - Direct                        91

1  Q    Okay.  So I'll get that back in there before we submit an

2  order, if we're allowed to do that.

3         THE COURT:  So, for purposes of Exhibit 12, you're

4  saying there should be two additional line items for two

5  vehicles?

6         MS. REA:  Well, we just had one item.  It was

7  Automobile Expense for car payments.  I guess my Excel skills

8  aren't that good.

9         THE COURT:  No, let me rephrase that.  I think that

10  was confusing.  Two car payments?

11         MS. REA:  Right.

12         THE COURT:  In addition to the Automobile Expense of

13  $750, there's two additional --

14         MS. REA:  Exactly.

15         THE COURT:  -- expense items for automobiles, right?

16         MS. REA:  Exactly.

17         THE COURT:  All right.

18         MS. REA:  Exactly.

19  BY MS. REA:

20  Q    What are Other Taxes?

21  A    Because we file in many different states, there are some

22  business taxes that may be due to keep the operation going.

23  Q    Okay.  How about Permits & Licenses?

24  A    Same type -- same thing.  Each state requires us to file

25  different types of permits and licenses as they come up.

Lee - Direct                           92

1   Q    Okay.  Why do you have so much postage expense?

2   A    So, we have a fulfillment department that mails out all

3   of the brochures and cards to each of the members after they

4   become members and purchase products.  So we're constantly

5   mailing those out.  And it is a big expense.

6   Q    Okay.  Is that the same for printing?

7   A    The same for printing.  It is part of the fulfillment

8   department.

9   Q    Okay.  And what about the Computer & Internet Expense?

10  A    I would suppose that that is also going to be

11  attributable to the cost we pay to our -- we have a firewall

12  network provider which is part of the computer system that we

13  have to pay on a monthly basis.

14  Q    Okay.  And the Rent, that's self-explanatory.

15  A    Yes.

16  Q    What's the Bonus line item?

17  A    Bonuses are probably to -- we hand out to the CSRs, so to

18  incentivize and to -- if they've had so many saves, to keep

19  members on the books, if they've had a month's worth of no

20  complaints against them, that type of thing.

21  Q    What's a CSR?

22  A    Customer Service Representative.

23  Q    Okay.  Okay.  That makes sense.  Shipping.  That's

24  probably --

25  A    Again, for the fulfillment.

1   Q   Okay.  Telephone & Long Distance.  Self-explanatory.

2   A   Yes.

3   Q   What are the Meals & Entertainment and Travel Expense

4   line items about?

5   A   Well, in this business, obviously, you have to have call

6   centers.  You're constantly going out to solicit guys to help

7   you write business.  We also have carriers that come on a

8   regular basis.  It's just normal for us to go out and try and

9   drum up new business, and that's part of the cost of doing

10   that.

11   Q   Okay.  And Workers' Comp Insurance.  That's pretty self-

12   explanatory.

13   A   Yeah.

14   Q   And Payroll.  That's what we're asking to pay.

15   A   Correct.

16   Q   The Legal Fees line item.  What do you understand that to

17   be?

18   A   That is for the legal services that are provided by our

19   counsel.

20   Q   But you understand that you can't pay any of us until the

21   Court says it's okay?

22   A   I do understand that, correct.

23   Q   Okay.  The next line item, Professional Fees, what is

24   that for?

25   A   So, we have -- either for our consultants or either for

1  our -- not the contract labor, but --

2  Q   Is this just for Robert Half, the staffing agent?

3  A   Yeah, the staffing guy.  Yes.

4  Q   Okay.  And then the last line is Premium Refunds.  Can

5  you explain that?

6  A   Yeah.  So obviously in this business you're going to have

7  members that are going to want to have, you know, buyer's

8  remorse or they feel like that this is not what they wanted,

9  so we have to refund them.  If we do not refund them, because

10  they have a 30-day look, if we don't refund, that would

11  result in a chargeback.  And of course, that affects our

12  merchant banking accounts.

13  Q   Okay.  And so we've asked -- in our motion that asks for

14  authority to pay carriers the premiums, we also ask to give

15  back those refunds if we need to?

16  A   It's essential in keeping the business going, correct.

17  Q   Okay.  So, aside from my error in the auto expense, do

18  you think this accurately, to the best of your knowledge,

19  does this accurately represent what you think your cash needs

20  will be over the next four weeks?

21  A   To the best of my knowledge.  That is correct.

22  Q   Okay.

23         MS. REA:  Pass the witness.

24         MR. ROSS:  Exhibit 12.

25         MS. REA:  Oh, Your Honor, can I offer Exhibit 12,

1   please?

2         THE COURT:  You may offer it.  Any objection?

3         MR. HARRELL:  No objection.

4         THE COURT:  All right.  Debtors' Exhibit 12 is

5   admitted.

6         MS. REA:  Thank you.

7         THE COURT:  Thank you.

8      (Debtors' Exhibit 12 is received into evidence.)

9         MR. HARRELL:  Just one moment, Your Honor.

10        THE COURT:  Sure.

11        MR. HARRELL:  I think I can cut this pretty short.

12        THE COURT:  Take your time.

13        (Pause.)

14                    CROSS-EXAMINATION

15  BY MR. HARRELL:

16  Q   Mr. Lee?

17  A   Yes, sir.

18  Q   Good evening.  We met at your deposition, correct?

19  A   We did, yes.

20  Q   Would you look at the bigger binder in front of you?

21  It's entitled "Cash Collateral Motion."

22  A   Yes.

23  Q   And that has our exhibits.  And please turn to Exhibit

24  10.  And I'm going to refer you to Exhibits 10, 11, 12, and

25  13.  First, I just want to identify them.  Exhibit 10 is the

1  general ledger of AHCM dated August 31, 2019, correct?

2  A    Yes.

3  Q    Exhibit 11 is the June 1, 2019 Comerica bank statement,

4  correct?

5  A    Yes.

6  Q    Exhibit 12 is the July 1, 2019 Comerica bank statement,

7  correct?

8  A    Yes.

9  Q    Exhibit 13 is the August 1, 2019 Comerica bank statement,

10  right?

11  A    Correct.

12        MR. HARRELL:  Your Honor, we offer Exhibits 10, 11,

13  12, and 13.

14        THE COURT:  Any objection?

15        MS. REA:  No.

16        THE COURT:  All right.  Then Insurety's Exhibits 10,

17  11, 12, and 13 are each admitted.

18        MS. REA:  Oh.

19        THE COURT:  Oh, hold on.  Yes?

20        MS. REA:  I'm sorry.  I just wanted to mention that

21  we have a redaction issue on one of them.  On the bank

22  statements, they need to be redacted.

23        MR. HARRELL:  And we will clean that up.  Thank you.

24        THE COURT:  All right.  So, Insurety Exhibits 10, 11,

25  12, and 13 are admitted.  And we'll note for purposes of the

Lee - Cross                                    97

1  record that Exhibit 11, 12, and 13 should be, I guess, under

2  seal.  That's probably easiest for purposes of today.

3          MR. HARRELL:  Yes, Your Honor.

4          THE COURT:  All right.

5          MR. HARRELL:  Yes.

6          THE COURT:  That way you don't have to worry about

7  redacting.  You just keep it here and it'll be under seal.

8  So if anybody tries to get it done, they'll have to file a

9  motion to get those three exhibits.

10         MR. HARRELL:  Great.  Thank you.

11         THE COURT:  All right.

12      (Insurety's Exhibit 10 is received into evidence.

13  Insurety's Exhibits 11, 12, and 13 are received into evidence

14  under seal.)

15  BY MR. HARRELL:

16  Q   So, Mr. Lee, these four exhibits that we've just offered

17  and admitted into evidence are the sum total of the financial

18  documents that have been provided to Insurety since this

19  litigation that we've been involved in started.  Correct?

20  A   Yes.

21  Q   Now, when I took your deposition, we talked at length

22  about the process whereby customers make payments on their

23  insurance policies, those payments come to AHCM, the third-

24  party administrator, and then they're disbursed into

25  different areas.  Correct?

1   A    Yes.

2   Q    And you're aware and we discussed the fact that AHCM is a

3   third-party administrator which, under our Insurance Code,

4   creates fiduciary duties and obligations.  Right?

5   A    That's correct, yes.

6   Q    And, indeed, the agreement that -- or one of the

7   agreements we have -- actually, maybe it's two of them --

8   between your company and my client says that that money will

9   be held by AHCM in trust.  And it uses the words "in trust,"

10  right?

11  A    I'm not familiar -- I -- not have the contract in front

12  of me, but I'll --

13  Q    You'd need to see the contract?

14  A    Yeah.

15  Q    Okay.  I can show it to you in a minute.

16  A    That's fine.

17  Q    But let -- in the interests of time, let's just keep

18  going.  Well, I think maybe I need to get you to identify

19  this.  I think that's an important point.

20          MR. HARRELL:  May I approach the witness?

21          THE COURT:  Of course.

22  BY MR. HARRELL:

23  Q    If you would turn in the other notebook to Exhibit 13.

24  That's the TPA servicing agreement.

25  A    Okay.

 1  Q    And if you'll go to the second page, Section 102, which

 2  is probably three-quarters of the way down.  It says, Form of

 3  Funds.

 4  A    Uh-huh.

 5  Q    And #1 talks about payments being collected, et cetera.

 6  And then the last sentence of Paragraph 1 says, "The TPA

 7  shall hold the policyholder payments in trust for the benefit

 8  of the insurance carrier, the buyer, the producers, and the

 9  IMO as outlined below in 1.02(2)."  Do you see that?

10  A    I do.

11  Q    And so does that refresh your recollection that when that

12  money comes in, it is held by the TPA, AHCM, in trust?

13  A    That is correct.

14  Q    And my client, Insurety, is one of the beneficiaries of

15  that trust, right?

16  A    Yes.

17  Q    Now, we talked at your deposition about a segregated

18  account that that money went into.  Do you recall that

19  discussion?

20  A    Yes.

21  Q    And before we took your deposition, at the time of your

22  deposition, I didn't have the bank statements.  We got them

23  later.  Well, it turns out that the bank statements have

24  money coming in from different sources and not just from

25  policyholders that Insurety has advanced commissions on the

1    policies of.  Right?

2    A    Yes.  It does have multiple lines of funds coming to that

3    account.

4    Q    And we found out when we looked at those accounts that,

5    from that Comerica account, that monies coming in from

6    different sources, that's basically an operating account for

7    these businesses, out of which expenses are paid, payroll is

8    paid, money goes to AWIS, money has gone to Mr. Lindsey and

9    to others.  Right?

10   A    Correct.

11   Q    And so it's true, is it not, that AHCM never set up a

12   segregated trust account for the policies that Insurety

13   advanced money on, did it?

14   A    We just, again, when we took over the company, we

15   continued to operate the account as it was.  And in my

16   interpretation, it is a segregated account because I can,

17   through each of the systems that we have, tell what are

18   premiums that need to go out to Insurety, what are premiums

19   needed to go out to carriers, and so forth and so forth.

20   Q    Well, it's all in one account, right?

21   A    It's in one account, but we are able to decipher who gets

22   paid what.

23   Q    Well, and when you tell somebody you've got a segregated

24   account for the policies that Insurety has an interest in,

25   don't you think that implies -- that at least implies that it

Lee - Cross                                    101

1    is a separate account for those policies?

2    A    Again, for me, when I'm told -- again, because we have

3    other accounts, we have accounts for the face-to-face people,

4    and the monies that were going in that account belonged to

5    the carriers, belonged to Insurety.  To me, my interpretation

6    is it's a segregated account.  Those are the monies that go

7    in there for those purposes.

8    Q    Well, and indeed, the money that went into that account

9    from these policyholders, it got paid to insurance companies.

10   Those are your vendors, right?

11   A    Uh-huh.  Correct.

12   Q    But you quit paying it to Insurety, right?  We've heard

13   that today.

14   A    Yes.

15   Q    But during that period of time, that money that went into

16   the account was used -- being used for payroll and office

17   supplies and payroll taxes and rent and all the other kinds

18   of day-to-day expenses of the company, wasn't it?

19   A    Yes.

20   Q    And so it was not being held in trust for Insurety, was

21   it?

22   A    We still were able to determine and still can determine

23   today what belongs to Insurety as well as what belongs to

24   carriers and everyone else.

25   Q    Mr. Lee, did you hold our money in trust for us?

1   A    In that account, yes.

2   Q    Is that money in that account in trust for us?

3   A    Again, we're able to determine that the money belongs to

4   you by the number of policies that you sold, and we can remit

5   to you what belongs to you.

6   Q    My question is a little bit different.  Is that money

7   that came in in August and September, let's say, sitting in

8   that account in trust for us?

9   A    For August and September, I mean, for the -- for the

10  monies that you advanced on or what you were due, again, I'm

11  quite able to -- my accounting team is quite able to tell

12  what belongs to you and what doesn't.  So as far as I'm

13  concerned, I know that this money is yours, so it's -- it's

14  entrusted to me to give it to you, if that's what you're

15  trying to tell me.  Ask me.

16  Q    Well, you're telling me you can tell me how much you owe

17  me.

18  A    Yes.

19  Q    But you can't tell me that there is four or five or six

20  million dollars sitting in that account that you could go

21  transfer to us today.  Right?

22  A    No, I cannot.

23  Q    Because that money isn't there, is it?  Our money is not

24  in that account, is it?

25  A    I couldn't tell you at this particular point what is in

1   the account.  I don't know.

2   Q    You know that our money is not in that account, don't

3   you, Mr. Lee?

4   A    I do not know that at this time.

5   Q    How much money is in that account?

6   A    I do not know that at this time.

7   Q    You're here in front of this Court asking for relief and

8   you can't tell us how much money is in the bank account?

9   A    I am not the chief financial officer.

10  Q    You're the COO, right?

11  A    That is correct.

12  Q    You run the company, right?

13  A    That is correct.  And that account and that balance

14  changes on an hourly basis.  And I said that to you in our

15  previous deposition.

16  Q    Well, look at the -- excuse me.  I didn't mean to

17  interrupt you.  Look at the bank statements.  Let's look at

18  -- the latest one we have is August 1, 2019 bank statement,

19  Exhibit 13 in the bigger book.  What was the ending balance

20  in that account on August 31st?

21  A    $96,294.56.

22  Q    And we know that's the latest information we've been

23  given, right?

24  A    Correct.

25  Q    And so if that much money were in the account, you

1    wouldn't be -- you would not be holding money that you could

2    pay to us today.  Right?

3    A    If that's what the balance is.  That's correct.

4    Q    And, of course, you're saying you don't know what the

5    balance is, right?

6    A    At this moment, I do not.

7    Q    And I think you told me at your deposition that you

8    learned it is really easy to get a balance -- or, to get a

9    bank statement.  Right?

10   A    That's correct.

11   Q    You could go to the CFO's office and you could push a

12   button and you could download a bank statement?

13   A    He could.

14   Q    Did you try to do that before you came to testify here in

15   this Court?

16   A    No, I did not.

17   Q    Did you think maybe that might be relevant?  That is, how

18   much money is in the bank?

19   A    I just followed instructions of my counsel, what I was

20   supposed to do here today.

21   Q    Okay.  So even though you could have just pushed a button

22   and gotten a bank statement and brought it in and showed us

23   all, you didn't do it?

24   A    I don't have access, but I could have instructed someone

25   to do so if I was told to.

Lee - Cross                                    105

1   Q    And you didn't try to do it, right?

2   A    I personally did not, no.

3        MR. HARRELL:  I'll pass the witness.

4        THE COURT:  Ms. Rea, redirect?

5        MR. HARRELL:  Oh, I'm sorry.

6        THE COURT:  No, that's fine.

7        MR. HARRELL:  Just, can I ask just one question?

8        THE COURT:  Yes, you may.  Not a problem.

9   BY MR. HARRELL:

10  Q   I had a question about the budget.  Let's go into the

11  skinnier binder.  And I think the budget is Exhibit 7.  Or,

12  no, Exhibit 12.  And the first line on Cost of Goods Sold --

13  let me just back up a minute.  Did you prepare the budget?

14  A    I did, with the help of the CFO and some others.

15  Q    Did you try to estimate the income side of the budget?

16  This shows the cost side of the budget, but where is the

17  income side of the budget?

18  A    This is what we were asked to prepare.

19  Q    So you didn't try to calculate how much money is coming

20  in?

21  A    This is what we were asked to prepare for today.

22  Q    All right.  Let's look at Debtors' Requests to Advance

23  Commissions.  And you see the number, it's $125,000?

24  A    Yes.

25  Q    And did you come up with that figure, or did somebody

1    else?

2         MS. REA:  Excuse me.  That exhibit got amended, and

3    we sent that to you.

4         MR. HARRELL:  Oh, I'm sorry.  Apologies.

5         MS. REA:  I brought extra copies.

6         MR. HARRELL:  It's in this notebook.  Oh, okay.

7         MS. REA:  Right.  It got amended after and I emailed

8    it to you.

9         MR. HARRELL:  Okay.

10        MS. REA:  That's the one he testified about.

11        MR. HARRELL:  Well, okay.

12        MS. REA:  I had sent you your notebook before we

13   changed it and then emailed you the new one after.

14        MR. HARRELL:  Okay.  So the Exhibit 12 that got

15   introduced is the revised Exhibit 12.  Is that right?  For

16   the record?

17        MS. REA:  Yes.

18   BY MR. HARRELL:

19   Q   And it shows requests to advance commissions of $787,00

20   for the first week and the second week, and then it drops to

21   $125,000.  Do you have that in front of you, --

22   A   I do.

23   Q   -- the revised one?

24   A   Yes.

25   Q   And did you come up with those numbers?

1    A    I'm sure we consulted with a team and came up with what

2    the advances might drop down to if we were doing some sort of

3    advancing.

4    Q    Okay.  And is there a reason that the first two numbers

5    are so large and then the second two numbers are

6    comparatively smaller?

7    A    The first two numbers are advances that have occurred the

8    previous week and would occur this week.  The last two are an

9    estimate of advances that would occur on a much smaller

10   level, because we would not be able to maintain doing those

11   larger ones.  Or we're asking not to do those larger ones.

12   Q    Okay.  And so are you saying that, for weeks three and

13   four, you had a smaller sales force or that, with that sales

14   force, you would be paying them less money?

15   A    It would be a smaller sales force.

16   Q    Okay.  And why do you think you have a smaller sales

17   force?

18   A    Well, because if we're not able to advance, continue it

19   with AWIS, AWIS would have to cut its sales force down in

20   order to survive, aside with the face-to-face people.

21   Q    And you heard our discussion about Mr. Brock that has

22   kind of a shadow company that some of these sales

23   representatives or producers might end up going to.  Is that

24   part of that plan?

25   A    I don't know anything about a shadow company.  It's a

Lee - Cross                                           108

1  legitimate insurance agency that will market to agents that

2  would have a contract with a separate TPA that AHCM would

3  then be able to derive revenue from by servicing its members.

4  Q    Well, and so when we see the advanced commissions numbers

5  being cut by three-quarters, is that because a number of

6  those producers would be working at Mr. Brock's business?

7  A    They probably would, in order for us to, again, have AHCM

8  survive off that revenue stream.

9  Q    I'll ask you the same question as I asked Ms. Mascorro.

10  Is there a legal obligation to make advances to those sales

11  agents?

12  A    I'm not familiar with the contract in that respect, but I

13  do know if we do not make advances they will not sell the

14  products and we would not have any business.

15  Q    And we understand that there's a commercial reason to do

16  it.  I don't think anybody is arguing with that.  But do you

17  know if there is a legal obligation to make advances to those

18  agents?

19  A    I'm not aware of the contract so I couldn't answer that.

20          MR. HARRELL:  Pass the witness.

21          THE COURT:  Ms. Rea?

22                      REDIRECT EXAMINATION

23  BY MS. REA:

24  Q    Mr. Lee, Mr. Harrell was asking you about, in effect,

25  whether you put Insurety's money in a separate account.

1  A    Yes.

2  Q    Have you ever told them or testified that it was in a

3  completely separate account?

4  A    To my recollection, I probably said segregated.  To me,

5  segregated account is --

6  Q    All right.

7  A    -- just I've always called it that because I know exactly

8  what goes in there and what's supposed to come out of it.

9  Q    Okay.  But you have never said it was a totally separate

10  account, --

11  A    No.

12  Q    -- and we are now willing to put it in -- going to put it

13  in a separate account?

14  A    Correct.

15  Q    Okay.  And if you'll look at Debtors' Exhibit 13, where

16  Mr. Harrell pointed you to Section 1.02 --

17  A    Yes.

18  Q    -- where it says that the TPA shall hold in trust the

19  policyholder -- shall hold the policyholder payments in trust

20  for the benefit of those people as outlined in 1.022.  And

21  then if you go to the next page at the Romanette (ii), it

22  says, Second, to the buyer's account identified on A1.  Would

23  you please flip to Exhibit A1?  It's on Page -- if you'll

24  look at the bottom of Debtors' Exhibit 13, Page 14.

25         MR. HARRELL:  Excuse me.  Would you repeat that?  I

1   got lost.

2          MS. REA:  That's okay.  I'm asking him to look at --

3   the reference on Page 3 of Exhibit 13 is to the buyer's

4   account identified on Exhibit A1 of the agreement, which is

5   on Debtors' Exhibit 13, Page 14.

6   BY MS. REA:

7   Q    Do you see that, Mr. Lee?

8   A    A1?  Yes.  It just says buyer's account.

9   Q    Does it identify any account that they want you to put

10  that money into?

11  A    It does not.

12  Q    Okay.

13         MS. REA:  Pass the witness.

14         MR. HARRELL:  Nothing further.

15         THE COURT:  All right, sir.  Thank you.  You may step

16  down.

17     (The witness steps down.)

18         MR. FORSHEY:  We'd call Rusty Brock, Your Honor.

19         THE COURT:  All right.  Please come forward, sir.

20       HAROLD R. "RUSTY" BROCK, DEBTORS' WITNESS, SWORN

21                         DIRECT EXAMINATION

22  BY MR. FORSHEY:

23  Q    Would you state your name for the record, sir?

24  A    Harold R. Brock, Jr.

25  Q    And you go by Rusty?

Brock - Direct                             111

1  A    Yes.

2  Q    Would you give the Court -- how long have you been in the

3  insurance business?

4  A    I've been in it over -- since 1981.

5  Q    So you've been in it 39 years?

6  A    I don't know.  That's -- a long time.

7  Q    Okay.  Give the Court an overview of what you -- your

8  experience in the insurance industry.

9  A    Much like most people, I started off as a licensed health

10 insurance agent, selling health insurance to individuals and

11 self-employed people.  Then had aspirations to become a

12 manager, got in management, and wound up being a national

13 marketing director of a company called National Health

14 Insurance Company for about twenty years.  And then, then

15 went out, opened up a call center.  I had my own call centers

16 and sold health insurance.

17 Q    Okay.  Do you have any types of licenses right now?

18 A    I have a life and health license.  I'm a resident agent

19 of the State of Texas.  Moved here from Kentucky and

20 transferred my resident license from Kentucky to Texas in

21 2008.  And then I hold a nonresident license in all the

22 states.

23 Q    Are you the agent of record for AWIS of various states?

24 A    Yes.

25 Q    Okay.  What's your position with AWIS?

Brock - Direct                          112

1    A    I'm president of AWIS.

2    Q    And since when?

3    A    Since I believe it was January.

4    Q    And describe your duties as president of AWIS.

5    A    I just help with the coordination of agents producing,

6    agents' complaints.  They're good at that, having problems,

7    trying to fix them for them.  Just coordination.  Help look

8    at our business.  Help keep it profitable.  Help our

9    persistency, keeping business on the books.  That type of

10   thing.

11   Q    All right.  Look at Exhibit 4, would you, please, sir?

12   A    Okay.  I think I've got it.

13         MR. HARRELL:  Would you repeat the exhibit number?

14         MR. FORSHEY:  Four, please.

15         THE WITNESS:  Is this it?

16   BY MR. FORSHEY:

17   Q    Yes, sir.

18   A    I already have my pages messed up.

19   Q    That looks like it.

20   A    Okay.

21         MR. FORSHEY:  And Your Honor, 4 has previously been

22   admitted, I believe.

23         THE COURT:  Yes, it has.  Debtors' Exhibit 4.

24   BY MR. FORSHEY:

25   Q    All right.  Now, look at the top.  That member paid a

1    premium of $234.  Do you see that?

2    A    Correct.

3    Q    All right.  Now, down below, it shows $114.75, which is

4    the net rate paid to the carrier.

5    A    Correct.

6    Q    What's that?

7    A    Yes.  Okay.  Any time you sell a product, there's a cost

8    to the carrier or the vendor for the benefits of that

9    product.  And that represents -- in this particular case, I'm

10   not familiar with -- it doesn't say what particular product

11   without looking further.  But that $114.75 is what the

12   carrier charges us as a net rate that we pay to them on a

13   monthly basis.

14   Q    All right.  Now, that, I would take it, obviously is not

15   sold to Insurety, correct?

16   A    No, sir.  Our obligation is to the carrier for that.

17   Q    Then it shows that there's a commission on this of what

18   percentage, sir?

19   A    Thirty-seven percent.

20   Q    Which is how much money?

21   A    $86.58.

22   Q    Okay.  Now, is that what is sold to Insurety?

23   A    Yes.

24   Q    Then we have, on the side, basically what is the premium

25   less what we paid to the carrier and what's paid to Insurety.

Brock - Direct                              114

1    And how much is that, sir?

2    A    $32.67.

3    Q    All right.  Now, looking over here where it says -- under

4    the column, it says Not Insurety's.

5    A    Okay.  Yes.

6    Q    What is that?

7    A    Okay.  That is the expenses that AHCM incurs to manage

8    and service the business.  Customer service, fulfillment,

9    merchant fee expenses.  All the expenses outside of

10   commission and carrier cost or vendor cost.

11   Q    Is that sold to Insurety?

12   A    To my knowledge, no.

13   Q    Okay.  To your knowledge, does Insurety have any rights

14   to that money?

15   A    I would not think so.

16   Q    Okay.  Now, this one here is one of the individual

17   members.  It looks like they're paying on a policy, and

18   there's a W number there.  Do you see that?

19   A    Yeah.  That is a -- should be a product number or -- this

20   is a system thing, so it's probably either product number or

21   member number.  Okay?

22   Q    Okay.

23   A    Okay.

24   Q    Now, the members are the individuals who buy the

25   policies?

Brock - Direct                                    115

1   A    Correct.

2   Q    All right.  If AH -- if the Debtors go dark and quit

3   collecting and disbursing stuff, what happens to the

4   individual's coverage?

5   A    Would you repeat that?

6   Q    Okay.  If the Debtors go dark, so they can't --

7   A    I just got to get in my mind the Debtors.

8   Q    Sure.

9   A    We're the Debtor, right?

10  Q    You're the Debtors.

11  A    Okay.  All right.  Okay.  All right.

12  Q    Okay.  If the Debtors go dark --

13  A    Okay.

14  Q    -- and they quit collecting and disbursing that money, --

15  A    Okay.

16  Q    -- what's the likely effect going to be on the

17  policyholders?

18  A    Well, I mean, it's an obvious thing.  If you don't have

19  people providing the services, just like any of us, we would

20  quit doing business and have to find some other way to obtain

21  services.

22  Q    Okay.

23  A    Or coverage.  Let's call it, not services, but coverage.

24  Q    Okay.  Now, if a policyholder doesn't get paid those

25  monies, what is it likely going to do?

Brock - Direct                              116

1    A    Say that again?  If a policyholder?

2    Q    Yeah.  I mean, if an insurer, the policy issuer, --

3    A    Okay.  Okay.

4    Q    -- if it doesn't get the money, what's it likely to do?

5    A    Then what they do, anytime you don't pay, much like your

6    car insurance, if you don't pay it, you're not going to have

7    any coverage.

8    Q    So the policies get canceled?

9    A    The policy will terminate automatically.

10   Q    And that means the member would lose their coverage?

11   A    Would lose benefits, and it would cause us some pretty

12   serious problems.

13   Q    Would you look at Exhibit 9, sir?

14   A    Is that this one?  I just always get my pages messed up.

15         MR. FORSHEY:  May I approach, Your Honor, and make

16   sure?

17         THE COURT:  Yes, of course.

18   BY MR. FORSHEY:

19   Q    Yes, sir.

20   A    Okay.  All right.

21   Q    Now, it says that the top, Sold Commission Transactions.

22   What is that, sir?

23   A    As I've mentioned before, we have a platform, a system

24   called CyberX that transacts -- produces documents and -- I'm

25   trying to think of the proper word, but of all the

Brock - Direct                                    117

1   transactions, everything is recorded in it.  And then this is

2   what the system says happened on these dates as far as the

3   top number goes.

4   Q   Okay.  CyberX, that's a system to keep track of insurance

5   payments and stuff?

6   A   It's a system that we onboard new agents.  So it has

7   multiple facets.  We sign up new agents, put their

8   commissions, all their different licenses in there, be sure

9   that they're in compliance.  When the agent has an

10  opportunity, he has a platform of funds, so he has a consumer

11  on the phone or in front of it, and it gives him the pricing

12  of the product, all the different fees that are associated

13  with that sale, and then it generates, after the sale is made

14  and we send an electronic signature to the member, they

15  approve it, send it back, it does all those type of things,

16  and then it tracks that individual member from cradle to

17  grave.

18  Q   Is that an industry standard system?

19  A   It's the only one that I know of.  I'm not saying there's

20  not other ones out there different, but that's the one that

21  I'm most familiar with.  Not with CyberX, but that type of

22  platform that operates in that manner, period.

23  Q   All right.  On Exhibit 9, up at the top left-hand corner,

24  the first thing we have is the number $5,136,152.  What is

25  that number, sir?

Brock - Direct                              118

1   A    Okay.  That's an August 31st, I believe, pretty sure

2   about that date, that the renewal premium that came in that

3   we felt like was the result of sales made with the Insurety

4   relationship.

5   Q    Okay.  Now, is that an actual number pulled off --

6   A    That's an actual number we pulled off of the system, yes.

7   Q    As of August 31?

8   A    Yes, sir.

9   Q    And that was the last one you had available?

10  A    Well, yes.  Yes, sir.

11  Q    All right.  Then, less a five percent monthly lapse.

12  What is that, sir?

13  A    Okay.  Because this is a mature block of business that we

14  started writing over a year ago, that $5 million represents

15  policies from -- somebody mentioned that we have a falloff

16  ratio, a higher ratio in the first three or four months.

17  Okay?  A lot of this block of business is mature business

18  that's exceeded that.  Okay.  So this represents all the

19  block of business from the time they advanced the first penny

20  to the -- 'til August 31st.

21  Q    Uh-huh.  Where did you get the five percent --

22  A    Okay.

23  Q    -- lapse?

24  A    Excuse me.  That was really your question.

25  Q    Yeah.  Well, I mean, --

Brock - Direct                                119

1  A    Okay.  So, --

2  Q    -- what is it and how did you derive it?

3  A    Okay.  The reason I did, I felt like it was a little bit

4  too aggressive, but I couldn't take in consideration without

5  doing a really -- really, a forensic dive into how many was

6  written a year ago that month.  Because this fluctuates month

7  to month.  And this is a lot of data together.  So five

8  percent typically, after the business is on five, six, seven

9  months, probably five months, six months, two to three

10 percent normal falloff after that is kind of traditional.  So

11 to be conservative, I said, well, let's use five.

12     What it does do is it says this, though.  Whether it's

13 five percent, two percent, or ten percent, one hundred

14 percent of the commissions or renewals that come in that

15 commissions are due would be applied.  Whether these numbers

16 are half right or twice right, it doesn't matter.  One

17 hundred percent of what the system says is going to be

18 credited.  But just for illustrative purpose, to show how

19 this block would perform under these assumptions, this is

20 what I used.

21 Q    Would the five percent, would that be a common assumption

22 --

23 A    That would --

24 Q    -- in the industry?

25 A    Yes.  In my opinion.

Brock - Direct                    120

1    Q    All right.  Now, the next column says Forty Percent COMM,

2    which I assume is commission.

3    A    Correct.

4    Q    And it says, Insurety's Money.

5    A    Yes.

6    Q    What is that, sir?

7    A    Okay.  As you notice in the other exhibit you talked

8    about where it referred to 37 percent, that was an exact

9    percentage on that exact product.  Okay.  As you will note,

10   it varies.  Some products are 37 percent, as we saw.  Some

11   are 45.  Some are 70.  Depends on the particular product.  So

12   if you -- we know that approximately 40 percent is a pretty

13   good number to use.  But, again, whether it's 40 percent or

14   37 percent, one hundred percent of that commission would be

15   Insurety's money.

16   Q    The next, then, column, it says, Debtors' Money-35

17   Percent.

18   A    Okay.  So we've already accounted for hypothetically 40

19   percent.  The carrier, which we saw in that one case of a

20   $234 premium, was $114.  Historically, because our products

21   have variances in prices, it's going to run between 15 and 20

22   percent.  And then you're going to have a merchant fee

23   between three and five percent.  In most cases, five percent.

24   So that's 25 percent.  So the 40 and 25 is 65, correct?  And

25   then that leaves 35 percent left over for us to pay our

Brock - Direct                    121

1  expenses, customer service, maintain the business, and those

2  type of expenses.

3  Q    Then the next column, it says, Beginning Debit, $21,761

4  --

5  A    Yeah.

6  Q    -- 251?

7  A    That was the number I was given for at the end of August.

8  So I used that as a base.  Obviously, we knew that that

9  amount was owed.

10  Q    Okay, but what does it mean?

11  A    It means that that was a -- excuse me.  That was the

12  amount of money that Insurety had advanced on these sales

13  that were outstanding.

14  Q    Do you mean the amount they came out of pocket?

15  A    Yes.  Yes, sir.

16  Q    Because it hadn't been rebated or returned?

17  A    It has not been paid back to them.

18  Q    All right.  Okay.  The next column is the Debit Balance.

19  A    Uh-huh.

20  Q    What's that, sir?

21  A    Okay.  So, what I did is I took the monthly premium --

22  or, excuse me, the 40 percent commission and subtracted and

23  applied that one hundred percent to the debit balance.  And

24  as you can see, it reduces it in an incremental manner until

25  it wound up in the fifteen or the sixteenth month being paid

Brock - Direct                              122

1  off.

2  Q   Now, the final column is Service Fee to Insurety for

3  Advancement.

4  A   Okay.

5  Q   What's that?

6  A   Insurety charges us a service fee that varies from $7,

7  $12, or $17.50, depending on the product and the advance.

8  And that is the money based upon these numbers that they're

9  entitled to for their service fee or their -- their money.

10  Let's just call it their money.  What they call it, I don't

11  know.

12  Q   All right.  Now, running down these columns, over the 16

13  months that you have projected, how much would be returned to

14  Insurety?

15  A   It should be 20 -- well, I don't know what -- the other

16  one.  But the $21 million would be paid off, obviously.  And

17  I don't have a total for the -- is that -- what do we call

18  that?  Service fee.  And the service fee for Insurety does

19  not stop in the fifteenth month.  That goes on forever.

20  Q   Now, how much money will the Debtors have, then, for

21  operations?

22  A   We would have -- let me get my facts here.  Let's see

23  here.  The number that's there, $19,122,000 and change.

24  Q   All right.  Now, on Exhibit #9, are you assuming any new

25  advances there?

Brock - Direct                        123

1    A    No.  No new -- no any new business.

2    Q    I mean, that's basically the ACH -- or, pardon, that's if

3    the Debtors sit here and they collect this money as well as

4    they have?

5    A    Yes.

6    Q    All right.

7         MR. FORSHEY:  I'd offer Exhibit 9 into evidence, Your

8    Honor.

9         THE COURT:  Any objection?

10        MR. HARRELL:  One moment, Your Honor.

11      (Pause.)

12        MR. HARRELL:  So, we don't agree at all with the

13   numbers, Judge, but in the interests of time, we're not going

14   to object and it can come in.

15        THE COURT:  All right.  Thank you.  Then Debtors'

16   Exhibit 9 is admitted.

17      (Debtors' Exhibit 9 is received into evidence.)

18   BY MR. FORSHEY:

19   Q    Assume that the Debtors went dark and had no more money

20   to operate.  How would that affect your waterfall here in

21   Exhibit 9?

22   A    Well, it would affect every column.

23   Q    How?

24   A    It would -- it would decrease.  I can't tell you how

25   much, but it will decrease.  Substantially.

Brock - Direct                                          124

1    Q    Would it be a gradual decrease or would it be like a

2    fall-off-the-table decrease?

3    A    It's been my experience that normally when you -- when

4    you stop paying people, things happen fairly quickly.  It's

5    not a gradual effect.

6    Q    All right.  Would you look at Exhibit 10, sir?

7    A    And that's this one?

8         MR. FORSHEY:  May I approach, Your Honor?

9         THE COURT:  Yes, of course.

10   BY MR. FORSHEY:

11   Q    Yes, sir.

12   A    Okay.

13   Q    Okay.  What we've done is we've put two things on Exhibit

14   10.  What's the thing at the bottom?

15   A    The one at the bottom is -- are figures that I was given

16   that represents the numbers that -- of earned commissions

17   that came in during the time frame that you see from 7/29 to

18   10/13 on weekly bases, and then it shows where we advanced

19   the total debit.  It has a member count.  And then it looks

20   like we have total commissions and total premiums.  Those are

21   the numbers that I see there.

22   Q    Okay.  So, --

23   A    But it represents the sales made in those time frames.

24   Q    In terms of purchasing commissions?

25   A    Yeah.  Well, yes.

Brock - Direct                    125

1    Q    Okay.  And this was a period when Insurety was not

2    advancing?

3    A    Yes.

4    Q    Okay.  And so what was the total amounts of commissions

5    that were advanced?

6    A    Eight hundred -- excuse me.  $8,488,407.

7    Q    And that's an actual number?

8    A    To my best of my knowledge, yes.

9    Q    Okay.  Then what's that above this in Bucket 2?  What is

10   that?

11   A    Okay.  So we started off with a member count of about

12   14,745.  Now, this is a -- not a mature block of business.

13   So I was a little bit more aggressive, more in line with what

14   some of the other people have represented, that the falloff

15   is heavier in the initial stages.  And so I used a higher

16   notate, because in our business, typically, when people buy

17   something, as you all mentioned, they have -- I think some --

18   one of the counsel has represented 25, 30 percent, somebody

19   said more.  So I used a 35 percent notate factor.

20        And, again, this is not a forensic accounting.  This is

21   just industry standards.  They already said the first three

22   or four months is high.  So I used 35 percent, 16, 15, 13,

23   10.  In about the fifth or sixth month, about six months, I

24   just dropped it to five and kept it five on.  And so that's a

25   result, if you look at the member count, that's how -- imply

Brock - Direct                    126

 1  it decreased.  I wanted to try and give a fair and accurate

 2  representation with my best guesstimate.

 3  Q   Okay.  So, based on this $8.5 million in purchased

 4  commissions, how much are you projecting in the first fifteen

 5  months in terms of payments on those?

 6  A   Is that the $10 million?  Is that -- am I looking at it

 7  right?

 8  Q   I believe so.

 9  A   Okay.  Yeah.  Whatever those numbers are.  I assume that

10  that's the correct number there.  Ten -- whatever those

11  numbers total up to.  If that's $10 million, then I agree

12  with it.

13  Q   All right.  And it looks like $8.5 million was actually

14  advanced.  Is that right?

15  A   That's the way I see it, yes.

16  Q   So basically the Debtors would have a right to $8.5

17  million out of that $10.2 million?

18  A   I couldn't make that determination, but if that's what

19  you're asking, I would say you subtract the two, yes.

20  Q   Okay.  Now, the next thing it says is ACHM Revenue.  What

21  is that?

22  A   Okay.  That's the difference in the 35 percent that we

23  would keep for operating expenses and customer service and so

24  forth.

25  Q   And how much does that reflect, then?

Brock - Direct                           127

1   A    $7.8 million.

2   Q    And then Advance Fee Revenue, what is that?

3   A    So, on all the products, we have the same -- we use the

4   same advance fee that they had been using because our system

5   had already been coded.  We just -- it would disrupt, you

6   know, operations.  So we just left the advance fees in there

7   as is.

8   Q    So, --

9   A    And that's what that represents.  Those calculations came

10  from the advance fees.

11  Q    Okay.

12  A    Service -- could be service fees.

13  Q    Now, this Exhibit #10, it doesn't contemplate additional

14  advances, does it?

15  A    No.  In other words, this doesn't contemplate any new

16  business or any additional advances of any kind.

17  Q    Okay.  But based upon that model, it's going to be about,

18  what, a little over $9 million in income to the Debtors?

19  A    Approximately, yes.

20  Q    Over the next fifteen months?

21  A    Yes, sir.

22  Q    Okay.  Now, the same question I asked you before on

23  Exhibit 9.  If the Debtors go dark and quit doing business,

24  how would that affect revenue?

25  A    Exactly the same way it would affect any business.  When

Brock - Direct                    128

1  you go dark, dark means you can't see.  It's not --

2            MR. FORSHEY:  I'd like to offer Exhibit 10, Your

3  Honor.

4            THE COURT:  Any objection?

5            MR. HARRELL:  With the same stipulation, Judge.  No

6  objection, but we don't agree with it.

7            THE COURT:  All right.  Debtors' Exhibit 10 is

8  admitted.

9         (Debtors' Exhibit 10 is received into evidence.)

10  BY MR. FORSHEY:

11  Q    Okay.  Go to Exhibit 11, please.  11A.

12  A    And that's this one?

13  Q    Yes, sir.

14  A    Okay.

15  Q    What is that?

16  A    That is our face-to-face block of business as it is -- I

17  believe it shows as September.  That was a renewal premium

18  that came in.  And then the disbursement of those funds.

19  Q    All right.  What we talked about in Exhibit 9 and 10,

20  that goes to the call centers?  Is that correct?

21  A    This?

22  Q    No.  The Exhibits 9 and 10, the last two ones.

23  A    Yes.  Yes, sir.

24  Q    All right.  Explain to the Court, what's the difference

25  on 11A that we're looking at now, the face-to-face?

Brock - Direct                              129

1   A    Well, I mean, it's pretty obvious.  Face-to-face means

2   exactly what it says.  Eyeball to eyeball.  This is the

3   existing sales force that was in place when we bought the

4   company, day one.  Mostly Hispanic and Korean market.

5   Q    Okay.  Does Insurety purchase any of that, sir?

6   A    To my knowledge, no.

7   Q    Does Insurety have any relation to this face-to-face

8   business?

9   A    Not that I know of.

10  Q    All right.  Explain to the Court how you prepared Exhibit

11  11A and what it shows.

12  A    I took the numbers that were given to me that came in on

13  a renewal basis, okay, and then I just took a small two

14  percent, because this is a -- a face-to-face block of

15  business has a different attrition rate compared to anything

16  else because the people have sold it face-to-face.  They have

17  a relationship with the consumer.  So the consistency on the

18  business is ten to one over anything else.  So the falloff

19  ratio is very, very minimal.  This is a solid block of

20  business that's been on the business, some of it as maybe as

21  ten -- as much as ten years.  So the attrition -- but it's

22  not a perfect world, I know it's going to fall off, so I was

23  very conservative, or very liberal, let's say, in not letting

24  much fall off.

25  Q    All right.  The right-hand column where it says Balance,

Brock - Direct                          130

1    is that the amount of money that would flow through to the

2    Debtors?

3    A    Yes.

4    Q    Okay.  Going from right to left, what's the Renewal

5    column?

6    A    The Renewal column was the figure I was given off of our

7    AWIS platform.  We use a different platform for this

8    particular marketing.  It's an internal house one that had

9    been used well before we bought the company.  And these

10   numbers came from that system.  Much like CyberX, but it's

11   not Cy -- this has nothing to do with CyberX.  This is AWIS

12   platform.

13   Q    And then what's the last?  What's what?

14   A    That's where I just showed a small percentage falling

15   off, and you can see it's not large.

16   Q    And then Commission?

17   A    Commissions is what we paid out if -- an exact number

18   that was given to me.  And then you can see that it just goes

19   right across.

20   Q    Okay.  Vendor.  What is that?

21   A    Vendor is a carrier.  In some of these cases, it's not an

22   actually insurance carrier.  A lot of these plans were

23   discount plans, and so they're not insured plans.  They're

24   noninsured plan.  So, but they do have a cost.

25   Q    All right.  And that says I think over the next fifteen

Brock - Direct                    131

1   months the Debtors will get $2.7 million in income from that?

2   A    Yes.

3   Q    Okay.

4        MR. FORSHEY:  I'd like to offer Exhibit 11A into

5   evidence, Your Honor.

6        THE COURT:  Any objection?

7        MR. HARRELL:  With the same stipulation that we don't

8   agree with it, no objection.

9        THE COURT:  All right.  Debtors' Exhibit 11B -- 11A

10  is admitted.

11       THE WITNESS:  Okay.

12    (Debtors' Exhibit 11A is received into evidence.)

13  BY MR. FORSHEY:

14  Q    Okay.  Let's look at 11B.

15  A    All right.  Okay.

16  Q    What is that, sir?

17  A    Okay.  As I already mentioned earlier, we're forming a

18  new relation -- I have an agency called National Individual

19  Insurance Agency.  And we're going to start marketing the

20  products AHCM or NAPP products to that agency.  And so this

21  is an estimate, a projection of what we think, based upon our

22  previous performances, of what we see our new business of new

23  people, not existing members but new business that we do not

24  have on the books now, what we see it going to over the next

25  36 months.

Brock - Direct                              132

1   Q    What exactly would the Debtors be doing for that income

2   here?

3   A    The Debtors would be providing all of the services that

4   they provide now for our existing block of business.

5   Customer service, fulfillment, retention, accounting.  All

6   the things necessary to keep a piece of business alive.

7   Q    Would it be fair to characterize this as basically a pure

8   fee income?

9   A    It's a pure fee income.  There is no advance monies

10  involved in this.  There would be nothing else but just pure

11  administrative expenses.

12  Q    So you don't have to go borrow money or find somebody to

13  buy the commissions?

14  A    We'd prefer not to.

15  Q    You just service them and get paid a fee?

16  A    Yeah.

17  Q    Okay.  How is that fee calculated?

18  A    How is that fee calculated?

19  Q    Yes, sir.

20  A    The far column to the right, the $90,000, starting there?

21  Is that what you're talking about?

22  Q    Yeah.  Start over where it says Month 1 New 5000.

23  A    Okay.  We used a figure of $18.  I think it's been

24  mentioned in here somewhere between $14 and $20.  So this is

25  based upon $18.  Okay?

Brock - Direct                           133

1   Q    $18 of what?

2   A    Per member per month.  Now, again, what I did, if you'll

3   look at here, if you'll look at the new business column and

4   then look at the renewal, and I know there are going to be

5   objections to the numbers so let's get that out there right

6   now, so the numbers are reflective of an attrition rate.  The

7   35 percent, the 16 percent, the 15.  Because this is new

8   business.  So you're going to experience the high falloff in

9   the first three or four months.  So that's taken in

10  consideration.  Because you can see that we wrote $5,000 --

11  5,000 policies in the first month, and 2,400 renewed,

12  renewable, the way it laid out.  So you have 7,700 total

13  sales for the second month.  So this is just an estimate

14  based upon our experience of what the attrition rate will be.

15  So these are what we would see maybe as hopefully really net

16  numbers.  Not gross numbers before attrition, but after

17  attrition.

18       And it's -- again, we monitor this.  And if we see it's

19  trending differently, than we make adjustments in our model.

20  Because we have to be accurate with this, because if you're

21  off, it's a lot of money.

22  Q    Now, I notice starting in Month 8 you use five percent

23  for the attrition rate.

24  A    Yes.

25  Q    Why did you pick that?

1    A    Because that's typically when we see the business -- and

2    most people in here so far have testified or mentioned that

3    that's when the business starts settling down.  The more

4    mature it gets.  And really, quite honestly, the five percent

5    is probably a high number to carry out all the way.

6    Q    Okay.

7    A    But I'd rather be too high than the other way.

8    Q    So in each month, you've taken the total on the right-

9    hand side, which is, I think, the number of customers after

10   attrition for that month?

11   A    Yes.

12   Q    Is that correct?

13   A    That was my intention, anyhow.

14   Q    And then what did you multiply that by?  Eighteen?

15   A    $18.00.

16   Q    And that gives us the fees on the right-hand side?

17   A    Yes.

18   Q    Is that something that can be bolted onto the current

19   structure?  Can you just add that?

20   A    I don't understand what the question is.

21   Q    Well, I mean, can you start doing this with what you've

22   got now, in terms of people and equipment?

23   A    Well, all the capacities that we have to maintain the

24   existing box of business that we have would be utilized -- I

25   don't like to use the word exactly, but almost exactly like

Brock - Direct                           135

1   it is now.  The functionality of selling this business, no

2   matter what shadow company you're putting it under, is going

3   to work the same way.

4   Q   Okay.  So basically what you're proposing is you're going

5   to take the people and machinery and equipment you've got now

6   and use it on this side of the business?

7   A   For new members that we -- are not present members with

8   us now.

9   Q   And over the first three years, how much income are you

10  projecting?

11  A   Beg your pardon?

12  Q   How much income are you projecting for that three-year

13  period?

14  A   $24 million.

15  Q   Okay.

16        MR. FORSHEY:  I'd like to offer Exhibit 11B into

17  evidence, Your Honor.

18          THE COURT:  Any objection?

19        MR. HARRELL:  You know what, if we had time I would

20  take him on *voir dire*.  But in the interests of time, I'm not

21  going to object, but we just don't agree with any of this.

22          THE COURT:  All right.  With that caveat, Debtors'

23  Exhibit 11B is admitted.

24      (Debtors' Exhibit 11B is received into evidence.)

25  BY MR. FORSHEY:

Brock - Direct                              136

1  Q    All right.  Now, let's go back to Exhibit 9, which is the

2  collection of the sold transactions.

3  A    Okay.

4  Q    Now, the business we talked about in Exhibit 11B, will

5  that help keep these agents, the producers, in place on what

6  we've got reflected in Exhibit 9?

7  A    I'm sorry.  Would you repeat that?

8  Q    Okay.  Having this new agency and handling its business,

9  will that help to promote the collections on Exhibit 9, and

10  if so, how?

11  A    Okay.  Still don't understand that.

12  Q    Okay.  You've heard a lot of testimony about that the

13  producers are going to move on and flip the policies or do

14  different things, right?

15  A    Okay.  Okay.

16  Q    Now, what I want to know is, if you're doing this other

17  line of business we've talked about in Exhibit 11B, --

18  A    Yeah.

19  Q    -- is that going to help keep these producers, the

20  agents, in place?

21  A    If I'm understanding the question, I would say yes.

22  Q    Okay.  How?

23  A    Okay.  So, if we're able to continue to offer our

24  existing sales force products and commissions, they're going

25  to continue to sell with us.  And if we have -- right now, as

Brock - Direct                          137

1   we know, we might not be able to, depending on what happens.

2   So that if we are able to go forward, it will help not only

3   secure new business, but it will help ensure our old

4   business.  If that's -- if that's -- if I'm understanding

5   your question.

6   Q   All right.  If the Debtors quit operating, I understand

7   -- if I understand what you're saying, it means probably the

8   consumer is going to lose their coverage.  Is that right?

9   A   I would -- I would not see why they would.

10  Q   Okay.  Now, let's go to the impact on the producers, the

11  agents.

12  A   To do what?

13  Q   If the two Debtors go dark and quit doing business.

14  A   Well, as has been mentioned, they have to have a

15  paycheck.  They're going to go somewhere to get one.

16  Q   All right.  What's going to be, in your view, the impact,

17  then, on the collection of these sold commissions?

18  A   As you mentioned earlier, I can't tell you how quick it's

19  going to fall off, but it's going to fall off.  And everybody

20  from A to Z is not going to win.  It's just a question of how

21  much you're going to lose.

22  Q   Does keeping this in place, does that maximize the value

23  to Insurety?

24  A   In my opinion, it would.

25  Q   How?  Why?

Brock - Direct                              138

1   A    Because the more people we can keep on the books, the

2   more they can be assured that they get paid and the more

3   money we make to provide our fees and services.

4   Q    Thank you.

5   A    I mean, it's just really quite that simple.  There's no

6   advantage to us for this block of business to go away.  And

7   if it -- okay, that's -- I won't -- I'll just be quiet.

8   That's probably a better thing.

9         MR. FORSHEY:  Your Honor, I want to make sure I've

10  got -- I think I offered and been admitted 9, 10, 11A, and

11  11B.  Is that correct?

12        THE COURT:  They have all been admitted.

13        MR. FORSHEY:  Thank you.  I'll pass the witness, Your

14  Honor.

15        THE COURT:  Thank you.  Mr. Harrell?

16                      CROSS-EXAMINATION

17  BY MR. HARRELL:

18  Q    Mr. Brock, good evening.

19  A    Good evening.

20  Q    Are you telling us that for Exhibit 9 to work you need

21  Exhibit 11B working to keep these agents in place and

22  interested?

23  A    I didn't say we had to.  I said it would help.

24  Q    Okay.

25  A    If I did --

Brock - Cross                                      139

1   Q    Pardon me?

2   A    If I did say that, then -- I can't predict the future.

3   All I can tell you is that if you have stability with your

4   company, --

5   Q    Yeah.

6   A    -- however you might do that, it would help ensure this.

7   Q    Right.  And just to be sure that I understand, Exhibit

8   11B that has a $24 million Debtor income number, --

9   A    Okay.

10  Q    -- this is a projection into the future for a new company

11  that basically you're just getting off the ground?

12  A    I would say yes.  And I think it would be probably common

13  practice to do a projection.

14  Q    Now, I don't disagree with that.

15  A    Okay.  So, yeah, this is a projection.

16  Q    This is a projection and --

17  A    Based -- but based upon historical facts of what we've

18  done so far.

19  Q    So if you can just answer my question, sir.

20  A    Okay.  I'll be glad to.

21  Q    It's 7:00 o'clock almost --

22  A    I understand.

23  Q    -- and we've got a very patient Court.

24  A    And I appreciate it, Your Honor.

25  Q    And so this is my question.  You've been in this business

Brock - Cross                           140

1  a long time, but --

2  A    Okay.

3  Q    -- I take it that Exhibit 11B is -- this is kind of --

4  this is a new business in the sense of a new enterprise that

5  you're trying to build from what you have in your business?

6  A    I'd say that's probably an accurate statement.

7  Q    And so we don't have any proof that any of these numbers

8  in 11B are going to work out in the way that you have

9  projected them and by Month 36 you will have collected $24

10 million, right?

11 A    Correct.

12 Q    And this is just assumptions?

13 A    One hundred percent.

14 Q    And one of the big assumptions is that you're going to

15 have loyal customers who, 36 months after they buy the

16 policy, are still paying on the same policy?

17 A    I don't know that it says that, but what you can do, if

18 you wanted to really get accurate, you could take the 5,000

19 new, use these factors, and tell me how many -- I don't know

20 how many.  It might be four.  So I might tell you we might

21 have four out of 5,000 at the end of 36 months.  But there

22 might be some --

23 Q    Okay.  But sitting here --

24 A    -- on my assumption.

25 Q    -- today on the witness stand at five of 7:00, --

Brock - Cross                          141

1    A    I got you right here.  6:53, yeah.

2    Q    -- you can't tell us one way or the other, can you?

3    A    I cannot.

4    Q    Okay.

5    A    Nobody can that I know of in this world.

6    Q    Yeah, you know, well, unless you've got a crystal ball,

7    right?

8    A    No, you'd have to have a gun.  Crystal balls don't work.

9    Q    Okay.  All right.

10   A    Maybe you believe in them.  I don't.

11   Q    By the way, who ran out 11B, this schedule?

12   A    I did.

13   Q    Did you have somebody help you or did you go to the

14   computer and just do it yourself?

15   A    I went to the computer myself.

16   Q    All right.  And so --

17   A    And I'll go ahead and admit, that's not my friend.

18   Q    And the computer isn't your friend, but you figured out a

19   way to generate this?

20   A    I did.

21   Q    And do you have a list of assumptions or something that

22   you built into this?

23   A    What I did is I looked at our sales that we're presently

24   doing and used that as kind of a starting point of about

25   5,000 new members a month.  And I know open enrollment is

Brock - Cross                              142

1  coming, okay?  And when I first did this, it was a few --

2  about a month or so ago, okay?  So, open enrollment comes,

3  and typically what we have seen happen in the past, our

4  business almost doubles in those two-month period and then it

5  drops back off.  And if you'll see the new business, I tried

6  to model that that way based upon what we had done last year

7  during this same time frame.  So -- go ahead.

8  Q    Yeah.

9  A    Did that answer your question?

10  Q    Well, not really, but --

11  A    Well, I'll be glad to.  So ask, ask it --

12  Q    -- I know you're doing the best you can.  I think when it

13  gets late it's just sometimes communication --

14  A    Yeah.

15  Q    It's probably my fault.

16  A    No, no.  It's probably me.

17  Q    Gets a little bit more difficult.

18  A    I'm --

19  Q    Your assumption here is that you're going to sign up

20  something like 8,000 new members a month, right?

21  A    In time.  We -- if -- now, again, that's an assumption

22  that we are able to do business, we have a good reputation

23  and we can provide services and products to the members, yes.

24  Q    So, I mean, you've got like signing up 200,000 new

25  members.

Brock - Cross                                    143

1  A   Over how long?

2  Q   Over 36 months, right?

3  A   I wouldn't doubt it.

4  Q   And have you done that before in your business?

5  A   Yes.  Yes.

6  Q   Are you -- do you have 200,000 members right now in your

7  business?

8  A   I do not have 200,000 in my business.  But you're asking

9  me, can I?

10 Q   Yeah.

11 A   That was your question, I thought.

12 Q   And you think you can?

13 A   I think I can.  But --

14 Q   But you don't have those members now?

15 A   I never represented that we did.

16 Q   I'm not suggesting you did represent that.

17 A   Okay.

18 Q   And so have you found a bank or somebody who's willing to

19 lend you money under this plan?

20 A   We -- I believe it's been testified to that we don't have

21 a lending partner at this time.

22 Q   Right.  And to be clear, this is money that would come

23 into your business.  What's the name of your business?

24 A   I just mentioned it earlier.  National Individual

25 Insurance Agency.

Brock - Cross                                    144

1  Q    And who owns that business?

2  A    I do.

3  Q    You own it a hundred percent?

4  A    Yes.

5  Q    Okay.  So we, Insurety, don't have any interest in it as

6  creditors, right?

7  A    Not that I know of.  I would hope not.

8  Q    And none of the other creditors in this bankruptcy have

9  any interest in that business?

10  A    I would hope not.

11  Q    It's -- this is your business?

12  A    Well, it depends -- to answer your question, you asked

13  me, did I own it, and I told you a hundred percent.  So

14  you're asking me again, do I own the business?

15  Q    I think you answered my question.

16  A    I did.

17  Q    And --

18  A    But you asked it again, though.

19  Q    Mr. Brock -- see, now you made me forget my next

20  question.

21  A    Okay.  That's -- we got -- no, I don't want to say we

22  have time, because we don't.

23  Q    So you own this business?  And what's your position with

24  AWIS?

25  A    I believe I mentioned it in testimony that I was

Brock - Cross                                        145

1   president -- am president of AWIS, yes.

2   Q   So you're wearing two hats sitting here today in

3   connection with two different businesses?

4   A   I guess you would have to say that, because if I'm

5   president of one and I own the other, then that would be a

6   conclusion that you'd have to take.

7   Q   All right.  Let's go back to Exhibit 9 briefly, please.

8   Who prepared this exhibit --

9   A   And, again -- and, again, is this the one we're talking

10  about?

11  Q   Yes, sir.

12  A   Okay.  All right.

13  Q   Who prepared Exhibit 9?

14  A   I did.

15  Q   And did you do this all by yourself, without any help?

16  A   So, by you -- I'm just going to say yes, because you're

17  questioning whether I did or didn't, so I'm just going to

18  tell you yes, like I told you on the other one.  So it's yes,

19  I did.  With the help of some other people checking me out,

20  giving -- giving me information.

21  Q   So you had to get some numbers to plug in here --

22  A   Yeah.

23  Q   -- at the beginning, right?

24  A   Yeah.  That's exactly right.  I was given these numbers

25  in the beginning, yes.

Brock - Cross                              146

1   Q   Okay.  And --

2   A   And they came from CyberX.  Not the $21 million.  That

3   was given to me by either Deborah or Randee or somebody that

4   had that information.  CyberX, I don't -- I would not know

5   where to find that information at.

6   Q   Is there somebody at AWIS or the TPA who helped you at

7   the beginning get you the numbers so you could prepare this?

8   Who was the individual you worked with?

9   A   I -- we went to -- I went to CyberX, and all you had to

10  do is put a date range in there and it tells you what the

11  renewals were for that month.  Okay.

12  Q   Okay.

13  A   So that gave me my base number.  The five million and

14  change a month.  Number one.

15  Q   Okay.  So --

16  A   So that was the beginning point of everything.  Okay?  So

17  that's the only number you really need that -- that I needed,

18  okay, was what the renewal was.  And then I needed to know

19  what the assumed debit balance was total.  $21 million.

20  Those are the only two numbers I needed.  And then taking a

21  factor of lapsing attrition, if you want to call it that, and

22  just making those numbers pay out.

23  Q   Okay.  So, excuse me for asking this again.

24  A   Okay.

25  Q   You said you got the $5.1 million out of the --

Brock - Cross                              147

1    A    From the system.

2    Q    Out of the system.  Now, explain to us what that number

3    actually represents.

4    A    Okay.  So what it does, if you go into the system, you

5    put in your date range, okay, then it's going to give you the

6    amount of new business that was in that particular date

7    range, the amount of renewal business in that date range.

8    And renewal and new business is two different entities.  And

9    then it has a column where it combines them both.  But all I

10   was focused on was the renewal business, because I felt like

11   that renewal premium, regardless of what the amount of money

12   was, was the money that should be considered in Insurety's --

13   as Insurety's money to pay -- derive the commissions from.

14   Okay.

15   Q    And that, those are renewals for their payments that come

16   into AHCM --

17   A    Correct.

18   Q    -- of our money, right?

19   A    Well, part of it is your money, yes, correct.

20   Q    Of that $5 million?

21   A    Exactly.

22   Q    That's our -- our money?

23   A    Well, we interpret that as the 40 percent would be your

24   money and then the fees would be your money.

25   Q    And that was for what months that came in?

Brock - Cross                                148

1    A    From inception.

2    Q    Okay.  So you're saying that's the money that came in

3    from the beginning of the contract?

4    A    According to CyberX.

5    Q    And so how many months is that?

6    A    Well, how many months have you advanced?

7    Q    Well, I'm asking you.

8    A    I don't know how --

9    Q    You prepared this.

10   A    Well, I did not prepare it based upon how many months.  I

11   prepared it from day one to now.  Now, how many months that

12   is, I'd say probably at least 15, 16.  However -- no, however

13   many months we've been in business, that you've been in

14   business.

15   Q    You don't even know?

16   A    I cannot give you an exact date.  Do you know?

17   Q    And so my other question is, it is through what date?

18   What date did you prepare this?

19   A    August 31st.

20   Q    Through August 31st?

21   A    Yes.

22   Q    So we don't have anything from September here?

23   A    No.

24   Q    Just through August 31st?

25   A    Exactly.

1   Q    Okay.  And so if we go through this one month at a time,

2   can you tell me what percentage of the policies were from

3   July?

4   A    I couldn't, based upon this number.  But, yes, you can go

5   ahead and isolate it, if you want to do it by the day.

6   Q    Okay.  I understand that we can get a lot out of the

7   computer.

8   A    Right.  Okay.

9   Q    And I'm just focused on what you --

10   A    But what are your questions?

11   Q    -- know today testifying here and what went in to baking

12   this cake.

13   A    Okay.

14   Q    And my question is, did you look at the number of

15   policies for July?

16   A    In the August 31st renewal, whatever renewed a second

17   month, okay, would have been in there.  If it renewed in that

18   time frame, the July renewals would be in there.

19   Q    Let me try asking the question a different way.

20   A    Okay.  Go ahead.

21   Q    Sitting here in front of the Court today, can you tell us

22   what percentage of the policies are attributable to any

23   specific month during the contract?

24   A    Not even maybe.

25   Q    Not close?

1    A    Not even.

2    Q    Okay.

3    A    Nor did I intend to.

4    Q    All right.  Now, you know that policies that are the most

5    recent policies are going to have the biggest attrition

6    rates?

7    A    Exactly.

8    Q    So if you're going to, use your word, forensically, --

9    A    Yeah.  Yeah.

10   Q    -- or I might use the word scientifically, --

11   A    Right.

12   Q    -- prepare something like this, what you would do is you

13   would take the number of policies in each month and then you

14   would apply a different attrition rate to those policies, --

15   A    Yeah.

16   Q    -- right?

17   A    That would be a way to do it, yes.

18   Q    Well, that would be the accurate way to do it?

19   A    Well, that's an opinion.

20   Q    Well, --

21   A    Okay?  So what I'm telling you is this here is just what

22   it is, okay?  And regardless of whether the attrition is 15

23   percent, five percent or whatever, one hundred percent of the

24   dollars that came in, regardless of the attrition rate, would

25   be applied to the commission.

Brock - Cross                          151

1   Q    Right.

2   A    So if I did not account for this accurately, the numbers

3   would change, but they would be the numbers based upon the

4   facts.

5   Q    But this Exhibit 9 is a projection going forward, right?

6   A    It's -- and some of this business is a year old.  So I

7   would have gone into every month --

8   Q    Can you just answer my question?

9   A    Okay.  Be glad to.

10  Q    Is this a projection going forward?

11  A    Well, it -- yes.  Because this is August.  Yes.  Okay.

12  Yes.

13  Q    Simple question.  Is it a projection going forward?

14  A    Okay.  Yes.  Yes.

15  Q    And so if you're looking at what the projection is for

16  the next month, like September, --

17  A    Uh-huh.

18  Q    -- you would want to know, if you were trying to make a

19  really accurate prediction, what your mix of old and new

20  policies were that you were figuring into that projection,

21  right?

22  A    Yes.

23  Q    And you didn't do that?

24  A    I did not do that.  I think I already told you that.

25  Q    And by using a five percent number, that's just kind of

Brock - Cross                          152

1  an estimate number that you used just to -- for ease of

2  calculation?

3  A    Just to give some kind of clarity to what it could look

4  like.  Hopefully, it would be better.  Because if it's not,

5  if it's worse, it takes longer.  In other words, if the

6  attrition rate is different, maybe it's seven percent, maybe

7  it's two percent, whatever number, it's going to affect the

8  performance of the product.

9  Q    And so when we look at the number at the bottom,

10 $21,854,518.42, --

11 A    Yes.

12 Q    -- that looks like a really precise number, but --

13 A    Well, it has to be precise.

14 Q    But you -- can I ask -- can I finish my question?

15 A    Sure.  Go ahead.  Go ahead.

16 Q    When you look at the number that is the sum of this

17 column, --

18 A    Yeah.

19 Q    -- it is a precise number down to the pennies, isn't it?

20 A    Yes.

21 Q    So can you tell the Court with reasonable certainty that

22 that's going to be the number 16 years into the -- I'm sorry,

23 16 months into the future?

24 A    No.

25 Q    And it --

Brock - Cross                                    153

1    A    Because initially it was an assumption.

2    Q    And it's based on your assumption of five percent?

3    A    Exactly.

4    Q    And it's based on this computer run that did not

5    distinguish policies in different months?

6    A    It -- one hundred percent correct.

7    Q    And can we say the same thing about Bucket 2, the

8    $19,122,703.62?

9    A    You can say it about every column.

10   Q    That's just a projection?

11   A    Again, yes.

12   Q    And, again, you can't tell us if that has any accuracy

13   with reasonable certainty to this?

14   A    I can tell you it has a fairly decent --

15   Q    No, that's --

16   A    But that's an opinion and that don't write any checks.

17   Q    Can you let me finish my question, please?

18   A    I can't tell when you stop.

19   Q    I know.  I'm bad about that.

20   A    Okay.

21   Q    I apologize.

22   A    And I apologize for interrupting you.

23   Q    Well, I talk slow and I think slow, so just bear with me.

24   A    Well, I'm from Alabama, so you know I do.

25   Q    My simple question is, you can't verify to the Court that

1   this $19.122 --

2   A    Yeah.

3   Q    -- million sum is a number with reasonable certainty that

4   is going to exist after 16 months, can you?

5   A    Would you define reasonable certainty?

6   Q    With any kind of certainty, can you say that that is

7   what's going to be there?

8   A    I'd say I couldn't, I'd rather -- rather than this go on.

9   Q    Okay.  And, by the way, there is no contractual --

10  there's no contractual obligation for these customers to keep

11  paying, is there?  They can quit at any time, can't they?

12  A    I think, I think that's an obvious statement.

13  Q    Okay.  Let's go to Exhibit 10.  And I'm not going to

14  belabor this, but did you do all the calculations in Exhibit

15  10 also?

16  A    No.  The --

17  Q    All right.

18  A    The bottom portion of that was provided to me from the

19  CyberX system from Randee.

20  Q    Okay.

21  A    And so what I did is I took the larger numbers that you

22  can see, the 14,745, which is the most amount of members,

23  okay, and then put the attrition rate on that, and then used

24  the factors 40 percent commission and so forth on the rest of

25  it.

Brock - Cross                                    155

1   Q    Okay.  So, --

2   A    Those are assumptions also.

3   Q    So you used this $1.7 million of earned commissions at

4   the bottom of this page, right?

5   A    Yes.

6   Q    And tell me again where you plugged that -- oh, I see.

7   You plugged it in at the top --

8   A    Yes.

9   Q    -- under Earned Commissions --

10  A    Yeah.

11  Q    -- in that first line?

12  A    Correct.

13  Q    And then you did the rest of the work in the top graph

14  here?

15  A    Right.  As is --

16  Q    And --

17  A    Yes.  Yes.

18  Q    And it was the same kind of estimate or projection that

19  you did in the other places that we talked about, right?

20  A    It wasn't the same.  It was similar.  I was more

21  aggressive because this was a new box of business so I used a

22  higher attrition rate.

23  Q    Right.  A higher attrition rate that you came up with?

24  A    And -- well, that y'all had testimony against that said

25  this is what it typically is in the industry.  It just so

Brock - Cross                              156

1   happened I used those same numbers unknowingly.

2   Q    So my question is, you didn't know and you didn't

3   calculate how many policies were in each -- each month and

4   what the age of the different policies were when you did it?

5   A    Well, this only represents two months, so it's pretty

6   hard to deep -- dive in too deep into that.

7   Q    But you didn't look at that, I take it?

8   A    No, I took -- I made the assumption that 35 percent of

9   them would fall off immediately.  The first month.

10  Q    Let me ask you, let me ask you a question about the

11  business you're running today.  How many agents do you have,

12  or producers?

13  A    At this time?

14  Q    Yeah.  Today.

15  A    Today?

16  Q    Uh-huh.

17  A    I don't know how many we've contracted with.  I really

18  don't -- I don't know.  Randee could have answered that

19  question.  I don't know how many have contracted with us.

20  None of them are producing at this time.

21  Q    Okay.  So I'm talking about your new business.

22  A    I'm talking about my new business.

23  Q    And so what's Randee's relationship to your new business?

24  A    She is part of AHCM.  She provides agent services for

25  these people.

Brock - Cross                              157

1    Q    Okay.  So your new business is using AHCM.  And so are

2    you paying people in your new business yet?

3    A    I think I just ment... what, you mean as far as

4    employees?

5    Q    Or in any way are you giving them money.

6    A    No.  Not at this time.

7    Q    Okay.  And they have not sold anything yet?

8    A    Not yet.

9    Q    So if we go back to Exhibit -- what was the first exhibit

10   we talked about -- 11B, --

11   A    Uh-huh.

12   Q    -- which is for your new business, your first line is

13   5,000 new members.  And have you sold 5,000 new policies in

14   that business?

15   A    Well, I think we just said that I have not sold any new

16   business, so how could I sell 5,000?

17   Q    So what you're telling us, then, is this 5,000 new in

18   Exhibit 11B is just a made-up number?

19   A    It's a projection.  Just like we discussed about 15

20   minutes ago.

21   Q    And based on no sales?

22   A    No sales.  No.  Okay?

23        MR. HARRELL:  One moment, Your Honor.

24        (Pause.)

25   BY MR. HARRELL:

Brock - Cross                          158

1  Q   One more question.  For your new business, I think you

2  said you didn't have a lender for that business, right?

3  A   Correct.

4  Q   So you have no funding source for your new business,

5  sitting here today, do you?

6  A   At this particular moment, no.

7           MR. HARRELL:  Pass the witness.

8           THE COURT:  All right.  Thank you.  Mr. Forshey?

9           MR. FORSHEY:  No further questions, Your Honor.

10          THE COURT:  All right.  Thank you, sir.  You may step

11 down.

12          THE WITNESS:  Thank you.

13     (The witness steps down.)

14          THE COURT:  Ms. Rea or Mr. Forshey, any other

15 witnesses or exhibits for your cases in chief on each of the

16 pending matters for today?

17          MR. FORSHEY:  The only exhibit I'd like to offer

18 would be the organizational chart.

19          MR. HARRELL:  No objection, Your Honor.

20          MR. FORSHEY:  I don't think that's controversial.

21          MR. HARRELL:  I think that's 4, isn't it?

22          THE COURT:  No, I think it's 3.

23          MR. FORSHEY:  It's 3.

24          MR. HARRELL:  Oh, 3.  Maybe.  Okay.

25          THE COURT:  All right.  Then Debtors' Exhibit 3 is

1   admitted.

2        (Debtors' Exhibit 3 is received into evidence.)

3        MR. FORSHEY:  And I think Exhibit 7 has already been

4   admitted.

5        THE COURT:  It has.

6        MR. FORSHEY:  Okay.  With that, Your Honor, we would

7   rest.

8        THE COURT:  All right.  Mr. Peck or Mr. Harrell?

9        MR. HARRELL:  So, we're prepared to call a witness,

10  Your Honor, but I'd like to have like just three or four

11  minutes just to talk to our people on whether we need to do

12  that.

13       THE COURT:  That's fair.

14       MR. HARRELL:  And if we don't, I think everybody will

15  be real happy.  But we might need to.  So, could you give us

16  --

17       THE COURT:  Absolutely.  And, again, I realize it's

18  7:15.  It's fine.  It doesn't bother the Court at all.  The

19  only thing that concerns the Court is that -- and this isn't

20  projecting what the Court is thinking -- but I do know that

21  there are some payments that arguably want to be made

22  tomorrow, so payments arguably want to be made tomorrow, I

23  assume I have to finish the hearings tonight to at least rule

24  yes or no.  Am I missing anything on that?

25       MR. FORSHEY:  No, sir.

1          THE COURT:  All right.  Why don't you let Karyn know

2     when you're ready to start and she'll come get us.

3          MR. HARRELL:  Thank you.

4          THE COURT:  Okay.

5       (A recess ensued from 7:15 p.m. until 7:30 p.m.)

6          THE CLERK:  All rise.

7          THE COURT:  Thank you.  Please be seated.  All right.

8     We're back on the record.

9          MR. HARRELL:  Judge, I have good news and bad news.

10    The bad news is we're calling one more witness.  The good

11    news is we cut down the testimony to about a tenth of what we

12    had.  So we -- I promise we will put him on very quickly.

13         THE COURT:  All right.  Call your witness.  And

14    please come forward, sir, to be sworn in.

15         MR. HARRELL:  Walt Bratic.

16         THE CLERK:  Please raise your right hand.

17       WALTER BRATIC, INSURETY CAPITAL'S WITNESS, SWORN

18                    DIRECT EXAMINATION

19    BY MR. HARRELL:

20    Q   Mr. Bratic, would you please introduce yourself to the

21    judge?

22    A   Yes.  My name is Walter Bratic.  My last name is spelled

23    B-R-A-T-I-C.

24    Q   And Mr. Bratic, you work with -- whether you're an

25    employee, I'm not sure what your status is, but you're

1  affiliated with Whitley Penn, which is an accounting firm,

2  right?

3  A    It's an accounting firm based in and started here in Fort

4  Worth.  It's a Texas-based accounting firm.

5  Q    And you're a forensic accountant and you've done that

6  kind of work your entire career since--?

7  A    1976.

8  Q    All right.

9  A    Actually, 1978.

10  Q    Mr. Bratic, tell the Court quickly what your educational

11  background is.

12  A    I have two formal college degrees.  I have a bachelor's

13  degree from the University of Pennsylvania in Philadelphia.

14  I also have a master's of business administration degree from

15  the Wharton School of Business, which is also at the

16  University of Pennsylvania.

17  Q    You started your career working for Pricewaterhouse?

18  A    I actually started working for Ernst and Ernst, but I've

19  spent 17 years of my career in public accounting, and for 10

20  to 11 years I was a partner at Pricewaterhouse in their

21  forensic bankruptcy and accounting group.

22  Q    And you're a CPA?

23  A    I'm a certified public accountant.  I've been licensed by

24  the State of Texas since 1981.  I also am a certified fraud

25  examiner, and I also am certified in financial forensics by

Bratic - Direct                              162

1    the American Institute of Certified Public Accountants.

2    Q    In connection with your work, Mr. Bratic, do you have

3    occasion to provide projections?

4    A    Yes.  I work a lot with financial projections.  I've been

5    doing that for 40 years.

6    Q    And is that in connection with computing future damages

7    and future costs and all that kind of thing in connection

8    with that?

9    A    Not just future damages, but also, for example, business

10   projections for startup companies or new technologies.  And

11   so there are various guidelines issued by the American

12   Institute of Certified Public Accountants for CPAs and when

13   they prepare financial forecasts and financial projections.

14   Q    Now, when did we retain you for this case?

15   A    The afternoon before the Friday supposed document

16   inspection that I went to.

17   Q    Yeah.

18   A    And that was probably a month ago.  Roughly.

19   Q    Maybe two and a half months.

20   A    Was it that long?

21   Q    Maybe two months ago now.

22   A    Time's flown.

23   Q    And I don't have the date.  But we called you and asked

24   you --

25   A    Yes.

Bratic - Direct                                        163

1    Q    -- to go over to a document inspection because the

2    Debtors were going to produce financial documents, right?

3    A    That's correct.

4    Q    And just to cut this short, you went to that inspection

5    and you got very, very little, right?

6    A    Very little.  Yes.  Almost nothing new.

7    Q    And so we had after that two different court hearings in

8    state court in Houston, right?

9    A    Yes.

10   Q    And you were our testifier, our witness, our expert, and

11   you testified in both of those court proceedings, right?

12   A    That is correct.

13   Q    And so we got you involved because we were trying to get

14   records, and then we finally got some records, and we heard

15   about that earlier today.  Have you had a chance to review

16   those records?

17   A    Yes.  I reviewed those very limited records that were

18   produced.

19   Q    Did we ever get nearly what we wanted or asked for?

20   A    No.  Not even close.

21   Q    About how many hours have you spent working on this,

22   which would include your review of the records, your

23   appearance in court, and then just readings pleadings and

24   other things?

25   A    My time alone would be somewhere around 50 hours, but I

Bratic - Direct                                    164

1  had staff working under my direction and supervision, and I'd

2  say all told we collectively have somewhere around 150 hours

3  on this project.

4  Q   Now, you've been in this hearing today, you've heard the

5  testimony, you've heard about Exhibits 9 and 10 of the

6  Debtors, right?

7  A   Yes.  Let me make sure while I look at them.  Correct.

8  Yes, I'm looking at them.  Yes.

9  Q   And you were here when the last witness spoke about how

10  he prepared those exhibits?

11  A   Mr. Brock.  Yes.

12  Q   And by the way, we got those last night.  You got a copy

13  of them today?

14  A   Yes.

15  Q   And you were able to review them today, right?

16  A   I was.

17  Q   And you had a couple people at the office who were

18  helping you and were doing some analysis, right?

19  A   Yeah.  We're trying to, you know, trying to understand

20  the projections and -- as best we could.  Because there was

21  no underlying documentation supporting these projections.

22  Q   Was there a list of assumptions or the types of things

23  you usually see or expect to see when somebody is projecting

24  numbers into the future?

25  A   No, there weren't.  There weren't any -- no lists

Bratic - Direct                                    165

1   accompanying these projections.

2   Q    All right.

3   A    No list of assumptions.

4   Q    Okay.  Well, but now having heard the testimony, you know

5   how they were prepared?

6   A    I understand now how they were prepared, yes.

7   Q    Do you have an opinion regarding whether these

8   projections in Exhibits 9 and 10 and also in 11 were prepared

9   with any kind of accuracy or pursuant to any of the standards

10  that are used when somebody is trying to project numbers into

11  the future?

12  A    I do have an opinion, and they certainly don't rise to

13  the level of scrutiny that I would expect for financial

14  forecasts to be presented in a court, particularly in terms

15  of them being property vetted and analyzed and supported with

16  documentary evidence to support the assumptions underlying

17  the projections.  None of that exists here.

18  Q    And you've been involved in financial institutions

19  throughout your career.  Would a financial institution lend

20  money on projections like this?

21  A    No.  Not in my opinion.  Absolutely not.

22  Q    And so if those projections are the basis by which the

23  Debtors intend to provide what they call adequate security --

24  adequate --

25          MR. PECK:  Protection.

Bratic - Direct                                166

1          MR. HARRELL:  Protection.  Thank you.

2     BY MR. HARRELL:

3     Q    Adequate -- it's late -- adequate protection, would you

4     put any stock in them as adequate protection for our client,

5     Insurety, to get repaid what it is owed?

6     A    No.  I would not.

7     Q    And have you seen anything else in the records that we

8     have been -- have been produced to us throughout your time

9     working on this case for the last two or so months that would

10    indicate that we, Insurety, have adequate protection if our

11    money is used by the Debtors to fund additional expenses of

12    any kind?

13    A    Well, actually, it's to the contrary.  And what I mean by

14    that is the one limited -- the very limited piece of

15    financial information that was produced recently, prior to

16    the Debtor filing for bankruptcy, were three bank statements

17    for the Comerica account at ACHM [sic] for the month of June,

18    July, and August and also a general ledger for that same

19    three-month period for ACHM.  I've studied that analysis.

20    And, of course, the nice thing about bank statement is --

21    bank statements is and why they're very reliable is because

22    they're prepared by an independent third party and it shows

23    transactions coming in and coming out.  There were about $23

24    million of cash came into that ACHM account in those three

25    months, and $24 million went out.  And of the $24 million

Bratic - Direct                                    167

1   that went out, only about $1.2 million had been paid to

2   Insurety for previous payments which came in in early June,

3   but then all the payments stopped.  Disbursements were made

4   to all kinds of third parties with very little documentation

5   either in the general ledger or in the bank statements.  And

6   the general ledger didn't even come close to balancing to the

7   ending cash balances.  They were off by $1.2 million, for

8   example, just in the month of August.  For example, you've

9   got in the record the seventy -- $96,000 was the bank balance

10  at ACHM Comerica on August 31st.  The general ledger showed

11  that that bank had a cash balance of $1.2 million.

12  Q   So you're saying the records -- the few records we got

13  didn't even sync?

14  A   Didn't sync even closely.  And so that's why I relied

15  heavily on the bank statements to look at the flow of monies

16  in and out.

17      And so if you're looking at what Insurety claims it had

18  been owed these past months as far as its purchased assets

19  which should have been repatriated or repaid to it as the

20  commission payments came in to ACHM, $24 million leaked out

21  the system and very little ever went to Insurety.  And that's

22  why, based on that historical analysis, in very recent time

23  period, going back to June, July, and August, and then

24  looking at these projections, I don't believe there's

25  adequate protection, not based on what has been produced

1    today.

2    Q    And when you do a projection, do you have to base a

3    projection on past history?

4    A    Yes.  You look at past trends and then you forecast it

5    forward based on past trends, you might look at industry data

6    and so forth, so on, to establish trend lines and so forth,

7    something that you can have some degree of reliance may

8    likely occur in the future as best you can tell.

9    Q    And did you see that here?

10   A    No.

11   Q    Was that done here?

12   A    No, it wasn't done at all.

13          MR. HARRELL:  Pass the witness, Your Honor.

14          MR. FORSHEY:  No questions, Your Honor.

15          THE COURT:  All right.  Thank you, sir.

16          THE WITNESS:  Thank you.

17       (The witness steps down.)

18          MR. HARRELL:  Thank you.  We'd rest, Your Honor.

19          THE COURT:  All right.  Any rebuttal, or do we rest

20   and close on all evidence?

21          MR. FORSHEY:  Yes, Your Honor.

22          THE COURT:  All right.  Then we'll go to closing

23   arguments.

24             CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

25          MR. FORSHEY:  Your Honor, the one thing that there

1   has been no contrary evidence on is that anybody is going to

2   be hurt by the Debtors' continued operation or that everybody

3   is not going to be better off.  I mean, you've heard a lot of

4   brickbats thrown at the Debtors about the injunctions and

5   other things, but, you know, the one thing you haven't heard

6   anybody say is that everybody is going to be better off if we

7   don't operate.  Nobody has argued that and nobody has put in

8   any evidence of that.

9            THE COURT:  Can I ask you a couple questions --

10           MR. FORSHEY:  Yes, sir.

11           THE COURT:  -- just to make sure I understand the

12   exhibits and the testimony?

13           MR. FORSHEY:  Sure.

14           THE COURT:  So, on Exhibit 9, the very first figure

15   there, in Month 1, the $5,136,152, is my understanding

16   correct that that represents the member payments for renewal

17   policies that were created or that came into existence from

18   either the date the Debtor came into existence back sometime

19   in 2018 up until August 1st, I think the testimony was?

20           MR. FORSHEY:  Yes.

21           THE COURT:  And that's the -- and those are all

22   policies that arguably --

23           MR. FORSHEY:  I think it was August 31st.

24           THE COURT:  August 31st.  And so that's arguably the

25   policies that members are making their monthly payments on?

1    Arguably, those are -- that's the universe of policies that

2    Insurety might have, either own part of the interest or have

3    an interest in.  Is that correct?

4         MR. FORSHEY:  That's -- yes.  That, and then the ones

5    that were purchased during the summer on Exhibit 10.

6         THE COURT:  Well, let me finish.  So the way I

7    understand Exhibit 9, then, is that's the universe of

8    policies, and assuming they don't lapse and the customers

9    continue to make their monthly payments, that's a runoff, if

10   you will, or a liquidation of those policies of which

11   Insurety had potentially purchased some of the commissions?

12        MR. FORSHEY:  Yes.  That was the intent.

13        THE COURT:  Okay.  So that's -- and when we go to,

14   for example, Exhibit 11B, did I understand the testimony that

15   in order for Exhibit 9, the projections that are included on

16   Exhibit 9, the runoff of those policies, one of the risks or

17   several risks are the members will stop making payments?

18        MR. FORSHEY:  Correct.

19        THE COURT:  And that if producers weren't paid, they

20   potentially could take their customers, their contacts, and

21   say, hey, we've got policies over here, so stop making those

22   payments and come over here with me.  Was that part of the

23   testimony?

24        MR. FORSHEY:  Yes, sir.

25        THE COURT:  And that the purpose for 11B is to keep

1    the producers from fleeing.  If they're not going to have as

2    much business with the Debtors, it's to give them another

3    opportunity to sell other products but stay not necessarily

4    within the tent of the Debtors but under some control, to

5    where they can then make potentially new fee income for the

6    Debtors, but as I interpret the evidence, is that that really

7    is to help keep the producers here so that the numbers on

8    Exhibit 9 can actually come to fruition?

9          MR. FORSHEY:  That's correct.

10          THE COURT:  Is that -- was that the intent of those

11    exhibits?

12          MR. FORSHEY:  Yes.  That -- I mean, it's for both,

13    to show that if we've got somebody friendly that's dealing

14    with these agents, he's not trying to pirate our business and

15    he can keep that over here where we can collect the Exhibit 9

16    stuff.  That's the big idea first.  It's to keep them in

17    place and keep them from terminating the policies, selling to

18    other people, so we get that runoff.

19        The other thing is it opens a really good potential going

20    forward to bolt on business.

21          THE COURT:  Which may or may not --

22          MR. FORSHEY:  Which may or may not happen.

23          THE COURT:  Which may or may not happen.  And so it

24    doesn't seem to provide adequate protection, if you will, to

25    Insurety, but that's a potential element, and I use that word

 1   very loosely, of adequate protection to show why Exhibit 9 is

 2   --

 3            MR. FORSHEY:  No, I --

 4            THE COURT:  -- is potentially doable?  I think that

 5   it showed that -- at least the column in Column 1 shows about

 6   $55 million of payments if those policies, based upon a five

 7   percent runoff or lapse, --

 8            MR. FORSHEY:  That's correct.

 9            THE COURT:  -- that hopefully within 16 months there

10   would be $55 million coming in, --

11            MR. FORSHEY:  Yes, sir.

12            THE COURT:  -- of which -- okay.  So I did understand

13   the exhibit correctly.

14            MR. FORSHEY:  Yes, sir.

15            THE COURT:  All right.  I'm sorry.  I didn't mean to

16   interrupt.  I thought that was important for me to

17   understand.

18            MR. FORSHEY:  No, no.  No, that's -- it's a

19   complicated business.  It took us a long time -- I'm not

20   going to pretend to you that I understand all we had hoped

21   to.  But I just think the one thing you haven't heard anybody

22   say is that it helps anybody if we go dark.  Because if we do

23   go dark, I don't think you're going to have the runoff.

24   You're going to have basically a crash and burn.

25       The only evidence you've heard is that everybody's

1   wellbeing is maximized if the Debtors stay in business.  And

2   that is the insureds.  Their premiums get paid.  The agents,

3   the producers, they get paid.  The creditors get paid.

4          THE COURT:  I understand.  I don't mean to interrupt.

5   I just, it is getting late.  I want to make sure I tick off a

6   couple issues that I had in my head.

7       Back to Exhibit 9, but another question on the impact of

8   whether or not it's a reliable exhibit.  We go to Exhibit 12,

9   which is the budget, and my recollection from the testimony

10  was that the reason the advances go down in Weeks 3 and 4 is

11  because the sales force decreases pretty substantially,

12  correct?

13         MR. FORSHEY:  Potentially, yes.  We don't have --

14         THE COURT:  So does that mean that those producers

15  are gone?  And if they leave, how would that impact Exhibit

16  9?

17         MR. FORSHEY:  Those are the guys that we're trying to

18  keep in place by having the other entity so that they don't,

19  on our existing policies, they don't migrate.  That's what

20  we're trying to do, --

21         THE COURT:  Okay.

22         MR. FORSHEY:  -- is to keep them in place.

23  Obviously, the optimum situation would be if we can keep

24  advancing to them.  The cash isn't there.  So we're doing the

25  best that we can to keep them in place through that mechanism

1  so we can get the best runoff possible.

2          THE COURT:  Okay.  All right.  My apologies.  I

3  didn't mean to interrupt your train of thought.

4          MR. FORSHEY:  No, no.  It's -- I'm not going to

5  belabor the point.  You've heard the evidence.  Thank you for

6  your patience.

7          THE COURT:  Now, let me ask, if you're done, I just

8  want to ask you, could you tick off for me, so in case I

9  missed it, what sort of adequate protection, assuming the

10  Court were to say that -- what sort of adequate protection

11  does the Debtor provide to Insurety, to make sure I

12  understand, because I don't know if I really heard -- I don't

13  know, for example, when we looked at the budget, I don't

14  know, well, I don't know how much money is coming in.  So I

15  guess I was looking at Exhibit 9 as sort of the form of

16  adequate protection, but I'll let you tell me.

17          MR. FORSHEY:  No, we were --

18          THE COURT:  Where's the adequate protection for

19  Insurety?

20          MR. FORSHEY:  No, we were thinking Exhibits 9 and 10

21  would reflect what would be coming in.  What we had proposed

22  on the sheet that I gave you is that, as Insurety's money

23  comes in -- and let me, if you don't mind, Your Honor, let me

24  get my sheet.

25      First of all, that on the stuff that they had bought,

1    they would get that.  That would come in.  And we would use

2    that -- that money would come in Bucket 1, and that would

3    simply be placed in another account.

4         THE COURT:  Understood, but that's not really a lot

5    -- that's not a lot of adequate protection if the Court's

6    going to allow $1.2 million out the door tomorrow, of which,

7    if -- let me make sure I understand the budget right.  So we

8    have roughly $1.2 million on Exhibit 12 would be going out.

9    Of that $1.2 million, how much of that, if any, does the

10   Debtor believe is Insurety's money or that they have an

11   interest in?

12        MR. FORSHEY:  Well, it would be very -- it would be

13   very little.  Remember, their security interest is only in

14   their purchase stuff.  That's all it is.  It doesn't hit in

15   the other things.

16     So that, for example, the Debtors' money that shows up on

17   Exhibit 9 and Exhibit 10 and what you see in Exhibit 11A, the

18   third-party stuff, that isn't their money at all.

19        THE COURT:  Well, I understand.  So, out of this $1.2

20   million, how much of that will be, in your terms, their

21   money?

22        MR. FORSHEY:  Very little, I think.

23        THE COURT:  Okay.

24        MR. FORSHEY:  Because what we -- let me show you what

25   we propose to do, because it's difficult to calculate what

1   this income would be in advance.  On the sold commissions,

2   they get all of that.  So there -- I mean, there's nothing

3   really to adequately protect.  They're going to get all of

4   that.

5       Then over here on Bucket 2, we propose that any of this

6   that is collected over the next four weeks, we'll give them

7   70 and we'll keep 30.  The 30 percent that we keep we will

8   say, the sales that attributable to that, we're going to say

9   that that is their stuff.  So when you go over here on the

10  budget and you see that we're going to be -- Debtors request

11  advance commissions, 787, 787, to the extent that that comes

12  out of their stuff here, they're going to get 100 percent of

13  that.  And then they have a replacement lien in the stuff

14  that they don't have liens against to the extent there's a

15  diminution of value.  But there's not -- the way we've tried

16  to tailor this is to get rid of most of their objections, but

17  we're not really proposing to use very much of their stuff at

18  all.

19      On Exhibit 9, it's zero, and on Exhibit 10 it's a 70/30

20  split, and whatever we buy from that they get 100 percent of

21  that 30.  I mean, they own it.

22      The purpose of making that payment, Your Honor, is that

23  these guys are expecting it.  If we don't make it, you can

24  guess what that's going to do.  But they're adequately

25  protected because they get 100 percent of that.  So the money

1   we're talking about going out the door, most of that, the

2   great, great majority of that, is going to be our money.  And

3   to the extent that we're using any of their money over here

4   on Bucket 2, we're giving them their 30 percent.  They

5   actually own what we're buying there.  So we're really not

6   using very much of their stuff.

7       Now, if we had more time, I'm going to have better

8   budgets in terms of being able to parse out the other things

9   and do that.  But we're not using hardly any of their stuff

10  at all.  And to the extent we are, we're saying that it is

11  theirs.  So I think they're -- I think they are adequately

12  protected.  And I think they're also adequately protected,

13  the indubitable equivalent.  I mean, what happens if we keep

14  doing that?  I mean, it's --

15          THE COURT:  That's a question I have for Mr. Peck or

16  --

17          MR. FORSHEY:  I mean, it's over.  And if what we're

18  doing is giving them their best option to get repaid, it's

19  kind of hard to see how that's not adequate protection.

20      Thank you, Your Honor.

21          THE COURT:  All right.  Thank you, sir.  Mr. Peck?

22      CLOSING ARGUMENT ON BEHALF OF INSURETY CAPITAL, LLC

23          MR. PECK:  Thank you, Your Honor.  All right.  It's

24  been a long day.  Let's start with this.  Mr. Forshey says in

25  his pleadings that the Debtors will seek to recharacterize

1    the relationship between Insurety and its clients.  That's

2    not currently teed up for hearing, and as you know, that

3    would require an adversary proceeding, which has not been

4    filed.  And it's certainly not teed up for a stay.  So to

5    grant the Debtors' motion even on an interim basis, you would

6    have to ignore the plain language of the commission

7    assignment agreement, which clearly states that the

8    commissions were assigned to Insurety and are Insurety's

9    property.

10         THE COURT:  Well, let me ask, and that's part of the

11   questions I was asking Mr. Forshey.  How much of the budget

12   -- and, you know, dummy it down for me; I've been on this

13   case now for about 24 hours -- how much of the budget that --

14   of the funds that they want to go out the door tomorrow, how

15   much of that do you think is Insurety's money?

16         MR. PECK:  It's a tough question to answer, Your

17   Honor.  I think the answer is -- well, I don't think we can

18   answer it given the materials we have today.

19         THE COURT:  And that's the problem I'm running into.

20   It's, I hear the argument on, you know, is it -- was it a

21   true sale or was it a pledge or assignment?  You know, pledge

22   is -- the word pledge is in the document, the word sale is in

23   the document, --

24         MR. PECK:  Right.

25         THE COURT:  -- and I certainly can't tonight make a

1   determination as to that issue.  And I think you can

2   appreciate that.

3        The problem I'm facing is, if producers aren't paid

4   tomorrow, I think there's a likelihood, just from experience,

5   that the future ability to collect premium payments from

6   customers is going to go drastically down.  That being the

7   case, and that seems to be something that Insurety would not

8   want to have happen, what is the Court to do here?  I

9   understand the legal arguments, and we're certainly going to

10  --

11        MR. PECK:  Sure.

12        THE COURT:  But help me.  How do we deal with

13  tomorrow's issue?

14        MR. PECK:  Right.  And I think, Your Honor, the fact

15  that I'm up here and that we've been here for three hours

16  arguing, four hours arguing, been here arguing about this

17  shows that, as bad as that scenario may be and as much as it

18  may harm Insurety's ability to recover that stream, we think

19  it's worse in the Debtors' hands.

20        There are other alternatives, there are other processors

21  we could turn to to do the services that the Debtors do, to

22  provide the collection activity and the remittance activity

23  the Debtors provide, but --

24        THE COURT:  And I appreciate that.  I mean, I think a

25  lot of the focus, I think, of you and Mr. Harrell really is

1  pointing -- you know, the motion to appoint a trustee is

2  coming down the pike.  I get that.

3       MR. PECK:  Sure.

4       THE COURT:  Whether or not that's a meritorious

5  motion, whether or not it's something that should be heard ex

6  -- I'm not even going to comment on that --

7       MR. PECK:  Right.

8       THE COURT:  -- because I understand.  I get the fact

9  that there's not -- that there is concern that there's been

10  prior noncompliance with court orders.  And I get that.  But

11  how does that help me for tonight?  I've got to make a

12  decision tonight.  And if the decision is not to grant the

13  use of cash collateral, I think the evidence seems to

14  indicate that there would be clear irreparable injury and

15  harm to everybody, including Insurety.

16     So what is it that Insurety wants with respect to the

17  cash collateral order, knowing that you have all these other

18  issues with -- maybe there should be somebody else in place.

19  I don't know.  I get that.  But that doesn't help me for

20  what's before me right now.

21       MR. PECK:  Right.

22       THE COURT:  And right now is I've got a request to

23  pay employees, producers, some other contracts.  And if those

24  payments don't get made, you know, you're not -- I think the

25  Chapter 11 Trustee is not going to do you much good.

1          MR. PECK:  That's correct, Your Honor.

2          THE COURT:  I think it's going to be a Chapter 7.

3    And to the extent there are issues -- and Mr. Bratic hit on

4    great issues.  They're just not helpful for the Court today,

5    but there are certainly issues that I anticipate will be

6    looked into.

7          MR. PECK:  Sure.

8          THE COURT:  Rightfully so, potentially.

9          MR. PECK:  And I think, you know, I don't know if

10   this helps, Your Honor, but, I mean, this problem is of the

11   Debtors' making in that we don't know how much cash they have

12   in the bank today, I don't think.  I don't think I heard that

13   testimony today.

14         THE COURT:  I didn't, either, but that's --

15         MR. PECK:  And we don't know, of that cash, to go

16   back to your first question, how much of that is Insurety's

17   money and how much is the Debtors' money.  Because if there

18   was some testimony that the Debtors do generate some of the

19   revenues, a portion of these premiums are not Insurety's

20   money.  And I don't know if that money will be sufficient to

21   cover the expenditures, at least in the first week or two, or

22   whatever it is, or not.  But that money would not be ours,

23   not be Insurety's, and would be ostensibly available for use.

24   I just don't know how much it is because the Debtors haven't

25   told us.

1          THE COURT:  I understand.  And I'm with you on that.

2   But with November 1st right around the corner, and we did

3   hear testimony on what that means, and we have -- I think

4   pretty much everyone in the room has decisions to make on

5   what sort of policies they're going to look to for health

6   coverage and all that starting next year, --

7          MR. PECK:  Uh-huh.

8          THE COURT:  -- if these producers aren't paid

9   tomorrow, doesn't that -- isn't that bad for Insurety?

10         MR. PECK:  It's not great, Your Honor, but we think

11  it's worse to leave the Debtors in place.

12         THE COURT:  And I hear you, but that's not before me

13  today.

14         MR. PECK:  Yeah.  Correct.

15         THE COURT:  Well, I guess in a roundabout way, if the

16  Court denies the motion to use cash collateral, it's

17  certainly going to be a tailspin.

18         MR. PECK:  Right.

19         THE COURT:  But the issue of who should be in place

20  tomorrow, next week, next month, fair question, fair issues,

21  we can deal with that.  But I'm just afraid, with a stroke of

22  a pen, those issues will become pretty moot and you're

23  looking at the Chapter 7 trustee down the road doing a lot of

24  forensic work that may or may be able to collect against

25  whatever actions that may be out there.  I don't know.

1          MR. PECK:  It's a tough question, Your Honor.

2          THE COURT:  What I do know is you have these

3    policies, and as long as those members out there and those

4    customers keep making the payments each month, doesn't that

5    help everybody?  For at least the short term?

6          MR. PECK:  I think our client would say it helps but

7    other alternatives would help more.

8          THE COURT:  And I appreciate that.

9          MR. PECK:  Yeah.

10          THE COURT:  All right.

11          MR. PECK:  So, and let me -- let me frame up one

12    issue that's sort of related, Your Honor.  So, there was a

13    lot of testimony today about this new company, I can't

14    remember the name of it, this new insurance company that has

15    been formed by the president of one of the Debtors.  And the

16    -- I think the spin on that from the Debtors is that that's

17    going to actually help the Debtors collect on Insurety's

18    money.  We don't view it that way, because, first, --

19          THE COURT:  And those are the questions I asked Mr.

20    Forshey about, 11B versus 9, is that the whole purpose for

21    11B was to show incentive for producers to stay that would

22    make Exhibit 9 more possible of actually being satisfied of

23    that, I guess.

24          MR. PECK:  Correct.  And I think, you know, we view

25    it differently.  Two things.  First, because on 11B none of

1    that has been tested, it's a new venture, have no idea if

2    it'll be successful or not, --

3         THE COURT:  Granted.  The weight is very, very

4    little.

5         MR. PECK:  Right.

6         THE COURT:  It is zero help for adequate protection.

7         MR. PECK:  Right.

8         THE COURT:  Other than is that some little potential

9    needle that you can place on the scale to help keep producers

10   in the game, if you will, while the policies hopefully stay

11   in place.

12        MR. PECK:  Right.  And I think the answer is it might

13   keep producers in place at this new entity, but that doesn't

14   mean those producers are going to help the collection of the

15   amount that belongs to Insurety.  And the reason I say that

16   is what we're concerned about is these producers that move

17   over to the new agencies will get their customers to switch

18   to new policies.

19        THE COURT:  Exactly.  I mean, that's the testimony.

20        MR. PECK:  So I think it's -- so we think 11B or 11A,

21   whichever it is, is actually -- makes us worse off, because

22   now you've taken these producers and are saying, hey, you're

23   still in the family but you're now over here, Insurety is

24   left behind, and these producers are going to have a new

25   relationship and try to get their customers to switch to a

1    new product.

2        And so we think maybe it keeps the producers happy, but

3    we don't think that actually results in any kind of

4    protection for us.  In fact, we think it results in harm to

5    us.  So, and we just learned about this today, so we've been

6    trying to digest the ramifications of it, but --

7            THE COURT:  And none of that's happened to this

8    point, at least if I understand the testimony.  That's at

9    least the plans that Mr. Brock might have, but I don't know

10   if that has started yet.  I didn't hear that in testimony.

11   But it's a fair point.  You make a very, very fair point.  We

12   don't know what the reaction of the producers would be.

13           MR. PECK:  That's right, Your Honor.  And, you know,

14   I certainly appreciate the testimony from Mr. Brock that, you

15   know, this is a friendly transaction, but that doesn't

16   guarantee that the producers are going to treat it

17   accordingly and be loyal.

18       A few other things.  As you noted, the budget does not

19   include a revenue component, only expenses.  So it makes it

20   incredibly difficult for us sitting here to determine what

21   the Debtor looks like a week, two weeks, a month from now.

22   Exhibits 9, 10, and 11 are simply Mr. Brock's musings on what

23   might happen, as Mr. Bratic testified about the numerous

24   weaknesses in the Debtors' projections and he talked also

25   about the inconsistency in the books and records.

1      Obviously, the Debtor has the burden of proof on adequate

2    protection, and the only evidence appears to be those

3    exhibits that I just mentioned, 9, 10 and 11.

4      I think what we're struggling with the most, Your Honor,

5    is if the Debtors are free to use our funds --

6           THE COURT:  And, again, we don't know from the budget

7    how much would be Insurety's funds, --

8           MR. PECK:  Correct.

9           THE COURT:  -- correct?

10          MR. PECK:  That's a problem.

11          THE COURT:  And Insurety doesn't know, right?

12          MR. PECK:  That's correct, Your Honor.  I mean, we

13   have no -- not only do the exhibits today not explain that,

14   but we would have -- not have any reporting to even know how

15   much of our funds are --

16          THE COURT:  But Insurety's not taking the position

17   that the $1.2 million for Week 1 is all their funds?

18          MR. PECK:  I wouldn't think it would be, Your Honor,

19   but I just have no idea.  Because, as we talked about, some

20   of the premium payments as they come in are -- do belong to

21   the Debtors.

22          THE COURT:  Understood.

23          MR. PECK:  But because our funds were never

24   segregated, --

25          THE COURT:  But then what's happened in the past has

1  happened in the past.

2        MR. PECK:  No, I agree, Your Honor, but --

3        THE COURT:  You know, I saw the bank statement showed

4  $96,000.  That's, you know, --

5        MR. PECK:  Right.

6        THE COURT:  If any of that came in that was

7  Insurety's money, that's gone.

8        MR. PECK:  Right.

9        THE COURT:  So this appears to be funds that are

10  coming in each month, so it's new money coming in, of which a

11  percentage would be Insurety's.

12        MR. PECK:  Right.

13        THE COURT:  And that percentage would be 30 percent?

14        MR. PECK:  Yeah.  I can't answer it, Your Honor.  I

15  really don't know the --

16        THE COURT:  Well, that's what I'm trying to get to.

17        MR. PECK:  Yeah.

18        THE COURT:  So, if the $1.25 million, if that is

19  coming in on policies that were -- that have been in place

20  for months that has Insurety's interest in it, are we really

21  talking about Insurety's risk or lack of -- or, harm would be

22  30 percent of $1.2 million going out the door?

23        MR. PECK:  I really --

24        THE COURT:  I know.  It's an unfair question.

25        MR. PECK:  I can't answer that.  I don't know, Your

1   Honor.

2          THE COURT:  I get it.  It's an emergency motion and

3   you're -- and I get it.

4          MR. PECK:  Yeah.  The only person -- the people who

5   have an answer to that question are the Debtors, and they

6   won't tell us.  So I don't -- that's why we can't answer the

7   question.

8          THE COURT:  All right.

9          MR. PECK:  A few other points.  The biggest problem

10  for us going forward, and this goes back to one of your first

11  questions, is, you know, Mr. Forshey has made some

12  improvements on the original motion as far as a settlement

13  proposal, including reporting and things of that nature, and

14  he mentioned those at the outset of today's hearing.  The

15  underlying problem is that that still leaves the Debtors in

16  place to decide, when a dollar comes in the door, is it

17  Insurety's, is it the Debtors', or someone else's?  And --

18         THE COURT:  Well, I don't know.  I thought the

19  testimony was pretty clear that the, on a go -- today, going

20  forward, but at least -- actually, did I write it down?  Was

21  it Apex or CyberX?  The CyberX system.  The testimony was

22  very credible testimony from -- it wasn't Mr. Jordan; it was

23  Mr. Lee, I believe.  Is that correct?  Mr. Lee?  That he hits

24  a button and that tells us how much each dollar that comes in

25  -- I guess a member makes a -- a customer makes a payment,

1   the payment goes in the bank, you know it came from that

2   policy, you know 30 percent or whatever it is is commission

3   that would go to Insurety.  So they can do that, right?

4          MR. PECK:  I suppose they can.

5          THE COURT:  Well, I know they have, and I get all

6   that.  I get that.  But at least -- and, again, those are

7   issues that are all fair game, but I'm not sure they're fair

8   game for right now on what the Court should do today vis-à-

9   vis the actual motions that are before me.

10          MR. PECK:  Understood, Your Honor.  Let me just wrap

11  up, then, by saying two things.  First, and I know based on

12  what you just said you probably are not going to love what

13  I'm about to say, but when you look at the evidence today

14  from the CEO who testified that the Debtors violated the

15  state court order simply because it wasn't feasible to do so;

16  the Debtors' COO, Mr. Lee, who made it clear that money

17  required to be held in trust was not; and Mr. Brock, who

18  admitted that he has formed a non-debtor entity that will

19  offer the same or similar products that we're relying on

20  customers to pay, to pay amounts to Insurety, --

21          THE COURT:  Let me ask a question.  Because I -- Mr.

22  Harrell did hit on that point about, you know, that funds

23  held in trust and the documents.  You know, the relationship

24  has been going on for, what, since 2018?

25          MR. PECK:  I think that's right, Your Honor.

1        THE COURT:  Was there ever an expectation there'd be

2   a separate bank account for those?  And if so, where was

3   Insurety back when things were hunky-dory?  As opposed to

4   what Mr. Lee testified to:  I know what's in there, I hit a

5   button and I can -- was the intent really or the -- did

6   Insurety really believe that there would be separate bank

7   accounts for each of those?  That a dollar comes in from the

8   customer and we're going to parcel off parts of that to the

9   different accounts?

10       MR. PECK:  Right.  Well, Your Honor, I think that is

11  required by the Texas Insurance Code.  It's not --

12       THE COURT:  It might be.  I don't know.

13       MR. PECK:  Yeah.  It's --

14       THE COURT:  I just, I --

15       MR. HARRELL:  If I could speak to that, Judge.

16       THE COURT:  Absolutely.

17       MR. HARRELL:  We had no idea until we got those bank

18  statements in mid-September.  And, in fact, when I took Mr.

19  Lee's deposition, he talked about the segregated account,

20  which is what we thought, is all that money went into a

21  separate account.  And then we got the bank statements and

22  they didn't.

23       THE COURT:  Understood.

24       MR. HARRELL:  So, anyway, --

25       THE COURT:  And I appreciate the clarification.

1          MR. HARRELL:  -- that's our -- that was our

2    expectation, yes.

3          THE COURT:  I understand the clarification.

4          MR. PECK:  I suppose it's no different than a client

5    that, you know, that you hold money for in your trust

6    account.  They probably don't know it's not in the trust

7    account until they ask for it back and it's not there.

8          THE COURT:  Excellent point.

9          MR. PECK:  So, just to wrap up, I'd say, you know,

10   what we're asking for you to do is deny the cash collateral

11   motion, recognizing the implications -- on us, more than

12   anyone, because we're the largest constituency, the largest

13   constituent in this case -- and I recognize this result may

14   seem a harsh one, but I guess two points.  One, this is the

15   nature of the contractual arrangement in this case and the

16   contractual arrangement that is common to the industry.

17      And, again, you know, after all, we are the ones that

18   stand to lose the most from the relief being denied.  So,

19   given that we're --

20         THE COURT:  How are -- where are you going to lose

21   that?  Just help me out with that.

22         MR. PECK:  Well, to your point, Your Honor, is if the

23   producers aren't paid tomorrow, the producers go away, the

24   producers try to move their clients, who are generally in

25   this premium stream --

1          THE COURT:  But if I sustain your objection, isn't

2    that inevitable?

3          MR. PECK:  Yes.  I'm saying that, despite that fact,

4    we're prosecuting this objection.  So, we understand that

5    that could be the result, and we're okay with it.

6          THE COURT:  All right.

7          MR. PECK:  Thank you, Your Honor.

8          THE COURT:  All right.  Any brief rebuttal?

9          MR. FORSHEY:  No, Your Honor.  I think you've heard

10   everything.  Again, thank you for your patience.

11         THE COURT:  It'll take me a couple minutes up here.

12      (Pause, 8:11 p.m. )

13         THE COURT:  All right.  Let me see if I can ramble

14   through the various motions that are before the Court.  And I

15   apologize, it will not be as clear and concise as I would

16   like, but given the hour and given the important issues of

17   the day, I will do my best.

18      First, the motion for joint administration, which in the

19   American Worker's case is Docket #4, and also in the

20   Association Healthcare case, Docket #4, the Court finds that

21   that motion has merit, should be granted as requested there.

22   I don't think there was any opposition voiced from anybody.

23   That's more of a procedural motion than anything else.  So

24   the Court will grant the motion for joint administration in

25   each of the cases, pursuant to the request in the motion.  I

 1   believe the lead case, then, would be the American Workers

 2   case, once that gets entered.

 3       Second, the motion, the expedited motion regarding

 4   utilities, which is at Docket #7 in the American Workers case

 5   and also Docket #7 in the Association Health Care case,

 6   again, I didn't hear a lot of objections.  That's more of a

 7   typical motion that we see.  And I'll caveat this that I'm

 8   going to have to address the cash collateral last, so I will

 9   get to that, because obviously some of these then require

10   payments to be made.  But based upon the evidence before the

11   Court, the Court will grant those on an interim basis, with

12   a final hearing can be set on the utilities.  I didn't

13   recall, I don't recall, I didn't see proposed forms of

14   orders.  Were there proposed forms of orders that were filed?

15           MS. REA:  On some, Your Honor.  I can give you all of

16   them if you'd like.  Some were attached and some weren't.

17           THE COURT:  Okay.  Do you have those handy?

18           MS. REA:  Uh-huh.

19           THE COURT:  That would be helpful for me right now.

20       (Pause.)

21           MS. REA:  We've put them in order for you.  May I

22   approach?

23           THE COURT:  Yes, of course.  Thank you.  Has Mr. Peck

24   been given a copy of each of these?  If not, if you have a

25   spare set, I'd like for you to give those to Mr. Peck.

1        With the joint administration motion, the Court has

2   reviewed the proposed form of order and the Court is

3   satisfied with that form of order and will grant those

4   motions.  And I'll give you an opportunity to critique.

5        I think I'd best just hit the elephant in the room, and

6   that's the cash collateral order, because everything else

7   kind of tees off of that.  So, (pause).  I hate to do this,

8   but give me about five minutes.

9        (A recess ensued from 8:17 p.m. until 8:25 p.m.)

10            THE CLERK:  All rise.

11            THE COURT:  Thank you.  Please be seated.  All right.

12   We're back on the record.  Next I'll jump to the Court's

13   ruling on the expedited motion to use cash collateral, which

14   is at Dockets 5 in each of these cases.  In the motions, the

15   Debtors seek authority to use what they allege to be cash

16   collateral pursuant to Section 363 of the Code.  Of course,

17   pursuant to Section 363(e), the Debtors may use property in

18   which Insurety has an interest only if the Debtors can

19   provide adequate protection to Insurety.  Pursuant to 11

20   U.S.C. Section 363(p), the Debtors, of course, have the

21   burden of proof on adequate protection, but Insurety has the

22   burden of proof on the issue of the validity or extent of

23   such interest in the funds.

24        For purposes of this interim hearing only, the Court

25   finds and concludes that the Debtors have satisfied their

1    burden of proof on the issue of adequate protection, and

2    based upon the very shortened notice, Insurety has not been

3    able to satisfy its burden on ownership of the "purchased"

4    commissions [Court edit], but that's -- we will take that up

5    probably at a final hearing on the ownership issue.  So this

6    really is without prejudice to Insurety continuing to

7    prosecute their ownership interest as opposed to a pledge or

8    security interest in the commissions.

9         The Court has reviewed the interim order authorizing use

10   of cash collateral, and the Court is satisfied with much of

11   the representations as the Court's findings and conclusions,

12   but I do have a few modifications, which I'll tell them to

13   you right now.

14             MS. REA:  Okay.

15             THE COURT:  First, on Page 4, Paragraph L.

16             MS. REA:  Paragraph L, okay.

17             THE COURT:  It says the fourth category, cash from

18   commissions allegedly sold to Insurety, although the Debtor

19   contests that characterization, are arguably cash collateral

20   -- so insert the word arguably -- because both Insurety and

21   the Debtors claim to have an interest in them.  So insert the

22   word claim, too.

23             MS. REA:  Okay.

24             THE COURT:  This cash flow source will be referred to

25   herein solely for convenience as collateral or cash

1  collateral.  We will reserve the issue on -- ownership issue

2  for a future date.

3      In Paragraph 5 on Page 5, and I guess I will ask --

4          MS. REA:  Your Honor,

5          THE COURT:  Yes?

6          MS. REA:  -- could I ask you a question?  Did you

7  want to say this cash flow source will be referred to herein

8  solely for --

9          THE COURT:  For convenience.

10         MS. REA:  -- convenience as the cash?  Or cash -- but

11  the last thing you said, we'll reserve that issue for later,

12  did you want that in there as well?

13         THE COURT:  No, that's fine.

14         MS. REA:  Okay.  Okay.

15         THE COURT:  That's fine.  It's just, it's pretty

16  clear on the record that the Court is not going to make the

17  determination today, tonight, on whether or not Insurety owns

18  those proceeds or they have an interest in them.

19         MS. REA:  Okay.

20         THE COURT:  On Page 5, Paragraph 5, it says, by the

21  close of business each, and then it -- choose a day of the

22  week.  I guess I would look to Insurety.  Is there a

23  particular day on which [Court edit] you'd like the Debtors

24  to provide the reports and budgets that are reflected in

25  that?  It doesn't matter to me.  Monday, Wednesday, Friday?

1           A VOICE:  Tuesday.

2           MR. PECK:  Wednesday?

3           A VOICE:  Tuesday.

4           THE COURT:  Tuesday?

5           MR. PECK:  Tuesday would be good for us, Your Honor,

6   --

7           THE COURT:  All right.

8           MR. PECK:  -- if it doesn't matter to the Debtor.

9           THE COURT:  So, by close of business each Tuesday.

10  And then the next paragraph, Paragraph 6, in the first and

11  second lines, strike these words:  the assets available for

12  payment of Insurety's claim far exceed the money it loaned,

13  period, moreover, comma.  Strike that phrase.  So the

14  sentence would read, And Insurety is adequately protected

15  because -- and then it picks up -- if the Debtors are not

16  permitted to use potential cash collateral, and it reads

17  forward.

18      I would strike Paragraph 9 on Page 6.

19      And then, finally, I want to add in, as further forms of

20  adequate protection to Insurety, are the proposed terms that

21  were included on the I guess I'll call it a demonstrative

22  that Mr. Forshey provided.  And so each of those forms of

23  adequate protection will also be included on this interim

24  cash collateral order.

25      And to be clear, the Court does find further that without

1   granting this relief on an interim basis, that the evidence

2   reflects that there would be irreparable and immediate harm

3   to the Debtors and their estate and that the use of the cash

4   collateral is necessary to prevent immediate and irreparable

5   harm to the Debtors and their estates.

6          MS. REA:  Your Honor?

7          THE COURT:  Yes.

8          MS. REA:  Which date?  We didn't put an end date to

9   the interim period.

10          THE COURT:  That was going to be my next question --

11          MS. REA:  Okay.

12          THE COURT:  -- for the parties.  I think we'll want

13   to have a final hearing.  I would like to look to Mr. Peck or

14   Mr. Harrell.  They did put on evidence that was concerning to

15   the Court about what happened in the state court.  Obviously,

16   if this Court's orders are not complied with, there will be

17   severe ramifications for that for the Debtors.  But I would

18   like to potentially have a final hearing sooner rather than

19   later.  When would the parties think you would like to have a

20   final hearing so that we can at least have some sort of an

21   indication of whether or not the accountings have been

22   provided as they should be.  Mr. Peck?

23          MR. PECK:  I guess the only concern, Your Honor -- I

24   think we certainly would like a hearing sooner rather than

25   later, and the only thing I'm struggling with a little bit is

1  that, based on your ruling, it will be important for us to

2  prove up our ownership of the funds at that final hearing,

3  and that may require discovery.  I'm not sure yet.  But --

4          THE COURT:  That's fine.  Fair enough.

5          MR. PECK:  So, --

6          THE COURT:  And, again, I don't know.  I don't know

7  if it's a legal issue.  I don't know if there's a factual

8  issue there.

9          MR. PECK:  Uh-huh.

10         THE COURT:  I mean, I've heard the document --

11         MR. PECK:  Right.

12         THE COURT:  -- briefly.  I mean, I didn't probably

13 have as much time in this case.  I don't know when you were

14 retained.  But, you know, there were words in there that said

15 we pledge and things of that nature.  I'm not sure what all

16 that means.  I do know under Texas law -- and apparently

17 Florida law is the controlling law -- it may be a complete

18 sale.  But I just can't -- I'm not prepared, on this very

19 short notice, with what the Court finds would be just

20 irreparable harm to everybody if I didn't allow at least the

21 payments to go forward.  That's why I'm doing it on an

22 interim basis, but --

23         MR. PECK:  Understood.  Understood.  And so my point

24 is that the sooner we have the hearing the better for us, but

25 at the same time, that requires us to engage in whatever

1  discovery we need on that issue on a very expedited basis.

2  So I don't know if you have thoughts on that.

3       MR. HARRELL:  Sounds fair.  I think we just need to

4  do it quickly.  So, --

5       THE COURT:  I can either give you a date now for a

6  final hearing, and then if there's discovery issues the Court

7  will hear anything on an expedited basis.

8       MR. PECK:  True.

9       THE COURT:  I'm pretty easy to get expedited hearings

10 when they're needed.  But I'll look to the parties.

11      MR. PECK:  Happy to do a placeholder now or happy to

12 talk about it and come back --

13      THE COURT:  What is the Debtors' ask?

14      MR. FORSHEY:  My ask would be I'm going to be out of

15 pocket the week of October 28th.

16      THE COURT:  I'm going to be out of pocket that week

17 as well.

18      MR. FORSHEY:  Okay.

19      THE COURT:  I'll be in Washington D.C. [Court

20 correction].

21      MR. FORSHEY:  And my suggestion would be the 6th,

22 7th, 8th, 11th, or 12th.  Any of those days, I think I could

23 do it.

24      THE COURT:  So we're talking about -- we have time on

25 the 7th, which is a Thursday.  I'm not sure about the

1    afternoon of the 6th.  Friday is wide open.  I usually don't

2    -- I schedule hearings on Fridays few and far between, but

3    this is a case that I'd be happy to do that.  My calendar

4    shows the 11th is Veteran's Day, so if that's a federal

5    holiday then we can't have it that day.

6          MR. HARRELL:  So maybe the 7th or the 8th, since

7    those are both available.  I have got to check with my

8    office, because I've got a deposition scheduled -- actually,

9    in Dallas, so it'd would work out great.  Could we get back

10   to the Court tomorrow?

11         THE COURT:  Yes.  Yeah.  And Mr. Peck knows how to

12   get in touch with Ms. Calfee, as does Ms. Rea and Mr.

13   Forshey.  So I'll tell you what.  The parties can work that,

14   hopefully just get that date from Ms. Calfee that is

15   convenient for all the parties.

16         MR. HARRELL:  That would be great.

17         THE COURT:  The Court is fine with any date.  I was

18   just trying to get it as expedited as Insurety wanted that.

19   So, with that, any other questions on form of order on the

20   use of cash collateral?

21         MS. REA:  I don't think so.

22         THE COURT:  All right.

23         MS. REA:  But I'll circulate it to everybody and make

24   sure.

25         THE COURT:  And then that takes us to -- now I'll go

 1  back to the utilities motion.  I've read the proposed form of

 2  order, and the Court is fine with the proposed form of order,

 3  and, again, filling in the dates.  I don't know if you want

 4  to do the same dates or if we have to do it within the 20

 5  days or -- I'll let you just fill in that date --

 6        MS. REA:  Okay.

 7        THE COURT:  -- that's appropriate for the utilities.

 8    Then the next matter is the motion to pay pre-petition

 9  debt, which is at Dockets 6 in both cases.  The Court had

10  reviewed that motion.  The Court has reviewed the form of

11  order.  The Court had no changes to the form of order.  And,

12  again, I know, Mr. Peck, you probably got these ten minutes

13  ago.  Any comments to any of these other form of orders,

14  other than, of course, Insurety is reserving its rights to

15  say that it owns --

16        MR. PECK:  Right.

17        THE COURT:  -- the property that it owns.

18        MR. PECK:  Your Honor, I perused them quickly, and I

19  think the only comment that I made to the order, that would

20  require expenditures, that they be consistent with whatever

21  your ruling was going to be on the cash collateral order.

22        THE COURT:  All right.  So -- and I didn't have any

23  other reaction to the other form of orders, which I only

24  read.  I didn't have any other comments to finish out the

25  record, which also included the motion to disburse to

1  insurance carriers, et cetera, which is at Docket #8 in each

2  of the cases, and then also the motion, of course, to pay the

3  pre-petition commissions to producers at Dockets #9.  So I

4  didn't have any other comments to the form of orders.  Yes?

5       MR. PECK:  Your Honor, if I might ask, I did just re-

6  looked at the proposed terms that you referred to that Mr.

7  Forshey passed around.  And given the confusion in the

8  testimony regarding the term segregated account, his first

9  item is, Commissions purchased by Insurety will be as

10  collected.  Don't know -- I guess I don't know what the word

11  "as" is doing there.  That might be a typo.  But will be

12  collected and transferred into a segregated account at BBVA

13  Compass.

14       THE COURT:  I interpreted that as, as money comes in,

15  then a portion of it would go to a -- its own segregated

16  account.  That's how I interpreted that.  Is that the intent?

17       MR. FORSHEY:  Yes, sir.

18       THE COURT:  And is that --

19       MR. PECK:  Right.  But I guess we need it segregated

20  not in the COO's definition of segregation.

21       THE COURT:  Oh, no, this is a brand new account with

22  just those funds.

23       MR. PECK:  Okay.

24       THE COURT:  That's how I interpreted this, that now

25  there will be a separate bank account with a portion of those

1     monthly premium payments that come in and then applied to

2     Insurety.  That portion is going to be immediately

3     transferred to a brand new account which is only Insurety's

4     funds.  That's how I interpreted that.  Is that correct, Mr.

5     Forshey?

6           MR. FORSHEY:  Yes.

7           THE COURT:  Okay.  That was --

8           MR. FORSHEY:  It's going to be truly in a segregated

9     account.

10          THE COURT:  Yeah.  So, --

11          MR. PECK:  Okay.  And then, sorry to do this on the

12     fly, Your Honor, but --

13          THE COURT:  No.

14      (Counsel confer.)

15          MR. PECK:  Your Honor, I mean, Mr. Harrell just

16     pointed out that, while we're fighting about this on a final,

17     funds aren't paid until the 10th day of the next calendar

18     month.  My guess the request would be that those payments

19     would come more frequently.  If the money's just sitting

20     there and it's in trust for us, I'm not sure why it needs to

21     -- why we need to wait so long.

22          THE COURT:  Mr. Forshey?

23          MR. FORSHEY:  I think we'd suggest biweekly, with the

24     idea that if a week ends on a Sunday, we'd do it by the next

25     Friday.  That's what we would propose.

1          THE COURT:  Do you understand -- I'll look at the

2     business people -- do you understand what that meant?

3          MR. GRAY:  Yes, I do, Your Honor.  I do, Your Honor,

4     and I don't -- I would prefer even more frequently than

5     biweekly.

6          THE COURT:  Weekly?  Is there any reason why it

7     couldn't be done weekly?

8          MR. FORSHEY:  Well, that's -- we think that's a lot

9     of burden to do that.  I mean, yeah, it can, but it's just

10    extra work.

11         THE COURT:  Well, it's only on an interim, so I guess

12    this would be for the next three weeks.

13         MR. FORSHEY:  Okay.  So, weekly?  Made on the Friday

14    after the week ends?

15         THE COURT:  Yes.

16         MR. FORSHEY:  Okay.

17         THE COURT:  And then we can chat about that at a

18    final.

19         MR. PECK:  And then while you're up here, Mr.

20    Forshey, in Paragraph 2 we mention the normal collection

21    report.  Is that the collection -- collection reports under

22    the contract, or I didn't know what you meant by normal

23    collection report.

24         MR. FORSHEY:  Well, that's the collection -- what the

25    collection report that we've provided in the past.

1           MR. PECK:  Do we -- do we understand what that means?

2           MR. GRAY:  I do, Your Honor, but the Debtors -- we

3    had problems with the Debtors actually providing all of the

4    data that we need in order to match up collection payments

5    with the actual policies that have been purchased.  It was

6    submitted in evidence that -- or, through testimony that it's

7    no problem for them to click some buttons on CyberX to get

8    that.

9           THE COURT:  All right.  I'll tell you what.  To the

10   extent if there's -- you know, we can do this off the record.

11   To the extent there are reports that Insurety was getting in

12   the past that it isn't now, and to the extent there are new

13   forms of reporting, it probably makes sense for you to chat

14   with the CFO or the COO to figure out what reporting can be

15   made.

16      I would like as fulsome of reporting as possible over the

17   next four weeks.  Three weeks, three or four weeks.  I'm not

18   sure how we can clarify that here.  Again, what I don't mind

19   doing, and I don't want to make extra work for anybody, but

20   if there is a dispute or a request that you think the Debtor

21   should be able to make a report available and there's a

22   dispute about that, we can have a telephone conference or

23   emergency hearing to deal with that.  But hopefully I

24   wouldn't have to deal with those issues, but I understand the

25   point you're trying to make.  You just want to make sure

1   you're getting accurate reporting to the extent possible.  I

2   don't want to overburden the Debtor to do make-work, either,

3   so -- and I don't know what sort of reports the Debtor can

4   produce.

5           MR. HARRELL:  Thank you, Your Honor.

6           THE COURT:  All right.  But it's a fair point, and

7   I'm glad you raised it, so at least the parties all know that

8   there's got to be cooperation in providing the reporting.  I

9   mean, we are -- in bankruptcy, and I'm sure Mr. Forshey has

10  told the Debtor, it's now a fishbowl.  It's a glass bowl.

11  Welcome to the world of bankruptcy.  So everyone gets their

12  opportunity to see with pretty clear eyes what is, in fact,

13  going on.

14          MR. PECK:  Thank you, Your Honor.  I think that was

15  the only other clarification we were looking for.

16          THE COURT:  All right.

17          MR. PECK:  I assume, Ms. Rea, you're going to

18  circulate the revised cash collateral order?

19          MS. REA:  I'll circulate all the orders.

20          MR. PECK:  Okay.

21          MS. REA:  Except for the joint administration.

22          THE COURT:  And one other comment.  Before I do that,

23  I wanted to check one more thing.  (Pause.)  All right.  And

24  obviously, to the extent schedules and Statement of Financial

25  Affairs are important, I know they're due on the 28th.  I

1  don't know if there is going to be a request to extend the

2  time for that.  But obviously, the sooner those can be

3  prepared and filed, --

4        MR. FORSHEY:  We will enter --

5        THE COURT:  All right.

6        MR. FORSHEY:  -- request an extension, Your Honor.

7        THE COURT:  All right.

8        MR. FORSHEY:  We do not have the resources to get

9  them done by then.

10       THE COURT:  You will be filing a motion to extend

11 time?

12       MR. FORSHEY:  Yes, sir.

13       THE COURT:  All right.  Clearly, there will be the --

14 whatever hearing, whatever day you seek, subject to any

15 objection that's filed, and they're not going to be filed

16 before the final hearing with a sufficient time period for

17 Insurety to have had an opportunity to review those.  So,

18 just FYI.

19    All right.  Anything else?  I do have one last comment

20 since I know it's late and I know that there's payments that

21 need to go out.  I doubt that there's going to be an order

22 uploaded tonight that's going to get entered tonight or

23 tomorrow, but I'm fine with authorizing the Debtor with this

24 oral ruling to make those payments.  I just want to put that

25 on the record so everyone knows that the Debtor has the

1  authority to go forward and make those payments, even though

2  the order might be later in the day before it gets entered.

3  All right?

4          MR. FORSHEY:  Understood.

5          THE COURT:  All right.  Anything else for today?

6          MR. FORSHEY:  Thank you, Your Honor.

7          THE COURT:  Okay.  Thank you very much.  And again,

8  I appreciate the professionalism and the excellent pleadings

9  that were filed on very short notice and did assist the

10 Court.  Thank you.

11      (Proceedings concluded at 8:43 p.m.)

12                        --oOo--

13

14

15

16

17

18

19

20                      CERTIFICATE

21     I certify that the foregoing is a correct transcript from
   the digital sound recording of the proceedings in the above-
22 entitled matter.

23   **/s/ Kathy Rehling**                        **10/22/2019**

24 _____    _____

   Kathy Rehling, CETD-444                     Date
25 Certified Electronic Court Transcriber

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS
- By Mr. Forshey                                               9
- By Mr. Peck                                                 14

WITNESSES

Debtors' Witnesses

Landon Jordan
- Direct Examination by Ms. Rea                              23
- Cross-Examination by Mr. Harrell                           48
- Redirect Examination by Ms. Rea                            63
- Recross-Examination by Mr. Harrell                         66

Randee Mascorro
- Direct Examination by Ms. Rea                              67
- Cross-Examination by Ms. Young                             75
- Cross-Examination by Mr. Harrell                           76
- Redirect Examination by Ms. Rea                            80

Delbert Lee
- Direct Examination by Ms. Rea                              81
- Cross-Examination by Mr. Harrell                           95
- Redirect Examination by Ms. Rea                           108

Harold R. "Rusty" Brock
- Direct Examination by Mr. Forshey                         110
- Cross-Examination by Mr. Harrell                          138

Insurety Capital's Witnesses

Walter Bratic
- Direct Examination by Mr. Harrell                         160

EXHIBITS

Debtors' Exhibits

3      Organizational Chart                  Received 158
4      Sample Cash Flow                      Received  71
5      Proposed Adequate Protection-Utilities Received  83
6      List of Employees                     Received  84
7      List of Producers                     Received  79

1

                              INDEX
2                            Page 2

3    Debtors' Exhibits, cont'd.

4    8     Producer Onboarding Documents          Received  79
     9     "Sold" Commission Transactions         Received 123
5    10    Bucket 2-Commission Transactions       Received 128
     11A   Face-to-Face                           Received 131
6    11B   Projected New Income                   Received 135
     12    Cash Collateral Budget                 Received  95
7    13    TPA Servicing Agreement                Received  42
     14    Commission Assignment Agreement        Received  42
8    15    Exclusive Management Agreement         Received  42
     20    TRO                                    Received  43
9    21    Temporary Injunction                   Received  43

10   Insurety Capital's Exhibits

11
     1     Amended Order                          Received  79
12   10    General Ledger                         Received  96
     11    Comerica Bank Statement 6/1/19 *Under Seal* Received  96
13   12    Comerica Bank Statement 7/1/19 *Under Seal* Received  96
     13    Comerica Bank Statement 8/1/19 *Under Seal* Received  96
14
     CLOSING ARGUMENTS
15   - By Mr. Forshey                                     168
     - By Mr. Peck                                        177
16
     RULINGS                                              192
17
     19-44208-11 American Workers Insurance Services, Inc.
18
     Expedited Motion for Joint Administration of Cases American
19   Workers Insurance Services, Inc.; Case No. 19-44208-mxm11
     and Association Health Care Management, Inc., Case No. 19-
20   44209-elm11 filed by Debtor American Workers Insurance
     Services, Inc. (4)
21
     Expedited Motion to Use Cash Collateral filed by Debtor
22   American Workers Insurance Services, Inc. (5)

23   Emergency Motion to Pay Pre-Petition Debt - Emergency
     Motion for Authority to Pay Pre-petition Wages, Payroll
24   Taxes, and Other Employee-Benefit Claims Filed by Debtor
     American Workers Insurance Services, Inc. (6)
25

1                                    INDEX
                                    Page 3
2
RULINGS, cont'd.
3
Expedited Motion Regarding Utilities filed by Debtor American
4    Workers Insurance Services, Inc. (7)

5    Expedited Motion for Entry of Order Authorizing Debtors to
     Disburse (a) to Insurance Carriers and Providers Premiums
6    Received by the Debtors from Members Pre-Petition, and (b) to
     Members Premium Refunds Received by the Debtors Pre-Petition
7    filed by Debtor American Workers Insurance Services, Inc. (8)

8    Expedited Motion to Pay Pre-Petition Debt - Debtors' Motion
     for Entry of Order Authorizing Debtors to Pay Pre-Petition
9    Commission Obligations to Producers as Critical Vendors filed
     by Debtor American Workers Insurance Services, Inc. (9)
10

11   19-44209-11 Association Health Care Management, Inc.

12   Expedited Motion for Joint Administration of Cases American
     Workers Insurance Services, Inc.; Case No. 19-44208-mxm11
13   and Association Health Care Management, Inc., Case No. 19-
     44209-elm11 filed by Debtor Association Health Care
14   Management, Inc. (4)

15   Expedited Motion to use cash collateral Filed by Debtor
     Association Health Care Management, Inc. (5)
16
     Expedited Emergency Motion to Pay Pre-Petition Debt -
17   Emergency Motion for Authority to Pay Pre-Petition Wages,
     Payroll Taxes, and Other Employee-Benefit Claims filed by
18   Debtor Association Health Care Management, Inc. (6)

19   Expedited Motion Regarding Utilities filed by Debtor
     Association Health Care Management, Inc. (7)
20
     Expedited Debtors' Motion for Entry of Order Authorizing
21   Debtors to Disburse (a) to Insurance Carriers and Providers
     Premiums Received by the Debtors from Members Pre-Petition,
22   and (b) to Members Premium Refunds Received by the Debtors
     Pre-Petition filed by Debtor Association Health Care
23   Management, Inc. (8)

24

25

INDEX
Page 4

RULINGS, cont'd.

Expedited Motion to pay pre-petition debt- Debtors' Motion
for Entry of Order Authorizing Debtors to Pay Pre-Petition
Commission Obligations to Producers as Critical Vendors
filed by Debtor Association Health Care Management, Inc.
(9)

END OF PROCEEDINGS                                              209

INDEX                                                     210-213