Ian T. Peck, TBN #24013306
Jarom J. Yates, TBN #24071134
**HAYNES AND BOONE, LLP**
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile: 214.651.5940
Email: ian.peck@haynesboone.com
Email: jarom.yates@haynesboone.com

Robert S. Harrell
State Bar No. 09041350
Andrew Elkhoury
State Bar No. 24097648
**MAYER BROWN LLP**
700 Louisiana Street, Suite 3400
Houston, Texas 77004
Telephone: (713) 238-2700
Facsimile: (713) 238-4888
Email: rharrell@mayerbrown.com
Email: aelkhoury@mayerbrown.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| AMERICAN WORKERS INSURANCE | ) | Case No. 19-44208-mxm11 |
| SERVICES, INC., | ) | |
| | ) | |
| ASSOCIATION HEALTH CARE | ) | Case No. 19-44209-elm11 |
| MANAGEMENT, INC. | ) | |
| | ) | Jointly Administered Under |
| | ) | Case No. 19-44208-mxm11 |
| Debtors. | ) | |

## MOTION OF INSURETY CAPITAL LLC FOR ENTRY OF AN ORDER (I) DIRECTING APPOINTMENT OF EXAMINER PURSUANT TO 11 U.S.C. § 1104(c), AND (II) ESTABLISHING EXAMINER'S DUTIES AND POWERS

# TABLE OF CONTENTS

**Page**

I.     Jurisdiction and Venue .................................................................................................. 1

II.    Background .................................................................................................................... 1

    A.     Insurety's Relationship to the Debtors ............................................................... 1

    B.     The Debtors Commence their Chapter 11 Cases ................................................ 2

    C.     The NIIA Motion ................................................................................................ 3

    D.     The Debtors' Numerous Reporting Discrepancies ............................................. 4

         i.      The Debtors' Prepetition Reporting ........................................................ 4

         ii.     The Debtors' Postpetition Reporting ...................................................... 4

         iii.    Insurety's Identification of Numerous Discrepancies and
              Irregularities in the Various Data Sets .................................................... 6

    E.     Insurety's Efforts to Obtain Clarification of the Reporting Discrepancies ........... 7

    F.     Discrepancies and Irregularities in the Debtors' Financial Records ..................... 8

    G.    Evidence of Twisting ......................................................................................... 9

    H.    The Debtors' Conflicts of Interest and Dealings with Insiders .......................... 11

         i.      Mr. Jordan's Insider Relationships ........................................................ 11

         ii.     Mansfield Management ......................................................................... 12

         iii.    NIIA ..................................................................................................... 13

         iv.    Mr. Brock's Insider Relationships ........................................................ 14

         v.     Other Insider Relationships ................................................................... 14

    I.     The New CRO Application ................................................................................ 15

III.   Relief Requested ......................................................................................................... 15

IV.   Basis for Relief Requested .......................................................................................... 16

    A.     The Appointment of an Examiner is Warranted under the Circumstances
         of These Chapter 11 Cases ................................................................................ 16

         i.      The Appointment of An Examiner is in the Interests of the
              Debtors' Estates ................................................................................... 17

ii.     The Debtors' Qualifying Combined Unsecured Debts Exceed $5,000,000 .......................................................................................... 22

B.     Establishment of Examiner's Duties and Powers Pursuant to 11 U.S.C. § 1106(b) ............................................................................................................. 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Dewey & LeBoeuf LLP,*
478 B.R. 627 (Bankr. S.D.N.Y. 2012) ................................................................... 22

*In re Erickson Ret. Communities, LLC,*
425 B.R. 309 (Bankr. N.D. Tex. 2010) ................................................................... 22

*In re Gilman Servs.,*
46 B.R. 322 (Bankr. D. Mass 1985) ....................................................................... 18

*In re Keene Corp.,*
164 B.R. 844 (Bankr. S.D.N.Y. 1994) ................................................................... 18

*In re McCornhill Publishing, Inc.,*
73 B.R. 1013 (Bankr. S.D.N.Y. 1987) ................................................................... 18

*In re Revco D.S., Inc.*
898 F.2d 498 (6th Cir. 1990) ........................................................................... 22, 24

*In re UAL Corp.,*
307 B.R. 80 (Bankr. N.D. Ill. 2004) ...................................................................... 16

**Statutes**

11 U.S.C. §502(a) ...................................................................................................... 23

11 U.S.C. §§ 1104 and 1106 ........................................................................................ 1

11 U.S.C. §1104(c), and (II) ............................................................................. 1, 22, 23

11 U.S.C. § 1106(b) ............................................................................................. 24, 25

28 U.S.C. §§ 157 and 1334 ........................................................................................... 1

28 U.S.C. § 157(b)(2)(A) .............................................................................................. 1

28 U.S.C. §§ 1408 and 1409 ......................................................................................... 1

Bankruptcy Code § 1104(c) .................................................................... 15, 16, 22, 24

Bankruptcy Code § 1104(c)(1) and (c)(2) ................................................................. 17

Bankruptcy Code §§ 1104(c) and 1106(b) ........................................................... 16, 24

Bankruptcy Code § 1106 ........................................................................................... 24

**Other Authorities**

Bankruptcy Rule 3001(f) ..................................................................................................................... 23

Bankruptcy Rule 3003(b)(1) .............................................................................................................. 23

Bankruptcy Rules 3001(f) and 3003(b)(1) ......................................................................................... 23

Black's Law Dictionary ...................................................................................................................... 22

Order (i) .............................................................................................................................................. 25

Insurety Capital, LLC ("Insurety") files this *Motion of Insurety Capital LLC for Entry of an Order (I) Directing Appointment of Examiner Pursuant to 11 U.S.C. §1104(c), and (II) Establishing Examiner's Duties and Powers* (the "Motion"). In support of the Motion, Insurety would show the Court as follows:

## I.     Jurisdiction and Venue

1.      The Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The legal predicate for the relief sought herein is 11 U.S.C. §§ 1104 and 1106.

## II.     Background

### A.     Insurety's Relationship to the Debtors

2.      Debtor American Workers Insurance Services, Inc. ("AWIS") is an insurance marketing organization ("IMOs") from which Insurety, prior to the petition date, acquired future commissions (and fees) through cash payments (the "Purchased Assets"). Insurety has purchased future commissions from AWIS since July 2018.

3.      Insurety and AWIS agreed to use Debtor Association Health Care Management, Inc. ("AHCM" and together with AWIS, the "Debtors"), a licensed third-party administrator ("TPA"), to collect insurance premiums and other fees paid by policyholders. Under the TPA servicing agreement between AWIS, AHCM, and Insurety (the "TPA Servicing Agreement"), after collecting insurance premiums, AHCM was obligated to hold the premiums in trust "for the benefit of the insurance carrier, the Buyer [Insurety], the Producers, and the IMO [AWIS]." TPA Servicing Agreement § 1.02(1). Specifically, AHCM was required to hold the premiums in trust until remitting the agreed upon portion of the premiums through a waterfall, first to insurance

carriers, then to Insurety (*i.e.* Insurety's Purchased Assets), then to other parties as required by the parties' various agreements.

4.      Policyholders pay premiums to the TPA on a daily basis, usually by credit card, check, or money order. The TPA collects the premium payments and reports the collections to Insurety on a monthly basis. Along with the submittal of the monthly collection report, the TPA sends Insurety its assets every month.

5.      When Insurety declined to purchase certain commissions offered by AWIS in July 2019—consistent with its contractual right to exercise discretion—the Debtors should have continued to provide Insurety their monthly collection reports and to submit the commissions received from policyholders on account of the policies for which Insurety purchased the future commissions. The Debtors also should have held the portion of the payments from policyholders constituting Insurety's Purchased Assets in trust. Instead of transferring Insurety's assets to Insurety or holding them in trust, the Debtors converted Insurety's Purchased Assets that AHCM collected (and was obligated to hold in trust for Insurety) to purchase additional insurance commissions from their Producers for the Debtors' own benefit.

**B.      The Debtors Commence their Chapter 11 Cases**

6.      On October 14, 2019 (the "Petition Date"), the Debtors commenced their chapter 11 cases. In discussions preceding the first day hearing, Insurety urged the Debtors to retain a chief restructuring officer (CRO). The Debtors declined, but ultimately agreed to retain a financial advisor and filed a retention application on October 22 [Docket No. 40] seeking to retain William L. Roberts ("Mr. Roberts") and CR3 Partners, LLC ("CR3") as financial advisor. The Debtors did not set the initial application for hearing.

7.      On November 11, 2019, the Debtors abruptly withdrew the application to retain Mr. Roberts and CR3 as financial advisor and filed an application to retain CR3 and Mr. Roberts

as CRO [Docket 79] (the "CRO Application") and requested an expedited setting for November 13, 2019. Although Insurety had initially requested that the Debtors retain a CRO, Insurety filed an objection to the CRO Application [Docket No. 86] because it was concerned that the proposed CRO was not given sufficient autonomy or oversight and the mandate proposed by the Debtors did not allow the CRO to provide reports and/or recommendations to the Court. The Court approved the CRO application [Docket No. 90] and the Debtors retained CR3 and Mr. Roberts as CRO.

### C. The NIIA Motion

8.      The Debtors disclosed during the first day hearing that they were contemplating a transition of the AWIS business to a non-debtor affiliate of the Debtors.[1] In December 2019, the Debtors filed a motion seeking authorization for AHCM to enter into a servicing agreement with NIIA [Docket No. 113] (the "NIIA Motion").[2] In fact, the Debtors disclosed that AHCM and NIIA had already begun conducting business "on or about October 21, 2019" and that the proposed agreement would "formalize[] the relationship between AHCM and NIIA." NIIA Motion ¶¶ 17-18. In light of the transition of the AWIS business to NIAA, Insurety believed any CRO appointed by the Court should have more oversight and autonomy than the Debtors desired.

9.      Insurety objected to the NIIA Motion [Docket No. 161] because, *inter alia*, the arrangement effectively displaces the agreement between AHCM and AWIS, is likely to harm AWIS and its creditors, enhances the risk of twisting, and will benefit the Debtors' insiders to the detriment of AWIS and its creditors. Because of the insider nature of the transaction, heightened scrutiny must be applied to the transaction and enhanced transparency should be required of the

---

[1] First Day Transcript p. 57, lns. 3-19.

[2] The Debtors subsequently filed *Supplement to Debtors' Motion for Authority to Enter into Servicing Agreement Between Association Healthcare Management, Inc. and National Individual Insurance Agency, LLC* [Docket No. 139] (the "NIIA Supplement")

Debtors and NIIA before any transaction between AHCM and NIIA can be approved. A hearing on the NIIA Motion was been continued to July 6, 2020 [Docket No. 264].

**D. The Debtors' Numerous Reporting Discrepancies**

10. Not only are the Debtors' prepetition reports inconsistent with the Debtor's postpetition reports, but the Debtor's postpetition reports contradict themselves as well. The following is a summary of the different reports the Debtors' have provided Insurety.

*i. The Debtors' Prepetition Reporting*

11. Prior to the Petition Date, on a weekly basis, AWIS sent Insurety funding reports composed of a list of policies written, the commission amounts on those policies, the requested advance amount and other information (the "Original Funding Reports"). Similarly, from August 2018 through July 2019, the Debtors also provided monthly collection reports to Insurety that purported to contain a complete listing of renewed policies and related collection amounts (the "Original Collection Reports").

*ii. The Debtors' Postpetition Reporting*

12. After the Petition Date, pursuant to court order, by agreement, and/or in response to discovery requests propounded by Insurety, the Debtors and CyberX Group, LLC ("CyberX"), have provided, *inter alia*, the following reports and data to Insurety:

a. **Cancellation Report.** A list of cancelled policies that was received from the Debtors through discovery on December 2, 2019 (the "Cancellation Report"). The Cancellation Report ostensibly contains a list of all policies cancelled from July 2018 through December 1, 2019 tracked by member ID and termination date. The Cancellation Report also included detailed information such as member and product information for each cancelled policy.

b. **Discovered Collection Reports.** The collection reports provided by the Debtors through discovery in November 2019 which cover the period from August 2018 through July 2019 (the "Discovered Collection Reports"). The Discovered Collection Reports report data on a monthly basis and ostensibly incorporate the collections received as tracked by policy number.

c. **Postpetition Collection Reports.** The collection reports provided by the Debtors to Insurety since the Petition Date through the present (the "Postpetition Collection Reports"). The Postpetition Collection Reports have not always been presented in a consistent format and some lack crucial data, such as, for example, the individual policy IDs for which collections are being reported.

d. **CyberX Collection Reports.** In response to a subpoena issued by Insurety, CyberX produced collection reports to Insurety in November 2019 which cover the period from August 2018 through October 2019 (the "CyberX Collection Reports"). The Debtors license and use a software system developed by CyberX to process new policies written and collections received. Because CyberX merely licenses and hosts the data processing software used by the Debtors, but does not manage or populate policy-related data, the CyberX Collection Reports should match the Original Collection Reports and the Discovered Collection Reports for the periods in question. However, these reports do not match.

e. **Discovered Funding Reports.** The funding reports produced by the Debtors through discovery which cover the period from August 2018 through July 7, 2019 (the "Discovered Funding Reports"). The Discovered Funding Reports appear to be generated on a weekly basis and ostensibly contain a comprehensive list of the funds requested for commission advances on new policies as tracked by policy number.

f. **CyberX Funding Reports.** The funding reports provided by CyberX through discovery in November 2019 which cover the period from August 2018 through October 2019 (the "CyberX Funding Reports"). The CyberX Funding Reports ostensibly incorporate the funds required for commission advances on new policies as tracked by policy number. The CyberX Funding Reports also include detailed information regarding the member, product, and commissionable amount associated with each new policy.

g. **Member File.** A spreadsheet containing a list of members who have purchased policies through AWIS that was received from the Debtors after the Petition Date (the "Member File"). The Member File contains data relating to 71,953 member IDs, and includes the initial payment date along with other key data.

h. **Product Persistency Report.** A report received from AHCM that identifies the annual persistency and falloff by month for every active product offered by AHCM from October 2018 through September 2019 (the "Product Persistency Report"). The Product Persistency Report ostensibly contains a comprehensive list of every product offered by AHCM to policy holders tracked by product name. The Product Persistency Report identifies the total number of enrollments, no takes, and falloffs by month to determine the total number of terminations, as well as the falloff percentage, for each product.

i. **Face-to-Face Data.** A spreadsheet produced by the Debtors through discovery in November 2019 containing a list of members who purchased a policy in a "face-to-face" setting from October 2018 through September 2019 (the "Face-to-Face Data"). The Face-to-Face Data is generated on a monthly basis and is composed of policy information such

as the associated Member ID, billing frequency, and monthly premium for each face-to-face policy.

### iii.   Insurety's Identification of Numerous Discrepancies and Irregularities in the Various Data Sets

13.     Because the Debtors and Insurety historically used the Debtors' reports to determine the amount of money to transfer to Insurety on a monthly basis (as both Insurety's assets and fees)—and have continued to use the Debtors' postpetition reports to determine and transfer Insurety's assets back to Insurety under the Court's Final Order on Cash Collateral—accurate postpetition reporting is necessary for the Debtors to perform their postpetition obligations.

14.     Insurety, with the help of its financial advisor, Whitely Penn, engaged in an in-depth analysis and comparison of the data and information included in the various reports received from the Debtors and CyberX from both the prepetition and the postpetition periods.

15.     Based on its review of the various reports, Insurety identified an alarming number of discrepancies and irregularities. Insurety included an overview of its analysis and findings in a letter sent by Insurety's counsel to the Debtors' counsel on May 13, 2020 (the "May 13 Letter"). A copy of the May 13, 2020 letter is attached hereto as **Exhibit A** and is incorporated herein by reference in its entirety. The chart below provides a summary of some of the key discrepancies Insurety has identified.

**Summary Chart of Discrepancies in the Reports**

| Comparing… | To… | Discrepancy |
|---|---|---|
| Cancellation Report | Discovered Collection Reports | Missing/withheld collections from 10,124 Policies ($4,020,170.37) |
| Original Collection Reports | Discovered Collection Reports | Discovered Collection Reports omit 4,200 policies included in the Original Collection Reports. These same policies also do not appear in the Cancellation Report. The omission of 4,200 policies means that the Debtors' postpetition reporting on Insurety collections is likely grossly understated. Substantial discrepancies in the number of policies reported and the amounts collected (e.g. 2,500 discrepancy in number of policies reported for April 2019) |
| Original Collection Reports | CyberX Collection Reports | Substantial discrepancies in the number of policies reported and amounts collected (e.g., $600,000 discrepancy for July 2019) |
| CyberX Funding Reports | Original Funding Reports | Substantial discrepancies in the number of policies reported and amounts collected (e.g., $172,000 and 604 policies for October 2018) |
| Discovered Collection Reports | Cancellation Report | Substantial discrepancies in Unique Members (22,600 Member-difference) |
| Funding Reports | Member File | Substantial discrepancies between no-take credits acknowledged in the Funding Reports and the cancellation data in the Member File (e.g. 11,163 un-credited no-takes, and 4,135 only partially credited no-takes representing over $2.6 million in unreported, or underreported, credits) |

**E.  Insurety's Efforts to Obtain Clarification of the Reporting Discrepancies**

16.  Since Mr. Roberts' retention as CRO, Insurety has attempted to work with him, to learn the reasons these reporting discrepancies exist. In early December 2019, Whitley Penn contacted Mr. Roberts by phone and email to inform him of these discrepancies. In January 2020, an Insurety representative and Whitley Penn met in person with Mr. Roberts and presented him with documents and files identifying a number of the discrepancies described above. Insurety was

informed by Mr. Roberts that he would review the Insurety analysis and conduct an internal review to resolve the discrepancies and otherwise provide further clarification to Insurety. When Insurety followed up in February and March, it was informed by Mr. Roberts that he had still not begun his review of the materials. On April 3, 2020, Insurety again contacted Mr. Roberts only to learn that he had still not reviewed the materials—but intended to do so.

17. Despite Insurety's efforts over six months to obtain answers through Mr. Roberts Insurety knows little more today than it knew when it started the process. Insurety is aware that Mr. Roberts has experienced health issues that have made it difficult or impossible for him to continue serving as the Debtors' CRO. However, Insurety also believes that Mr. Roberts failed to provide the information and analysis Insurety requested because (1) the Debtors do not want Insurety or the Court to have access to the requested information and analysis, and (2) Mr. Roberts lacked the authority, independence, and mandate to obtain and/or provide that information and analysis.

### F. Discrepancies and Irregularities in the Debtors' Financial Records

18. While Insurety has had only limited access to the Debtors' financial records, Insurety has reviewed the following financial information and reporting:

    a. The AHCM general ledger for the period beginning in June 2018 through early October 2019 produced by AHCM through discovery in the Chapter 11 Cases (the "AHCM General Ledger").

    b. AHCM bank statements for Comerica account ending in 4886, Bank of America account ending in 3124, and Capital One account ending in 8773, for the period beginning in July 2018 through September 2019 that were produced by AHCM through discovery in the Chapter 11 Cases (collectively, the "Bank Statements").

    c. The Debtors' postpetition revenue summaries prepared by AHCM, which ostensibly indicate actual / projected revenues for October through December 2019 (the "Debtors' Revenue Summaries"). The Debtors' Revenue Summaries additionally identify the actual / projected cost of goods sold and gross profit for each month.

19.     Through its review of the AHCM General Ledger, the Bank Statements, and the Debtors' Revenue Summaries, Insurety has identified a number of disconcerting discrepancies and irregularities. For example, Insurety's review of the AHCM General Ledger revealed that the balances in the Comerica Bank Statements decreased by approximately $763,000 from June 2019 through August 2019, whereas the balance for the Comerica account as described in the AHCM General Ledger increased by approximately $475,000 during the same time period. Similarly, the AHCM General Ledger for September 2019 indicated revenues of $5.7 million while the Debtors' Revenue Summaries indicated revenues of $7.7 million during the same period.

20.     In short, the limited financial information the Debtors have provided to Insurety, coupled with the lack of meaningful assistance by Mr. Roberts have prevented the "fishbowl" transparency discussed by the Court at the First Day Hearing. As a result, Insurety has been unable to find out why the gross discrepancies in the Debtors' reports exist and how they can be addressed. An investigation and analysis of Debtors' books and records is thus necessary to protect the Debtors' estates, and the assets of Insurety and the other creditors.

**G.      Evidence of Twisting**

21.     Twisting occurs when a producer signs up an existing customer of one IMO (e.g. AWIS) pursuant to a new producer agreement with a new entity (e.g. NIIA) in order to earn a new commission. The risk of twisting is particularly great where a producer receives an advance because once the advance is received the producer has a strong incentive to transition the existing customer to a new policy that will allow the producer to receive a new commission.

22.     During Insurety's cross examination of Mr. Jordan at the first day hearing, he conceded that if the AWIS business, including agents working for AWIS, was transitioned to NIIA

that agents would have an incentive to sell existing AWIS customers new policies to earn a new commission – i.e. engage in twisting.[3]

23.     After learning through the NIIA Motion that the Debtors had begun transitioning the AWIS business to NIIA, Insurety asked the Debtors' CRO to conduct an analysis to determine whether twisting was occurring. At a meeting in January 2020 between Mr. Roberts, Insurety, and Whitley Penn, Insurety learned that Mr. Roberts had compared lists of AWIS policyholders and the NIIA policyholders and that at the time of his analysis, 188 members (i.e. policyholders), with an unknown number of policies, left AWIS and transitioned to NIIA. Of those 188 members, 41 were sold the new policy by the same agent who sold them the old policy. Mr. Roberts said he intended to investigate the 41 members (presumably by reviewing the recorded calls) but suggested that he was less concerned about the remaining 143 members because a different agent had sold each of the new policies.

24.     Insurety advised Mr. Roberts it was common practice for an agent who wanted to collect a new commission to have an affiliated agent sell the new policy to disguise twisting scheme. Mr. Roberts acknowledged the concern and stated he would include sales to the other 143 members in his investigation. Mr. Roberts also indicated that he would update his analysis. Despite several subsequent inquiries by Insurety to Mr. Roberts, Mr. Roberts has not provided any additional information regarding his investigation of the 188 potential cases of twisting. Mr. Roberts has also not informed Insurety whether he has reviewed subsequent reporting to determine whether additional potential instances of twisting have occurred.

---

[3] First Day Transcript pp. 60 ("**Q:** And so if agents go from your company to Mr. Brock's company…then there is a danger of those agents and their customers switching out policies, isn't there? **A:** There's certainly a chance."); *Id.* at 66-67 (**Q:** And one other thing. Once you wind down this part of your business that has these agents in it that receive these advances and you move those agents over to Mr. Brock's agency, those agents have an incentive to change policy with one of their customers because then they can get a commission again, correct? **A:** If they were allowed to, yes.").

### H.    The Debtors' Conflicts of Interest and Dealings with Insiders

25.    Based on testimony during the first day hearing, statements in pleadings filed with the Court, information provided in the Debtors' schedules (the "Schedules") and statements of financial affairs (each, a "SOFA"), and testimony provided during the § 341 meeting (the "341 Meeting"), it is clear that the Debtors' finances and operations are intertwined and otherwise closely tied to the Debtors' indirect owner Mr. Jordan, Mansfield Business Management, LLC ("Mansfield Management"), and various of the Debtors' officers and/or employees, including, *inter alia*, Mr. Brock, Randee Moscorro, Delbert Lee, and Omar Kasani.

#### i.    *Mr. Jordan's Insider Relationships*

26.    Mr. Jordan is the ultimate indirect owner of both of the Debtors. First Day Transcript, p. 24, lns. 1-2. In the AHCM SOFA, Mr. Jordan is also identified as the "CEO and Chairman of Board" of AHCM. Mr. Jordan is not listed as the CEO of AWIS in the AWIS SOFA, Mr. Jordan testified at the first day hearing that he was the "CEO and owner" of the Debtors and that he is "involved in the operation of both of [the] Debtors." First Day Transcript, p. 24, lns. 1-2; p. 25, lns. 8-19. During the 341 Meeting, Mr. Brock also testified that Mr. Jordan is the 100% owner of Mansfield Management. As more fully discussed below, Mansfield Management received over $1.2 million from AHCM during the year preceding the petition date. AHCM SOFA p. 15.

27.    In addition to being the owner, CEO and director of the Debtors, and the owner of Mansfield Management, Mr. Jordan is also the indirect owner of NIIA. Although both Mr. Jordan[4] and Mr. Brock[5] testified at the hearing that NIIA was Mr. Brock's agency, in the NIIA Motion, the Debtors disclose that NIIA is actually owned by Mr. Jordan, although Mr. Brock is identified

---

[4] First Day Transcript, p. 57, lns. 14-19; p. 59, lns. 5-8.
[5] First Day Transcript, p. 131, lns. 17-25.

as the managing member of NIIA. NIIA Motion ¶ 3. Since filing the NIIA Motion, the Debtors have further clarified that the direct owner of NIIA is Grayford Business Management, LLC. NIIA Supplement ¶ 2.

### ii. *Mansfield Management*

28.     Until the 341 meeting, the Debtors disclosed almost nothing about the relationship between the Debtors and Mansfield Management other than disclosures in the SOFAs that the Debtors made $1,247,581.40 in insider payments to Mansfield Management and that Mansfield Management made a loan to the Debtors. At the 341 Meeting, based on questions to Mr. Brock by Insurety's counsel, Mr. Brock disclosed that Mansfield Management is wholly owned by Mr. Jordan and that Mansfield Management was specifically set up to do business with the Debtors. Mr. Brock testified at the 341 Meeting that he is not aware of any other business conducted by Mansfield Management aside from the business it conducts with the Debtors.

29.     Mr. Brock's testimony at the 341 Meeting revealed that Mansfield Management effectively serves as a pass-through entity from which a number of the Debtors' executives and employees receive payments from Mansfield Management, all from funds received by Mansfield Management from the Debtors. Specifically, Mr. Brock testified that the following individuals receive payments from Mansfield Management: Mr. Brock, Mr. Lindsay, Delbert Lee (the AHCM chief operating officer) ("Mr. Lee"), Randee Mascorro (the AWIS Senior Director of Business Operations and Secretary and sole employee of AWIS) ("Ms. Mascorro"), Robert Barns, Rami Hassan, and Ralph Scott. Although Mr. Brock testified that he received between 15-20% of the Mansfield Management revenues, Mr. Brock testified that he has no written agreement with Mansfield Management, nor does he have a formal title. Mr. Brock further testified that he is not aware of any agreement between Mansfield Management and NIIA.

### iii. NIIA

30. During the First Day Hearing, Mr. Jordan and Mr. Brock suggested that NIIA was owned by Mr. Brock. In the NIIA Motion, the Debtors originally stated that NIIA is wholly owned by Mr. Jordan, and Mr. Brock is the Managing Member. During the 341 Meeting, Mr. Brock also testified that he was the president of NIIA. Notably, during the First Day Hearing, Mr. Jordan never testified that he was the owner of NIIA, even though, in reference to NIIA, Mr. Jordan testified that the Debtors had entered into "an agreement with an agency that we're very familiar with" to take over the AWIS call center business. First Day Transcript p. 44, lns. 13-24; *see also* First Day Transcript p. 57, lns. 14-19 (confirming that "Mr. Brock set up a company that can do what AWIS can do"). In the NIIA Supplement, the Debtors have changed the foregoing and are now taking the position that NIIA is owned by Grayford Business Management, LLC. The NIIA Supplement does not disclose the owners of Grayford Business Management, LLC, or whether it holds any other assets or conducts any other business.

31. Indeed, "Grayford Business Management, LLC" appears to be a typo, as Insurety has found no records of its existence. Instead, a "Graford Business Management, LLC" was formed on October 23, 2019 with Landon Jordan as its Registered Agent and Member. But, this entity was involuntarily terminated by the Texas Secretary of State on December 4, 2019, for not paying the filing fee prescribed by law, and failing to correct its neglect, delinquency, or omission after being provided notice to its registered office. *See* **Exhibit B**. Accordingly, NIIA appears to be owned by a defunct entity.

32. Perhaps thinking that it is better to ask forgiveness than permission, the Debtors disclosed in the NIIA Motion that "[o]n or about October 21, 2019, NIIA began selling Product to customers through the Producers at the call centers", even though the Debtors did not file the Motion for authority to do so until December 11, 2019. NIIA Motion ¶ 17. The Debtors similarly

disclosed their intention to make a first payment of $250,000 to NIIA on December 15, even though they would not have yet received court authorization. NIIA Motion ¶ 20. In the NIIA Supplement, the Debtors have disclosed that the initial payment was actually $210,000, net of fees payable to AHCM.

### iv.    *Mr. Brock's Insider Relationships*

33.    Mr. Brock testified during the First Day Hearing that he is the president of AWIS. The AWIS Schedule also identifies Mr. Brock as its president. As mentioned elsewhere herein, Mr. Brock is also the managing member and president of NIIA. During the 341 Meeting, Mr. Brock testified that he does not have an employment agreement with NIIA and that he does not expect any compensation from NIIA for the work he performs as president. Mr. Brock's testimony raises the question of how he will be compensated for the work he performs for NIIA. Notably, even though the Schedules and SOFAs do not directly disclose that Mr. Brock received compensation from the Debtors, through his testimony at the 341 Meeting, Insurety learned that Mr. Brock was receiving payments through Mansfield Management. Presumably Mr. Brock will receive some form of payment for his services.

### v.    *Other Insider Relationships*

34.    In addition to Mr. Brock and Mr. Jordan, other of the Debtors' officers also have insider relationships with Mansfield Management and potentially with NIIA. For example, as previously discussed, both Ms. Mascorro and Mr. Lee receive payments from Mansfield Management. The Debtors have not disclosed how much Ms. Mascorro or Mr. Lee have received from Mansfield Management, the nature of the payments, the work provided in consideration for the payments, or any other relevant details. In fact, but for the questioning of Mr. Brock at the 341 Meeting, non-insiders would not know of the relationships between Mansfield Management and the Debtors' officers. Under the circumstances, particularly the lack of transparency into the

various affiliations and relationships between the Debtors and non-debtor affiliates, including NIIA and Mansfield Management, there is an enhanced risk that the Debtors and their estates will be harmed if the Motion is approved.

## I. The New CRO Application

35.     On April 24, 2020, the Debtors filed the *Debtors' Application for Order (A) Authorizing the Employment and Retention of Harris & Dickey, LLC to Provide a Chief Restructuring Officer and Certain Additional Personnel to the Debtors, and (B) Designating John Tittle, Jr. as Chief Restructuring Officer for the Debtors* [Docket No. 231] (the "New CRO Application").

36.     On May 13, 2020, Insurety sent the May 13 Letter to the Debtors informing the Debtors that Insurety would be filing a limited objection to the New CRO Application and would seek the appointment of an examiner. On May 15, 2020, Insurety filed its limited objection to the New CRO Application [Docket No. 272]. While Insurety did not object to the Debtors' retention of Mr. Tittle or Harris & Dickety ("H&D"), Insurety believed that it would be preferable for H&D to be retained as financial advisor and for consideration of H&D's appointment as CRO to be considered together with this Motion. The Debtors requested an expedited setting to consider the New CRO Application and the Court granted the motion to expedite and set a hearing for May 21, 2020. While Insurety would have preferred that the Debtors retain H&D as financial advisor until a hearing on this Motion could be considered, for reasons of efficiency and judicial economy Insurety opted to withdraw its objection to the entry of an order approving the New CRO Application subject to a reservation of rights.

## III.    Relief Requested

37.     Insurety requests that the Court order the appointment of an examiner in these chapter 11 cases pursuant to Bankruptcy Code § 1104(c) to conduct an investigation in accordance

with Bankruptcy Code §§ 1104(c) and 1106(b) into (i) the insider relationships, prepetition and postpetition transfers to insiders, and potential self-dealing by and amongst the Debtors, the Debtors' officers and directors, the Debtors' affiliates, and the affiliates of the Debtors' insiders, (ii) the discrepancies and irregularities identified by Insurety in the data provided by the Debtors both before and after the Petition Date, (iii) the Debtors' data management and data processing systems, (iv) the Debtors' books and records, financial reporting, and financial reporting systems, and (v) potential instances of twisting that have occurred since the Petition Date.

## IV.    Basis for Relief Requested

### A.    The Appointment of an Examiner is Warranted under the Circumstances of These Chapter 11 Cases

38.    Bankruptcy Code § 1104(c) governs requests for the appointment of an examiner and provides in relevant part:

> If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court **shall** order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate . . . if –
>
>    (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; **or**
>
>    (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added).

39.    Under Bankruptcy Code § 1104(c), four requirements must be met for an examiner to be appointed:  (1) the debtor must still be in possession of the estate; (2) a plan must not have been confirmed; (3) a party in interest must request the appointment; and (4) either (a) the appointment of the examiner is in the interests of the estate or (b) the specified unsecured debts of the debtor must exceed $5 million. *In re UAL Corp.*, 307 B.R. 80, 84 (Bankr. N.D. Ill. 2004).

40. Here, the first three requirements are easily met. The Debtors continue as debtors and debtors-in-possession, no plan has been confirmed (or proposed), and Insurety, a party in interest in these Chapter 11 Cases, has filed this Motion. As more fully addressed below, each of the requirements of Bankruptcy Code § 1104(c)(1) and (c)(2) are also met.

### i.     *The Appointment of An Examiner is in the Interests of the Debtors' Estates*

41. The Debtors' estates are in sore need of an objective independent third party to provide transparency and to assess potential mismanagement, misconduct, and irregularities from both before and after the Petition Date. As detailed in the background section of the Motion, many facts and circumstances in these chapter 11 cases favor the appointment of an examiner. The Debtors' pervasive insider connections, conflicts of interest, potential self-dealing, and evidence of twisting are by themselves a sufficient basis to appoint an examiner. The numerous reporting discrepancies, evidence of financial mismanagement, and related concerns described in the Motion also raise serious questions about the reliability of the information reported by the Debtors. Furthermore, eight months into these chapter 11 cases, the Debtors have not filed a plan and have not described in any detail their proposed exit strategy from these cases. The clarity and transparency that will come through the appointment of an examiner will assist parties-in-interest in assessing the viability of any future plan ultimately proposed by the Debtors or other parties-in-interest.

42. In a chapter 11 case with an unsecured creditors' committee, the committee would have likely investigated many of the issues described in the Motion. Here, where no committee has been appointed, the need for an examiner is more acute.

43. **Pervasive Insider Connections and Conflicts of Interest.** The need for an independent investigation is particularly appropriate here where there are pervasive insider

connections, conflicts of interest, and potential self-dealing, including on a postpetition basis. *See e.g. In re Gilman Servs.*, 46 B.R. 322, 327 (Bankr. D. Mass 1985) (noting that insider transactions "warrant[] an investigation by an examiner where there are unanswered questions concerning the transaction and interrelationship of the parties involved"); *In re Keene Corp.*, 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994) (citation omitted) ("Often, appointment of an examiner is warranted when the debtor's transaction with affiliates should be investigated."); *In re McCornhill Publishing, Inc.*, 73 B.R. 1013 (Bankr. S.D.N.Y. 1987) (approving the appointment of a trustee to "investigate the financial affairs of the debtor" where, *inter alia*, "the debtor's directors have conflicting interests in various affiliated entities…[t]he debtor's president has closely intertwined the affairs of the debtor corporation with those of the affiliated entities" and "[t]he debtor's financial records are incomplete and haphazard"). At the 341 Meeting, parties-in-interest learned that the Debtors' key officers received over $1 million in payments from the Debtors through Mansfield Management, even though no formal written agreement exists between the Debtors and Mansfield Management or Mansfield Management and the Debtors' officers. More recently, the Debtors are seeking to transition the AWIS business to NIIA, an entity owned and controlled by Mr. Jordan and Mr. Brock. Insurety has raised concerns about that transaction. An independent examiner should closely review the entire relationship between AWIS, AHCM, NIIA, Mansfield Management, Mr. Brock, Mr. Jordan, and the other officers and employees of the Debtors. To date, the Debtors and NIIA have provided very limited information relating to the transaction. The appointment of an independent examiner to fully investigate the insider relationships, insider transfers, and pervasive conflicts of interest involved in these chapter 11 cases would be beneficial to all parties in interest.

44. **Numerous Material Reporting Discrepancies.** Insurety has identified numerous reporting discrepancies in the various reports produced by the Debtors and CyberX during the

prepetition and postpetition periods. As is evident from the chart below, the scale and extent of reporting discrepancies is extensive.

**Summary Chart of Discrepancies in the Reports**

| Comparing… | To… | Discrepancy |
|---|---|---|
| Cancellation Report | Discovered Collection Reports | Missing/withheld collections from 10,124 Policies ($4,020,170.37) |
| Original Collection Reports | Discovered Collection Reports | Discovered Collection Reports omit 4,200 policies included in the Original Collection Reports. These same policies also do not appear in the Cancellation Report. The omission of 4,200 policies means that the Debtors' postpetition reporting on Insurety collections is likely grossly understated.<br><br>Substantial discrepancies in the number of policies reported and the amounts collected (e.g. 2,500 discrepancy in number of policies reported for April 2019) |
| Original Collection Reports | CyberX Collection Reports | Substantial discrepancies in the number of policies reported and amounts collected (e.g., $600,000 discrepancy for July 2019) |
| CyberX Funding Reports | Original Funding Reports | Substantial discrepancies in the number of policies reported and amounts collected (e.g., $172,000 and 604 policies for October 2018) |
| Discovered Collection Reports | Cancellation Report | Substantial discrepancies in Unique Members (22,600 Member-difference) |
| Funding Reports | Member File | Substantial discrepancies between no-take credits acknowledged in the Funding Reports and the cancellation data in the Member File (e.g. 11,163 un-credited no-takes, and 4,135 only partially credited no-takes representing over $2.6 million in unreported, or underreported, credits) |

45. Both the nature and extent of the reporting discrepancies call into serious question the reliability of the Debtors' reporting and the integrity of the Debtors' data management and data

processing systems as well as the Debtors' internal processes, policies, and procedures followed by the Debtors in managing their data management and data processing systems.

46. Insurety has substantial experience working with IMOs and TPAs. The lack of reliability and detail in the Debtors' reporting, as well as the scale and scope of the discrepancies Insurety has identified in the Debtors' reporting data, falls far outside industry standards. Insurety has been trying for months to obtain further information to clarify the discrepancies it has identified to little avail. Absent the appointment of an independent examiner the Debtors are highly unlikely to provide the necessary information and transparency to resolve the material discrepancies in the Debtors' reporting. Indeed, given the prevalence of inconsistent and unreliable reporting, absent a review by an independent third party, it will be virtually impossible for the Debtors to regain credibility with respect to the reporting they provide in these chapter 11 cases.

47. **Clear instances of financial mismanagement.** Insurety has identified clear instances of financial mismanagement on the part of the Debtors and their officers. For example, from testimony at the first day hearing and subsequent disclosures in their Schedules and SOFAs, it is clear the Debtors ignored their obligation to hold Insurety's Purchased Assets in trust (i.e. the fraction of policy payments from members that Insurety was entitled to receive) and instead used millions of dollars of trust fund monies to purchase new commissions (and perhaps for operating capital).[6]

48. Insurety has also conducted a review of the AHCM General Ledger, the Bank Statements, and the Debtors' Revenue Summaries. While limited in scope, Insurety's review of the foregoing financial information identified numerous discrepancies in the Debtors' financial reporting. Ultimately, the limited financial information produced to Insurety together with the

---

[6] Cite to Delbert Lee Testimony and the Schedules (Debtors' cash as of the petition date).

gross discrepancies in that information have made it impossible to conduct a more fulsome analysis of the Debtors' books and records. However, the discrepancies that Insurety has identified raise serious questions regarding the Debtors' financial record-keeping generally and undermine the credibility of the Debtors' financial disclosures in their chapter 11 cases. An examiner could review the Debtors financial reporting, investigate deficiencies and irregularities, and bring enhanced credibility to the Debtors' financial reporting moving forward.

49. **Evidence of Twisting.** The Debtors' CRO identified 188 potential instances of twisting in his analysis of what Insurety believes was only the first several weeks of NIIA's business relationship with AHCM. Since the January 2020 meeting between Insurety and the CRO, the CRO has not provided Insurety with an update of either (a) his investigation of the 188 potential instances of twisting or (b) his twisting analysis (or whether he even conducted one) for the period after the January 2020 meeting. Since the January 2020 meeting, more than four months have passed and to Insurety's knowledge the Debtors have not conducted any additional analysis or investigation into instances of potential twisting. Insurety is particularly concerned with the Debtors' apparent apathy regarding the issue of twisting because the Debtors' insiders, including NIIA, have a clear conflict of interest with regard to twisting. Specifically, instances of twisting (as between AWIS and NIIA) will benefit NIIA and certain of the Debtors' insiders, whereas the Debtors and their estates are harmed when such twisting occurs. An examiner would be in a position to both (a) investigate twisting and (b) recommend procedures and safeguards to prevent twisting.

50. The appointment of an examiner to conduct a targeted investigation is appropriate under the circumstances and is in the interests of the Debtors' estates because an examiner would provide needed transparency, provide an objective assessment of the Debtors' current systems and

processes, identify potential instances of wrongdoing or mismanagement, and provide objective recommendations for addressing any issues identified through the investigation.

### ii. The Debtors' Qualifying Combined Unsecured Debts Exceed $5,000,000

51. Bankruptcy Code § 1104(c)(2) provides that "the court shall order" the appointment of an examiner if either "(1) such appointment is in the interests of creditors . . .; **or** (2) the debtor's fixed, liquidated, unsecured debts other than debts for goods, services or taxes, or owing to an insider, exceed $5,000,000.00." 11 U.S.C. § 1104(c). Courts have construed the language of § 1104(c) to mean the appointment of an examiner is mandatory if the statutory requirements of § 1104(c)(2) are met – *i.e.* if the debtors' "fixed, liquidated, unsecured debts other than debts for goods, services or taxes, or owing to an insider, exceed $5,000,000.00." *See In re Revco D.S., Inc*. 898 F.2d 498, 501 (6th Cir. 1990) (appointment is mandatory under section 1104(c)(2)); *In re Erickson Ret. Communities, LLC*, 425 B.R. 309, 312 (Bankr. N.D. Tex. 2010) ("where the $5 million unsecured debt threshold is met, a bankruptcy court ordinarily has no discretion").

52. There is little case law discussing what constitutes a "fixed, liquidated, unsecured debt" for purposes of Bankruptcy Code § 1104(c)(2). *See In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 637 (Bankr. S.D.N.Y. 2012) (mentioning the dearth of authority interpreting the meaning of the terms in Bankruptcy Code § 1104(c)(2) and discussing definitions of "fixed debt", "contingent debt", and "liquidated debt" in Black's Law Dictionary and the definitions of the same or similar terms "in other bankruptcy contexts"). However, because a claim asserted through a proof of claim

is "deemed allowed"[7] and "constitutes prima facie evidence of the validity of the amount of the claim",[8] the amounts asserted in proofs of claim should be considered "fixed and liquidated."[9]

53.     The chart below identifies unsecured claims totaling $10,649,699 that have either been identified in the Debtors' schedules (and not marked as contingent, unliquidated, or disputed) or that have been asserted pursuant to a proof of claim. The chart only includes claims that do not appear to be "debts for goods, services or taxes, or owing to an insider." In accordance with Bankruptcy Code § 502(a) and Bankruptcy Rules 3001(f) and 3003(b)(1), the claims should be considered both "fixed" and "liquidated" for purposes of Bankruptcy Code § 1104(c)(2). Because the Debtors combined qualifying unsecured debts exceed $5,000,000, the appointment of an examiner is mandatory.

| Claimant | Nature of Claim | Debtor | Claim No./Schedules | Unsecured Claim Amount |
|---|---|---|---|---|
| NXT Level Health LLC | unpaid commissions | AWIS | Claim No. 5 | $2,100,000 |
| United Enrollment Services, LLC | unpaid commissions | AWIS | Claim No. 3 | $350,000 |
| Data Partnership Group, L.P. | insurance premiums collected | AWIS/AHCM | Claim No. 9 (AWIS) Claim No. 8 (AHCM) | $4,264,407 |
| Dr. Michael Rabie | amounts under sale agreement | AWIS | Claim No. 10 | $3,500,000 |
| American Express National Bank | credit card | AHCM | Claim No. 4 | $66,584 |
| GreatAmerica Financial Services Corporation | chattel paper contracts | AHCM | Claim No. 5 | $171,708 |
| Zenith Real Estate | rent | AHCM | Schedules (3.25) | $30,000 |

---

[7] 11 U.S.C. §502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest…objects.").

[8] Bankruptcy Rule 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.").

[9] *See also* Bankruptcy Rule 3003(b)(1) ("The schedule of liabilities…shall constitute prima facie evidence of the validity and amount of the claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated.").

| Claimant | Nature of Claim | Debtor | Claim No./Schedules | Unsecured Claim Amount |
|---|---|---|---|---|
| FCAWMA | working capital | AHCM | Schedules (3.9) | $132,000 |
| Capital One, N.A. | credit card | AHCM | Schedules (3.5) | $15,000 |
| Assured Benefits Administration | health insurance | AHCM | Schedules (3.3) | $20,000 |
| | | | **Total** | **$10,649,699** |

### B. Establishment of Examiner's Duties and Powers Pursuant to 11 U.S.C. § 1106(b)

54. Once appointed, the scope of an examiner's investigation and duty to report is defined by the Court in accordance with Bankruptcy Code §§ 1104(c) and 1106(b). The bankruptcy court enjoys broad discretion in determining the appropriateness of the investigation, including its scope, duration, timing and subject matter. *In re Revco D.S., Inc.*, 898 F.2d 498, 501 (6th Cir. 1990). Bankruptcy Code § 1104(c) provides that an examiner shall:

conduct an investigation of the debtor[s] as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor or by current or former management of the debtor,…

11 U.S.C. § 1104(c). Bankruptcy Code § 1106 provides that:

except to the extent that the court orders otherwise, [the examiner shall] investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan.

11 U.S.C. § 1106(b) (incorporating § 1106(a)(3).

55. An examiner's reporting obligations are further described in Bankruptcy Code §§ 1106, which provides that as soon as practicable, an examiner shall:

(A) file a statement of any investigation conducted under [§ 1106(a)(3)], including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate; and

(B) transmit a copy or summary of any such statement to…such [] entity as the court designates.

11 U.S.C. § 1106(b) (incorporating § 1106(a)(4)).

56.    As more fully discussed above, the appointment of an examiner is appropriate in these chapter 11 cases. Insurety proposes that an examiner should be appointed and that the examiner should be given the authority and mandate to conduct an investigation (and provide a report and related recommendations) of the following matters: (i) potential instances of insider dealing, conflicts of interest, or breaches of fiduciary duty; (ii) the reporting deficiencies identified by Insurety; (iii) the Debtors' data management and data processing systems; (iv) the Debtors' books and records and financial reporting systems; and (v) twisting. Attached as **Exhibit C** is a more detailed description of the proposed scope of the Examiner's investigation.

WHEREFORE, Insurety respectfully requests that this Court enter an Order (i) granting this Motion, (ii) appointing an examiner for these bankruptcy estates, (iii) establishing the examiner's powers and duties, and (iv) granting Insurety such other and further relief as is just and proper.


RESPECTFULLY SUBMITTED this 20th day of May, 2020.

By: */s/ Jarom J. Yates*
**HAYNES AND BOONE, LLP**
Ian T. Peck
State Bar No. 24013306
Jarom J. Yates
State Bar No. 24071134
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile:  214.651.5940
Email: ian.peck@haynesboone.com
Email: jarom.yates@haynesboone.com

and

**MAYER BROWN LLP**
Robert S. Harrell
State Bar No. 09041350
Andrew Elkhoury
State Bar No. 24097648
700 Louisiana Street, Suite 3400
Houston, Texas 77004
Telephone: (713) 238-2700
Facsimile: (713) 238-4888
Email: rharrell@mayerbrown.com
Email: aelkhoury@mayerbrown.com

**ATTORNEYS FOR INSURETY CAPITAL, LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 20, 2020, true and correct copies of the foregoing were served via email upon the parties that receive electronic notices in these cases pursuant to the Court's ECF filing system.

*/s/ Jarom J. Yates*
Jarom J. Yates

## **Exhibit A**

May 13 Letter

# haynes*boone*

May 13, 2020

**VIA ELECTRONIC MAIL**

Robert Forshey
Forshey Prostok, LLP
777 Main Street, Suite 1290
Fort Worth, TX 76102
bforshey@forsheyprostok.com

> RE:     *In re American Workers Insurance Services, Inc. ("AWIS") and Association Health Care Management, Inc. ("AHCM" and together with AWIS, the "Debtors") (Jointly Administered Case No. 19-44209-mxm-11) – Request for Agreement to the Appointment of An Examiner Pursuant to Bankruptcy Code § 1104(c).*

Mr. Forshey,

As you are aware, we are bankruptcy counsel to Insurety Capital, LLC ("Insurety") in connection with the above-referenced jointly administered chapter 11 cases (the "Chapter 11 Cases"). It is our understanding that the Debtors' current chief restructuring officer, CR3 Partners, William Roberts, and Brandon Smith are no longer able to serve as CRO to the Debtors and that the Debtors are seeking to appoint a new CRO pursuant to the *Debtors' Application for Order (A) Authorizing the Employment and Retention of Harris & Dickey, LLC to Provide a Chief Restructuring Officer and Certain Additional Personnel to the Debtors, and (B) Designating John Tittle, Jr. as Chief Restructuring Officer for the Debtors* [Docket No. 231] (the "New CRO Application"). As you are aware, Insurety has been attempting to coordinate with Mr. Roberts since at least December 2019 to obtain further information regarding numerous discrepancies and irregularities contained in reports and financial information that Insurety has received from the Debtors and CyberX Group, LLC ("CyberX"). These discrepancies and irregularities relate to both prepetition and postpetition events and conduct and raise serious concerns that the Debtors, either through negligence or with intent, are misreporting and/or mishandling key information to the detriment of Insurety, policyholders, and the Debtors' estates. A summary of these discrepancies and irregularities, along with a description of Insurety's efforts to obtain further clarifying information from Mr. Roberts and the Debtors, is included hereafter in this letter. As more fully described below, despite Insurety's efforts to obtain answers from Mr. Roberts and the Debtors, few if any answers have been provided. The Debtors' New CRO Motion enhances Insurety's concerns that the Debtors are either unwilling or unable to provide the necessary clarification.

Insurety's concerns about reporting discrepancies and irregularities are compounded by its concerns about potential self-dealing and conflicts of interest by the Debtors' insiders. You are aware that Insurety has objected to the Debtors' request to enter into an agreement with its affiliate National Individual Insurance Agency, LLC ("NIIA") pursuant to the *Debtors' Motion*

**Haynes and Boone, LLP**
**Attorneys and Counselors**
2323 Victory Avenue
Suite 700
Dallas, Texas 75219
T (214) 651-5000
F (214) 651-5940
www.haynesboone.com

*for Authority to Enter into Servicing Agreement Between Association Healthcare Management, Inc. and National Individual Insurance Agency, LLC* [Docket No. 113] (the "NIIA Motion"). Insurety's primary concerns surrounding the NIIA Motion relate to the fact that NIIA is owned and controlled by the Debtors' insiders and Insurety is concerned that the agreement with NIIA is being made at the expense, and to the detriment, of the Debtors and their estates.

Insurety therefore intends to file a motion seeking the appointment of an examiner pursuant to Bankruptcy Code § 1104(c). Insurety believes that it would be in the best interests of the Debtors' estates to have an independent examiner conduct an examination of the Debtors' business operations, financial records, reporting and recordkeeping systems, as well as the relationship and agreements between the Debtors' insiders, the Debtors' affiliates, and the Debtors.

## I.    General Background

Insurety and AWIS entered into that certain *Commission Assignment Agreement* dated as of July 16, 2018 (the "CAA"), Insurety, AWIS and AHCM entered into that certain *TPA Servicing Agreement* dated as of July 16, 2018 (the "TPASA"), and Insurety and AWIS entered into that certain *Exclusive Management Services Agreement* dated as of July 16, 2018 (the "EMSA", and together with the CAA and the TPASA, the "Agreements").

Beginning in July 2018, Insurety began purchasing future commissions from AWIS pursuant to the terms of the Agreements. Under the terms of the CAA, when Insurety purchases commissions, Insurety obtains from AWIS all of its right, title, and interest, in the commissions, including the right to monthly administrative fees for the life of the underlying policies to Insurety (the "Purchased Assets"). The Agreements recognize that the Purchased Assets are Insurety's exclusive personal property, for which AWIS and AHCM are only custodians.[1]

In the ordinary course, AWIS would send Insurety a list of policies written, the commission amounts on those policies, the requested advance amount and other information every week (the "Original Funding Reports"). AHCM agreed, as a licensed TPA, and pursuant to the terms of the TPASA, to collect policyholder premiums and to remit the agreed upon portion through a waterfall, first to carriers, then to Insurety, then to other parties as more fully described in the Original Collection Reports (defined below). The amount of money AHCM transferred to Insurety through the waterfall was based on the data in the Original Funding Reports and Original Collection Reports.

Pursuant to the Bankruptcy Court's cash collateral orders, the Debtors are required to continue paying Insurety 100% of the amounts Insurety was entitled to receive in connection with Insurety's funding advances prior to July 24, 2019 as well as 100% of the commissions and other fees that Insurety would have been entitled to receive in connection with funding advances made by the Debtors after July 24, 2019 (the "Insurety Collections"). The methodology for calculating the Insurety Collections remains the same during the postpetition period as during the prepetition period. Therefore, discrepancies that existed in the underlying data in the Original Funding

---

[1] *See e.g.* EMSA § 1.03(d); TPASA § 1.02.

**haynes**boone

Reports or the Original Collection Reports requires adjustments in the amount of the Insurety Collections that Insurety is entitled to receive from the Debtors, both on a prepetition and a postpetition basis.

## II.    <u>Information Reviewed</u>

Insurety and its professionals have reviewed, *inter alia*, the following reports relating to the Purchased Assets received from the Debtors and/or Cyber-X from both before and after the Petition Date.

1. A list of cancelled policies that was received from the Debtors through discovery on December 2, 2019 (the "<u>Cancellation Report</u>"). The Cancellation Report ostensibly contains a list of all policies cancelled from July 2018 through December 1, 2019 tracked by member ID and termination date. The Cancellation Report also included detailed information such as member and product information for each cancelled policy.

2. The collection reports provided by the Debtors to Insurety in the ordinary course of business from June 2018 through July 31, 2019 (the "<u>Original Collection Reports</u>"). The Original Collection Reports ostensibly contained lists of all renewed policies and related collection amounts. The Original Collection Reports lacked key data that should have been provided in accordance with the Insurety reporting templates.

3. The collection reports provided by the Debtors through discovery in November 2019 which cover the period from August 2018 through July 2019 (the "<u>Discovered Collection Reports</u>"). The Discovered Collection Reports report data on a monthly basis and ostensibly incorporate the collections received as tracked by policy number. The data provided through the Discovered Collection Reports was more comprehensive then the data included in the Original Collection Reports. For example, member IDs were more consistently provided in the Discovered Collection Reports than in the Original Collection Reports.

4. The collection reports provided by the Debtors to Insurety since the Petition Date through the present (the "<u>Postpetition Collection Reports</u>"). The Postpetition Collection Reports have not always been presented in a consistent format and some lack crucial data, such as, for example, the individual policy IDs for which collections are being reported.

5. In response to a subpoena issued by Insurety, CyberX produced collection reports to Insurety in November 2019 which cover the period from August 2018 through October 2019 (the "<u>CyberX Collection Reports</u>"). The Debtors license and use a software system developed by CyberX to process new policies written and collections received. Because CyberX merely licenses and hosts the data processing software used by the Debtors, but does not manage or populate policy-related data, the CyberX Collection Reports should match the Original Collection Reports and the Discovered Collection Reports for the periods in question. However, these reports do not match.

6. The Original Funding Reports. The Original Funding Reports are the reports of new sales and chargebacks of policies in the Insurety Commission Advance Program.  These reports were supposed to, but often did not, contain the policy number, member information in addition to agent and commission information.  These reports were sent weekly and were the basis for the Insurety advances.  The Original Funding Reports were received from June 2018 until July 2019.

3

7. The funding reports produced by the Debtors through discovery which cover the period from August 2018 through July 7, 2019 (the "Discovered Funding Reports"). The Discovered Funding Reports appear to be generated on a weekly basis and ostensibly contain a comprehensive list of the funds requested for commission advances on new policies as tracked by policy number. The Discovered Funding Reports also include detailed information such as the amount earned and advance paid by Insurety for each policy as well as information specific to the member, agent, and product associated with each new policy. The Discovered Funding Reports contained a more complete data set than the data included in the Original Funding Reports although the Discovered Funding Reports still lack crucial data, such as, for example, the product created date, the product active date, and policy numbers in 39,559 funding rows (which covers the period ranging from 11/25/2018 through 01/06/2019).

8. The funding reports provided by CyberX through discovery in November 2019 which cover the period from August 2018 through October 2019 (the "CyberX Funding Reports"). The CyberX Funding Reports ostensibly incorporate the funds required for commission advances on new policies as tracked by policy number. The CyberX Funding Reports also include detailed information regarding the member, product, and commissionable amount associated with each new policy.

9. A spreadsheet containing a list of members who have purchased policies through AWIS that was received from the Debtors after the Petition Date (the "Member File"). The Member File contains data relating to 71,953 member IDs, and includes the initial payment date along with other key data.

10. A report received from AHCM that identifies the annual persistency and falloff by month for every active product offered by AHCM from October 2018 through September 2019 (the "Product Persistency Report"). The Product Persistency Report ostensibly contains a comprehensive list of every product offered by AHCM to policy holders tracked by product name. The Product Persistency Report identifies the total number of enrollments, no takes, and falloffs by month to determine the total number of terminations, as well as the falloff percentage, for each product.

11. A spreadsheet produced by the Debtors through discovery in November 2019 containing a list of members who purchased a policy in a "face-to-face" setting from October 2018 through September 2019 (the "Face-to-Face Data"). The Face-to-Face Data is generated on a monthly basis and is comprised of policy information such as the associated Member ID, billing frequency, and monthly premium for each face-to-face policy.

Insurety and its professionals have also reviewed, *inter alia*, the categories of financial information and reporting relating to the Debtors from both before and after the Petition Date listed below.

1. The AHCM general ledger for the period beginning in June 2018 through early October 2019 produced by AHCM through discovery in the Chapter 11 Cases (the "AHCM General Ledger").

2. AHCM bank statements for Comerica account ending in 4886, Bank of America account ending in 3124, and Capital One account ending in 8773, for the period beginning in July

haynesboone

2018 through September 2019 that were produced by AHCM through discovery in the Chapter 11 Cases (collectively, the "Bank Statements").

3. The Debtors' postpetition revenue summaries prepared by AHCM, which ostensibly indicate actual / projected revenues for October through December 2019 (the "Debtors' Revenue Summaries"). The Debtors' Revenue Summaries additionally identify the actual / projected cost of goods sold and gross profit for each month.

III. **Summary of Discrepancies and Irregularities Identified By Insurety and Its Professionals**

Based on its review of the above-mentioned documents, reports, and other information, Insurety has identified, without limitation, the discrepancies and irregularities as further described below.

### A. Discrepancies Between the Cancellation Report and the Collection Reports

The Purchased Assets include Insurety's rights in certain cash flows from the policies in which Insurety has purchased commissions, including the right to collect a monthly administrative fee for the life of the applicable policy. Coverage under a policy is predicated on the policyholder's payment of the required premiums. Failure to make a premium payment by the deadline in the policy results in the automatic termination of the insurance policy. In the ordinary course of its business, prior to the Petition Date, Insurety did not have access to the Cancellation Report, which identifies the termination date for each policy. Through discovery in the Chapter 11 Cases, however, Insurety obtained the Cancellation Report. Insurety then conducted an analysis of the Cancellation Report, comparing the policy termination dates in the Cancellation Report to information from the Discovered Collection Reports. Insurety expected to see that a policy would be removed from a Discovered Collection Report the month of or after the cancellation date reported in the Cancellation Report (depending on the relevant timing of the cancellation).

Instead, Insurety's analysis revealed discrepancies between the Cancellation Report and the Collection Reports with respect to 10,124 policies. Specifically, the Collection Report evidenced that collections from those 10,124 policies ceased prior to the date collections should have ceased based on the cancellation dates in the Cancellation Report. In other words, the discrepancies suggest that money was likely collected in connection with some or all of those 10,124 policies but not remitted to Insurety. In some instances, the Cancellation Report revealed that the policies included in Insurety's Purchased Assets were not actually cancelled. Instead, the insured continued to pay his/her premiums to AHCM for as long as 6 months after the purported cancellation date, but Insurety did not receive its commissions or monthly administrative fees from those active policies as required by the Agreements. Based on the foregoing discrepancies, the Debtors appear to have inappropriately withheld $4,020,170.37 in collections from Insurety.

### B. Discrepancies Between Original Collection Reports and Discovered Collection Reports

Insurety reviewed the Original Collection Reports and compared them to the Discovered Collection Reports, which revealed that the Discovered Collection Reports did not include 4,200 policies that were included on the Original Collection Reports. Notably, those policies also do not appear on the Cancellation Report. Because Insurety is entitled to its share of payments made

*haynes*boone

under those 4,200 policies during the postpetition period, it is critical that the discrepancies be resolved.

Insurety also compared the number of policies and collection amounts reported in the Original Collection Reports against the number of policies and collection amounts in the Discovered Collection Reports for the same period. There are substantial discrepancies between the Original Collection Reports and the Discovered Collection Reports in both the number of policies reported and the amounts collected. For example, the number of policies reported in the April 2019 Original Collection Reports was approximately 25,000 while the number of policies reported in the April 2019 Discovered Collection Reports was approximately 22,500.

### C. Discrepancies Between the Original Collection Reports and the Cyber-X Collection Reports

Insurety compared the number of policies and collection amounts reported in the Original Collection Reports to the number of policies and collection amounts in the CyberX Collection Reports for the same period. Insurety's analysis revealed that there are substantial discrepancies in both the number of policies reported and the amounts collected as between the Original Collection Reports and the CyberX Collection Reports. For example, collections in July 2019, as reported in the CyberX Collection Reports, were approximately $1.5 million, whereas collections in July 2019, as reported in the Original Collection Reports were approximately $2.1 million, representing a difference of approximately $600,000.

### D. Discrepancies in the CyberX Funding Reports and the Original Funding Reports

Insurety compared the number of policies and amounts advanced as reported in the Discovered Funding Reports and the CyberX Funding Reports for the same period. Insurety's analysis revealed that there are substantial discrepancies in both the number of policies reported and the amounts advanced between the Discovered Funding Reports and the CyberX Funding Reports. For example, amounts advanced on October 14, 2018, as reported in the CyberX Funding Reports, were approximately $181,000 on 779 policies, whereas amounts advanced on October 14, 2018, as reported in the Discovered Funding Reports were approximately $9,000 for 175 policies. There is an unexplained discrepancy of approximately $172,000 in the amount advanced and an unexplained discrepancy of 604 policies based on this analysis.

### E. Discrepancies in the Members Reported Through Collection Reports and the Cancellation Report

Insurety's analysis has also revealed that there are substantial discrepancies in the number of existing members reported in the Discovered Collection Reports and the Cancellation Report analyzed during the same time periods. For example, nearly 60,000 unique members are identified in the Cancellation Report while only 37,400 unique members were identified in the Discovered Collection Reports. Moreover, only 24,000 unique members appeared on both the Collection Reports and the Cancellation Report. The scale of these discrepancies is stunning and raises material concerns regarding the reliability of all the Debtors' reporting. Further, since the Insurety Collections are composed of two components – i.e. (1) the commission and (2) an administrative fee based on the number of members (per member, per month "PMPM"), any

improper reduction in the number of reported members would result in a direct reduction in the Insurety Collections both before *and during* the pendency of this matter.

### Summary Chart of Discrepancies in the Reports

| Comparing… | To… | Discrepancy |
|---|---|---|
| Cancellation Report | Collection Reports | Missing/withheld collections from 10,124 Policies ($4,020,170.37) |
| Original Collection Reports | Discovered Collection Reports | 4,200 policies missing |
| Original Collection Reports | CyberX Collection Reports | Substantial Discrepancies (e.g., $600,000 discrepancy for July 2019) |
| CyberX Funding Reports | Original Funding Reports | Substantial Discrepancies (e.g., $172,000 and 604 policies for October 2018) |
| Discovered Collection Reports | Cancellation Report | Substantial Discrepancies in Unique Members (22,600 Member-difference) |

### F. Evidence of Twisting

The parties agree that twisting is problematic because it removes assets from the Debtors' bankruptcy estates. At a meeting between Bill Roberts, Insurety's financial advisor Whitley Penn, and Insurety in January 2020, Bill Roberts stated that he compared lists of AWIS policyholders and the NIIA policyholders. Bill Roberts' analysis showed that, at that time, 188 members, with an unknown number of policies, left AWIS and transitioned to NIIA. Of those 188 members, 41 were sold the new policy (outside the Debtors' bankruptcy estates and reducing Insurety Collections) by the same agent who sold them the old policy (inside the estate and a part of the Insurety Collections). Mr. Roberts said he intended to investigate the 41 members (presumably by reviewing the recorded calls) and dismissed any concern over the remaining 143 members.

Insurety advised Mr. Roberts that it would be common practice to have an agent who was affiliated with the original agent sell the new policy in a twisting scheme. Mr. Roberts acknowledged the concern and stated he would include those in his investigation. Mr. Roberts also indicated that he would update his analysis. Mr. Roberts has not provided any additional information. Insurety does not have the data or methodology that Mr. Roberts relied on for his analysis.

### G. Discrepancies Between Reporting in the Member File and No-Take Credits in the Funding Reports

Insurety's review of the Member File suggests that the Debtors have retained over $2.6 million in connection with "no-take" accounts that should have been credited to Insurety in the Funding Reports. Under the Agreements, Insurety is entitled to a refund from the Debtors of amounts advanced for a policy that is cancelled within 30 days of funding. Insurety's review of the Member File showed that 11,163 members purchased policies against which Insurety made an advance which were cancelled within 30 days of funding and for which Insurety was never credited as required by the Agreements. Insurety's analysis of the Member File also showed that there were an additional 4,135 members who purchased policies against which Insurety made an advance which were cancelled within 30 days of funding and for which Insurety was only provided a partial credit.

### H. Discrepancies in Financial Records and Account Information

While Insurety has been provided relatively minimal access to the Debtors' financial information, through its review of the AHCM General Ledger, the Bank Statements, and the Debtors' Revenue Summaries, Insurety has identified a number of disconcerting discrepancies and irregularities. For example, Insurety's review of the AHCM General Ledger revealed that the balances in the Comerica Bank Statements decreased by approximately $763,000 from June 2019 through August 2019, whereas the balance for the Comerica account as described in the AHCM General Ledger increased by approximately $475,000 during the same time period. Similarly, the AHCM General Ledger relating to September 2019 indicated revenues of $5.7 million while the Debtors' Revenue Summaries indicated revenues of $7.7 million during the same period. Ultimately, the limited scope of financial information produced to Insurety together with the gross discrepancies in that information have made it impossible to conduct a more fulsome analysis of the Debtors' books and records. However, the discrepancies that Insurety has identified raise serious questions regarding the Debtors' financial record-keeping generally and undermine the credibility of any financial disclosures the Debtors have made or that they continue to make in their Chapter 11 Cases.

### IV. Insurety's Attempts to Obtain Further Information and Explanations from the Debtors and Mr. Roberts

The above-described discrepancies and reporting irregularities call into serious question the reliability of all of the Debtors' reporting and their activity. Similarly, the evidence of twisting raises concerns about the transition of the AWIS business to NIIA and whether appropriate procedures and protections are in place to prevent twisting. In early December 2019, Whitley Penn contacted Mr. Roberts by phone and email to inform him of the numerous discrepancies and reporting irregularities that they had discovered. In January 2020, an Insurety representative and Whitley Penn met in person with Mr. Roberts and presented him with documents and files identifying a number of the discrepancies described above as well as evidence of twisting. Insurety was informed by Mr. Roberts that he would review the Insurety analysis and conduct an internal review to resolve the discrepancies, investigate twisting, and otherwise provide further clarification to Insurety. Insurety followed up with Mr. Roberts again in February and March and was informed by Mr. Roberts that he had still not begun his review of the materials. On April 3,

*haynesboone*

2020, Insurety again contacted Mr. Roberts and was told by Mr. Roberts that he had still not reviewed the materials but intended to do so.

## V.    <u>The Need for an Examiner</u>

The Debtors have proved themselves either unwilling or unable to provide an explanation for the foregoing discrepancies and irregularities. After attempting to work with the Debtors and Mr. Roberts for almost six months to understand the numerous discrepancies and irregularities, Insurety has been given more questions and no answers. The time has come for an independent third party to conduct an in-depth review and analysis of the Debtors' financial records, business records, and reporting processes to provide the necessary clarity and credibility that is currently lacking. Absent a thorough review by an independent third party with experience in this industry, Insurety believes it is impossible to determine the true nature of the Debtors' members, collections, and respective rights and obligations. The need for transparency and reliability is particularly crucial when the Debtors are seeking to transition the AWIS business to an affiliated non-Debtor. A lack of precision and detail in the Debtors' records enhances the risk and likelihood that assets, opportunities, and information that belong to the Debtors can be transitioned or otherwise transferred, whether willfully or through negligence, to NIIA or other non-Debtor affiliates or insiders without detection.

Through this letter, we are informing you that Insurety will be raising a limited objection to the New CRO Application and intends to file a motion seeking the appointment of an independent examiner under Bankruptcy Code § 1104(c). While Insurety does not have a per se objection to the appointment of a new CRO, Insurety is concerned, based on the history of these Chapter 11 Cases and its interactions with Mr. Roberts, that a CRO will lack both the independence and the mandate to conduct the kind of analysis that will provide Insurety, the Court, and other parties in interest with the transparency called for under the circumstances. Because Insurety believes that an independent examiner will provide much-needed transparency to the estate while allowing the Debtors to maintain control of these Chapter 11 Cases as debtors-in-possession, Insurety is requesting that the Debtors consent to the appointment of an independent examiner.

Please call me at your earliest convenience to discuss the matters presented in this letter. We look forward to hearing from you.

Sincerely,

*/s/Jarom J. Yates*
Jarom J. Yates
Haynes and Boone, LLP
o: 214.651.5139
c: 214.551.8793
Jarom.yates@haynesboone.com

9

**Exhibit B**

Graford Business Management, LLC Filing with Texas Secretary of State

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation**
**Limited Liability Company**

**Filed in the Office of the**
**Secretary of State of Texas**
**Filing #: 803452997 10/23/2019**
**Document #: 922452060004**
**Image Generated Electronically**
**for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## Graford Business Management, LLC

### Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**Landon    Jordan**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**1409 Long & Winding Road    Mansfield  TX  76063**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: **Landon    Jordan**                                          Title: **Manager**

Address: **1409 Long & Winding Road    Mansfield  TX, USA  76063**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

### Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

## Organizer

The name and address of the organizer are set forth below.

**Landon Jordan**      1409 Long & Winding Rd. Mansfield TX 76063

### Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

## Landon Jordan

Signature of Organizer

**FILING OFFICE COPY**

Downloaded from www.sos.texas.gov

Ruth R. Hughs
Secretary of State

P.O. Box 13697
Austin, Texas 78711-3697



# Office of the Secretary of State

## REVOCATION OF CERTIFICATE OF FORMATION
## AND CERTIFICATE OF INVOLUNTARY TERMINATION
of
### Graford Business Management, LLC
File Number: 803452997

The Secretary of State hereby determines and finds the following:

1. That the above named domestic entity is required to pay the filing fee set by Chapter 4 of the Texas Business Organizations Code for its certificate of formation.

2. That the entity has failed to pay the fee prescribed by law when the same has become due and payable.

3. That the entity has been given notice of its neglect, delinquency or omission by regular mail addressed to its registered office.

4. That the entity has failed to correct the neglect, omission or delinquency.

It is therefore ordered that the certificate of formation of the above named entity be revoked as authorized by Section 405.033 of the Texas Government Code. It is further ordered that the entity status following the revocation of the instrument be shown as involuntarily terminated.

Dated: 12/04/2019



Ruth R. Hughs
Secretary of State

**Exhibit C**

Scope of Examiner's Investigation

(Exhibit 1 to Proposed Order)

**Scope of Examiner's Investigation**

1. Conduct an independent investigation and analysis of potential instances of insider dealing, conflicts of interest, or breaches of fiduciary duty, including each of the matters identified below, and provide a report relating to the same.

    a. Identify and analyze all agreements, formal and informal, between the Debtors and any "affiliate" or "insider" of the Debtors, including without limitation, Landon Jordan, Rusty Brock, Omar Kasani, Delbert Lee, Randee Mascorro, NIIA, Mansfield, Graford Business Management, LLC, and any other insider or affiliate of the Debtors or any of the foregoing.

    b. Identify and review all transfers by or to the Debtors (whether direct or indirect) to or from the Debtors' insiders or affiliates occurring since the petition date.

    c. Identify and review all transfers by or to the Debtors (whether direct or indirect) to or from the Debtors' insiders or affiliates occurring prior to the petition date.

    d. Conduct a review of the relationship between NIIA and AHCM to assess whether the agreement or relationship is in the best interests of the Debtors and their estates and whether the relationship is being conducted at arms-length.

    e. Conduct an analysis of the actions of the Debtors' officers and directors to assess whether there are any potential breaches of fiduciary duties or improper insider dealings that have occurred since June 2018 through the present.

2. Conduct an independent investigation and analysis of the various data sets identified in the May 13 Letter (as defined in the Motion), including each of the matters identified below, and provide a report relating to the same.

    a. Review and determine whether the discrepancies reported by Insurety are accurate.

    b. Analyze the reasons for any discrepancies identified, including whether any wrongdoing or mismanagement were involved.

    c. Provide an assessment of the correct data.

    d. Make recommendations regarding proper reporting on a go-forward basis.

3. Conduct an independent investigation and analysis of the Debtors' data management and data processing systems, including each of the matters identified below, and provide a report relating to the same.

    a. Review and determine whether the Debtors' data management and data processing systems meet industry standards.

    b. Review and determine whether there are any material deficiencies in the Debtors' data management and data systems.

    c. Review and determine whether appropriate safeguards and redundancies are in place to ensure the accuracy and consistency of the Debtors' data management and data processing systems.

    d.   Review and determine whether the Company's current and historical practices, policies, and procedures relating to the use and operation of the Debtors' data management and data processing systems are appropriate.

    e.   Recommend appropriate modifications or adjustments to the Debtors' data management and data processing systems to improve accuracy, consistency, and reliability.

    f.   Recommend appropriate modifications or adjustments to the Debtors' practices, policies, and procedures relating to the use and operation of the Debtors' data management and data processing systems.

4. Conduct an independent investigation and forensic analysis of the Debtors' books and records and financial reporting systems, including each of the matters identified below, and provide a report relating to the same.

    a.   Review the Debtors' books and records and financial reporting to determine any past wrong-doing.

    b.   Identify any irregularities, deficiencies, potential instances of wrong-doing or weaknesses in the Debtors' books and records, financial reporting, or financial record-keeping or reporting.

    c.   Identify any material modifications to the Debtors' books and records, financial reports, financial reporting systems, or other financial record-keeping processes since June 2018.

    d.   Make recommendations regarding modifications to the Debtors' financial record-keeping.

5. Conduct an independent investigation and analysis of potential twisting and provide a report and recommendations relating to the same. The investigation should include, without limitation, an investigation of the matters listed below.

    a.   A review and comparison of (i) the members/policy holders with AWIS as of the Petition Date through the present and (ii) the members/policy holders with NIIA from the Petition Date through the present to determine whether there is any overlap between the members/policyholders.

    b.   To the extent any overlapping members/policyholders are identified, an analysis of, inter alia, the following: (i) the date the AWIS policy was cancelled; (ii) the date the NIIA policy commenced; (iii) the identity of the producer that signed the policyholder/member; (iv) a review of relevant call records (including recordings) relating to the signing of the new policy with NIIA; and (v) any other matters deemed relevant by the examiner.