IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| In Re:<br><br>AMERICAN WORKERS INSURANCE SERVICES, INC. and ASSOCIATION HEALTH CARE MANAGEMENT, INC.,<br><br>Debtors. | **Case No. 19-44208-mxm-11**<br><br>Fort Worth, Texas<br>April 3, 2020<br>2:30 p.m.<br><br>MOTION TO COMPEL DISCOVERY FROM LANDON JORDAN AND NATIONAL INDIVIDUAL INSURANCE AGENCY, LLC FILED BY CREDITOR INSURETY CAPITAL, LLC (175)<br><br>*Excerpt: Exclusive of Ruling* |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MARK X. MULLIN,
UNITED STATES BANKRUPTCY JUDGE.

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtors: | J. Robert Forshey<br>Laurie Rea<br>FORSHEY & PROSTOK, LLP<br>777 Main Street, Suite 1290<br>Fort Worth, TX 76102<br>(817) 877-8855 |
| For Insurety Capital, LLC: | Jarom Joseph Yates<br>HAYNES AND BOONE, LLP<br>2323 Victory Avenue<br>Dallas, TX 75219<br>(214) 651-5139 |
| For Insurety Capital, LLC: | Robert S. Harrell<br>Andrew Elkhoury<br>MAYER BROWN, LLP<br>700 Louisiana Drive, Suite 3400<br>Houston, TX 77002<br>(713) 238-2700 |
| For Texas Department of Insurance: | J. Casey Roy<br>OFFICE OF THE TEXAS ATTORNEY GENERAL<br>P.O. Box 12548 MC-008<br>Austin, TX 78711-2548<br>(512) 475-4861 |

APPEARANCES:

| | |
|---|---|
| For Landon Jordan and National Individual Insurance Agency, LLC: | Eric M. Van Horn<br>SPENCER FANE, LLP<br>2200 Ross Avenue, Suite 4800 West<br>Dallas, TX 75201<br>(214) 750-3610 |
| For Landon Jordan and National Individual Insurance Agency, LLC: | Brian W. Zimmerman<br>Nick Reisch<br>SPENCER FANE, LLP<br>3030 Post Oak Blvd., Suite 1300<br>Houston, TX 77056<br>(713) 553-1234 |
| Recorded by: | Karyn Rueter<br>UNITED STATES BANKRUPTCY COURT<br>501 W. 10th Street<br>Fort Worth, TX 76102<br>(817) 333-6038 |
| Transcribed by: | Kathy Rehling<br>311 Paradise Cove<br>Shady Shores, TX 76208<br>(972) 786-3063 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

FORT WORTH, TEXAS - APRIL 3, 2020 - 2:32 P.M.

THE COURT: All right. Good afternoon, everyone. This is Judge Mullin. We are here in the American Workers Insurance Services case. I'll go ahead and take phone appearances. I'm the only one in the courtroom, along with the court reporter. When I call your name, if you could repeat your name and state for the record what party you represent, that would be terrific.

First, Mr. Yates?

MR. YATES: Yes, Your Honor. Jarom Yates from Haynes and Boone on behalf of Insurety Capital, LLC.

THE COURT: Mr. Van Horn?

MR. VAN HORN: Good afternoon, Your Honor. Eric Van Horn of Spencer Fane on behalf of Landon Jordan and NIIA.

THE COURT: Mr. Roy?

MR. ROY: Yes. Good afternoon, Your Honor. Casey Roy with the Texas Attorney General's Office on behalf of the Texas Department of Insurance.

THE COURT: Mr. Elkhoury?

MR. ELKHOURY: Good afternoon, Your Honor. Andrew Elkhoury on behalf of Insurety Capital.

THE COURT: Ms. Rea?

MS. REA: Good afternoon, Your Honor. Laurie Rea for the Debtors.

THE COURT: Mr. Zimmerman?

MR. ZIMMERMAN: Good afternoon. Brian Zimmerman on behalf of Landon Jordan and NIIA.

THE COURT: Mr. Forshey?

MR. FORSHEY: Bobby Forshey on behalf of the Debtor, Your Honor.

One of the principals of the Debtor, Rusty Brock, is also on, and he will just be listening only, Your Honor.

THE COURT: All right. Thank you. Ms. Wander?

MS. WANDER: Good afternoon. I'm with Insurety Capital.

THE COURT: Oh, okay. And I have Robert G. I'm sorry, but that's all I've got on my computer. Is he with you? Is he also with Insurety Capital?

MS. WANDER: He is, Your Honor.

A VOICE: Yes, Your Honor. Good afternoon.

THE COURT: Good afternoon. Mr. Reisch?

MR. REISCH: Yes, Your Honor. Good afternoon. Nick Reisch on behalf of NIIA and Landon Jordan.

THE COURT: Mr. Harrell?

MR. HARRELL: Good afternoon, Judge. Bob Harrell on behalf of Insurety.

THE COURT: All right. Is there anyone else on the telephone that I did not call who wishes to make an appearance?

All right. Then what we have before us today is the

motion to compel which has been filed by Insurety at Docket No. 175.

Just for the record, the Court has reviewed the motion to compel. The Court has also reviewed the Debtors' response at Docket 203, NIIA's response at Docket 204, and Insurety's reply, which was filed at Docket No. 209.

And, of course, although not relevant for today, but relevant to today, the Court has also reviewed the motion to enter into the servicing agreement between the Debtor, AHCM, and NIIA, which is at Docket 113, supplemented at Docket 139. The Court also reviewed the objection filed by Insurety at Docket 161 and the Debtors' reply at Docket 202.

I also noted on the docket sheet that NIIA had filed a motion to quash subpoenas at Docket 168. Is that relevant to today's hearing, or is that for another day?

MR. VAN HORN: Your Honor, this is Eric Van Horn on behalf of NIIA and Landon Jordan. No, the motion to quash is not -- is not set or otherwise on the Court's docket for today.

THE COURT: All right. Thank you, Mr. Van Horn.

With that, I will turn it over to counsel for the Debtors to proceed.

MR. HARRELL: Thank you, Judge. Bob Harrell for -- oh, but this would be --

THE COURT: I'm sorry, yes. Insurety.

MR. HARRELL: -- Insurety.

THE COURT: Totally my fault. Thank you, Mr. Harrell. Actually, I'll turn it over to Insurety's counsel.

MR. HARRELL: And first of all, Judge, can you hear me okay?

THE COURT: I hear you just loud and clear.

MR. HARRELL: Great. If I fade out, please let me know.

First, Judge, thank you very much for hearing our motion during this difficult time. And I guess you're just about the only person I know who's actually at the office. I think the rest of us are calling in from home. So we appreciate it.

THE COURT: Happy to be here.

MR. HARRELL: Judge, we were set for two days ago. We thought maybe we would get this resolved. We have narrowed down the dispute tremendously, and I think, as you can see from our reply, we've gotten this to the point that we're asking for only a few targeted documents. And those are the documents that would reflect communications between -- negotiations between NIIA and Landon Jordan on the one hand and their advance funding provider that NIIA has -- and so we've cut through most of what has been argued and set out in pages and pages of briefing. So I'm going to focus on those documents and why it is we think we're entitled to them

and why we think they should be compelled.

First of all, just if you'll indulge me for just a couple of minutes, because of the use of all these acronyms, I'm just going to review the parties quickly, and then I'll get directly into what's at stake here.

The Debtors are AWIS, and AWIS is an Insurance Marketing Organization, an IMO, that pays commission advances to independent insurance agents, which they call their producers.

AHCM, which is the other of the Debtors, is a third-party administrator, which we call a TPA, which collects the monthly insurance payments and fees paid by the policyholders. And it distributes the money from those fees. And it provides other services in connection with the operation.

AWIS and AHCM, the two Debtors, are sister companies. They're both owned essentially by Landon Jordan, and I say essentially because there could be other intermediate corporations or entities, but essentially they're owned by Mr. Jordan.

Our client, Insurety, provides up-front cash to IMOs to fund their commission advances, and in doing that it acquires future commissions and fees through these cash payments.

Insurety began to do that for AWIS back in July of 2018. That situation ended in the summer of 2019. And then, as you

know, we've got the bankruptcy.

On December the 11th, 2019, the Debtors filed their motion for authority to enter into a servicing agreement between AHCM and NIIA. NIIA is the other entity that's involved here, which is an entity that's affiliated because it also appears to be owned by Landon Jordan or one of his companies. Perhaps there's ownership by another gentleman, Rusty Brock. But I think it's undisputed that it's an affiliated company.

And so, in connection with this motion for authority to enter into the servicing agreement, NIIA then would be working with AHCM.

As another part of it, AWIS would no longer be the IMO that would be doing the work that it used to do in connection with these commissions.

As we fully understand, today is not the day to argue the merits of this motion to enter into the servicing agreement. But I think it is important that we make it clear, and I think the Court has seen this, that Insurety has duly filed its objections. We have raised a number of issues that we think are very serious that will be heard at the time that this motion is heard.

The big concern to us is that this arrangement that they have entered into effectively displaces the agreement between AHCM and AWIS and it takes AWIS basically out of the picture.

We believe that the situation is going to harm AWIS by taking it out of the picture, harm its creditors, and certainly Insurety, the biggest creditor. We think it will increase the risk of twisting and we think that it will benefit the Debtors' insiders, to the detriment of other creditors.

And along those lines, we have been working with Bill Roberts, the CRO, because we had concerns already that a number of the producers and policyholders had migrated from an AWIS relationship to this entity, this other entity owned by NIIA. And Mr. Roberts has confirmed that to us. And though so he is still working on the details of this, from the information he's been able to find, it looks like almost 200 former AWIS policyholders who had purchased policies through AWIS have now gone and are using another IMO, which we believe to be NIIA. And, obviously, the more business that's transferred away from AWIS to NIIA, the less AWIS's creditors will be able to recover from AWIS, and that hurts us, the biggest creditor.

We've objected, as I said, for a number of reasons. And what this boils down to is the Debtor's argument, which is that they had no choice but to create NIAA -- I'm sorry; NIIA; these are tongue-twisters, Judge -- because no advance partner like Insurety would provide funding to AWIS. In other words, AWIS could not continue to do what it had been doing and what it was designed to do because they could not

find another advance funder. And indeed, in their papers, they say now that AWIS is in a wind-down phase. And that creates tremendous concerns, because if indeed that's true, we know the creditors of AWIS are never going to get paid.

There is an inconsistency which we pointed out in our reply that we filed yesterday, and I want to discuss that for just a minute. The Debtors admit that they did not attempt to persuade NIIA's advance funder, whom we've not been told the name of, to provide commission advances to AWIS instead of NIIA, even though no agreement was finalized between NIIA and the advance funder until after AWIS filed for bankruptcy. So we have a big concern that these insiders who owe fiduciary duties to AWIS did not fulfill those fiduciary duties when they went out and replaced AWIS with NIIA, because we believe they had the duty to try to find an advance funder for AWIS first.

And as I said, there's a little bit of an inconsistency here which we think is telling. On the one hand, we've got the Debtors saying that they did not -- that there was no effort to find a funder, and then we've got Landon Jordan saying a different -- or telling a different story in his affidavit. And in his affidavit, Mr. Jordan said, There's no scenario under which AWIS can obtain an advance partner, at least while it is in bankruptcy. I have exhausted my attempts to do so.

Which would seem to indicate to us that, in bankruptcy, he has been trying to find another advance provider, but because of the bankruptcy, he's been unable to. And that's different from what we're seeing in the Debtors' papers, where they say that what really happened is that NIIA came on the scene prior to bankruptcy, they found an advance funder, bankruptcy came, and then they were so far along in the negotiation process it made no sense to change.

And, I mean, this inconsistency, I think, just comes back to what the Court said very early on in our very first hearing, when the Court rightly admonished everybody that transparency was going to be the hallmark in this Court and told us to think of things in a fishbowl. And for that reason, we just think they're violating that cardinal rule, because they will not share that information with us.

Bottom line, we're entitled to know what happened. We are entitled to know how this negotiation came about. Was it just prior to the bankruptcy proceeding? Did it proceed into the bankruptcy proceeding? Were there efforts to get that advance funder for AWIS? And -- and what happened in those negotiations? Those are the documents that we're looking for.

I'm not going to go through all of their objections to us and all the arguments they've raised, but I just want to highlight quickly two important ones. First, they say that,

well, if we -- if we tell Insurety that -- or, tell Insurety what the name of that advance funder is, Insurety will go out and wreck the deal. And as we said in our reply yesterday, we just think that's a red herring. There's no way we're going to do something like that. It would not be in our best interests, and we just wouldn't do it.

But more importantly for this hearing, we would stipulate that, if these documents were turned over to us, that Insurety would not institute discovery in this case in this court against this advance funding provider and would -- and during this case would not contact the advance funder to try to do anything. So I think that takes that issue off the table.

The other thing that the Debtors and NIIA raised was that our request was way too broad, that it wasn't tailored, that it was -- it would cause havoc in their business to try to get this information, et cetera. We think that by narrowing the request, tailoring it just to these negotiation documents, that that takes that concern off the table also.

So, the bottom line is what we're asking for is negotiation documents between NIIA and Landon Jordan on the one hand and the advance funder on the other hand, and the agreement between NIIA and the advance funder.

And with that, I will pass the mic.

THE COURT: All right. Thank you. Thank you, Mr.

Harrell.

Who would like to speak on behalf of -- who wants to go first, whether it's the Debtors or NIIA and Mr. Jordan? I'll leave that to Mr. Forshey and Mr. Zimmerman.

MR. VAN HORN: Good afternoon, Your Honor. It's Eric Van Horn for Landon Jordan and NIIA. We're going to be going first, and Nick Reisch will be handling the argument, and then it'll go over to Mr. Forshey for the Debtors.

THE COURT: All right. Thank you. Mr. Reisch?

MR. REISCH: Thank you, Your Honor. We appreciate the time this afternoon. And just so it's clear, I'm used to referring NIIA as Niya. Hopefully that's not going to confuse the Court.

THE COURT: That's fine.

MR. REISCH: I can try -- I can try and do NIIA, but I think I'd slip up and start saying Niya.

I think it's important to address, first of all, the points, the new issues raised by the reply, this issue of this offer related to advance partner that narrows down discovery requests, address this supposed inconsistency that counsel has alluded to, and then sort of move on to what this discovery is actually seeking related to what the decision before the Court is, and the reason -- and then the other reasons why we think that this is -- touch on briefly that we addressed in our response, to highlight some key arguments.

But first, regarding this offer, Your Honor, the thing they're offering to the Court, this is very similar to what they -- the offer they made to us. I would note that it isn't -- it isn't really -- the extent of the offer isn't really all that generous, because the primary objection, not the only objection, but the primary objection NIIA and Jordan had was related to information about the advance partner. Certainly, the other, the expense of doing all the extra discovery they sought that apparently now say they don't want was an issue, but it was not the most important issue. The most important issue was NIIA's afraid -- NIIA and Mr. Jordan are afraid of what happens when Insurety gets the name of that advance partner, all right? And that doesn't change.

And the fact that they're offering -- counsel is here offering to not contact the advance partner without leave of Court doesn't give our client any comfort. One, because there is -- there is very little way for the Court to actually police whether that happens. If the advance partner gets contacted by someone affiliated with Insurety that nobody in this Court knows, none of these lawyers know, that could happen and there wouldn't really be any way to prove it.

And the other issue being that counsel has made it very clear that this is not the end of the road. Them getting this information isn't the end of the story. They're going

to want to do discovery of the -- from the advance partner. Because they're not just taking our word. Landon Jordan's given you the declaration that says there's no other option. Here's -- here's what I explored already, and I have no connections with the advance partner, there's nothing -- no funny business going on. He's already given that to you. He's already given it to Insurety. And if the Court and Insurety don't take that at face value, then the only other option to verify this is to pursue discovery from the advance partner.

And our client is very concerned that that will be enough for the advance partner to decide that it's not worth it. All right? In the type of economy that is now currently existing, with the pandemic going on, it's the last time in the world they want there to be some problem come up, something -- a difficulty the advance partner has to deal with. And that is precisely what that discovery will engender. And we don't believe that's the end of the story.

That's why, when we considered their option, and we talked about alternatives, such allowing attorneys' eyes only -- while we don't trust Insurety, we have no reason to believe that these lawyers would violate any Court's orders or a protective order on it, Your Honor -- but at the end of the day, we said, well, what does that do? If they're not willing to take our word, then having that information is

only going to lead them to seek discovery from the advance partner. And that, we can't risk. Because at the end of the day, Your Honor, if this advance partner goes away, there is no one else out there. There's -- there -- it was hard enough to find this advance partner. It was somewhat fortuitous that they did. Nobody else is out there. That means it's the end of the road, not just for NIIA, but for both of the Debtors.

And I should remind the Court: Insurety has received over $9 million since the beginning of this bankruptcy, paying it back, in commissions and the fees associated with the commissions they -- over $9 million. In just a few months.

And AHCM has generated approximately $1.4 million in revenue.

And both of things are only possible because NIIA has stepped in to do what AWIS can't, and that is obtain and arrange for an advance partner to provide commission advances to these producers.

So, we don't believe that that offer or the protections that counsel is highlighting actually fix the issues we have with it. And that's why.

The second issue regarding the inconsistency, Your Honor, there is no inconsistency. All right? It's laid out in Mr. Jordan's declaration, and it's -- all that information is

consistent with the information that's in the Debtors' objection, or the Debtor response.

Mr. Jordon made efforts to try and find a different advance partner for AWIS prior to the bankruptcy. And he did a -- he did a lot of work with different advance partners, he came up with an option, they got very far down the road, and then Insurety, Your Honor, stepped in and sabotaged it. All right?

And so when counsel makes the argument, well, it's not in Insurety's interest, financial interest, to do something like that, we know that it wouldn't appear to be, but yet that's exactly what they did, was stepped in and made sure that AWIS couldn't get an advance partner.

And so Mr. -- so, and then they also went and got a temporary restraining order from a court telling AWIS that they couldn't get a different advance partner.

So they weren't just happy sabotaging it by -- with information or whatever they said to this other potential advance partner, they got a court order that said AWIS couldn't do it.

And so, again, prior to bankruptcy, Mr. Jordan tried to do an alternative arrangement. He had this company, NIIA, that Mr. -- one of his employees owned. He had the employee transfer it to him. And he arranged for a different advance partner to try and provide advances.

And as pointed out in the declaration, he got very far down the road there, to the point where they were -- they were sending out contracts to the producers. Because they were going to do advance contracts directly with NIIA's producers at that point, Your Honor. That's how they wanted to do it. And then file UCCs against them. So, basically, NIIA would organize it, but all the contracts would bypass NIIA and just go to the producers.

And then what did -- AWIS found -- or, Insurety found out about that. And what did they do? They went and filed UCC statements against those producers, even though they didn't have a contract with them, Your Honor. And, again, it sabotaged the deal.

So, that -- at that point, they had already, as far as Mr. Jordan was aware of any advance partners, he'd already gone through all those efforts both for AWIS and NIIA. Then one of his employees hears word about a different potential advance partner out there, and they go and approach them regarding NIIA.

Remember, Your Honor, at this time, there's a temporary restraining order in place, and there's already all sorts of litigation with AWIS. So they approached it from the viewpoint of doing a deal with NIIA to try and do this. It's the same deal that we presented to the Court, same -- same -- structured the exact same way. And they moved forward with

that prior to the bankruptcy and then into the bankruptcy.

So, there wasn't an opportunity to present this deal to AWIS, really, Your Honor, and there's no reason to think this other advance partner would actually, if they switched horses somehow and said, hey, we know we're really far along on this NIIA deal, but how about you do business with a company that just declared bankruptcy, Your Honor? I mean, yes, maybe people that know about bankruptcy, maybe judges and bankruptcy lawyers may know that it isn't quite as bad as people might think, lending money to a company in bankruptcy. But there's no reason to think that the average businessman out there knows that. And there's no reason to think that when they hear that there's some company in bankruptcy, that they're going to be jumping up and down to do business with them, or willing to do business with them at all.

And so there really is no inconsistency. It's just that he tried and failed with AWIS already. He's already exhausted those efforts. The only way they got traction is with NIIA, and only from one potential advance partner. There's nobody else out there.

So, when counsel said there's an consistency, there isn't. But he's not -- what he's saying is, even though you went down the road with NIIA, even though you tried and failed with AWIS before, you should have switched gears once we filed bankruptcy to try and do AWIS, just in case they

might have been willing to do business with a company that just filed bankruptcy and even though it would risk destroying the entire deal. That's what they're contending.

And I would point out, Your Honor, let's assume that argument has traction. If it does, that's an argument they can make to the Court at the time of the motion that doesn't involve any discovery. Because if the whole point is we wanted to know what efforts you took once the bankruptcy started to get AWIS, and then once the TRO was not in place anymore, to get AWIS the contract, they already know what efforts there were, there were none, because they didn't -- at that point, they'd already gotten down the road with NIIA and they weren't about to switch -- try and switch companies and basically refashion the entire deal for this advance provider.

And the next issue is -- what I'd point out, Your Honor, is this discovery they're seeking isn't actually discovery related to a contract that this Court could actually evaluate. The motion for this Court is to approve the contract between NIIA and AHCM. All right? But what they want discovery about is a separate contractual relationship that NIIA has with an advance provider. And that's akin, Your Honor, to, if this was a regular DIP financing deal, to one of the creditors going, well, we understand that we know the terms of the DIP financing transaction, but we want to

know about the contract that the DIP financer has with all of their venders or -- and we want to know if anybody associated with the debtors is somehow affiliated with that DIP financer. Basically, we want to peek behind the curtains and get into the finances of the DIP financer. That's the equivalent of what we're talking about here, Your Honor.

I don't -- I'm not a bankruptcy lawyer. I'm not a bankruptcy -- but the bankruptcies I've been involved with, and I have been involved with some, that has never been on the table as an option. And so it shouldn't be here, too. The Court shouldn't be trying to look behind the curtain at -- not at the contract it's actually going to approve or not, but to a separate deal that, while important to the NIIA deal, isn't one that is actually subject -- or, isn't one the Court has to approve.

And Your Honor, the -- what I'd point out is even if they're right, Insurety is right that Landon Jordan is somehow -- or, somebody else associated with NIIA or AWIS is somehow profiting from this deal, that doesn't change the Court's analysis, because the Court's analysis is, is this good for the Debtors and the creditors? That's the Court's decision about the NIIA contract.

And even if Landon Jordan was making a killing off this, even if Rusty Brock or anybody else associated with them were making a killing, that doesn't change the Court's analysis.

Because at the end of the day, if it's helping the Debtors and the creditors, it should be adopted, even if Mr. Jordan or Brock, Mr. Brock, anybody else, happened to be profiting.

And, of course, they're not, Your Honor. As we explained in the declaration, this arrangement doesn't lead to any more revenue for them than before. The only change between this deal is one is, yes, NIIA is substituted for AWIS. But AWIS couldn't get any business anyway, Your Honor. So it's not stealing their business; it's just -- it's essentially trying to preserve what they can.

And the second only difference is the $10 extra fee for the TPA. So there's a separate TPA with these advance partners, and they added an extra fee that comes out of AHCM net.

And then the final thing, Your Honor, I would point out is -- is while it's generally -- these arguments. Now, counsel didn't go into detail about its arguments in the papers, and I know the Court has read them. And I would proffer, Your Honor, that the reason for that is they don't have any powder to them. The truth is that they don't have any more than speculation for any of the concerns they're raising. Some of these things might be true, so the Court should allow us to look behind who's doing all of them. And then that's really not the standard for discovery. They should be able to demonstrate to the Court how the specific

showing of why the information they're seeking is reasonably likely to actually have relevant -- you know, produce relevant evidence. And they can't do it because this information won't.

And the other issue, Your Honor, is we only have to take Insurety's position here with a grain of salt. This is not a situation where you have multiple creditors coming forward and complaining. The U.S. Trustee's Office is not complaining. The only person that's complaining and the only person behind this motion to compel is Insurety. And what Insurety has done throughout -- before this bankruptcy and on the first day of this bankruptcy, Your Honor, is do everything they can to make sure that the Debtor fails, Your Honor. And the only reason the Debtors are in bankruptcy, the only reason, is because Insurety did everything they could to make sure that AWIS couldn't get another advance partner and couldn't get the advances they needed because Insurety just decided one day to up and stop the advances, even though there was no breach, and then try and use the problem that AWIS is now encountering -- it needed the advances but couldn't get them -- to try and take, you know, force, extort part of the company out of it.

So, and then on the, you know, in the first day hearings, Insurety comes to the Court and doesn't want to let the Court actually enter an order that will allow AWIS and AHCM to

survive. And the Court points out that, you know, you're -- if I grant this, they're going to fail, and that's going to be the -- for you, and Insurety says, we're happy -- we're fine with that, Your Honor.

Now they've turned around and they are acting as if they are the avatar, the only one trying to protect the Debtors and all the creditors, and everyone else is just, you know, letting this supposedly bad contract go through. There's -- Your Honor, there's no reason to believe that Insurety has somehow changed their position. They're just -- they're approaching it a different way. And it -- and, really, this isn't in the best interests -- this discovery and not approving the NIIA contract are not in the best interests of the Debtors or the creditors.

As we've shown, the Debtors are making a lot -- or, AHCM is making a lot of money off of this arrangement. Insurety has received millions and millions of dollars, and will receive more. And we're asking the Court to deny it completely. This discovery is not necessary, and Insurety hasn't been able to show you.

THE COURT: All right. Thank you, Mr. Reisch. Mr. Forshey?

MR. FORSHEY: Thank you, Your Honor. Can you hear me okay?

THE COURT: I hear you loud and clear.

MR. FORSHEY: Thank you. I'm going to try to stay away from the points that have been ably made by counsel for both Insurety and NIIA, and try to stick with basically four points to this.

The first one, Judge, is on transparency. If you'll note, the only thing that's really at issue is the identity of the advance partner. Everything else, as best I can tell, they've been furnished what they wanted and the discovery and the disclosures they needed.

If you look at our reply to their objection, we went through and one by one made the disclosures they asked for. There has not been a lack of transparency. There's just one thing we think we can't tell them, and that is the identity of the advance partner.

The second thing is -- that has gotten a bit lost in this is what is before you for decision. The contract that we've proposed is between the Debtors and NIIA. What you have to decide is whether that contract is in the best interest of the Debtors' estates. And what Mr. Jordan or anybody else may hypothetically be doing in the background with respect to NIIA, frankly, we don't see as being germane to the inquiry. I mean, the evidence is going to show, and our papers set forth, that this arrangement is outcome-determinative for the Debtors. And it's an arrangement that we desperately have to have in order to survive, and it's a big one for us.

That's the issue before the Court, not what type of interest somebody else may have on the other side of the transaction.

Three is, again, to reiterate: This arrangement is outcome-determinative, Your Honor. Because the AWIS policies, because there are no more commissions advanced, there are no more sales, and gradually those policies are running off. The effect of that is that the Debtors' income is going to slowly go down unless we can replace it with something else. And here is the something else that we can not only replace it with but do very, very well.

And the last point, Judge, is Rule 26 allows you to balance their need for the information against the needs of the case and the realities of where we are. I mean, it's no longer enough, like it was under some of the earlier versions of Rule 26, to say it could lead -- it could reasonably lead to the discovery of admissible evidence. You've got to balance their need for this information against our concerns, legitimate concerns, that if they learn the identity of the advance partner they are going to do what they can to ruin that relationship. And given where we are financially in the country, with all the jitteriness in the financial markets, tipping the boat at all with our advance partner would be very, very unwise.

We would submit that their need for this information is

attenuated. Their motion -- their basis and reasons for seeking it, their motives, are questionable. And that if something happens bad, the results to us are going to be incalculable. It's death.

With that, Your Honor, I would ask -- I'd be ready to respond to any questions you might have. Thank you, sir.

THE COURT: All right. Thank you. Given -- let me ask this before I go back to Mr. Harrell. Anyone else wish to make a statement?

All right. First I'll go back to you, Mr. Harrell. I'll let you respond to what Mr. Reisch and Mr. Forshey stated. And now is the time when the Court probably has questions for all three counsel. So, we'll go back to you, Mr. Harrell. First, do you have any response to either --

MR. HARRELL: Uh, --

THE COURT: Go ahead.

MR. HARRELL: Yes. Yes, Your Honor.

First of all, this notion that if the Court enters an order and the stipulation that we're not going to contact this advance funder, any -- any notion that that puts the Debtors at risk or NIIA at risk is preposterous to me. This Court and every court enters orders every day, and as members of the bar and our clients, we comply with those orders.

And I think that's their big objection, is that somehow, in spite of an order you might enter, we're going to run

behind you and behind them and contact and scare away this advance funder. And, in fact, what I heard is that then -- that nobody will ever know it and they won't be -- they won't be able to enforce the Court's order. And I just think -- I'm sorry, but respectfully, I just think that's preposterous. We're willing to enter into the stipulation or order as we discussed, and by god, we'll comply with it.

But the second thing is Mr. Forshey says this is a contract between the Debtors and NIIA. That's all that matters. We heard that also from NIIA's lawyer. And we're not entitled to go behind it or look in the background or behind the curtain or whatever other analogy you want to use. Well, we disagree entirely with that. The contract between the Debtors and NIIA is -- it exists because NIIA can get this funding from this funder. And if that weren't in the picture, then it wouldn't exist. That's the first connection.

The second connection is that the contract between NIIA and this new funder uses a second TPA besides AHCM for part of the -- for part of the TPA services, and this second TPA funder -- or, this second TPA is getting part of the money.

And third, what I keep hearing is Insurety should be happy because, with the present arrangement, AHCM is going to be receiving service fees and has already received a million dollars. And what I'd point out to the Court is that these

service fees that go to the TPA are a fraction of what the IMO, AWIS or NIIA, would make. And there is no way that those service fees would ever satisfy the debt that Insurety has to collect in this bankruptcy. So any notion that they're doing Insurety a favor with this arrangement, we just -- we disagree with, Judge.

And then, finally -- sorry, let me just catch -- let me get a sip of water real quick, please.

THE COURT: Sure. Take your time.

(Pause.)

MR. HARRELL: I am going to spare the Court a discussion of the fight that Insurety had with Landon Jordan and with AWIS prior to the bankruptcy. And you know, maybe the day will come where we have to actually have that fight again in the Bankruptcy Court. But the bottom line today is none of that is relevant. The only thing that is relevant is, are we entitled to this discovery?

And frankly, Judge, this is a discovery dispute. You know, we'll talk about the merits in depth when we have the hearing on this contract. But we should be entitled, we are entitled and we should be allowed to test what they're saying, as in any other discovery dispute or any other dispute in court. And essentially what they're saying is this is how it happened, this is why we did it, be thankful we did it for you, but we're not going to let you look at any

of the documents. And that's just not the way it should work. And certainly, Judge, in a court that values transparency and the fishbowl, we just think we're entitled to this.

THE COURT: All right. Thank you, Mr. Harrell. A couple of questions for you, sir. When I read the response that you filed yesterday -- well, let me go back. In the original motion to compel, there are really three different broad requests. There's Request No. 5, Request No. 6, and Request No. 9. I won't go into the detail of those right now, but in the response that you filed, it stated that, notwithstanding -- this is a quote from your -- from Paragraph 9 of your pleading, which says, "Notwithstanding all of its outstanding requests to the following, written communications between, on the one hand, Landon Jordan and/or Rusty Brock, and on the other hand, NIIA's advance funding provider, up until the execution of NIIA's advance funding agreements."

What I had interpreted that to mean is we're really down to two issues. At least the two issues I thought we were down to, but I'm going to come back to after my main question, were, number one, who is the identity of the advance funder; and then, number two, all the communications between Mr. Jordan, Mr. Brock, and NIIA, with that advance funder, up until the execution of the funding agreement.

So, my question for you is, are those the only two issues we have for today, or is Insurety going back to the broad requests of Request No. 5, Request No. 6, and Request No. 9?

MR. HARRELL: So, Judge, that's all we have. We've taken off the table a request for internal communications within NIIA and, you know, a broader request to this. But I do need to note one thing, and that is, in our haste to get this over to the Court yesterday, we did not say in Paragraph 9 that we also wanted the agreement. And we had put that in our proposal to the other side, which, you know, I think (inaudible). And we do want that agreement as well. And it was just, it was an oversight as we were trying to get this on file yesterday.

And just to be clear, what we want is really the communications between NIIA and the advance funder, whether they came from Landon Jordan or Rusty Brock or whoever. There can't be that many of those. That's it. That's what we want.

THE COURT: Okay. A couple questions for you, Mr. Harrell. First, I didn't really hear -- and I do agree with your -- one of your last comments. We are here today on a discovery dispute. I let, frankly, all three counsel went off a little bit on the history. I gave you all that opportunity to do so, although it's not really before me today.

So what's before me today is the discovery dispute as to what's necessary for Insurety to be prepared to prosecute its objection on the motion. And what I hear you say is, from Insurety's point of view, you need the two things. Number one, the identity of NIIA's advance funding provider. And then, number two, all the negotiations leading up to whatever the agreement might be.

First question: What -- why do you need to know the identity of the advance funding provider?

MR. HARRELL: Judge, one of the things they say in their papers is that they're not affiliated with that advance funder, and we just -- we want to test that. And we just want to --

THE COURT: What's -- why is that important to test that? If it was an insider or a third-party provider, what difference does it make? Because in your paper, it also said that -- your Argument 4 argues that, "Documents responsive to this request will allow Insurety to test the Debtors' theory on why they could not seek DIP funding for AWIS."

So, as to the identity, why is that even relevant to the purpose for your seeking the discovery, which is to test the Debtors' theory on why they could not secure DIP funding?

MR. HARRELL: If the funder was an insider, Your Honor, then they could have done the deal with AWIS. I mean, if this is an insider transaction, or if the funder perhaps

is a creditor in this bankruptcy or had some other relationship, then there could be a side deal or something else. But, in essence, they could have done this deal with AWIS, and it just proves that they chose not to.

THE COURT: Okay. Let me ask my second question, because then that might help you answer the first question. The second question is: If the Court were to determine that the -- and I haven't made any decisions, but I'm just trying to bounce some ideas -- if the Court had determined that the actual identity of the party really wasn't that relevant but the terms of any contract or potential funding contract potentially could be relevant to allow Insurety to prepare for its opposition of the Debtors' motion, and if you were to be given the communications but any and all identifying marks about as to who the funder was -- wouldn't that get you to the same place that you're seeking?

Again, at that point, it doesn't matter if it's an insider or a third party if the issue is and the argument, at least the way I took from your papers, was that AWIS does have the ability to obtain DIP financing. Regardless of the identity, wouldn't that be all the information you need to prosecute the objection, at least as you've outlined in your objection to the underlying motion?

MR. HARRELL: So, I'll say this, Judge. That gets us very far down the road. I have to agree with that.

But I still think we need to know the name of that -- of that funder, because that is the only way we will know whether it was an insider deal or it's a deal with another creditor or another affiliated party. And --

THE COURT: But, again, and I don't mean to cut --

MR. HARRELL: -- to be a --

THE COURT: I don't mean to cut you off, but, again, --

MR. HARRELL: I'm sorry.

THE COURT: No, that's fine. And it's part of the issue with phones hearings. But it's okay. But -- and I apologize for cutting you off. But, again, what difference does that make? If the terms are the terms, whether it's from an insider, outsider, it doesn't matter, isn't that the real issue, regardless of who is agreeing to fund?

And, for example, there's nothing to prevent Insurety from wanting to do the type of funding, although Insurety obviously had made the business decision pre-bankruptcy to no longer fund. But what difference does it make if it's an insider or some independent third party if the terms are known to the parties and the argument would be those are fair terms that the Debtor should have used -- the Debtor being AWIS -- should have used for the benefit of AWIS's creditors? That might be an argument that you might -- that Insurety argues. Again, I'm not making any sort of comment or

analysis or determination on whether that's a good argument or not. But for purposes of today, if you get the underlying data but you just don't know who the identity is -- which, again, I'm struggling to understand why the identity is necessary in order for Insurety to prosecute its objection, which it states is to test the theory, the Debtors' theory on why they could not secure DIP funding for AWIS.

MR. HARRELL: So, Judge, if that funder was affiliated somehow with Mr. Jordan or Mr. Brock or was an insider, then they have separate fiduciary duties to AWIS, in addition to the duties that Jordan and Brock have. And so, if nothing else, that could affect the standard under which the agreement is analyzed, and it could just create other issues regarding breaches of fiduciary duty.

THE COURT: Again, that has nothing to do with -- that has nothing to do with -- or maybe it does, and help me, help me with that -- what does that have to do with the underlying motion? It sounds like you're articulating issues that would be more appropriate for a motion to appoint a trustee or along those lines, similar to what we talked about at the first day hearings.

But here again, on the point that Mr. Forshey made, is that the contract is really between -- well, it's between the Debtors, but it's between AHCM and NIIA to perform those services. I'm struggling again to determine why the identity

of the funding partner is relevant, or even -- and not going off into the breach of fiduciary duty issues, I'm not sure that's even relevant for the specific issue that's on the motion to enter into the servicing agreement. But I guess that could be argued.

MR. HARRELL: So, Judge?

THE COURT: Yes. Go ahead.

MR. HARRELL: I'm obviously not doing a very good job of explaining this. And what I'd like to do, if you don't mind, is just come back in a few minutes, because I have a feeling you've got questions for the others.

THE COURT: That's fine.

MR. HARRELL: And --

THE COURT: Fair enough.

MR. HARRELL: And I can -- I can communicate with others on our team and maybe figure out a better way to explain my concern on that.

THE COURT: Understood. That's fair enough. Let me go to Mr. Reisch and ask some reverse end of the question on the second part.

I hear loud and clear the Debtors' position and NIIA's position, and, frankly, Mr. Jordan's position, all three parties, the Debtor as well as NIIA and Mr. Jordan, who is the ultimate owner of both those entities, why the identity -- why there's concern about the identity. But is there --

what's the argument against authorizing the discovery so long as NIIA and Mr. Jordan can redact any and all information that would lead to the identity of the advance funding provider, so that Insurety at least can see the terms of whatever the agreement might be between this third party and NIIA?

MR. REISCH: Your Honor, our concern isn't really with giving that information, the actual terms and the identity. We actually discussed that as a -- when we -- when we -- when the Court gave us a few extra days to try and see if we could reach a deal as an alternative. Ultimately, we decided that Insurety would be asking that, that at the end of the day, what they're really after is to dig around the name of the advance partner, and even if they got the name, you know, it's unlikely that they would stop there, because you couldn't really tell just from the name if there was some sort of side agreement, as they say, with Landon Jordan.

But if it were -- and we'd be concerned that it sort of is going to snowball, Your Honor. If they get that, then we'd be back to the Court, you know, a week from now, going, well, now that we have, you know, all the terms, now we really need to know the name.

But if it was really, Your Honor, if it were just limited to the terms, if it were just limited to the terms of what the deal actually is itself, without actually going into

identity and discovery, then we'd be willing to do it.

THE COURT: All right. Thank you. Before I go to Mr. Forshey, any other reply or comment you'd like to make, Mr. Reisch, now that you've heard Mr. Forshey and Mr. Harrell's second go at it? And if the answer is --

MR. REISCH: The only thing I would note, Your Honor, other than what we've already said, is this theory about this -- it being an insider deal, I mean, it's not true. I mean, obviously, Insurety is not going to take our word for it. But I'll just note, Your Honor, it actually doesn't make any sense.

You know, this is a bankruptcy proceeding. AWIS and AHCM and Mr. Jordon and everybody has spent a lot of time and money and whatever in it. And the theory that they could have -- that they have this other advance provider just they always have waiting in the wings, and they could have done it through AWIS but chose (inaudible), doesn't make it, you know, any related sense, because if that were true, why wouldn't they just have done that? Why would they have bothered to file bankruptcy if they could have done that? But that's the only point that I'll make.

THE COURT: All right. Thank you. Mr. Forshey? Same question.

MR. FORSHEY: Your Honor?

THE COURT: I guess it's really a two-part, and if

you could just respond in whatever fashion you think is appropriate.

But if the Court were to protect the name of the potential advance funding provider, what's the harm in allowing Insurety to at least see the communications that gave rise to, you know, the negotiations between NIIA and the third-party provider which ultimately resulted in a potential agreement? What's the harm in allowing those type of communications to be produced?

MR. FORSHEY: Your Honor, I think that's fine. I don't see any issues on -- if there's complete redaction so it doesn't disclose the identity. And I guess also we'd probably ask them to keep that confidential, but we already have a confidentiality order. So, in response to your question, I don't see a problem with what you're proposing, Your Honor.

THE COURT: Okay. I guess I'll come back to you, Mr. Harrell. And, again, I'm trying to be as transparent as I can. I'm struggling with why the identity is that important to prepare for the objection. I understand why terms of a -- that argue that Insurety might want to argue could show that it's not in the Debtors' best business judgment to enter into the contract with NIIA, but, rather, to pursue other alternatives. I get that.

So why shouldn't just the terms, the negotiations up to,

the communications that show the negotiations over those terms, up to an agreement, but having all of the identifiable markings in those communications that would identify the actual advance funding provider to be redacted, why shouldn't that be enough?

MR. HARRELL: And so I'm going to try one more time, and I'm not sure I'm going to get there, but I'm going to try. If we look at where -- where are the assets held? Are they -- is this is going to be happening in the estate or outside of the estate? And --

THE COURT: What's the "this"?

MR. HARRELL: Well, this stuff, this funding. And not only the funding, but just the -- the income that comes from that funding will now be outside of the -- of the estate.

THE COURT: Well, the funding --

MR. HARRELL: And --

THE COURT: Obviously, I don't think there's a lot of -- you know, well, let me -- my guess is, if the Court were to ultimately approve that transaction and NIIA starts, through its funding provider, starts getting producers to gin up the business, and then the funder provides for the advance commissions, that's really between NIIA and its funding partner. My understanding is that the -- that AHCM would then be doing administrative work and will be receiving a

service fee.

And I understand your point, Mr. Harrell, that that's potentially peanuts compared to what AWIS could make if it, in fact, did the originations with the producers. I understand all that.

I've kind of lost my own train of thought now. Sorry about that. I'll go back to you.

MR. HARRELL: Okay. Well, --

THE COURT: Oh, I know why. I know why. Because you had said "this." Well, that would be the transaction. So obviously, clearly, NIIA would be making whatever money it makes for its creditors and its interest holders. And the only benefit that the Debtors would get would be whatever service fees AHCM would receive in the contract with NIIA. So I don't think there's a dispute about how that's the mechanism for at least what is being proposed. Am I wrong on that?

MR. HARRELL: I think you're right about that. And maybe I'll let Jarom just jump in for a second, because he -- you know, it's impossible for me to congregate with people. And Jarom, if you've got any thoughts, could you just jump in, please?

MR. YATES: Sure. Jarom Yates on behalf of Insurety, Your Honor.

So, one reason that the identity of the advance funder

could be relevant, and we wouldn't know until we knew the identity of the advance funder, is that, under this new arrangement, there is a second TPA in addition to AHCM that is receiving a portion of the payments that, under the prior agreement between AWIS and AHCM, AHCM would have received.

And so, to the extent that there is an identity of interest between that TPA, the new TPA and the advance funder, that could be a relevant piece of information, but we wouldn't know it without knowing the identity of the advance funder.

Which gets back to, I think, a broader issue here, which is what the right standard for reviewing the agreement is. In this motion to approve the NIIA agreement, the Debtors suggested that the standard should just be business judgment under Section 363. And one of the things we pointed out in our papers is that when you're dealing with an insider transaction, which this clearly is -- regardless of the identity of the advance funder, this is an insider transaction because NIIA is wholly owned by Landon Jordan indirectly. And --

THE COURT: And I understand. And I understand. That's a very important point that the Court certainly is giving kind of scrutiny. Because, you know, if this were a -- if NIIA were an independent third party, had no relationship whatsoever to AWIS or AHCM, most of the requests

on their face would probably not be relevant because NIIA and what it does, its business and what financing and funding partners they receive would completely be irrelevant.

But in this case, given Mr. Jordan's relationship with both entities, as well as Mr. Brock's, I could see where, even though ordinarily that type of information would probably be beyond any reasonable discovery request, in this case, I think that's where I was at least heading to, is, as long as Insurety got the terms of and the negotiations of those terms with a third party, what difference does it make if the third party is an insider or not? Because ordinarily a lot of this probably would be denied on its face but for the heightened scrutiny the Court is giving it because of Mr. Jordan's and Mr. Brock's relationship with both NIIA and the Debtors.

MR. YATES: I think I've got two -- at least two thoughts based on that, Your Honor. One is, because the arrangement is materially different here between AHCM and the new advance funder, between AHCM and NIIA, in particular -- there is a different TPA also that's getting some of the funds -- the fact that that is the case makes it relevant to know what the relationships between the advance funder and that TPA are, to determine whether there is anything untoward going on because of that.

THE COURT: Okay.

MR. YATES: Because as --

THE COURT: Go ahead. Finish your sentence. I didn't mean to interrupt.

MR. YATES: So, in other words, because of the heightened scrutiny here, it's important to understand who the parties are and why that might be different, and the identities of the parties could be extremely relevant. Even if the advance funder is not an insider, it's important to know who they are and if they have a relationship to that other TPA, because if they do, they're essentially -- the advance funding agreement isn't the whole story. And because this is subject to heightened scrutiny, you know, the parties should have an opportunity to look at that. And that was my first point.

And the second point is if this -- if we knew that NIIA was not an insider, I still think that the identity of the advance funder would still be relevant because the Debtors have taken the position that that relationship, that advance funding relationship, is crucial. In another context, it would be important to understand the identity of the advance funder in order to test how viable that financing arrangement is. Is this an entity that really has the financial wherewithal to provide this financing?

Because, as has been mentioned, without the advance funding agreement, you don't have the agreement with NIIA.

And so it is relevant who that party is to determine whether or not they're actually capable of complying with the -- with their obligations under the agreement. That's relevant to the AHCM estate. It's relevant to NIIA. It's relevant to the whole transaction.

And if they don't have that financial backing or the financial ability to perform, that's something the Court should know before approving this agreement. And there's really no way to know that without knowing the identity of that advance funder.

THE COURT: Well, let me understand. Because -- and I think you've articulated, in a -- typically, in a, say, in a 363 sale, where a third-party buyer is going to come in and buy the assets of the debtor, obviously, the viability of and the ability of that buyer to perform and to actually close the deal is always an important issue, which may include -- contain information if that buyer is financing the transaction through either an insider or a traditional lender. Got you with that. I thoroughly understand that.

That's not what we have here, I don't think. What we have here is we have an agreement with -- a potential agreement with AHCM and NIIA that, if NIIA -- if there are -- the producers that are working with NIIA produce contracts and then the funder advances the commissions and there is money to be made, then AHCM will receive fees. But if NIIA

doesn't do anything, then AHCM will not have received any fees, and it gets back -- and if that's the point, than what difference does it make?

So I hear you on the viability of the funder, but I don't think that's of -- I think that analogy is a little bit off. Where am I wrong on that?

MR. YATES: Well, Your Honor, but couldn't that be the case in the event of a 363 sale where you've got only one buyer, so there's really not any competition? You're still going to want to know whether they've got the financial ability to close. And so --

THE COURT: But that's different. That's --

MR. YATES: -- whether they've got funding --

THE COURT: No, I think that's completely different, because, there, it's -- you're closing where -- and if that were the case, if NIIA were buying assets, it would be fair game to determine if NIIA had the ability to actually buy the assets. There's no assets being bought here. This is just an agreement between AHCM to service whatever NIIA produces in the future, which may be zero.

MR. YATES: And that might -- that may be the case, Your Honor. But the reality is that they are entering into an agreement, and it's because there is some funding being provided. And if it weren't for that, then they wouldn't be able to do the agreement, --

THE COURT: Well, --

MR. YATES: -- which makes it relevant to the transaction. And --

THE COURT: But Mr. Harrell is going to tell us that this agreement is peanuts to AHCM compared to what AWIS could perform if it kept performing the services that it was performing.

So the way I take that comment or that argument is, even if NIIA goes lights out and AHCM earns servicing fees which far exceed what they're even anticipating, I hear from Mr. Harrell that, even in that circumstance, the Debtor may -- the Debtor being AWIS -- may be breaching its fiduciary obligation or its business judgment into entering into a contract with NIIA and forgoing whatever rights they might have to do this business in and of itself.

So, again, I'm kind of lost as to why the identity of a funding provider to NIIA is even relevant to the contract that's -- the underlying contract for which Insurety is seeking discovery to prosecute its objection.

MR. YATES: And Your Honor, would your thoughts be different if there was a relationship between the new TPA and the advance funder?

THE COURT: I don't know why it would. But, again, I don't know. I mean, that's -- you've brought in a whole issue that really wasn't -- at least I didn't pick up on in

any of the papers. So, it's a brand new issue that I think I'm hearing.

MR. YATES: Well, I think --

THE COURT: And, again, --

MR. YATES: I think it goes to the entirety of the transaction. And that -- because that's where the issue, you know, in the motion to enter into the agreement itself is. Well, what are the implications of that agreement? And to the extent that there is a relationship between that new TPA and the advance funder, it seems to be -- it's hard for me to understand how that would not be relevant in analyzing what the impact of this agreement is and whether it's an appropriate use of the Debtor's decision-making.

And I know this was mentioned, that fiduciary duties may not be front and center with this type of -- but, Your Honor, I do think that, because you have the same individuals representing AHCM, AWIS, and NIIA, that the identity of this advance funder, because those individuals owe fiduciary duties to every single one of these entities -- and these are corporations, Your Honor. Fiduciary duties are owed. And because those fiduciary duties are owed, it does make it more relevant who the advance funder is. Because those duties are owed to each of these companies, including AWIS, that is essentially being cut out of this. And without understanding --

THE COURT: I mean, AWIS --

MR. YATES: -- who the identity of the advance funder is, it's impossible to evaluate whether or not this is an appropriate transaction, because it's been negotiated by those individuals with fiduciary duties.

THE COURT: All right. Anything further?

MR. HARRELL: Yes, Judge. So, just to be clear, what we've been talking about hypothetically is getting the agreement without the name of the funder. And what I understand was also the communications, the negotiations. That's very important to us as well.

THE COURT: Say that again? I didn't quite catch that. What's very important as well?

MR. HARRELL: The communications between the advance funder and NIIA, which would show the timing of when those negotiations were happening and show what the nature was and whether or not AWIS was ever considered as -- as a party to do the deal.

THE COURT: Understood.

MR. HARRELL: Okay. I just -- we'd been talking about the identity and the agreement. I just wanted to make sure that --

THE COURT: I think I've been -- I think I -- hopefully, I've been clear when I keep saying all the communications between NIIA and Mr. Jordan and Mr. Brock with

the advance funding provider throughout the negotiations, up until the signing of an agreement, if there has been such a signing of an agreement. But in all those documents, the identity of the advance funding provider be redacted. I thought that -- I need to make sure that Mr. Reisch and Mr. Forshey understood, but that's what I intended with my comments.

MR. HARRELL: Great. Thank you.

MR. REISCH: And Your Honor, we understood the limitation.

THE COURT: All right.

MR. REISCH: This is Mr. Reisch. We understood it. And the one thing we'd ask, if -- if the Court is considering giving -- with that idea, giving them the communications and the contracts with the identity redacted, is if you can make it attorney's eyes only. At least if they want to show it to their client or anybody else, they would come back to the Court and explain the reason why they need it.

THE COURT: Are you saying for even the redacted documents to be attorney's eyes only? Mr. Reisch, is that --

MR. REISCH: Yes.

THE COURT: What's the purpose for that and why would those need to be attorney's eyes only?

MR. REISCH: Just another measure of protection, Your Honor. So just our client is very concerned about Insurety

knowing things of business. Not -- again, not necessarily the counsel, which is why we're asking for attorney's eyes only, but our client is concerned about Insurety knowing any of this stuff.

THE COURT: And I get that, and I'm well aware of how this could be sensitive information. But if it's -- my guess is the -- maybe I'm dumbing it all the way down by my own experience, which I apologize for. But if I were to have received that, I would have had to go to the client can say, does this make sense? Because I don't know.

So why -- and, again, if there's a reason, if there's a real reason of harm, now would be the time to articulate that, as to why, if it was just the negotiation -- the negotiation and -- communications and agreement, all redacted with the identity redacted, and we're just talking terms, it could be with any party. You know, Insurety and its counsel wouldn't know for sure. But why shouldn't the attorneys be able to share those communications with the client in order to be prepared for the hearing on the motion to enter into the servicing agreement? There might be valid reasons. I just don't know. That's why I'm asking. Mr. Reisch or Mr. Forshey?

MR. REISCH: Your Honor, this is Mr. Reisch. I guess -- I've articulated -- to the extent I have a reason, I've articulated it, so --

THE COURT: All right. Thank you. All right. Anything further, then, from the parties?

MR. HARRELL: Yes. And just -- just the clarification that when we're talking about communications between the advance funder and NIIA, that would include Brock and Landon or somebody else that works there that was involved in those communications.

So, anyway, that -- with that clarification, I'm done. Thank you, Judge.

THE COURT: All right. Thank you. All right.

All right. Give me a couple minutes here just to gather my thoughts, because I want to make sure I hit the issues so that at least you have a full record of what the Court ultimately orders.

(Transcript excerpt concluded at 3:56 p.m. Ruling transcribed separately. Proceedings concluded at 4:12 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **03/31/2021**

______________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX
Excerpt: Exclusive of Ruling

PROCEEDINGS 3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

END OF PROCEEDINGS 52

INDEX 53