J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX  76102
Telephone: 817-877-8855
Facsimile:  817-877-4151
bforshey@forsheyprostok.com
srosen@forsheyprostok.com

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

Brian W. Zimmerman
State Bar No. 00788746
Nicholas J. Reisch
State Bar No. 24046699
SPENCER FANE LLP
3040 Post Oak Blvd, Suite 1300
Houston, TX 77056
Telephone: 713-552-1234
Facsimile:  713-963-0859
bzimmerman@spencerfane.com
nreisch@spencerfane.com

ATTORNEYS FOR LANDON JORDAN

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| AMERICAN WORKERS INSURANCE SERVICES, INC., | ) | Case No. 19-44208-mxm11 |
| | ) | |
| | ) | Case No. 19-44209-mxm11 |
| ASSOCIATION HEALTH CARE MANAGEMENT, INC. | ) | |
| | ) | |
| | ) | |
| Debtors. | ) | **Jointly Administered Under** |
| | ) | **Case No. 19-44208-mxm11** |

**SECOND AMENDED JOINT PLAN OF REORGANIZATION FOR AMERICAN WORKERS INSURANCE SERVICES, INC. AND ASSOCIATION HEALTH CARE MANAGEMENT, INC.**

Dated:  December 29, 2022.

# TABLE OF CONTENTS

**Page**

**ARTICLE I - DEFINITIONS AND RULES OF CONSTRUCTION** .................................................7

    A.    Defined Terms ................................................................................7

    B.    Rules of Interpretation and Construction ...........................................15

**ARTICLE II    CLASSIFICATION OF CLAIMS AND INTERESTS** ...........................................16

  2.1  Unclassified Claims.....................................................................16

  2.2  Classes of Claims ......................................................................17

  2.3  Claims and Interests...................................................................17

  2.4  Impaired Classes of Claims and Interests ...........................................17

  2.5  Impairment or Classification Controversies ........................................17

**ARTICLE III - TREATMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS** ...............................................................17

  3.1  Administrative Expenses ..............................................................17

  3.2  Priority Tax Claims ....................................................................18

  3.3  U.S. Trustee Fees ......................................................................19

**ARTICLE IV - TREATMENT OF CLAIMS AND INTERESTS** ..................................................19

  4.1  Class 1 – Convenience Claims..........................................................19

  4.2  Class 2 – Secured Claims ..............................................................19

  4.3  Class 3 – NXT Claim ....................................................................19

  4.4  Class 4 – Insurety Claim ..............................................................20

  4.5  Class 5 – DPG Claim ....................................................................21

  4.6  Class 6 – Other General Unsecured Claims (AWIS).....................................21

  4.7  Class 7 – Other General Unsecured Claim (AHCM) ....................................22

  4.8  Class 8 – Interests in the Debtor ....................................................22

  4.9  Attorney's fees and interest on Claims ..............................................22

**ARTICLE V - ACCEPTANCE OR REJECTION OF PLAN** .......................................................22

5.1  Classes Entitled to Vote ...............................................................................................22

5.2  Class Acceptance Requirement ....................................................................................22

5.3  Elimination of Vacant Classes ......................................................................................22

5.4  Cramdown ......................................................................................................................22

**ARTICLE VI - MEANS OF IMPLEMENTATION OF THE PLAN** ............................................22

6.1  Transfer and Vesting of Assets ....................................................................................22

6.2  Issuance of New Equity .................................................................................................23

6.3  Servicing Agreement .....................................................................................................23

6.4  Global Settlement ..........................................................................................................23

6.5  Liability for Claims .........................................................................................................23

6.6  Assumption of Obligation to Make Distributions ...........................................................24

6.7  Actions by the Debtors and the Reorganized Debtors to Implement the Plan ...............24

6.8  Source of Funding for Operations and Plan Obligations ...............................................24

6.9  Continued Existence of the Debtors ..............................................................................24

6.10  Management of the Reorganized Debtors ....................................................................24

6.11  Post-Effective Date Service List ...................................................................................24

6.12  Section 505 Powers ......................................................................................................24

6.13  Section 510(c) Powers ..................................................................................................24

6.14  Section 506(c) Powers ..................................................................................................25

6.15  Discharged Plan Injunction ...........................................................................................25

6.16  Settlement with Dr. Rabie .............................................................................................25

**ARTICLE VII - PROVISIONS GOVERNING DISTRIBUTION** ...............................................25

7.1  Distributions ....................................................................................................................25

7.2  Timing and Amount of Distributions ...............................................................................25

7.3  Means of Cash Payment .................................................................................................26

7.4    Record Date for Distributions ..............................................................................26

7.5    Delivery of Distributions.....................................................................................26

7.6    W-9 Forms ............................................................................................................26

7.7    Time Bar to Cash Payments................................................................................26

7.8    Cure Period...........................................................................................................26

7.9    Distributions after Substantial Consummation ...................................................27

7.10  Disallowed Claims ...............................................................................................27

**ARTICLE VIII - RETENTION OF RETAINED CLAIMS AND RETAINED DEFENSES** ............27

8.1    Retention of Retained Claims..............................................................................27

8.2    Retention of Retained Defenses..........................................................................27

8.3    Estate Privilege ....................................................................................................27

8.4    Assertion of Retained Claims and Retained Defenses .......................................27

8.5    Claims against Insurety .......................................................................................28

**ARTICLE IX - PROCEDURES FOR RESOLVING AND TREATING
CONTESTED CLAIMS** ....................................................................................................28

9.1    Claims Listed in Schedules as Disputed.............................................................28

9.2    Responsibility for Objecting to Claims and Settlement of Claims ....................28

9.3    Bankruptcy Rule 9019 ........................................................................................28

9.4    Objection Deadline..............................................................................................28

9.5    Response to Claim Objection ..............................................................................28

9.6    Distributions on Account of Contested Claims ..................................................29

9.7    No Waiver of Right to Object .............................................................................29

9.8    Counterclaims by Reorganized Debtors .............................................................29

9.9    Claims Paid or Reduced Prior to Effective Date ...............................................29

**ARTICLE X - EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................................29

10.1   Assumption and Rejection of Executory Contracts ...........................................30

10.2    Cure Claim Payments ....................................................................................29

10.3    Bar to Rejection Claims ................................................................................30

10.4    Rejections Claims ........................................................................................30

10.5    Reservation of Rights ..................................................................................30

**ARTICLE XI - CONDITIONS PRECEDENT TO CONFIRMATION AND
EFFECTIVENESS OF PLAN** ..................................................................................31

11.1    Conditions to Confirmation and Effectiveness of Plan ..................................31

11.2    Notice of the Effective Date .........................................................................31

**ARTICLE XII - EFFECT OF THE CONFIRMATION OF THE PLAN** .......................31

12.1    Compromise and Settlement ........................................................................31

12.2    Discharge ...................................................................................................31

12.3    Plan Injunction ...........................................................................................32

12.4    Setoffs ......................................................................................................32

12.5    Recoupment ...............................................................................................32

12.6    Turnover ....................................................................................................33

12.7    Automatic Stay ...........................................................................................33

**ARTICLE XIII - JURISDICTION OF COURTS AND MODIFICATIONS TO THE PLAN** ...........33

13.1    Retention of Jurisdiction .............................................................................33

13.2    Abstention and Other Courts .......................................................................34

13.3    Non-Material Modifications ..........................................................................35

13.4    Material Modifications .................................................................................35

**ARTICLE XIV - MISCELLANEOUS PROVISIONS** ..............................................35

14.1    Severability ...............................................................................................35

14.2    Oral Agreements; Modifications of Plan, Oral Representation or Inducements ............35

14.3    Waiver .......................................................................................................35

14.4    Notice .......................................................................................................36

14.5    Compliance with All Applicable Laws ............................................................37

14.6    Duties to Creditors...........................................................................................37

14.7    Binding Effect ..................................................................................................37

14.8    Governing Law, Interpretation .......................................................................37

14.9    Payment of Statutory Fees .............................................................................37

14.10 Filing of Additional Documents .....................................................................37

14.11 Computation of Time.......................................................................................37

14.12 Elections by the Reorganized Debtors.............................................................38

14.13 Release of Liens ..............................................................................................38

14.14 Rates ...............................................................................................................38

14.15 Compliance With Tax Requirements ..............................................................38

The proponents of this Plan are the Debtors, American Workers Insurance Services, Inc. and Association Health Care Management, Inc., and Landon Jordan, individually.

**ARTICLE I**
**DEFINITIONS AND RULES OF CONSTRUCTION**

A.    **Defined Terms.**

In addition to such other terms as are defined in other sections of this Plan, the following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural, masculine and feminine forms of the terms defined below).

1.1.    "Administrative Bar Date" shall refer to the deadline to file Claims for Allowance as an Administrative Expense set forth in section 3.1(c) of the Plan.

1.2.    "Administrative Claim Notice" shall mean a written pleading filed with the Bankruptcy Court asserting an Administrative Claim.

1.3.    "Administrative Expense" includes any cost or expense of administration of the Debtors' chapter 11 case allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Estates of the Debtors, any actual and necessary expenses of operating the business of the Debtors, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Estates of the Debtors under section 1930, chapter 123 of title 28 of the United States Code.

1.4.    "Agreed Amendment" shall mean the *Agreed Amendment to Interim Order Authorizing Use of Cash Collateral, Approving Adequate Protection, Granting Replacement Liens, and Granting Related Relief to a Final Order* [Docket no. 71].

1.5.    "AHCM" shall refer to one of the Debtors, Association Health Care Management, Inc., the Debtor in Case no. 19-44209.

1.6.    "Allow" or "Allowance," when used with respect to a Claim, shall mean the process of determining whether a Claim is to be Allowed pursuant to this Plan.

1.7.    "Allowed," when used with respect to a Claim (other than an Administrative Expense), means a Claim (a) to the extent it is not Contested; or (b) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (i) as to which no Objection was filed by the Objection Deadline, or (ii) as to which an Objection was filed by the Objection Deadline, to the extent, if any, such Claim is ultimately allowed by a Final Order; provided, however, if a Claim is to be determined in a forum other than the Bankruptcy Court, such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court.  With respect to an Administrative Expense (other than Ordinary Course Claims) which is contested, such Claims will be Allowed when a Final Order has been entered by the Bankruptcy Court allowing such Administrative Expense Claim.

1.8.    "Assets" includes all right, title, and interest, both legal and equitable, in and to all property of every type or nature owned or claimed by the Debtors or the Estates as of the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, all property of the Estates as defined in section 541 of the

Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all of the following:  Retained Claims, Avoidance Actions, Retained Defenses, Estate Cash, Estate Insurance and the Executory Contracts.

1.9.    "AWIS" shall refer to one of the Debtors, American Workers Insurance Services, Inc., the Debtor for Case no. 19-44208.

1.10.    "Avoidance Action" means a cause of action and rights assertable by the Debtors against any Person, including but not limited to any Creditor, pursuant to Chapter 5 of the Bankruptcy Code, including without limitation, actions brought, or which may be brought, under sections 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, and including all causes of action, rights and remedies assertable by either of the Estates pursuant to Texas or other applicable law pursuant to section 544 of the Bankruptcy Code.

1.11.    "Ballot" means the form of ballot provided to holders of Claims or Interests entitled to vote pursuant to Bankruptcy Rule 3017(d), by which each such holder may accept or reject the Plan.

1.12.    "B of A Administrative Claim" shall refer to the Administrative Claim held by Bank of America, N.A. ("B of A") based on a Paycheck Protection Plan (PPP) loan made to the Debtors in the amount $613,795.00.

1.13.    "Bankruptcy Cases" shall mean Case Nos. 19-44208-mxm11 and 19-44209-mxm11 before the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, or any successor court thereto.

1.14.    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified as title 11 of the United States Code.

1.15.    "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, or any successor court thereto.

1.16.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, including all applicable local rules of the Bankruptcy Court, and any reference to a specific rule is a "Bankruptcy Rule."

1.17.    "Bar Date" is the deadline date established by the Bankruptcy Court, including through any standing order, for filing proofs of Claim or proofs of Interest which, in these Bankruptcy Cases, was March 12, 2020; provided, however, that if the Bankruptcy Court has ordered an extension of the time by which a particular Creditor may file a proof of Claim or proof of Interest, the date set by order of the Bankruptcy Court with respect to such Creditor shall be the Bar Date with respect to such Creditor, but only as to such Creditor.

1.18.    "Business Day" means any day other than Saturday, Sunday, a legal holiday, or a day on which national banking institutions in Texas are authorized or obligated by law or executive order to close.

1.19.    "Cash" shall mean cash and cash equivalents, including funds held in a checking or money market account.

1.20.    "Claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, legal, equitable, secured or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, secured or unsecured.

1.21.    "Claimant" means the holder of a Claim.

1.22.    "Class" means a category or group of holders of Claims or Interests as designated in Article II of the Plan.

1.23.    "Collateral" means any Asset subject to a valid and enforceable Lien to secure payment of a Claim, including any right of offset asserted against any Asset.

1.24.    "Commission Agreement" shall mean the Commission Assignment Agreement dated as of July 16, 2018, among AWIS and Insurety.

1.25.    "Confirmation Date" means the date of entry of the Confirmation Order.

1.26.    "Confirmation Hearing" means the hearing, as it may be continued from time-to-time, conducted by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan, as the same may be amended, modified, or supplemented.

1.27.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

1.28.    "Contested," when used with respect to a Claim, means a Claim: (a) that is listed in the Schedules of the Debtors as disputed, contingent, and/or unliquidated, or in the amount of "$0.00" or "Unknown"; (b) that is listed in the Schedules of the Debtors as undisputed, liquidated, and not contingent and as to which a proof of Claim has been filed with the Bankruptcy Court, to the extent the proof of Claim amount exceeds the scheduled amount; (c) that is not listed in the Schedules of the Debtors, regardless of whether or not a proof of Claim has been filed with the Bankruptcy Court; (d) as to which an Objection has been or may be timely filed and which Claim has not been Allowed by a Final Order; or (e) for which the proof of Claim is filed after the applicable Bar Date.  In addition, any Claim which is subject to an Objection or other pleading seeking either subordination (whether Equitable Subordination or otherwise) or recharacterization of such Claim, including pursuant to section 510(c) of the Bankruptcy Code, shall likewise be deemed to constitute a Contested Claim until such Objection has been resolved by a Final Order.

1.29.    "Convenience Claim" shall mean any Claim (including any Secured Tax Claim) against either of the Debtors either (a) which is Allowed in an amount of $1,500 or less, or (b) which the holder of any Allowed Claim elects to reduce to an Allowed amount of $1,500.

1.30.    "Creditor" shall have the same meaning as in section 101(10) of the Bankruptcy Code.

1.31.   "Cure Claim" shall refer to a Claim under section 365(b) of the Bankruptcy Code (a) for the payment or other performance required to cure any existing default under an Executory Contract, or (b) for any actual pecuniary loss resulting from any such default under an Executory Contract.

1.32.   "Debt" shall mean the liability by either of the Debtors on a Claim.

1.33.   "Debtors" shall mean AWIS and AHCM, the Debtors in the jointly administered Bankruptcy Cases.

1.34.   "Disallowed," when used with respect to all or any part of a Claim or Interest, means that portion of a Claim or Interest to which an Objection or motion to disallow has been sustained by a Final Order or, as to any Contested Claim, any portion thereof which is not Allowed by a Final Order of the Bankruptcy Court or the court or adjudicative body before whom the Objection is pending.

1.35.   "Disclosure Statement" means the written statement, as amended, supplemented, or modified from time-to-time, describing the Plan that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rules 3017 and/or 3017.1.

1.36.   "Distribution" shall mean any payment, transfer, or distribution of any money or property pursuant to this Plan.

1.37.   "Distribution Record Date" shall have the meaning given in section 7.4 of the Plan.

1.38.   "DPG" shall mean Data Partnership Group, L.P. and the DPG Health and Welfare Benefits Plan, both jointly and severally.

1.39.   "DPG Claim" shall mean all Claims by DPG against either or both of the Debtors arising or accruing before the Effective Date.

1.40.   "DPG Settlement Agreement" shall refer to the Settlement Agreement among the Debtors and DPG settling the parties' claims in Adversary Proceeding No. 20-04052 and any proofs of Claim filed by DPG, as approved by an order of the Bankruptcy Court entered on August 20, 2021, at Docket No. 507.

1.41.   "Effective Date" means the first Business Day after the Confirmation Date if the Confirmation Order is not stayed and on which all conditions to the Effective Date set forth in Article XI below have been satisfied by the occurrence, performance, or waiver thereof, or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay after the Confirmation Date, and upon which all conditions to the Effective Date set forth in Article XI below have been satisfied.

1.42.   "Equitable Subordination" shall be broadly construed and shall encompass any right or remedy to equitably subordinate or recharacterize as equity any Claim, including without limitation any such right or remedy pursuant to section 510(c) of the Bankruptcy Code.

1.43.   "Estate" or "Estates" shall mean the bankruptcy estates of either or both of the Debtors in the Bankruptcy Cases.

1.44.   "Estate Cash" shall mean all Cash held by the Estates.

1.45.   "Estate Insurance" shall include any insurance policy or interest in an insurance policy in which the Estates has an interest or rights.

1.46.   "Estate Privilege" shall be broadly construed to include any privilege held, claimed, or asserted by either of the Debtors, including without limitation the attorney-client privilege, work product privilege and any other applicable privilege.

1.47.   "Estate Professional" means those Persons employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328 and 1103 of the Bankruptcy Code or who are entitled to compensation or reimbursement pursuant to sections 503(b)(3)(D) or 506(b) of the Bankruptcy Code.

1.48.   "Exclusive Management Services Agreement" shall mean the document so entitled among AWIS, AHCM, and Insurety dated as July 16, 2018.

1.49.   "Executory Contract" shall mean any executory contract or unexpired lease which is subject to section 365 of the Bankruptcy Code.

1.50.   "Final Decree" shall mean the decree contemplated under Bankruptcy Rule 3022 closing these Bankruptcy Cases.

1.51.   "Final Order" means an order or judgment of the Bankruptcy Court or any other court or adjudicative body of competent jurisdiction (including the State Court), as to which the time to appeal or seek a rehearing or a petition for certiorari or a petition for review by the Texas Supreme Court shall have expired, and which order or judgment shall no longer be subject to appeal, rehearing, a certiorari proceeding or petition for review.

1.52.   "General Unsecured Claim" shall mean a Claim which is not a Secured Claim, is not an Administrative Expense, and is not entitled to any priority of distribution pursuant to section 507 of the Bankruptcy Code, and includes any Rejection Claims pursuant to section 502(g) of the Bankruptcy Code.

1.53.   "Global Settlement" shall mean the global settlement among the Debtors, Insurety and Jordan, and which was placed on the record during the afternoon of December 14, 2022, the transcript of which appears at Docket No. 681 is attached as **Exhibit "A"** hereto.

1.54.   "Global Settlement Agreement" shall mean the settlement agreement among Debtors, Insurety, and Jordan which evidences the Global Settlement, and which shall be in form of substance identical to the **Exhibit "B"** hereto.

1.55.   "Governmental Bar Date" shall mean April 11, 2020, the date by which governmental units must file proofs of claim pursuant to section 502(b)(9) and Bankruptcy Rule 3002(c)(1).

1.56.   "Governmental Unit" shall have the same meaning as in section 101(27) of the Bankruptcy Code.

1.57.   "Gray" shall mean Robert Gray, a defendant in one of the State Court Lawsuits.

1.58.    "Initial Distribution Date," when used with respect to any Claim Allowed prior to the Effective Date, shall mean the first Business Day of the second full calendar month after the Effective Date.  When used with respect to any Contested Claim or Rejection Claim that became an Allowed Claim after the Effective Date, this shall mean the later of (i) the first Business Day of the first full calendar month after the date on which any such Contested Claim or Rejection Claim becomes an Allowed Claim, or (ii) if the payment terms of Article IV of this Plan applicable to each such Claim specify a different date, then the date as calculated pursuant to the terms of Article IV of this Plan applicable to each such Claim.  The Initial Distribution Date shall be separately determined with respect to each Allowed Claim.

1.59.    "Insurety" shall refer to Insurety Capital LLC.

1.60.    "Insurety Claim" shall include all Claims asserted by Insurety against either or both of the Debtors, including without limitation: (a) all Secured Claims, General Unsecured Claims, and Rejection Claims, (b) all Claims relating to, or arising out of, any of the Insurety Contracts, including any Rejection Claims relating to any of the Insurety Contracts, and (c) all Claims asserted in the Insurety POCs or as a part of the State Court Lawsuits.

1.61.    "Insurety Commissions" shall mean the commissions purchased by Insurety pursuant to the Commission Agreement, and which are so named and referred to in the Agreed Amendment.

1.62.    "Insurety Contracts" shall include the Commission Agreement, the Exclusive Management Services Agreement, and the TPA Agreement, as well as any other contract between Insurety and one or both of the Debtors.

1.63.    "Insurety POCs" shall refer to the following proofs of claim respectively filed by Insurety against AWIS and AHCM:

        a)        Proof of claim 4-1 filed by Insurety against AWIS as a Secured Claim; and

        b)        Proof of claim 7-1 filed by Insurety against AHCM, also as a Secured Claim.

1.64.    "Insurety Service Fees" shall refer to the Service Fees payable to Insurety pursuant to the Commission Agreement.

1.65.    "Interests" shall mean the equity interests in either of the Debtors, and which are owned by AHCM Holdings, LLC.

1.66.    "Jordan" shall mean Landon Jordan, an individual residing in Tarrant County, Texas.

1.67.    "Lien" means any mortgage, lien, charge, security interest, encumbrance, or other security device of any kind affecting any Asset, including any right of offset asserted against any Asset.

1.68.    "New Equity" shall mean the equity interests in the Reorganized Debtors issued to Jordan or his designee pursuant to Article VI hereof.

1.69.    "NIIA" shall mean National Individual Insurance Agency.

1.70.    "NXT Claim" shall include all Claims asserted by NXT against either or both of the Debtors arising or accruing on or before the Effective Date.

1.71.    "NXT" shall mean NXT Level Health, LLC.

1.72.    "NXT Settlement Agreement" shall mean the Settlement Agreement among the Debtors and NXT approved by an order of the Bankruptcy Court entered on January 27, 2022, under docket number 557.

1.73.    "Objection" includes (a) an objection to the allowance of a Claim interposed by any party entitled to do so within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, and (b) as to any Taxing Authority, shall include a proceeding commenced under section 505 of the Bankruptcy Code to determine the legality or amount of any tax.  Any pleading seeking to Equitably Subordinate or recharacterize a Claim shall also constitute an Objection.

1.74.    "Objection Deadline" shall mean the later of (a) ninety (90) days following the Effective Date, unless otherwise extended by order of the Bankruptcy Court, or (b) as to any Rejection Claim filed after the Effective Date, ninety (90) days after the date on which the proof of Claim reflecting the Rejection Claim is filed.

1.75.    "Person" includes any individual, any type of incorporated or registered business or nonprofit entity, including any corporation, general partnership, limited partnership, limited liability company, limited liability partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, governmental entity or unit, or any political subdivision thereof, or any other entity of every type or nature.

1.76.    "Petition Date" means October 14, 2019.

1.77.    "Plan" means this *Second Amended Joint Plan of Reorganization for American Workers Insurance Services, Inc. and Association Health Care Management, Inc.*, as it may be modified from time-to-time.

1.78.    "Plan Documents" shall refer to the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case as modified from time to time) copies of which may be filed with the Bankruptcy Court in the Plan Supplement.

1.79.    "Plan Supplement" shall mean a document which may be filed with the Bankruptcy Court including the Plan Documents or other documents or information relating to the Plan.

1.80.    "Priority Claim" means a Claim that is entitled to priority of payment under sections 507(a)(4) through (7) of the Bankruptcy Code.

1.81.    "Priority Tax Claim" means a Claim entitled to priority of payment pursuant to section 507(a)(8) of the Bankruptcy Code, other than any Property Tax Claims.

1.82.    "Pro Rata Share" shall mean, as to the holder of a specific Claim, the ratio that the amount of such holder's Claim bears to the aggregate amount of all Claims included in the particular Class or category in which such holder's Claim is included.

1.83.   "Reorganized Debtor" or "Reorganized Debtors" means either or both of AHCM and AWIS from and after the Effective Date.

1.84.   "Retained Causes of Action" shall include all Claims and causes of action held are claimed by either of the Estates or Debtors against any Person, both for purposes of an affirmative discovery or as a counterclaim, offset as defense against any Claim against the Estates, the Debtors, or Reorganized Debtors, whether based on contract, tort or the common law, or any law, statute, or regulation of any governed body or entity, including without limitation, the Avoidance Actions, as well as all legal and equitable rights and remedies relating to the same, including any right or Claim for Equitable Subordination or Veil Piercing.  This includes the claims, defenses and rights of offset reflected in Article VII of the Plan or **Exhibit "C"** to the Plan.

1.85.   "Retained Defenses" shall include all defenses, affirmative defenses, offsets and rights of recoupment by either of the Estates or Debtors against any Person.  This includes all such defenses described in Article VII of the Plan or in **Exhibit "C"** to the Plan.

1.86.   "Rejection Claim" means a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any Executory Contract.

1.87.   "Schedules" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors as required by section 521 of the Bankruptcy Code.

1.88.   "Schedule of Rejected Executory Contracts" means the Schedule so entitled and attached to this Plan as **Exhibit "D"**.

1.89.   "Secured Claim" shall mean (a) a Claim secured by a Lien against an Asset, to the extent such Lien is valid, perfected and enforceable under applicable non-bankruptcy law and is not subject to avoidance under the Bankruptcy Code or other applicable non-bankruptcy law, and which is duly Allowed, but only to the extent that such Claim does not exceed the value of the Assets which the Bankruptcy Court finds are valid security for such Claim (except, if the holder of such Claim makes the election provided for in section 1111(b)(2) of the Bankruptcy Code, the entire amount of the Claim shall be a Secured Claim), and (b) any valid and enforceable right of offset asserted against the Debtors or any Asset.

1.90.   "Secured Creditor" shall mean the holder of a Secured Claim.

1.91.   "Servicing Agreement" shall refer to the Servicing Agreement between NIIA and AHCM dated October 1, 2019.

1.92.   "State Court Lawsuit(s)" shall refer to the following lawsuit(s):

*Insurety Capital, LLC v. American Workers Insurance Services, Inc., Association Health Care Management, Inc., and Landon Jordan*, Cause No. 2019-53545 in the 215th District Court of Harris County, Texas

and/or

*American Workers Insurance Services, Inc. and Association Health Care Management, Inc. v. Robert Gray*, Cause No. 2022-46684 in the 333rd District Court of Harris County, Texas

1.93.    "Substantial Consummation" means the day on which the Estates' Assets are vested in the Reorganized Debtors through the Confirmation Order.

1.94.    "Taxing Authority" shall include the State of Texas or any subdivision thereof, including without limitation any political subdivision of the State of Texas assessing ad valorem taxes against any of the Assets.

1.95.    "TPA Agreement" shall mean the TPA Service Agreement among AWIS, AHCM, and Insurety dated as of July 16, 2018.

1.96.    "Unclaimed Property" means any Cash, Distribution, payment or any other property unclaimed for a period of one hundred twenty (120) days after the date of the applicable Distribution, or such longer period which the Reorganized Debtors may fix in the exercise of their good faith business judgment.

1.97.    "U.S. Trustee" shall mean the office of the U.S. Trustee for Region 6.

1.98.    "U.S. Trustee Fees" shall mean the quarterly fees paid to the U.S. Trustee pursuant to 28 U.S.C., section 1930(a)(6).

1.99.    "Veil Piercing" shall include all rights, remedies, claims or remedial rights under applicable law to pierce the corporate veil of either of the Debtors or the Reorganized Debtors, including veil piercing as an alter ego or sham to perpetrate a fraud, and whether the Veil Piercing is direct or reverse piercing.

**B.     Rules of Interpretation and Construction**

1.100.   Unless otherwise specified, all section, Article and exhibit references in this Plan are to the respective section in, Article or section of, or exhibit to, the Plan as the same may be modified from time to time.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the interpretation of this Plan.

1.101.   The words "herein," hereof," and "hereunder" or other words of similar import shall refer to the Plan as a whole and not to any particular article, section, subsection or clause contained in the Plan, unless the context requires otherwise.

1.102.   All section references hereafter are to the U.S. Bankruptcy Code, Title 11 of the U.S. Code, unless otherwise indicated.  For example, a reference to section 502 is a reference to 11 U.S.C., Section 502.

1.103.   Whenever from the context it appears appropriate, each defined term used in this Plan, whether defined in either the singular or plural, shall include both singular and plural of any such defined term, and pronouns stated in masculine, feminine or neuter form shall include all of the masculine, feminine or neuter form.

1.104.   The rules of construction set forth in section shall apply to the Disclosure Statement, this Plan, the Confirmation Order and all Plan Documents.

1.105.  References herein to "after notice and hearing" or other similar language shall have the same meaning as in section 102(1).  Otherwise, terms used herein that are not specifically defined herein shall have the meaning ascribed to those terms, if any, in the Bankruptcy Code.

1.106.  All Exhibits to the Plan and all Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein.  Certain Plan Documents may be filed with the Clerk of the Bankruptcy Court prior to the commencement of the Confirmation Hearing.  Holders of Claims and Interests may obtain a copy of the Plan Documents, once filed, by a written request sent to the following address: Forshey & Prostok, LLP, 777 Main Street, Suite 1550, Fort Worth, Texas 76102, Attention: Julie Gonzalez; Fax Number (817) 877-4151; email: jgonzalez@forsheyprostok.com.

1.107.  Reference is here made to all exhibits to this Plan, all of which shall constitute an integral part of the Plan.  Defined terms in the Plan are given the same meaning in the exhibits.

1.108.  Reference herein to any agreement, contract, instrument or other document in this Plan shall refer to such agreement, contract, instrument or document as amended, supplemented or modified.

1.109.  The Debtors filed an *Amended Joint Plan of Reorganization for American Workers Insurance Services, Inc. and Association Health Care Management, Inc.* [Docket No. 609] ("Amended Plan").  Thereafter, the Debtors filed four modifications (collectively, the "Plan Modifications") to the Amended Plan as follows:

a.      *First Modification to the Amended Joint Plan of Reorganization for American Workers Insurance Services, Inc. and Association Health Care Management, Inc.*;

b.      *Second Modification to the Amended Joint Plan of Reorganization for American Workers Insurance Services, Inc. and Association Health Care Management, Inc.;*

c.      *Third Modification to the Amended Joint Plan of Reorganization for American Workers Insurance Services, Inc. and Association Health Care Management, Inc.; and*

d.      *Fourth Modification to the Amended Joint Plan of Reorganization for American Workers Insurance Services, Inc. and Association Health Care Management, Inc.*

This Plan incorporates terms of the Global Settlement and the Plan Modifications into the Amended Plan, and replaces and supersedes the Amended Plan and all Plan Modifications.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS

2.1.    Unclassified Claims.  Administrative Expenses and Priority Tax Claims have not been classified and are excluded from the Classes set forth below in accordance with section 1123(a)(1).

2.2.    Classes of Claims.  Below is a designation of the Classes of Claims and Interests pursuant to this Plan.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class. A Claim is included in a particular Class only to the extent that the Claim is an Allowed Claim within that Class.

2.3.   <u>Claims and Interests</u>.  Allowed Claims and Interests are classified under this Plan as follows:

    (a)    <u>Class 1</u> – Convenience Claims

    (b)    <u>Class 2</u> – Secured Claims

    (c)    <u>Class</u> 3 – NXT Claim

    (d)    <u>Class 4</u> – Insurety Claim

    (e)    <u>Class 5 </u>– DPG Claim

    (f)    <u>Class 6</u> – General Unsecured Claims against AWIS

    (g)    <u>Class 7</u> – General Unsecured Claim against AHCM

    (h)    <u>Class 8</u> – Interests in the Debtors

2.4.   <u>Impaired Classes of Claims and Interests</u>.  Classes 3 through 7 are impaired.  Classes 1 and 2 are unimpaired.  Pursuant to section 1126(g), Class 8 Interests neither receive nor retain any property under this Plan and are deemed to have rejected the Plan.

2.5.   <u>Impairment or Classification Controversies</u>. If a controversy arises as to the classification of any Claim or Interest, or as to whether any Class of Claims or Interests is impaired under the Plan, the Bankruptcy Court shall determine such controversy as a part of the confirmation process.

### ARTICLE III
### TREATMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

3.1.   <u>Administrative Expenses</u>.

    (a)    The Reorganized Debtors shall pay, in the ordinary course of their businesses and in accordance with the ordinary business terms applicable to each such expense or cost, the reasonable and ordinary expenses incurred in operating the Debtors' businesses or administering the Estates through the Effective Date (collectively, the "<u>Ordinary Course Claim(s)</u>").  The remaining provisions of this section 3.1 shall not apply to Ordinary Course Claims, except that if there is a dispute relating to any such Ordinary Course Claim, the Reorganized Debtors may move the Bankruptcy Court to apply the provisions of subsection 3.1(d) and/or Article IX below and require the holder of the Contested Ordinary Course Claim to assert such Claim through the Bankruptcy Cases.

    (b)    Each holder of an Allowed Administrative Expense (other than Ordinary Course Claims and Administrative Expense Claims by Estate Professionals), shall receive (i) the amount of such holder's Allowed Administrative Expense in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Administrative Expense becomes an Allowed Administrative Expense, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtors, or as otherwise ordered by the Bankruptcy Court.

(c)      Unless the Bankruptcy Court orders to the contrary or the Reorganized Debtors agree to the contrary in writing, the holder of a Claim for an Administrative Expense, other than such a Claim held by an Estate Professional or an Ordinary Course Claim, shall file with the Bankruptcy Court and serve upon the Reorganized Debtors and their counsel an Administrative Expense Notice within thirty (30) days after the Effective Date.  This deadline is the Administrative Bar Date.  Such notice shall include at a minimum: (i) the name, address, telephone number and fax number (if applicable) or email address of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim.  Failure to timely and properly file and serve such notice by or on the Administrative Bar Date shall result in such Claim for an Administrative Expense being forever barred from receiving any Distribution from the Reorganized Debtors.

(d)      A Claim for an Administrative Expense, for which a proper notice was filed and served under subsection 3.1(c) above, shall become an Allowed Administrative Expense unless an Objection is filed within thirty (30) days of the filing and service of such notice.  If a timely Objection is filed, the Claim shall become an Allowed Administrative Expense only to the extent allowed by a Final Order of the Bankruptcy Court.

(e)      The procedures contained in subsections 3.1(a), (c), and (d) shall not apply to Administrative Expense Claims asserted by Estate Professionals, who shall each file and submit an appropriate final fee application to the Bankruptcy Court no later than sixty (60) days after the Effective Date.  A Claim for an Administrative Expense by an Estate Professional in respect of which a final fee application has been properly filed and served shall become an Allowed Administrative Expense to the extent Allowed, and shall be paid in accordance with subsection 3.1(b) above.  Professional fees and expenses to any Estate Professional incurred on or after the Effective Date may be paid by the Reorganized Debtors without necessity of application to or order by the Bankruptcy Court.

(f)      If either of the Reorganized Debtors assert any Retained Claim as a counterclaim or defense to a Claim for an Administrative Expense, the Administrative Expense Claim shall be determined through either an adversary proceeding or contested proceeding, as appropriate, before the Bankruptcy Court.  The Bankruptcy Court shall have exclusive jurisdiction to adjudicate and Allow all Claims for any Administrative Expense.

(g)      In satisfaction of the B of A Administrative Claims, B of A shall be paid $613,795.00 plus any interest and/or attorneys' fees permitted by any agreement between the Debtors and B of A.

(h)      The NXT Claim is treated as a part of Class 3 below.  However, the Allowed Administrative Claim of NXT pursuant to the NXT Settlement Agreement shall be paid pursuant to section 3.1(b) above.

3.2.      Priority Tax Claims.  Each holder of an Allowed Priority Tax Claim shall receive, at the Reorganized Debtors' option: (a) the amount of such holder's Allowed Claim in one Cash payment on the applicable Distribution Date; (b) payment in accordance with section 1129(a)(9)(C) and with interest as provided § 511, or (c) such other treatment as may be agreed to in writing by the holder of the Allowed Priority Tax Claim and the Debtors.  The Debtors, however, believe that all such Allowed Priority Tax Claims will be paid in full as holders of Class 1 Convenience Class Claims.

3.3.    U.S. Trustee Fees.  Any U.S. Trustee Fees due as of the Effective Date shall be paid in full on the Effective Date or as soon thereafter as is practicable.  After the Effective Date, the Reorganized Debtors shall continue to pay the U.S. Trustee Fees as they accrue and become due and payable until the Final Decree is entered and the Bankruptcy Cases are closed.

## ARTICLE IV
## TREATMENT OF CLAIMS AND INTERESTS

4.1.    Class 1 – Convenience Claims

(a)    Each holder of an Allowed Convenience Claim (without any election to reduce the amount of the Claim) shall be paid in full as soon as practicable after the Effective Date.  Any holder of an Allowed Claim against either or both of the Debtors may elect to reduce the amount of the Claimant's Allowed Claim to $1,500, and to be treated as a Convenience Claim, by giving written notice to the Debtors or Reorganized Debtors, as appropriate, within 14 days of the Effective Date.  Any such Convenience Claim shall be paid as soon as practicable after the Debtor or Reorganized Debtors receive the written election by the Claimant for the Claim to be treated as a Convenience Claim.

(b)    Class 1 is unimpaired.

4.2.    Class 2 – Secured Claims

(a)    The legal, equitable, and contractual rights of the holders of Allowed Class 2 Secured Claim are unaltered by this Plan. Except to the extent that a holder of a Class 2 Allowed Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Secured Claim (Other) shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash from the Reorganized Debtors in an amount equal to the Allowed amount of such Claim, (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Class 2 Secured Claim Unimpaired pursuant to section 1124, or (iii) return of the applicable Collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(b)    Class 2 is unimpaired.

4.3.    Class 3 – NXT Claim

(a)    Reference is here made to the NXT Settlement Agreement for all purposes.  The respective rights, remedies, and obligations of the Debtors and NXT from and after the Effective Date, including in relation to the NXT Claim, shall be governed by, and subject to, the NXT Settlement Agreement.  NXT shall receive Distributions on behalf of the NXT Claim as follows:

i.    NXT shall have an Allowed Administrative Claim of $100,000 which shall be paid pursuant to section 3.1(b)(i) above;

ii.    NXT shall have an Allowed General Unsecured Claim of $100,000 which shall be entitled to receive Distributions as set forth in subsection (b) below.

(b)      NXT shall be paid 25% of its Allowed Claim in 48 substantially equal installments with the first such installment being due and payable on the final day of the first calendar month commencing at least 20 days after the Effective Date, and with a like installment being paid to NXT on the first day of each successive calendar month thereafter, until the total Distributions to NXT are equal to 25% of its Allowed Claim.

4.4.    Class 4 – Insurety Claim

(a)      The Insurety Claim shall be treated as a part of Class 4.  Insurety shall not be entitled to any other Distributions under this Plan except as a member of Class 4.

(b)      The Reorganized Debtors shall have no property interests in either the Insurety Commissions or the Insurety Service Fees which shall remain the property of Insurety. The Reorganized Debtors shall account for and pay the Insurety Commissions and Insurety Service Fees to Insurety as follows:

i.      As the Insurety Commissions and Insurety Service Fees are received by the Reorganized Debtors, they shall be paid into the New Comerica Account (as such term is defined in the Agreed Amendment);

ii.      Each Friday, the Debtors will transfer the Insurety Commissions and Insurety Service Fees collected through the previous Sunday from the New Comerica Account to Insurety by a wire transfer based on wire transfer information provided by Insurety;

iii.      The Friday transfers shall be accompanied by (A) a printout of the New Comerica Account statements for the Monday through Sunday period for which the Insurety Commissions and Insurety Service Fees were collected, and (B) a detailed collection report for the summer period of time reflecting all collections on the Insurety Commissions.

It is the intent of the above that the payment of, and accounting for, the Insurety Commissions and the Insurety Service Fees shall continue after the Effective Date in the same manner as during the course of the Bankruptcy Cases pursuant to the Agreed Amendment.

(c)      All Insurety Contracts shall be deemed as rejected on the Effective Date based on the Confirmation Order.

(d)      Based on the Insurety Claim, Insurety shall have an Allowed General Unsecured Claim in the amount of $2,840,000 ("Allowed Insurety Claim"), all which shall be paid as a part of Class 4.  All other Claims by Insurety against the Debtors or either of them shall constitute Disallowed Claims.

(e)      On the Effective Date, the Reorganized Debtors shall pay to Insurety the sum of $340,000 ("Initial Insurety Distribution") utilizing funds from the Contributions (as defined below) from Jordan.

(f)      In addition to the Initial Insurety Distribution, Insurety shall receive 60 monthly Distributions totaling $2.5 million as follows:

i.      The first such monthly Distribution to Insurety shall be made on the Effective Date, with 59 subsequent Distributions being due and payable by the Debtors to

Insurety on the first Business Day of each of the next 59 successive calendar months following the Effective Date; and

ii.    The first such 36 monthly Distributions shall each be in the amount of $33,333.34 each, and the last 24 monthly Distributions shall each be in the amount of $54,166.66 each, for a total of $2.5 million.

(g)    The Reorganized Debtors shall not be deemed to be in default in making any Insurety Distribution until Insurety has given ten (10) days written notice of any alleged default and the Reorganized Debtors have failed to cure the default during the notice period.

4.5.    Class 5 – DPG Claim

(a)    Reference is here made to the DPG Settlement Agreement for all purposes.  The respective rights and obligations of the Debtors, Jordan and DPG from and after the Effective Date, including in relation to the DPG Claim, shall be governed by the DPG Settlement Agreement.  DPG shall receive Distributions on behalf of the DPG Settled Claim as follows:

i.    DPG has already been paid $550,000 as an Administrative Claim after the approval by the Bankruptcy Court of the DPG Settlement Agreement.  The Debtors paid $230,000 of this sum, and Jordan paid $320,000;

ii.    DPG shall have an Allowed General Unsecured Claim in the amount of $475,000 ("DPG Unsecured Claim") which Claim shall be paid in 30 substantially equal installments of $15,833.33 each, with the first such installment being made on the applicable Initial Distribution Date, and with a like installment to be made on the first day of the next 29 successive calendar months until the total Distributions to DPG pursuant to this Plan are equal to the amount of the DPG Unsecured Claim.

(b)    Upon the payment of the full amount of the DPG Unsecured Claim, the releases set forth in section 3(b)(ii) to the DPG Settlement Agreement shall become effective.

(c)    DPG is impaired.

4.6.    Class 6 – Other General Unsecured Claims (AWIS)

(a)    Class 6 shall include all General Unsecured Claims against AWIS not treated in Classes 1 through 5 above.

(b)    Each holder of an Allowed Class 6 Claim shall receive Distributions equal to 25% of any such Allowed Claims, payable in 48 substantially equal monthly installments, with the first such installment being due and payable on the Initial Distribution Date applicable to each such Allowed Claim, and with a like installment being due on the first day of each successive calendar month thereafter, until the aggregate Distributions on account of each such Class 6 Allowed Claim are equal to 25% of each such Class 6 Allowed Claim.

(c)    Class 6 is impaired.

4.7.    Class 7 – Other General Unsecured Claims (AHCM)

(a)     Class 7 shall include all General Unsecured Claims against AHCM not treated in Classes 1 through 6 above.

(b)     Each holder of an Allowed Class 7 Claim shall receive Distributions equal to 25% of any such Allowed Claims, payable in 48 substantially equal monthly installments, with the first such installment being due and payable on the Initial Distribution Date applicable to each such Allowed Claim, and with a like installment being due on the first day of each successive calendar month thereafter, until such Distributions on account of each Allowed Claim are equal to 25% of each Class 7 Allowed Claim.

(c)     Class 7 is impaired.

4.8.    Class 8 – Interests in the Debtor.  On the Effective Date all existing Interests in each of the Debtors shall be cancelled, and the holders of such Interests shall receive no property or Distributions on account of the Interests.  Pursuant to section 1126(g), holders of Class 8 Interests are deemed to have rejected the Plan.

4.9.    Attorney's fees and interest on Claims.  No holder of an Allowed Claim shall be entitled to any award of attorney's fees or costs based on, or any interest on, any Allowed Claim except as otherwise expressly set forth herein.

## ARTICLE V
## ACCEPTANCE OR REJECTION OF PLAN

5.1.    Classes Entitled to Vote.  Each impaired Class of Claims or Interests entitled to vote shall separately vote to accept or reject the Plan.  An unimpaired Class shall not be entitled to vote to accept or reject the Plan is deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Class 8 Interests shall be deemed to have rejected the Plan.

5.2.    Class Acceptance Requirement.  An impaired Class of Claims shall have accepted the Plan if it is accepted by the holders of at least two-thirds (2/3) in amount, and more than one-half (1/2) in number, of the Allowed Claims in such Class that have voted on the Plan.

5.3.    Elimination of Vacant Classes.  Any Class of Claims that is not occupied as of the date of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

5.4.    Cramdown.  This section shall constitute the request by the Plan proponent, pursuant to section 1129(b), for the Bankruptcy Court to confirm this Plan notwithstanding the fact that the requirements of section 1129(a)(8) have not been met.

## ARTICLE VI
## MEANS OF IMPLEMENTATION OF THE PLAN

6.1.    Transfer and Vesting of Assets.  On the Effective Date, all Assets of the Estates of both Debtors shall be transferred to and vested in the Reorganized Debtors by the Confirmation Order free and clear of all Liens, Claims, rights, Interests and charges except as expressly provided in this Plan.

6.2.    <u>Issuance of New Equity</u>.  On the Effective Date, the New Equity shall be issued by the Reorganized Debtors to Jordan or his designee(s) as directed by Jordan.  As consideration for the issuance of the New Equity, Jordan shall make the following payments or provide the following benefits to the Reorganized Debtors (collectively, the "<u>Contributions</u>"):

a.      On or before the Effective Date, Jordan shall pay to the Reorganized Debtors the sum of $1.0 million;

b.      Jordan shall also cause the Servicing Agreement to be modified as set forth in section 6.3 below; and

c.      Jordan has provided the Debtors with $320,000 to partially fund the administrative claim pursuant to the DPG Settlement Agreement and is entitled to an Allowed Administrative Expense Claim, and shall have an Allowed Administrative Expense Claim based on providing these funds to the Debtors to allow them to consummate the DPG Settlement Agreement. However, Jordan will receive no Distributions on account of this Allowed Administrative Expense from the Reorganized Debtors until all Allowed Claims included in Classes 1 through 7 have received all Distributions to which the holders of such Allowed Claims are entitled to receive pursuant to the Plan.

The $340,000 Insurety Initial Distribution shall be paid from the $1.0 million cash included in the Contributions, and the balance of such funds shall be used by the Debtors to fund Distributions pursuant to the Plan.

6.3.    <u>Servicing Agreement</u>.  The Servicing Agreement shall be assumed by AHCM on the Effective Date.  The Servicing Agreement is presently terminable on 90 days written notice. As further consideration for the issuance of the New Equity, after the assumption of the Servicing Agreement, Jordan shall also cause the Servicing Agreement to be modified so that it is not terminable, except for cause with an appropriate opportunity for the cure of any default by the Reorganized Debtors, for a period of at least five (5) years from the Effective Date.  The form of the amendment to the Servicing Agreement is attached as **<u>Exhibit "E"</u>**.

6.4.    <u>Global Settlement</u>.  The Global Settlement is hereby incorporated as an integral part of the Plan and shall also be evidenced by the Global Settlement Agreement.  Insurety shall receive the Allowed Insurety Claim based on the Global Settlement, and the State Court Lawsuits shall be dismissed subject to the terms set forth in, and otherwise in accordance with the Global Settlement and the Global Settlement Agreement.  All Claims among the Debtors and Insurety in the State Court Lawsuit shall be dismissed with prejudice pursuant to the Global Settlement Agreement; <u>provided</u>, <u>however</u>, that nothing in the Global Settlement Agreement, including the dismissal with prejudice of Insurety's Claims against the Debtors, shall in any way impair or impact Insurety's rights pursuant to this Plan based on its Allowed Class 4 Claim. However, any Claims among Insurety and Jordan, or among the Debtors and Gray, are addressed in, and subject to, the Global Settlement Agreement.

6.5.    <u>Liability for Claims</u>.  This Plan does not affect the legal and corporate structures of the Reorganized Debtors. Except as otherwise provided in this Plan, each Debtor shall continue to maintain its separate corporate existence as a Reorganized Debtor after the Effective Date for all purposes except as expressly set forth herein.  However, each Reorganized Debtor shall be jointly and severally liable to make all Distributions required under this Plan to the Holders of Class 3 and 5 Claims and to Insurety for the Class 4 Allowed Insurety Claim.  AWIS will be solely responsible to make Distributions on account of the Allowed Class 6

Claims, and AHCM shall be solely responsible to make Distributions on behalf of Allowed Class 7 Claims.  Each of the Debtors shall be responsible to make Distributions to their respective Creditors holding Allowed Class 1 Claims, although the Debtors believe that all Class 1 Creditors entitled to receive any Distribution hold Claims against AHCM.  Notwithstanding anything in this section to the contrary, all post-Effective Date fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930, if any, shall be calculated on a separate legal entity basis for each Reorganized Debtor, and each of the Reorganized Debtors shall be responsible for the payment of their own trustee's fees.

6.6.    <u>Obligation to Make Distributions</u>.  Each of the Reorganized Debtors shall be deemed to have assumed the obligation to make all Distributions pursuant to this Plan in accordance with Section 6.5 above.

6.7.    <u>Actions by the Debtors and the Reorganized Debtors to Implement the Plan</u>.  The entry of the Confirmation Order shall constitute all necessary authorizations for the Debtors, the Reorganized Debtors and their respective affiliates to take or cause to be taken all actions necessary or appropriate to consummate, implement or perform all provisions of this Plan from and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation.

6.8.    <u>Source of Funding for Operations and Plan Obligations</u>. The Reorganized Debtors' obligations under the Plan shall be funded from the following:  (a) the Contributions, (b) the Assets, and (c) funds generated through the operation of the Reorganized Debtors' businesses, including income derived from the Servicing Agreement.

6.9.    <u>Continued Existence of the Debtors</u>.  The Debtors shall continue to exist as the Reorganized Debtors from and after the Effective Date, with all powers available to such legal entities, in accordance with applicable law and pursuant to their constituent documents.  Upon the Effective Date, the Reorganized Debtors may, within their sole and exclusive discretion, take such action as permitted by applicable law and their constituent documents as they determine is reasonable and appropriate.

6.10.    <u>Management of the Reorganized Debtors</u>. From and after the Effective Date, the Reorganized Debtors shall be managed in accordance with applicable law and their respective corporate documents.  There will be no change in the Debtors' corporate documents or management upon the Effective Date.  The Reorganized Debtors shall continue to be managed by their current management, including Jordan and Harold "Rusty" Brock.

6.11.    <u>Post-Effective Date Service List</u>.  Pleadings filed by any party-in-interest with the Bankruptcy Court after the Effective Date shall be served on the following Persons (collectively the "<u>Service List</u>"): (i) any Person directly affected by the relief sought in the pleading, (ii) the U.S. Trustee, (iii) parties which have filed a Notice of Appearance in these Bankruptcy Cases, (iv) the Reorganized Debtors through legal counsel, and (v) Jordan through legal counsel.

6.12.    <u>Section 505 Powers</u>.  All rights and powers pursuant to section 505 of the Bankruptcy Code are hereby reserved to the Estates and shall be transferred to, and vested in, the Reorganized Debtors on the Effective Date by the Confirmation Order.

6.13.    Section 510(c) Powers.  All rights and powers to seek or exercise any right or remedy of Equitable Subordination are hereby reserved to the Estates and shall be transferred to, and vested in, the Reorganized Debtors on the Effective Date by the Confirmation Order.

6.14.    Section 506(c) Powers.  The Estates hereby reserve all rights and powers pursuant to section 506(c) of the Bankruptcy Code, and all such rights shall be specifically transferred to, and vested in, the Reorganized Debtors on the Effective Date by the Confirmation Order.

6.15.    Discharged Plan Injunction.  Either or both of the Reorganized Debtors shall have full power, standing, and authority to enforce the discharge pursuant to this Plan (section 12.2 below) and the Plan Injunction (section 12.3 below) against any Person, either through an action before the Bankruptcy Court or any other court or tribunal having appropriate jurisdiction.

6.16.    Settlement with Dr. Rabie. Dr. Mahmoud "Mike" Rabie ("Rabie") filed proofs of claim against each of the Debtors in the amount of $3,500,000.00 (the "Rabie Claims").  The Debtors have objected to the Rabie Claims, and Rabie has responded to the Debtors' objections. The matter has not yet been set for hearing, nor has it been decided by the Court. The Debtors believe they have claims against Rabie for recovery of prepetition transfers in the amount of $684,490.20.  The Debtors have not yet filed a complaint but have shared a draft complaint with Rabie.  The Debtors and Rabie have agreed to resolve these disputes as follows:

a)  Rabie agrees to withdrawal of the Rabie Claims with prejudice to refiling and agrees that the Rabie Claims shall not be payable by the Debtors;

b)  Rabie agrees to waive and release any and all claims against the Debtors;

c)  The Debtors agree to waive and release, and the Debtors expressly do not retain, any and all claims they have or may have against Rabie; and

d)  The releases granted herein do not and are not intended to release any individual or entity other than the Debtors and Rabie.

The above settlement among Rabie and the Debtors shall be deemed to be fully effectuated by the entry of the Confirmation Order.

## ARTICLE VII
## PROVISIONS GOVERNING DISTRIBUTION

7.1.    Distributions.  All Distributions to be made under this Plan shall be made by the Reorganized Debtors in the manner provided in this Plan and the Confirmation Order.

7.2.    Timing and Amount of Distributions.  No Distribution shall be made on account of any Claim until such Claim is Allowed, except as otherwise set forth in this Plan or otherwise ordered by the Bankruptcy Court.  No Distribution shall be made on account of any Contested Claim until such Claim is Allowed.  Except as expressly set forth in the Plan or in the Confirmation Order, the Reorganized Debtors shall, in the exercise of their good faith business judgment, determine the timing and amount of all Distributions which are required to be made under the Plan, consistent with the requirements of making such Distributions on a timely basis as required by this Plan.  The Reorganized Debtors may, but shall not be required to, seek approval of, or any other appropriate relief from, the Bankruptcy Court with respect to any of

such Distributions.  Any Unclaimed Property may be paid into the registry of the Bankruptcy Court or otherwise distributed in accordance with the orders of the Bankruptcy Court.

7.3.    <u>Means of Cash Payment</u>.  Cash payments pursuant to this Plan shall be made by check drawn on, or by wire transfer from, a domestic bank, or by other means agreed to by the payor and payee.

7.4.    <u>Record Date for Distributions</u>.  As of the close of business on the Effective Date (the "<u>Distribution Record Date</u>"), the register for Claims and Interests will be closed, and there shall be no further changes in the holder of record of any Claim or Interest.  Although there is no prohibition against the transfer of any Claim by any Creditor, the Reorganized Debtors shall have no obligation to recognize any transfer of any Claims or Interests occurring after the Distribution Record Date, and the Reorganized Debtors shall instead be authorized and entitled to recognize and deal for all purposes under this Plan, including for the purpose of making all Distributions, with only those holders of Claims so reflected as of the Distribution Record Date.  However, the Reorganized Debtors may, in the exercise of their sole discretion, agree to recognize transfers of Claims after the Distribution Record Date, but shall have no obligation to do so under any circumstances.

7.5.    <u>Delivery of Distributions</u>.  All Distributions, deliveries and payments to the holders of any Allowed Claims shall be made to the addresses set forth on the respective proofs of Claim filed in these Bankruptcy Cases by such Claimants or, if the Distribution is to be made based on a Claim reflected as Allowed in the Schedules, at the address reflected in the Schedules.  Any such Distribution, delivery or payment shall be deemed as made for all purposes relating to this Plan when deposited in the United States Mail, postage prepaid, addressed as required in the preceding sentence.  If any Distribution is returned as undeliverable, no further Distribution shall be made on account of such Allowed Claim unless and until the Reorganized Debtors is notified of such holder's then current address, at which time all missed Distributions shall be made to the holder of such Allowed Claim.  However, all notices to the Reorganized Debtors reflecting new or updated addresses for undeliverable Distributions shall be made on or before one hundred twenty (120) days after the date of the attempted Distribution or such longer period as the Reorganized Debtors may fix in the exercise of their sole discretion.  After such date, all Unclaimed Property shall revert to the Reorganized Debtors and the Claim of any holder with respect to such property shall be discharged and forever barred.

7.6.    <u>W-9 Forms</u>.  W-9 forms must be provided to the Reorganized Debtors within thirty (30) days of a request made by the Reorganized Debtors.  If no W-9 form is provided within thirty (30) days of such request, the Reorganized Debtors may seek an order from the Bankruptcy Court that any Claim held by any such Person shall be deemed as discharged and forever barred.

7.7.    <u>Time Bar to Cash Payments</u>.  Checks issued in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Reorganized Debtors by the holder of the Allowed Claim with respect to which such check originally was issued.  Any request for reissuance in respect of such a voided check shall be made on or before one hundred twenty (120) days after the date of issuance of such check or such longer period as the Reorganized Debtors may fix.  After such date, all Allowed Claims in respect of any such voided checks shall be deemed discharged and forever barred without the necessity of any further order by the Bankruptcy Court.

7.8.   <u>Cure Period</u>.  Except as otherwise set forth herein, the failure by the Reorganized Debtors to timely perform any term, provision or covenant contained in this Plan, or to make any payment or Distribution required by this Plan to any Creditor, or the failure to make any payment or perform any covenant on any note, instrument or document issued pursuant to this Plan, shall not constitute an event of default unless and until the Reorganized Debtors have been given thirty (30) days written notice of such alleged default in the manner provided in this Plan, and provided an opportunity to cure such alleged default.  Until the expiration of such thirty (30) day cure period, the Reorganized Debtors shall not be in default, and performance during such thirty (30) day cure period shall be deemed as timely for all purposes.  Such written notice and passage of the thirty (30) day cure period shall constitute conditions precedent to declaring or claiming any default under this Plan or bringing any action or legal proceeding by any Person to enforce any right granted under this Plan.  Cure periods shall be determined separately for each payment default and for each Creditor entitled to a Distribution under this Plan.  However, this section 7.8 shall not apply to the Insurety Claim, NXT Claim or the DPG Claim.

7.9.   <u>Distributions after Substantial Consummation</u>.  All Distributions of any kind made to any Creditor after Substantial Consummation and any and all other actions taken under this Plan after Substantial Consummation shall not be subject to relief, reversal or modification by any court unless the implementation of the Confirmation Order is stayed by an order granted under Bankruptcy Rule 8007.

7.10.   <u>Disallowed Claims</u>.  No Distributions shall be made on account of any Disallowed Claim.

**ARTICLE VIII**
**RETENTION OF RETAINED CLAIMS AND RETAINED DEFENSES**

8.1.   <u>Retention of Retained Claims</u>.  Pursuant to section 1123(b)(3), on the Effective Date, all Retained Causes of Action shall be transferred to, and vested in, the Reorganized Debtors based on the Confirmation Order, both for purposes of seeking an affirmative recovery against any Person and as an offset or defense against any Claim asserted against the Estates, the Debtors, or either of the Reorganized Debtors.  The Retained Causes of Action are reflected in the attached **<u>Exhibit "C"</u>**.

8.2.   <u>Retention of Retained Defenses</u>.  Pursuant to section 1123(b)(3), on the Effective Date, all Retained Defenses shall be transferred to, and vested in, the Reorganized Debtors on the Effective Date based on the Confirmation Order.  For this purpose, all Retained Defenses are hereby reserved and retained by the Debtors, the Estates, and all Reorganized Debtors including without limitation all such Retained Defenses available to the Estates pursuant to section 558.  The Retained Defenses are also reflected in the attached **<u>Exhibit "C"</u>**.

8.3.   <u>Retention of Estate Privileges</u>.  On the Effective Date, all Estate Privileges shall be vested in the Reorganized Debtors based on the Confirmation Order, and the Reorganized Debtors which shall be vested with the sole and exclusive right, standing and authority to assert all Estate Privileges on behalf of the Debtors, the Estates or Reorganized Debtors, as appropriate or necessary.

8.4.   <u>Assertion of Retained Claims and Retained Defenses</u>.  The Reorganized Debtors shall have, and be vested with, the exclusive right, authority and standing to assert all Retained Claims and Retained Defenses for the benefit of the Reorganized Debtors, including as Claims for affirmative relief, as counterclaims, and as defenses.

8.5.    Claims Against Insurety.  Based on the Global Settlement Agreement, the Debtors have fully resolved and settled all Claims against both Insurety and Gray pursuant to the Global Settlement and Global Settlement Agreement.  The Reorganized Debtors do not retain any Retained Cause of Action against either Insurety or Gray, or any Retained Defenses with respect to Debtors' obligations under the Plan with respect to Insurety's Allowed Class 4 Claims which, section 12.4 below notwithstanding, shall not be subject to setoff.

## ARTICLE IX
## PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS

9.1.    Claims Listed in Schedules as Disputed.  Any Claim which is listed in the Schedules as unliquidated, contingent or disputed, and for which no proof of Claim has been timely filed, shall be treated as Disallowed as of the Effective Date without the necessity of any further action by the Reorganized Debtors or further order of the Bankruptcy Court other than the entry of the Confirmation Order.

9.2.    Responsibility for Objecting to Claims and Settlement of Claims.  The Reorganized Debtors shall have the exclusive standing and authority to either object to any Claim, or to settle and compromise any Objection to any Claim, including as follows:

(a)    From and after the Effective Date, the Reorganized Debtors shall have the sole and exclusive right to (i) file, settle, or litigate to Final Order any Objections to any Claims; and (ii) seek to subordinate any Claim.  Any Contested Claim may be litigated to Final Order by the Reorganized Debtors; and

(b)    From and after the Effective Date, the Reorganized Debtors shall have the sole and exclusive right to settle, compromise or otherwise resolve any Contested Claim without the necessity of any further notice or approval of the Bankruptcy Court.

9.3.    Bankruptcy Rule 9019.  Bankruptcy Rule 9019 shall not apply to any settlement or compromise of a Contested claim after the Effective Date.

9.4.    Objection Deadline.  All Objections to Claims shall be served and filed by the Objection Deadline; provided, however, the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of Claim.  The Reorganized Debtors may seek to extend the Objection Deadline, either across the board or separately as to any Claim or Claims, pursuant to a motion filed on or before the then applicable Objection Deadline with respect to any Claim.  Any such motion may be granted without notice or a hearing.  In the event that the Reorganized Debtors file such a motion and the Bankruptcy Court denies such motion, the Objection Deadline shall nevertheless be automatically extended to that date which is ten (10) Business Days after the date of entry of the Bankruptcy Court's order denying such motion to extend the Objection Deadline.  Any proof of Claim other than one based upon a Rejection Claim and which is filed more than thirty (30) days after the Effective Date shall be of no force and effect and need not be objected to by the Reorganized Debtors.  Nothing contained herein shall limit the right of the Reorganized Debtors to object to Claims, if any, filed or amended after the Objection Deadline.

9.5.    Response to Claim Objection.  If the Reorganized Debtors file an Objection to any Claim, then the holder of such Claim shall file a written response to such Objection within thirty (30) days after the filing and service of the Objection upon the holder of the Contested Claim.  Each such Objection shall contain appropriate negative notice advising the Creditor

whose Claim is subject to the Objection of the requirement and time period to file a response to such Objection and that, if no response is timely filed to the Objection, the Bankruptcy Court may enter an order that such Claim is Disallowed without further notice or hearing.  The negative notice in the Objection shall satisfy the notice requirements of Rule 3007(a) of the Bankruptcy Rules, and the Reorganized Debtors shall not be required to send a separate notice of the Objection to the Creditor whose Claim is subject to the Objection.

9.6.    <u>Distributions on Account of Contested Claims</u>.  If a Claim is Contested, then the dates for any Distributions as to such Contested Claim shall be determined based upon its date of Allowance and the resulting applicable Initial Distribution Date.  No Distribution shall be made on account of a Contested Claim until such claim is Allowed.  Until such time as a contingent Claim becomes fixed and absolute by a Final Order Allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and Distributions under the Plan.  Any contingent right to contribution or reimbursement shall continue to be subject to section 502(e) of the Bankruptcy Code.

9.7.    <u>No Waiver of Right to Object</u>.  Except as expressly provided in this Plan, nothing contained in the Disclosure Statement, this Plan or the Confirmation Order shall waive, relinquish, release, or impair the Reorganized Debtors' right to object to any Claim.

9.8.    <u>Counterclaims by Reorganized Debtors</u>.  The Reorganized Debtors may assert Retained Claims as counterclaims against any Claim asserted against the Estates, Debtors or Reorganized Debtors, and any such proceeding shall constitute a "core" proceeding.

9.9.    <u>Claims Paid or Reduced Prior to Effective Date</u>.  Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors or any other Person prior to the Effective Date, including pursuant to orders of the Bankruptcy Court. To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made.  Nothing in the Plan shall preclude the Reorganized Debtors from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

**ARTICLE X**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

10.1.    <u>Assumption and Rejection of Executory Contracts</u>.  All Insurety Contracts shall be deemed as rejected on the Effective Date based on the Confirmation Order.  This Plan shall constitute a motion to assume all other Executory Contracts on the Effective Date, except as expressly set forth in this Plan, unless an Executory Contract (a) is identified on the Schedule of Rejected Executory Contracts attached hereto as **Exhibit "D"**, which contracts which shall be deemed rejected as of the Effective Date based on the Confirmation Order, (b) has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, or (c) is the subject of a motion to assume or reject filed on or before the Effective Date.  The Reorganized Debtors may file a motion for the assumption or rejection of any Executory Contract at any time through or on the Effective Date and any such motion shall be determined by the Bankruptcy Court thereafter.  **Exhibit "D"** may be modified or supplemented through a document contained in the Plan Supplement.

10.2.    <u>Cure Claim Payments</u>.  The Debtors assert that they do not owe any Cure Claims for any Executory Contract assumed in the Plan.  Any counterparty to an Executory

Contract assumed by ether of the Reorganized Debtors who asserts the existence of an unsatisfied Cure Claim as of the Effective Date, must assert any such Cure Claim by a written demand for payment thereof filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date and served on the Reorganized Debtors as provided herein.  Any dispute as to the existence or amount of any such Cure Claim shall be determined by the Court as a contested matter pursuant to Bankruptcy Rule 9014 as a "core" matter. Unless the holder of a Cure Claim and the Debtors or Reorganized Debtors agree in writing to other treatment of such holder's Cure Claim, or other treatment of such holder's Cure Claim is otherwise provided for under the Plan, any cure payment which may be required by section 365(b)(1) under an Executory Contract that is assumed under this Plan shall be made by the Reorganized Debtors within 14 days after the entry of a Final Order resolving the Cure Claim dispute. Notwithstanding the foregoing, in the event of a dispute regarding the amount of any Cure Claim, the cure of any other defaults, the provision of adequate assurance of future performance, or any other matter pertaining to assumption, the Reorganized Debtors shall make such cure payments and cure such other defaults and provide adequate assurance of future performance, all as may be required by section 365(b)(1), following the entry of a Final Order by the Bankruptcy Court resolving such dispute.

10.3.    Bar to Rejection Claims.  Except as otherwise ordered by the Bankruptcy Court, any Rejection Claim based on the rejection of an Executory Contract shall be forever barred and shall not be enforceable against the Reorganized Debtors or the Assets unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtors and their bankruptcy counsel, or the Reorganized Debtors and their counsel, as the case may be, by the earlier of thirty (30) days after the Effective Date, or thirty (30) days after entry of the Final Order approving rejection of such Executory Contract.

10.4.    Rejection Claims.  Any Rejection Claim (other than one which is included in or based upon the Insurety Claim or the rejection of any of the Insurety Contracts, which Rejection Claims have been fully resolved based on the Global Settlement and as otherwise set forth herein), not barred by section 10.3 above or which not based on any Insurety Contract, shall be classified as either a Class 6 or Class 7 Claim subject to the provisions of sections 502(b)(6) and 502(g); provided, however, that any Rejection Claim based upon the rejection of an unexpired lease of real property, either prior to the Confirmation Date, upon the entry of the Confirmation Order, or upon the Effective Date, shall be limited in accordance with section 502(b)(6) and state law mitigation requirements.  All Rejection Claims shall be deemed as Contested Claims until Allowed.  Nothing contained herein shall be deemed as an admission by the Debtors or the Reorganized Debtors that the rejection of any Executory Contract gives rise to or results in a Rejection Claim or shall be deemed as a waiver by the Debtors or the Reorganized Debtors of any objections or defenses to any such Rejection Claim if asserted. However, upon the conclusion of the Confirmation Hearing, there are no Rejection Claims other than those of Insurety which are included and treated in Class 4.

10.5.    Reservation of Rights.  Nothing contained in the Plan shall constitute an admission by the Debtors or Reorganized Debtors that any contract or lease is in fact an Executory Contract or that either the Debtors or Reorganized Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## ARTICLE XI
## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF PLAN

11.1.   Conditions to Confirmation and Effectiveness of Plan.  The Plan shall not become effective until the following conditions shall have been satisfied through the occurrence, waiver, or performance thereof, any of which conditions may occur concurrently with the Effective Date: (a) the Confirmation Order shall have been entered, in both form and substance acceptable to the Debtors; (b) the necessary Plan Documents have been executed and delivered; (c) the Contributions have been made to the Reorganized Debtors by Jordan or his designees through good funds; (d) the amended Servicing Agreement has been executed and delivered; and (e) all other conditions specified by the Debtors or Jordan have been satisfied.

11.2.   Notice of the Effective Date.  On the Effective Date, the Reorganized Debtors shall cause to be filed with the Court and served on all Creditors and parties-in-interests a notice of the Effective Date.

## ARTICLE XII
## EFFECT OF THE CONFIRMATION OF THE PLAN

12.1.   Compromise and Settlement.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies subject to, or dealt with, under this Plan, including, without limitation, all Claims against the Debtors or Estates arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, fixed or contingent, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors or the Estates.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements embodied in this Plan, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interest of the Debtors, the Debtors' bankruptcy Estates, Creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness.  The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtors, the Estates, and the Assets. Except as otherwise provided herein, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtors and their affiliates, successors, assigns, the Estates, the Assets, or the Reorganized Debtors any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

12.2.   Discharge. The terms, covenants and consideration under the Plan shall be in exchange for, and in complete satisfaction, discharge, and release of, all Claims of any nature whatsoever against the Debtors, the Reorganized Debtors and the Assets arising before the Effective Date.  Except as otherwise expressly provided herein, upon the Effective Date, the Debtors and the Reorganized Debtors, and their successors in interest and assigns, shall be deemed discharged and released pursuant to section 1141(d)(1)(A) from any and all Claims, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i), whether or not (a) a proof of Claim based upon such debt is

filed or deemed filed under section 501; (b) a Claim based upon such debt is Allowed under section 502; (c) the holder of a Claim based upon such debt has accepted the Plan; or (d) the Claim has been Allowed, Disallowed, or estimated pursuant to section 502(c). The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors and the Reorganized Debtors, and their successors in interest and assigns, other than those obligations specifically set forth pursuant to the Plan. The discharge granted to the Debtors does not inure to the benefit of Jordan as a non-debtor.

**12.3.   Plan Injunction. This section is referred to herein as the "Plan Injunction". Except as otherwise expressly provided herein, as of the Effective Date all holders of Claims against, or Interests in, the Debtors, the Estates, or any of the Assets, that arose prior to the Effective Date are hereby permanently enjoined and prohibited from the following: (i) the commencing or continuation in any manner, directly or indirectly, of any action, case, lawsuit or other proceeding of any type or nature against the Debtors, Reorganized Debtors, Assets, or the Estates, with respect to any such Claim or Interest arising or accruing before the Effective Date, including without limitation the entry or enforcement of any judgment, or any other act for the collection, either directly or indirectly, any Claim or Interest against the Estates, the Debtors or the Reorganized Debtors or the Assets; (ii) the creation, perfection or enforcement of any Lien, right, or burden, either directly or indirectly, against the Assets, Debtors, or Reorganized Debtors with respect to any such Claim or Interest arising or accruing before the Effective Date, or (iii) taking any action in relation to the Debtors, Estates, or Reorganized Debtors or Assets, either directly or indirectly, which violates or does not conform or comply with the provisions of this Plan applicable to such Claim or Interest, or (iv) any act or conduct by Insurety which, either directly or indirectly, seeks to enforce, or collect the Insurety Claim, or enforce any Final Order entered in the State Court Lawsuit, against the Reorganized Debtors on their property except in compliance with, and subject to, the terms of this Plan, the Global Settlement Agreement, and the Confirmation Order. The Plan Injunction shall also be incorporated into the Confirmation Order. The Plan Injunction does not inure to the benefit of Jordan as a non-debtor or his property.**

**12.4.   Setoffs.** Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtors may setoff against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before such Distribution is made), any Claims, rights, Retained Claims and Retained Defenses of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such Claims, rights, Retained Claims and Retained Defenses against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release of any such Claims, rights, Retained Claims and Retained Defenses that the Estate may possess against such Claimant. In no event shall any Claimant or Interest holder be entitled to setoff any Claim or Interest against any Claim, right, or Retained Claim of the Debtor without the consent of the Debtors or the Reorganized Debtors unless such holder files a motion with the Bankruptcy Court requesting the authority to perform such setoff notwithstanding any indication in any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

**12.5.   Recoupment.** Except as otherwise expressly provided for in the Plan, in no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any

Claim, right, account receivable, or Retained Claim of the Debtors or the Reorganized Debtors unless (a) such holder actually provides notice thereof in writing to the Debtors or the Reorganized Debtors of its intent to perform a recoupment; (b) such notice includes the amount to be recouped by the holder of the Claim or Interest and a specific description of the basis for the recoupment, and (c) the Debtors or the Reorganized Debtors have provided a written response to such Claim or Interest holder, stating unequivocally that the Debtors or the Reorganized Debtors consent to the requested recoupment.  The Debtors and the Reorganized Debtors shall have the right, but not the obligation, to seek an order of the Bankruptcy Court allowing any or all of the proposed recoupment.  In the absence of a written response from the Debtors or the Reorganized Debtors consenting to a recoupment or an order of the Bankruptcy Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

    12.6.   <u>Turnover</u>.  On the Effective Date, any rights of the Estates to compel turnover of Assets under applicable nonbankruptcy law and pursuant to section 542 or 543 of the Bankruptcy Code shall be deemed transferred to and vested in the Reorganized Debtors.

    12.7.   <u>Automatic Stay</u>.  The automatic stay pursuant to section 362 of the Bankruptcy Code, except as previously modified by the Bankruptcy Court, shall remain in effect until the Effective Date of the Plan as to the Debtors, the Estates and all Assets.  As of the Effective Date, the automatic stay shall be replaced by the discharge pursuant to section 1141 and the Plan Injunction.

## ARTICLE XIII
## <u>JURISDICTION OF COURTS AND MODIFICATIONS TO THE PLAN</u>

    13.1.   <u>Retention of Jurisdiction</u>.  Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to these Bankruptcy Cases and the Plan, to the full extent allowed or permitted by applicable law, including without limitation for the purposes of invoking sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

        (a)     To hear and determine any and all objections to, or applications or motions concerning, the allowance of Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense;

        (b)     To hear and determine any and all applications for payment of fees and expenses pursuant to this Plan to any Estate Professional pursuant to sections 330 or 503 of the Bankruptcy Code, or for payment of any other fees or expenses authorized to be paid or reimbursed under this Plan, and any and all objections thereto;

        (c)     To hear and determine pending applications for the rejection, assumption, or assumption and assignment of Executory Contracts and the allowance of Claims resulting therefrom, and to determine the rights of any party in respect to the assumption or rejection of any Executory Contract;

        (d)     To hear and determine any and all adversary proceedings, applications, or contested matters, including relating to the allowance of any Claim;

        (e)     To hear and determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or

enforcement of the Plan or in connection with the enforcement of any remedies made available under the Plan, including without limitation, (i) adjudication of all rights, interests or disputes relating to any of the Assets, (ii) the valuation of all Collateral, (iii) the determination of the validity of any Lien or claimed right of offset; and (iv) determinations of Objections to Contested Claims;

(f)    To liquidate and administer any disputed, contingent, or unliquidated Claims, including the Allowance of all Contested Claims;

(g)    To administer Distributions to holders of Allowed Claims as provided herein or in the Confirmation Order;

(h)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(i)    To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation the Confirmation Order;

(j)    To enforce the discharge granted to the Debtors pursuant to section 1141 and the Plan Injunction against any Person;

(k)    To enter and implement all such orders as may be necessary or appropriate to execute, interpret, construe, implement, consummate, or enforce the terms and conditions of this Plan or the Confirmation Order and the transactions required or contemplated pursuant thereto;

(l)    To hear and determine any motion or application which the Reorganized Debtors are required or allowed to commence before the Bankruptcy Court pursuant to this Plan or the Confirmation Order;

(m)    To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan;

(n)    To determine proceedings pursuant to section 505 of the Bankruptcy Code;

(o)    To enter a Final Decree closing these Bankruptcy Cases; and,

(p)    To determine any other matter or dispute relating to the Estates or the Assets and the Distribution thereof, including all issues pertaining to any Claim or matter relating to the Global Settlement Agreement, including to any obligation of the Debtors to Insurety.

13.2.    <u>Abstention and Other Courts</u>.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to these Bankruptcy Cases, this Article of the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

13.3.   <u>Non-Material Modifications</u>.  The Reorganized Debtors may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, correct any non-material defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable.  The Reorganized Debtors may undertake such non-material modification pursuant to this section insofar as it does not adversely change the treatment of the Claim of any Creditor or the Interest of any Interest holder who has not accepted in writing the modification.

13.4.   <u>Material Modifications</u>.  Modifications of this Plan may be proposed in writing by the Debtors at any time before confirmation, provided that this Plan, as modified, meets the requirements of sections 1122 and 1123, and the Debtors shall have complied with section 1125.  This Plan may be modified at any time after confirmation and before its Substantial Consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129, and the circumstances warrant such modification.  A holder of a Claim or Interest that has accepted or rejected this Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

14.1.   <u>Severability</u>.  Should the Bankruptcy Court determine any provision of the Plan is unenforceable either on its face or as applied to any Claim or Interest or transaction, the Reorganized Debtors may modify the Plan so that any such provision shall not be applicable to the holder of any Claim or Interest.  Such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan, or (b) require the re-solicitation of any acceptance or rejection of the Plan.

14.2.   <u>Oral Agreements; Modification of Plan; Oral Representations or Inducements</u>. The terms of the Plan, Disclosure Statement and Confirmation Order may only be modified in writing and may not be changed, contradicted or varied by any oral statement, agreement, warranty or representation. No Person may reasonably rely on any purported oral modification to the Plan.  Neither the Debtors nor their attorneys have made any representation, warranty, promise or inducement relating to the Plan or its confirmation except as expressly set forth in this Plan, the Disclosure Statement, or the Confirmation Order or other order of the Bankruptcy Court.

14.3.   <u>Waiver</u>.  The Reorganized Debtors shall not be deemed to have waived any right, power or privilege unless the waiver is in writing and signed by the Reorganized Debtors. There shall be no waiver by any oral statement, implication, course of conduct or dealing, or through any delay or inaction by the Reorganized Debtors, of any right pursuant to the Plan, including the provisions of this anti-waiver section, and no person may reasonably rely on any purported waiver which is not in writing signed by the Reorganized Debtor.  The waiver of any right under the Plan shall not act as a waiver of any other or subsequent right, power or privilege.

14.4.   <u>Notice</u>.  Any notice or communication required or permitted by this Plan shall be in writing and shall be given, made, or sent as follows:

(a)      If to a Creditor, notice may be given as follows: (i) if the Creditor has filed no proof of Claim, then to the address reflected in the Schedules, or (ii) if the Creditor has filed a proof of Claim, then to the address reflected in the proof of Claim.

(b)      If to the Reorganized Debtors and/or Jordan, such notice shall be sent by depositing the communication in the United States Mail, postage pre-paid, addressed to the recipients at the respective addresses set forth below, with a copy being concurrently sent by email to counsel for the Reorganized Debtors and Jordan both through the United States Mail, and at the email addresses set forth below:

If to the Reorganized Debtors:

American Workers Insurance Services, Inc.
11111 Richmond Avenue, Suite 200
Houston, Texas 77082
Attn: Landon Jordan

Association Health Care Management Inc.
11111 Richmond Avenue, Suite 200
Houston, Texas 77082
Attn: Landon Jordan

With a copy being sent to counsel for the Reorganized Debtors as follows:

J. Robert Forshey
Suzanne K. Rosen
Forshey Prostok, LLP
777 Main Street, Suite 1550
Fort Worth, Texas 76102
bforshey@forsheyprostok.com
srosen@forsheyprostok.com

If to Jordan:

Landon Jordan
Association Health Care Management Inc.
11111 Richmond Avenue, Suite 200
Houston, Texas 77082

With a copy being sent to Jordan's counsel as follows:

Brian Zimmerman
Nick Reisch
Spencer Fane, LLP
3040 Post Oak Blvd., Suite 1300
Houston, Texas 77056
bzimmerman@spencerfane.com
nreisch@spencerfane.com

(c)     Any Creditor desiring to change its address for the purpose of notice may do so by giving notice to the Reorganized Debtors of its new address in accordance with the terms of this section.

(d)     Any notice given, made or sent as set forth above shall be effective upon being (i) deposited in the United States Mail, postage prepaid, addressed to the addressee at the address as set forth above; (ii) delivered by hand or messenger to the addressee at the address set forth above; (iii) telecopied or emailed to the addressee as set forth above, with a hard confirmation copy being immediately sent through the United States Mail; or (iv) delivered for transmission to an expedited or overnight delivery service such as FedEx.

14.5.   <u>Compliance with All Applicable Laws</u>.  If notified by any governmental authority that it is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its business, the Reorganized Debtors shall comply with such law, rule, regulation, or order; <u>provided, however</u>, that nothing contained herein shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings.

14.6.   <u>Duties to Creditors</u>.  No agent, representative, accountant, financial advisor, attorney, shareholder, officer, affiliate, member or employee of the Reorganized Debtors shall ever owe any duty to any Person (including any Creditor) other than the duties owed to the Reorganized Debtors or the ' bankruptcy Estates, for any act, omission, or event in connection with, or arising out of, or relating to, any of the following:  (a) the Debtors' Bankruptcy Cases, including all matters or actions in connection with or relating to the administration of the Estates, (b) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (c) any act or omission relating to the administration of the Plan after the Effective Date.

14.7.   <u>Binding Effect</u>.  The Plan shall be binding upon and shall inure to the benefit of the Reorganized Debtors, the holders of the Claims or Liens, the holders of Interests, and their respective successors-in-interest and assigns.

14.8.   <u>Governing Law, Interpretation</u>.  Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any Plan Documents without regard to conflicts of law.  The Plan shall control over the Disclosure Statement or any inconsistent term or provision of any other Plan Documents.  The Confirmation Order shall control over the Plan, the Disclosure Statement, and any provision of any Plan Document.

14.9.   <u>Payment of Statutory Fees</u>.   All accrued U.S. Trustee Fees shall be paid by the Reorganized Debtors as soon as practicable after the Effective Date, and thereafter shall be paid by the Reorganized Debtors as such statutory fees become due and payable.

14.10.  <u>Filing of Additional Documents</u>.  On or before Substantial Consummation of the Plan, the Reorganized Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

14.11.  <u>Computation of Time</u>.  Bankruptcy Rule 9006 shall apply to the calculation of all time periods pursuant to this Plan.  If the date for any Distribution, performance, act or event under the Plan is not a Business Day, then the time for making or performing such Distribution,

performance, act or event shall be extended to the next Business Day.  Any payment or Distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

14.12.  <u>Elections by the Reorganized Debtors</u>.  Any right of election or choice granted to the Reorganized Debtors under this Plan may be exercised, at the Reorganized Debtors' election, separately as to each Claim, Creditor or Person.

14.13.  <u>Release of Liens</u>.  Except as otherwise expressly provided in this Plan or the Confirmation Order, all Liens against any of the Assets transferred to the Reorganized Debtors shall be deemed to be released, terminated and nullified without the necessity of any order by the Bankruptcy Court other than the Confirmation Order.

14.14.  <u>Rates</u>.  The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

14.15.  <u>Compliance with Tax Requirements</u>.  In connection with the Plan, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by federal, state and local Taxing Authorities and all Distributions under the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution under the Plan.

*[The remainder of this page has been left intentionally blank]*

Dated:  December 29, 2022.

Respectfully submitted,

**AWIS:**

**American Workers Insurance Services, Inc.**

By: _Harold L. Brock Jr._

Name: Harold L. Brock, Jr.

Position: President

**AHCM:**

**Association Health Care Management, Inc.**

By: _____

Name: Landon Jordon

Position: CEO

**Jordan:**

By: _____
    Landon Jordan, individually

APPROVED:

/s/ J. Robert Forshey
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX  76102
Telephone: 817-877-8855
Facsimile:  817-877-4151
bforshey@forsheyprostok.com
srosen@forsheyprostok.com

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

Dated: December 29, 2022.

Respectfully submitted,

**AWIS:**

**American Workers Insurance Services, Inc.**

By:  _____

Name: _Harold L. Brock, Jr._____

Position: _President_____

**AHCM:**

**Association Health Care Management, Inc.**

By: _____

Name: _Landon Jordon_____

Position: _CEO_____

**Jordan:**

By: _____
    _Landon Jordan, individually_

APPROVED:

/s/ J. Robert Forshey_____
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX  76102
Telephone: 817-877-8855
Facsimile:  817-877-4151
bforshey@forsheyprostok.com
srosen@forsheyprostok.com

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

-and-

/s/ Brian W. Zimmerman
Brian W. Zimmerman
State Bar No. 00788746
Nicholas J. Reisch
State Bar No. 24046699
SPENCER FANE LLP
3040 Post Oak Blvd, Suite 1300
Houston, TX 77056
Telephone: 713-552-1234
Facsimile:  713-963-0859
bzimmerman@spencerfane.com
nreisch@spencerfane.com

ATTORNEYS FOR LANDON JORDAN

L:\BFORSHEY\American Workers Insurance  (Assc Health Care) #6050\Plan and DS\Second Amd Joint Plan of Reorg w Table of
Contents  12.29.2022.docx

# **Exhibit A**

Transcript of the Global Settlement appearing at Docket No. 681, a copy of which is incorporated as this **Exhibit "A"**.

# **Exhibit A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Case No. 19-44208-mxm-11** |
| | ) | |
| AMERICAN WORKERS INSURANCE | ) | Fort Worth, Texas |
| SERVICES, INC. and | ) | December 14, 2022 |
| ASSOCIATION HEALTH CARE | ) | 9:00 a.m. |
| MANAGEMENT, | ) | |
| | ) | AMENDED CHAPTER 11 PLAN |
| Debtors. | ) | (609) |
| | ) | |
| | ) | CONFIRMATION TRIAL - DAY 3 |
| | ) | *Excerpt: 1:52 p.m. to 2:06 p.m.* |
| _____ | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MARK X. MULLIN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtors:
J. Robert Forshey Suzanne
K. (Suki) Rosen FORSHEY &
PROSTOK, LLP
777 Main Street, Suite 1290
Fort Worth, TX  76102
(817) 877-8855

For Insurety Capital,        Sean T. Scott
LLC:                         MAYER BROWN, LLP
                             71 S. Wacker Drive
                             Chicago, IL  60606
                             (312) 701-8310

For Insurety Capital,        Robert S. (Bob) Harrell
                             Andrew C. Elkhoury
                             MAYER BROWN, LLP
                             700 Louisiana Street, Suite 3400
                             Houston, TX  77002
                             (713) 238-2700

For National Individual      Nicholas J. Reisch
Insurance Agency, LLC:       SPENCER FANE, LLP
                             3040 Post Oak Boulevard, Suite 1300
                             Houston, TX  77056
                             (713) 552-1234

1   APPEARANCES, cont'd.

2   For Landon Jordan              Brian W. Zimmerman
    Personally and National        SPENCER FANE, LLP
3   Individual Insurance           3040 Post Oak Boulevard,
    Agency, LLC:                     Suite 1400
4                                  Houston, TX  77056
                                   (713) 212-2651
5
    Recorded by:                   Jeanette Almarez
6                                  UNITED STATES BANKRUPTCY COURT
                                   501 W. 10th Street
7                                  Fort Worth, TX  76102
                                   (817) 333-6038
8
    Transcribed by:                Kathy Rehling
9                                  311 Paradise Cove
                                   Shady Shores, TX  76208
10                                 (972) 786-3063

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25            Proceedings recorded by digital sound recording;
              transcript produced by transcription service.

1       FORT WORTH, TEXAS - DECEMBER 14, 2022 - 9:00 A.M.

2       (Transcript excerpt begins at 1:52 p.m.)

3      THE COURT:  Please be seated.  Thank you.  All right.

4   We're back on the record.

5      All right.  Mr. Harrell, you were at the podium when we

6   stopped.  I understand there may have been some activity over

7   the lunch hour.  Is there anything to report, any housekeeping

8   issues we need to address?  Mr. Scott?  Mr. Harrell?  Mr.

9   Scott.

10      MR. SCOTT:  Thank you, Your Honor.  For the record,

11   Sean Scott on behalf of Insurety.

12      We have Mr. Brian Zimmerman on the line from Spencer Fane.

13   He represents Mr. Jordon personally.  I am pleased to note

14   that we have reached an agreement in principle amongst the

15   Debtors, Insurety, and Mr. Jordan.  I believe Mr. Zimmerman is

16   going to read into the record that agreement in principle, and

17   then we'll turn it to Mr. Forshey to address how that may

18   impact the further pendency of these proceedings.  But I think

19   Mr. Harrell's work for today might be over.

20      THE COURT:  All right.  Well, very good.  Thank you,

21   Mr. Scott.

22      MR. SCOTT:  Thank you, Your Honor.

23      THE COURT:  Mr. Zimmerman, go ahead and make your

24   appearance on the record.  Just state your name and the party

25   you represent, so we have it, and then you may proceed after

1   that.

2      MR. ZIMMERMAN:  Sure, Your Honor.  Thank you.  Brian

3   Zimmerman on behalf of Landon Jordan.  And I'll do the best I

4    can, Your Honor, to dictate the terms as I understand them in

5    the record, and Mr. Scott is there as well, who can correct or

6    clarify anything that I may misstate.

7        It's my understanding, Your Honor, that the payments under

8    the plan are currently at $2 million.  That amount will be

9    increased to $2-1/2 million, with $500,000 of that $2-1/2

10   million being paid over Years Four and Five.  And so that

11   would amount to an increase of the payments in the Years Four

12   and Five from their current level to $54,166 per month for 24

13   months.

14       In addition to that settlement term, Landon Jordan will

15   pay a total of $560,000 upon the effective date of the plan to

16   Insurety, and that $340,000 of the monies, as I understand

17   them, that are in -- as I understand it that are currently in

18   Bobby Forshey's trust account, the million dollars, $340,000

19   of that will go to Insurety, while $660,000 of that goes to

20   Bank of America.

21       In addition, Landon Jordan will pay $750,000 after the --

22   upon the effective date of the plan, for two years after the

23   effective date, $750,000, which amounts to $31,250 a month for

24   two years or 24 months.

25       In exchange for the consideration recited and other good

1    and valuable consideration, the parties will enter into a

2    binding settlement agreement, which will include global broad

3    releases, as broad as possible under Texas law, between

4    Insurety and the Debtors, as well as respective -- from each

5    party, their respective agents, successors, assigns,

6    beneficiaries, parents, subsidiaries, affiliates, officers,

7    directors, managers, owners, partners, shareholders, members,

8    employees, attorneys, insurers, and related parties.

9        There's a carve-out due to ongoing litigation between

10    Insurety and a gentleman by the name of C.J. Paganelli.  Mr.

11    Paganelli will not be able to benefit from the release, so

12    he's excluded, Your Honor, from the release.

13        In addition, there's two pending lawsuits in Harris County

14    District Court, one that was brought by Insurety Capital

15    against the Debtors, AWIS and AHCM, and Landon Jordan

16    individually.  As part of this settlement, Insurety will agree

17    to dismiss all claims that were brought or that could have

18    been brought in that lawsuit with prejudice to its right to

19    refile same.

20        Moreover, there's another case pending, Your Honor, in

21    state court that was brought by the Debtors against Mr. Robert

22    Gray.  It's pending in Harris County.  The Debtors will

23    dismiss that lawsuit and any claims that could have been

24    brought against Mr. Gray with prejudice to their right to

25    refile same.


1    Make sure I've covered everything else.

2    I believe, Your Honor, that I've accurately stated our

3    agreement for the record.

4        THE COURT:  All right.  Thank you, Mr. Zimmerman.

5    Mr. Scott?

6          MR. SCOTT:  And Your Honor, Sean Scott again, for the

7    record.

8          Two slight clarifications, which I think were implicit.

9    First, the payments over 24 months from Landon Jordan, the

10   indirect object may have been missing there.  That is to my

11   client, Insurety.  Understood that was intended.

12         And then with respect to the state court actions, there's

13   also Debtor counterclaims that have been raised as affirmative

14   counterclaims.  So that is covered by the broad scope of the

15   releases that Mr. Zimmerman pointed out, but it's not just the

16   dismissal of claims against Bob Gray personally but obviously

17   the counterclaims against Insurety in the proceeding.

18         THE COURT:  All right.

19         MR. SCOTT:  And with that, I think -- I think that

20   accurately reflects the agreement.

21         THE COURT:  All right.  Thank you, Mr. Scott.  Mr.

22   Forshey?

23         MR. ZIMMERMAN:  Your Honor?

24         THE COURT:  Yes, sir, Mr. Zimmerman?

25         MR. ZIMMERMAN:  On behalf of Landon Jordan -- I'm

1    sorry to interrupt the Court.  On behalf of Landon Jordan, Mr.

2    Scott's clarification is accurate.

3          THE COURT:  All right.  Thank you, Mr. Zimmerman.

4    Mr. Forshey?

5          MR. FORSHEY:  Aren't you happy you waited now?  Good

6    things come to those who wait.

7         THE COURT:  Good things come to those who wait.

8    Sometimes this happens sometimes earlier on, sometimes towards

9    the latter end, and sometimes even after I take something

10   under advisement.

11        But it's your case, not mine.  I'm thrilled if you're all

12   thrilled, and I use that in air quotes, but at least

13   settlements are usually much more palatable because the

14   parties agreed to it rather than having to rely upon what this

15   particular judge might do.

16        MR. FORSHEY:  Okay.  As far as where that would leave

17   us, then, we would still have a plan confirmation.  We would

18   recess today.  If anything happens, we would all come back to

19   where we are today and resume from where we are today.

20        THE COURT:  Okay.

21        MR. FORSHEY:  That would mean the payment from Mr.

22   Jordan effectively to us as Debtor is $660,000, which, as

23   you've gathered from the evidence, is what we need to pay B of

24   A.

25        The other $340,000 was basically going to be needed to

1    defray litigation costs that are gone.  So I think in terms of

2    that, it's a wash for the Debtors.

3        We're going to be --

4         THE COURT:  And that's what's turned over to

5    Insurety?

6         MR. FORSHEY:  Correct.  That's going to be paid to

 7   them as additional consideration.  It'll change our reserved

 8   causes of actions since we're giving those up.  That doesn't

 9   affect the other people.

10       With respect to the last two years, it makes the cash

11   higher for the last two years, but based on the projections

12   we've got, they're still doable.

13       So if the Court is inclined, Insurety has indicated that

14   part of the settlement is they will change their vote.  And

15   I'd like to get that, if I could, Mr. Scott, where they're

16   going to change and accept the plan, so we will have at that

17   point basically a consensual plan.  We would submit that the

18   record we've got now would adequately and amply support such a

19   confirmation.

20           THE COURT:  1129 --

21           MR. FORSHEY:  Yes, sir.

22           THE COURT:  -- (a)?  And then you probably wouldn't

23   even need to get to (b) at that point, but arguably it --

24           MR. FORSHEY:  No, I don't think we would have to go

25   to (b) at that point --


 1           THE COURT:  No.

 2           MR. FORSHEY:  -- if they accepted.

 3           THE COURT:  Mr. Scott, is that accurate?  Would you

 4   like to do that now or how -- do you want to wait to get -- to

 5   make sure there's no surprise?

 6           MR. FORSHEY:  Well, I think we all have to wait until

 7    it was -- it was done.

 8            THE COURT:  All right.  Understood.

 9            MR. FORSHEY:  And then, as part of that process,

10    where we could submit appropriate documents, the confirmation

11    order, whereas --

12            THE COURT:  And --

13            MR. FORSHEY:  And some type of document where they

14    changed their vote and withdrew their objection.

15            MR. SCOTT:  Your Honor, yes, I think Mr. Forshey

16    stated it accurately.  We'll have to have the definitive

17    documentation before we change our vote.  But at that point, I

18    believe, subject to the agreement, we would accept the plan as

19    modified.

20        And in that situation, I think Your Honor would not need

21    to get into the very interesting 1129(b) issues that --

22            THE COURT:  That's --

23            MR. SCOTT:  -- might have been part of Ms. Rosen's

24    and my closing argument today.

25            THE COURT:  All right.  Terrific.


 1        And of course, the Court -- Mr. Forshey, through Mr.

 2    Tittle, did go through the 1129(a) elements, as I was ticking

 3    those off.  At least that's the record.  So there is certainly

 4    sufficient evidence in the record as it sits today, assuming

 5    the objection is resolved.

 6        And I'll let you figure out, I guess file the papers you

7    need to file and then just reset this for a date, I'm assuming

8    prior to year-end?

9         MR. FORSHEY:  Well, do we need to come back, do you

10   think, Judge?

11        THE COURT:  I don't think so.  But I'll leave that up

12   to you.  If the parties decide that all the paperwork is filed

13   and done -- I'm guessing, is there going to have to be a

14   modification filed?

15        MR. FORSHEY:  Yes, sir.  There will have to be a

16   fifth modification filed.

17        THE COURT:  And then the fifth modification is filed,

18   so it's there, which the Court can obviously take a peek at to

19   be aware it doesn't impact any other creditors or classes.

20   And if the Debtor wants to rest on the record, I think the

21   Court would be happy to review a form of order, findings of

22   fact, conclusions of law, however you'd want to do that.

23        And clearly I think it's pretty clear that at least you've

24   addressed all the 1129(a) issues.  I think that was all done

25   yesterday and the day before.  I don't think we touched on any

1    of that today.  I think today was mainly the 1129(b) issues.

2         MR. FORSHEY:  Correct.

3         THE COURT:  But, and I think the Court would be happy

4    to sign that order.  But, again, you've got to file the

5    papers, and then if the request is there the Court would be

6    happy to do that.

7         THE COURT:  And, I mean, a preview.  We would ask to

8   waive the Rule 3020.

9        THE COURT:  And you've already asked for that.  And

10  of course, if there's no opposition to that, the Court would

11  be happy to waive that.

12       MR. FORSHEY:  And do that.  And then probably take

13  the plan effective before the 14 days.  So I think the plan

14  gives us that option if we want to do so.

15       THE COURT:  It does.  And, again, it's much easier

16  when there are no objections.  So, --

17       MR. FORSHEY:  It's a lot easier when everybody

18  agrees, isn't it?

19       THE COURT:  It is a lot easier from my perspective.

20  But, again, that's what I get paid to do, so I don't mind

21  making the decisions and I don't mind signing off on

22  agreements.  Again, I perceive these as -- all these matters

23  as your case, not mine.  So I'm happy to play whatever minor

24  role I can to get the parties to where they desire to be.

25       MR. FORSHEY:  Thank you very much, Your Honor.

1. THE COURT:  So, is that it?  Are we adjourned for
2. today?

3. MR. FORSHEY:  Yes, sir, unless --

4. THE COURT:  All right.  And then we'll just put on

5   the docket adjourned, reset to be determined, on the docket so

6   the parties know.  And then if -- when all the papers are

7   filed, you might put in a request in the paper for the Court

8   to waive closing arguments or whatever you want to do.  It's

9  your -- again, I just want to make sure that we don't have a

10  surprise from some other party.  I don't think we would.  Ms.

11  Young is not here, although she supported the plan on behalf

12  of the Trustee.  But I would be -- I don't see any reason to

13  come back for more testimony if we're simply going on an

14  uncontested plan.  The 1129(a) factors have all been dealt

15  with on my notes.  So I do find, I would be happy to find that

16  they are all satisfied.

17       MR. FORSHEY:  That's good.

18       THE COURT:  Feasibility, of course, was one of the

19  issues which I guess technically today touched as well.  But

20  if there are no objections based upon the testimony of Mr.

21  Tittle, I think there's sufficient there for the record.

22       MR. FORSHEY:  And I hope we don't have to come back,

23  because I'm either going to be in a car December 22nd, driving

24  my wife to Savannah, Georgia, or I'm going to be single.  It's

25  -- those are my options.

1        THE COURT:  So, which would be better for your wife?

2  Does she want to delay this?

3        MR. FORSHEY:  I'm going to try to be in that car.

4        THE COURT:  I clearly understand, and I would

5  certainly hate to get in between those familial issues.

6        So, but I'll be happy to -- again, you'll control when the

7  papers get filed.  But if they all get filed as I anticipate

8  they will be, you'd simply upload the form of orders and let

9  Ms. Calfee know.  And you know how good she is, she gets those

10   directly to me, and then once I sign them we can get those on

11   the docket so that the parties can move forward.

12          MR. FORSHEY:  That's all.  Thank you, Your Honor.

13          THE COURT:  All right?  Well, okay.  Well, it's been

14   a pleasure having all of you in court.  It's always good and

15   fun not only for the Court but for my lawyers to see very good

16   lawyering, and I think it was a very good -- it makes my job

17   more fun -- very good lawyering experience for my two young

18   lawyers, one of which will be leaving me at the end of the

19   month, so I'm glad to see where he has at least seen right

20   before he leaves another contested confirmation hearing.  And

21   I do compliment the parties on the papers.  They were

22   fabulous.  And direct and cross-examinations were also all

23   very effective.  So, --

24          MR. FORSHEY:  Thank you, Your Honor.

25          THE COURT:  All right.  With that, we'll be


1    adjourned.

2          MR. ZIMMERMAN:  Thank you, Your Honor.

3          THE COURT:  Thank you all very much.

4       (Proceedings concluded at 2:06 p.m.)

5                            --oOo--

6

7
8
9
10
11
12

```
13
14
15
16
17
18
19
```

20                          CERTIFICATE

21       I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                              **12/14/2022**

24
     Kathy Rehling, CETD-444                            Date

25   Certified Electronic Court Transcriber

INDEX
*Excerpt: 1:52 p.m. to 2:06 p.m.*

PROCEEDINGS                                             3
WITNESSES
-none-

EXHIBITS

-none-
RULINGS                                                13

END OF PROCEEDINGS                                     14

INDEX                                                  15

# **Exhibit B**

The Global Settlement Agreement pursuant to the Global Settlement is incorporated as this
**Exhibit "B"**.

**Execution Version**

## EXHIBIT B

## GLOBAL SETTLEMENT AGREEMENT

This Global Settlement Agreement ("**Global Settlement Agreement**") is entered into this 27th day of December 2022 by and between Insurety Capital LLC ("**Insurety**"), American Workers Insurance Services, Inc. ("**AWIS**"), American Health Care Management, Inc. ("**AHCM**," and together with AWIS, the "**Debtors**"), Landon Jordan ("**Jordan**"), and Robert Gray ("**Gray**") (each a "**Party**" and collectively the "**Parties**").

## RECITALS

**WHEREAS,** prior to the initiation of the Bankruptcy Cases, Insurety and the Debtors entered into the Insurety Contracts.

**WHEREAS,** prior to the initiation of the Bankruptcy Cases, certain disputes arose between Insurety and the Debtors relating to the Debtors' use of Insurety Commissions to fund the purchase of certain insurance commission advances;

**WHEREAS,** prior to the initiation of the Bankruptcy Cases, Insurety instituted the Insurety State Court Action in Harris County, Texas against the Debtors, and later amended its petition in that action to add Jordan as a defendant;

**WHEREAS,** prior to the initiation of the Bankruptcy Cases, the Debtors brought counterclaims against Insurety in the Insurety State Court Action, and later amended their counterclaims during the pendency of the Bankruptcy Cases;

**WHEREAS,** during the pendency of the Bankruptcy Cases, the Debtors initiated the Gray State Court Action in Harris County, Texas against Robert Gray;

**WHEREAS,** Insurety filed proofs of claim against the Debtors in the Bankruptcy Cases;

**WHEREAS,** the Debtors filed objections to Insurety's proofs of claim;

**WHEREAS,** the Debtors filed a First Amended Plan of Reorganization in the Bankruptcy Cases;

**WHEREAS,** Insurety filed an objection to and contested whether the First Amended Plan of Reorganization could be confirmed by the Bankruptcy Court;

**WHEREAS,** the Parties, seeking to avoid the potentially substantial and burdensome costs and risks associated with continued litigation, wish to resolve any and all disputes arising out of, or related to, the Insurety Contracts, the Insurety State Court Action, the Gray State Court Action, Insurety's proofs of claim, and the Bankruptcy Cases (collectively the "**Disputes**");

**NOW, THEREFORE,** in consideration of the mutual promises, covenants, and agreements contained herein, and for other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**Execution Version**

# I.   DEFINITIONS

"**Bankruptcy Cases**" means Case Nos. 19-44208-mxm11 and 19-44209-mxm11 before the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, or any successor court thereto.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, or any successor court thereto.

"**Effective Date**" shall have the same meaning as it has in the Plan.

"**Gray State Court Action**" refers to the lawsuit captioned *American Workers Insurance Services, Inc. et al. v. Robert Gray*, Cause No. 2022-46684 in the 333rd District Court of Harris County, Texas.

"**Insurety Commissions**" shall have the same meaning as it has in the Plan.

"**Insurety Contracts**" shall include the Commission Agreement, the Exclusive Management Services Agreement, and the TPA Agreement, as those terms are defined in the Plan.

"**Insurety Service Fees**" shall have the same meaning as it has in the Plan.

"**Insurety State Court Action**" refers to the lawsuit captioned *Insurety Capital, LLC v. American Workers Insurance Services, Inc., et al.*, Cause No. 2019-53545 in the 215th District Court of Harris County, Texas.

"**Plan**" shall mean the Second Amended Joint Plan of Reorganization for American Workers Insurance Services, Inc. and Association Health Care Management, Inc., dated December 27, 2022.

"**Reorganized Debtor(s)**" means either or both of AHCM and AWIS from and after the Effective Date.

# II.   AGREEMENT

1.   Debtors' Payment Consideration

The Debtors agree that Insurety shall have an allowed general unsecured claim in the amount of $2,840,000 ("**Allowed Insurety Claim**"), all which shall be paid as a part of Class 4 of their Plan, and as follows:

  a.   On the Effective Date, the Reorganized Debtors shall pay to Insurety the sum of $340,000 ("**Debtor Initial Distribution**").

  b.   In addition to the Debtor Initial Distribution, the Debtors shall pay to Insurety 60 monthly distributions totalling $2.5 million (each a "**Debtor Distribution**") as follows:

    i.   The first such monthly distribution to Insurety shall be made on the Effective Date, with 59 subsequent distributions being due and payable by the Debtors to Insurety on the first Business Day of each of the next 59 successive calendar months following the Effective Date; and

2

**Execution Version**

  ii. The first such 36 monthly distributions shall each be in the amount of $33,333.34 per month, and the last 24 monthly distributions shall each be in the amount of $54,166.66 per month, for a total of $2.5 million.

  c. For the avoidance of doubt, the payment of, and accounting for, the Insurety Commissions and Insurety Service Fees shall continue after the Effective Date in the same manner as during the course of the Bankruptcy Cases. The Debtors acknowledge and agree that they have no property interests in either the Insurety Commissions or the Insurety Service Fees, which are the property of Insurety, and that such payments shall be independent of, and made without setoff or deduction against, the payments of the Allowed Insurety Claim as set forth in the preceding subparagraphs of this paragraph 1.

  d. The Reorganized Debtors shall not be deemed to be in default in making any Debtor Distribution until Insurety has given ten (10) days written notice of any alleged default and the Reorganized Debtors have failed to cure the default during the notice period.

  e. The Parties shall amend the Plan to include the foregoing terms. With respect to the obligations of the Debtors to Insurety, in the event of any conflict between the terms of the Plan and Confirmation Order and this Global Settlement Agreement, the terms of the Plan and Confirmation Order control over this Global Settlement Agreement.

2. <u>Jordan Payment Consideration</u>

  a. On the Effective Date, Jordan shall pay to Insurety the sum of $560,000 ("**Jordan Initial Distribution**").

  b. In addition to the Jordan Initial Distribution, Jordan shall pay to Insurety 24 monthly distributions totalling $750,000 (each a "**Jordan Distribution**") as follows:

  i. The first such monthly distribution to Insurety shall be made on the Effective Date, with 23 subsequent distributions being due and payable by Jordan to Insurety on the first Business Day of each of the next 23 successive calendar months following the Effective Date.

  ii. Each of these distributions shall be in the amount of $31,250 per month, for a total of $750,000.

3. <u>Releases</u>

  a. Subject to paragraph 3f, upon the Effective Date, Insurety, for itself and its respective officers, agents, directors, stockholders, employees, attorneys, insurers, sureties, predecessors, successors, assigns, estates, parents, subsidiaries and affiliated companies, members, managers, heirs, executors, and administrators and each of them (the "**Insurety Releasing Parties**") releases and forever discharges Jordan and his respective past, present, and future agents, employees, attorneys, insurers, sureties, beneficiaries, predecessors, successors, assigns, estates, and affiliated companies (the "**Jordan Released Parties**"), from any and all manner of actions, controversies, suits, liens, losses, debts, dues, damages, claims, judgments, bonds, executions and demands of every nature, kind and description whatsoever in law or in equity, whether known or unknown, or whether suspected or unsuspected which any Insurety Releasing Party had or may have against any Jordan Released Party, including

without limitation the right to seek or obtain recovery from any Jordan Released Party, directly or indirectly, arising out of or relating to the Disputes.

      b.  Subject to paragraph 3f, upon the Effective Date, Insurety, for itself and for the Insurety Releasing Parties, releases and forever discharges the Debtors and their respective past, present, or future officers, agents, directors, stockholders, owners, employees, attorneys, insurers, sureties, beneficiaries, predecessors, successors, assigns, estates, parents, subsidiaries, and affiliated companies, members and managers, and each of them (the "**Debtor Released Parties**") from any and all manner of actions, controversies, suits, liens, losses, debts, dues, damages, claims, judgments, bonds, executions and demands of every nature, kind and description whatsoever in law or in equity, whether known or unknown, or whether suspected or unsuspected which any Insurety Releasing Party had or may have against any Debtor Released Party, including without limitation the right to seek or obtain recovery from any Debtor Released Party, directly or indirectly, arising out of or relating to the Disputes.

      c.  Subject to paragraph 3f, upon the Effective Date, the Debtors, for themselves and for their respective officers, agents, directors, stockholders, employees, attorneys, insurers, sureties, predecessors, successors, assigns, estates, parents, subsidiaries and affiliated companies, members, managers, heirs, executors, and administrators and each of them ("**Debtor Releasing Parties**") release and forever discharge Insurety and its respective past, present, or future officers, agents, directors, stockholders, owners, employees, attorneys, insurers, sureties, beneficiaries, predecessors, successors, assigns, estates, parents, subsidiaries, and affiliated companies, members and managers, and each of them, ("**Insurety Released Parties**"[1]) from any and all manner of actions, controversies, suits, liens, losses, debts, dues, damages, claims, judgments, bonds, executions and demands of every nature, kind and description whatsoever in law or in equity, whether known or unknown, or whether suspected or unsuspected which any Debtor Releasing Party had or may have against any Insurety Released Party, including without limitation the right to seek or obtain recovery from any Insurety Released Party, directly or indirectly, arising out of or relating to the Disputes.

      d.  Subject to paragraph 3f, upon the Effective Date, Jordan, for himself and for his agents, employees, attorneys, insurers, sureties, beneficiaries, predecessors, successors, assigns, estates, and affiliated companies ("**Jordan Releasing Parties**"), releases and forever discharges the Insurety Released Parties from any and all manner of actions, controversies, suits, liens, losses, debts, dues, damages, claims, judgments, bonds, executions and demands of every nature, kind and description whatsoever in law or in equity, whether known or unknown, or whether suspected or unsuspected which any Jordan Releasing Party had or may have against any Insurety Released Party, including without limitation the right to seek or obtain recovery from any Insurety Released Party, directly or indirectly, arising out of or relating to the Disputes.

      e.  Subject to paragraph 3f, upon the Effective Date, Gray, for himself and for his agents, employees, attorneys, insurers, sureties, beneficiaries, predecessors, successors, assigns, estates, and affiliated companies ("**Gray Releasing Parties**"), release and forever discharge the Debtor Released Parties from any and all manner of actions, controversies, suits, liens, losses, debts, dues, damages, claims, judgments, bonds, executions and demands of every nature, kind and description whatsoever in law or in equity, whether known or unknown, or whether suspected or unsuspected which any Gray Releasing Party had or may have against

---

[1] For the avoidance of doubt, the Insurety Released Parties include (but are not limited to) Robert Gray.

any Debtor Released Party, including without limitation the right to seek or obtain recovery from any Debtor Released Party, directly or indirectly, arising out of or relating to the Disputes.

  f. The following matters are not released or discharged by this Global Settlement Agreement:

    i. The Debtors' obligations with respect to the Insurety Service Fees and Insurety Commissions as discussed in paragraph 1(c), *supra*;

    ii. Any Party's obligations under this Global Settlement Agreement; and

    iii. Any Party's obligations under the Plan; furthermore,

    iv. Any actions, controversies, suits, liens, losses, debts, dues, damages, claims, judgments, bonds, executions and demands of every nature, kind and description whatsoever in law or in equity, whether known or unknown, or whether suspected or unsuspected that any Insurety Releasing Party had or may have against Christopher James Pagnanelli. Christopher James Pagnanelli shall not be considered part of the Insurety Released Parties, Debtor Released Parties, or Jordan Released Parties.

4. <u>Dismissal of Litigation</u>

  a. Within 10 days of the Effective Date, the Debtors shall file a stipulation of dismissal of their counterclaims with prejudice in the Insurety State Court Action.

  b. Within 10 days of the Effective Date, the Debtors shall file a stipulation of dismissal of their claims with prejudice in the Gray State Court Action.

  c. Within 10 days of the Effective Date, Insurety shall file a stipulation of dismissal of its claims against the Debtors and Jordan with prejudice in the Insurety State Court Action.

5. The Parties agree to bear their own respective costs and expenses arising from the Disputes.

6. In the event of any litigation or proceeding arising as a result of the breach of this agreement or the failure to perform hereunder, the party or parties prevailing in such litigation or proceeding shall be entitled to collect the costs and expenses of bringing or defending such litigation or proceeding (including reasonable attorneys' fees, court costs, and expenses), from the party or parties not prevailing.

7. The Parties agree that this Global Settlement Agreement does not constitute an admission of wrongdoing by any party and is being executed to resolve disputed claims.

8. The Parties acknowledge that this Global Settlement Agreement is a compromise of disputed claims and that no Party admits, and each expressly denies any liability on its part, and that the Settlement Agreement has been freely negotiated by each Party, ably represented by its own, independent legal counsel.

9. Each Party has reviewed this Global Settlement Agreement, had the opportunity to consult with counsel, and fully understands and voluntarily accepts all the provisions contained

in this Global Settlement Agreement. The Parties further agree that this Global Settlement Agreement was the product of arm's-length negotiations between and among the Parties and that any rule of construction that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Global Settlement Agreement.

10.      This Global Settlement Agreement and the application and interpretation thereof shall be governed exclusively by the laws of the State of Texas without regard to its conflict of laws rules. In the event of any dispute arising out of or relating to the Global Settlement Agreement, the Parties agree and submit to (a) the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Cases (and consent to the Bankruptcy Court entering a final judgment determining such matter), and (b) the exclusive jurisdiction of the state and federal courts in Harris County, Texas after the conclusion of the Bankruptcy Cases.

11.      This Global Settlement Agreement shall be fully binding upon and inure to the benefit of the Parties and their respective legal representatives, successors and assigns.

12.      This Global Settlement Agreement constitutes the entire agreement between the Parties related to their compromise of the Disputes. No representations or warranties have been made by any Party to any other Party in relation to this Settlement Agreement except for representations and warranties expressly set forth herein and set forth in the Plan. No change, alteration or modification of this Global Settlement Agreement may be made except in writing signed by all Parties.

13.      Each of the persons executing this Global Settlement Agreement on behalf of their respective principals warrants that he is the individual legally entitled to settle and release every claim herein referred to, and that he has the authority to bind his respective principals and has full authority to enter into this Global Settlement Agreement.

14.      Each Party represents that it is the sole party with the ability to settle and compromise the claims it is releasing herein.

15.      The Parties agree to execute any further documents necessary to effectuate this Global Settlement Agreement.

16.      If any provision, word, term, clause or part of this Global Settlement Agreement shall be adjudged invalid for any reason, the remainder of this Global Settlement Agreement and the remaining provisions contained herein shall continue in full force and effect.

17.      This Settlement Agreement may be executed in electronically and in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

Execution Version

**IN WITNESS WHEREOF,** the Parties Execute this Global Settlement Agreement by their duly authorized representatives.

**Insurety Capital LLC**

By: ___Robert Gray_____

Title: _Chief Executive Officer_____

Dated: ___12/28/2022_____

**American Workers Insurance Services, Inc.**

By: _HArold L. Brock Ji_

Title: _President_____

Dated: ___12-28-2022___

**Association Health Care Management Inc.**

By: _____

Title: _____

Dated: _____

**Landon Jordan**

Dated: _____

**Robert Gray**

Dated: ___12/28/2022_____

Execution Version

IN WITNESS WHEREOF, the Parties Execute this Global Settlement Agreement by their duly authorized representatives.

**Insurety Capital LLC**

By: ___Robert Gray___

Title: _Chief Executive Officer_____

Dated: ___12/28/2022_____

**American Workers Insurance Services, Inc.**

By: _____

Title: _____

Dated: _____

**Association Health Care Management Inc.**

By: _____

Title: ____CEO_____

Dated: __12/29/22_____

**Landon Jordan**

Dated: _12/29/22_____

**Robert Gray**

Dated: __12/28/2022_____

# Exhibit C

## Retained Causes of Action and Defenses

1.  The claims and causes of action asserted against Bene Market LLC in adversary number 21-4066, including but not limited to claims for breach of contract, tortious interference, failure to return unearned commissions, and fees and costs asserted by the Debtors based on the Debtors' belief that Bene Market LLC received commission advances when it sold products to AWIS and ACHM customers and later improperly moved AWIS customers resulting in the Debtors' inability to collect $7,933,327.00 in repayment of those commission advances.

2.  Except as expressly set forth in the Plan, all causes of action, claims, counterclaims, defenses and rights of offset or recoupment (including but not limited to all Retained Claims, Retained Defenses and Avoidance Actions) belonging to the Debtors shall, upon the occurrence of the Effective Date, be retained by, received by and vested in the Reorganized Debtors for the benefit of the Debtors' Estates.

3.  Except as expressly set forth in the Plan the rights of the Reorganized Debtors to commence, prosecute or settle such causes of action shall be preserved notwithstanding the occurrence of the Effective Date.  **No person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtors' Estates or the Reorganized Debtors will not pursue any and all available causes of action (including the Retained Claims, Retained Defenses and Avoidance Actions) against any Person, <u>except</u> as otherwise provided in the Plan.**

4.  Unless any causes of action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Debtors' Estates expressly reserve all causes of action (including all Retained Claims, Retained Defenses and Avoidance Actions) for later adjudication and, therefore, no preclusion doctrine, <u>including without limitation</u>, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or consummation of the Plan.  Without limiting the foregoing, parties are advised that the Debtors specifically preserve for the Reorganized Debtors any Avoidance Actions it may hold against all parties disclosed in the Debtors' Schedules or Statement of Financial Affairs, as hereafter amended or supplemented, as having received any conveyances or transfers from the Debtors.

5.  The Debtors expressly ***do not retain and hereby waive and relinquish*** any potential Avoidance Actions against the following insiders who have signed tolling agreements with the Debtors through October 14, 2022: APP Payments, Inc.; Mansfield Business Management, LLC; Mansfield Management Group, LLC; AHCM Holdings, LLC; Rendon Management Group, LLC; Graford Business Management, LLC; National Individual Insurance Agency, LLC; National Association of Preferred Providers; FC AWMA LLC; FCAWMA2 LLC; Delbert Lee; Landon Jordan; Omar Kasani; Randee Mascorro; Harold L. "Rusty" Brock; John Oxendine; and Oxendine Law Group, PC.  Although Insurety has expressed a belief that these parties may have received avoidable transfers, the Debtors

believe such any such claims are without merit.  Furthermore, Landon Jordan is making the Contributions in part to resolve any issues between himself, the other insiders, and the Debtors.  In addition, these insiders with Claims against the Debtors have agreed to waive any prep-Petition Date Claims and receive no distribution on such Claims under the Plan.

# <u>Exhibit D</u>

## Schedule of Rejected Contracts

1.      Commission Agreement;

2.      Management Agreement;

3.      TPA Agreement; and

4.      Any other Insurety Contract.

## Schedule of Assumed Contracts

**5.**     White Hill Office Building Lease dated as of April 26, 2019 among Daiker Partners, Ltd., as the landlord, and AHCM, as the tenant, covering office in Rockwall, Texas, as modified and extended; and

**6.**     Lease Agreement dates as of December 13, 2004, among Energy Corp. Equity Group, Ltd., as landlord, and AHCM, as tenant, covering the second floor (Suite 200) of 11111 Richmond Ave., Houston, Texas 77042.

# **Exhibit E**

### Amendment to Company Service Agreement

#### I.    Parties

A.    The parties (individually, a "Party" and collectively, the "Parties") to this Amendment to Company Service Agreement ("Amendment") are as follows:

**i.**    National Individual Insurance Agency, LLC ("NIIA"), a Texas limited liability company, which is an independent marketing organization; and

**ii.**    Association Health Care Management, Inc. ("Company"), a Texas corporation, acting as a third-party service provider.

#### II.    Recitals

B.    NIIA and the Company are parties to a Company Service Agreement ("Agreement") dated as of October 1, 2019, a true and accurate copy of which is attached hereto as Exhibit "1".

C.    The Company is the debtor-in-possession in the following bankruptcy case pending under Chapter 11 of the Bankruptcy Code:

> *In re Association Health Care Management, Inc.*, Case No. 19-44209-mxm-11 in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division

D.    An affiliated company, America Workers Insurance Services, Inc. ("AWIS") is also a debtor-in-possession in another bankruptcy case pending under Chapter 11:

> *In re American Workers Insurance Services, Inc.*, Case No. 19-44208-mxm-11 in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division

E.    The Company's and AWIS's bankruptcy cases (collectively, the "Bankruptcy Cases") have been administratively consolidated under the AWIS case style and number.

F.    The Company and AWIS have proposed a plan of reorganization ("Plan") in their Bankruptcy Cases.  Pursuant to the Plan, NIIA and the Company have agreed to modify the Agreement so that it will have a term of five years from and after the effective date of the Plan, subject to termination during this five year period for cause.  On **December** __, 2022, the Bankruptcy Court entered an order ("Confirmation Order") at Docket no. ___ in the AWIS bankruptcy case confirming the Plan.  The Plan and the Confirmation Order provide that the Agreement shall be amended as set forth herein.

#### III.    Terms and Covenants

ACCORDINGLY, for value received, the receipt and sufficiency of which is hereby

respectively acknowledged by both NIIA and the Company, and in accordance with the terms of

the Plan and the Confirmation Order, they hereby agree as follows:

1.      The above recitals are true and correct and shall constitute as an integral part of the Amendment.

2.      This Amendment shall be effective for all purposes on January 1, 2023 ("Amendment Effective Date").

3.      Section 1.05 of the Agreement entitled "Term and Termination" is hereby amended to read as follows:

1.  The term of this Agreement shall continue from and after the Amendment Effective Date for a term of five years through December 31, 2027 ("Contract Term").  During the Contract Term, this Agreement may only be terminated by a Party based on a Default as defined below.  After the expiration of the Contract Term: (a) this Agreement shall automatically renew on each successive anniversary of the Amendment Effective Date for an additional one-year period, and (b) during any such additional one-year period, either Party may terminate this Agreement, without cause, as such Party may in the sole exercise of its discretion may determine, by giving 90 days written notice of termination to the other Party.

2.  A "Default" shall mean:

   i.   The designation, delegation, subcontracting, or appointment of another to perform any of NIIA's or the Company's duties hereunder without the other Party's prior written consent;

   ii.  A material breach by either NIIA or the Company of any term, covenant, or condition contained in this Agreement; or

   iii. Any representation, warranty or certificate by either NIIA or the Company was materially correct, false, or misleading when made.

3.  Upon the occurrence of a Default, the Party asserting the Default may give the other Party written notice thereof specifying the Default.  If such Default is not cured within 14 days after such notice of Default is given, then the Party giving such written notice of Default may give written notice to the other Party terminating this Agreement.

4.  If this Agreement is terminated by either Party based on an uncured Default, the Company shall continue to provide and

perform all Services under this Agreement for a period of time as specified by NIIA to exceed 90 days, and NIIA shall continue to pay and fully compensate the Company for its services in accordance with the terms of this Agreement.

4.      This Agreement reflects the complete agreement between the Parties regarding the subject matter hereof.  Except as expressly set forth herein, the remainder of the Agreement remains unchanged.

NIIA:

National Individual Insurance Agency, LLC

By: _____

_____, its _____


COMPANY:

American Health Care Management, Inc.

By: _____

_____, its _____